1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF OREGON

3        THE HON. MICHAEL J. McSHANE, JUDGE PRESIDING

4

5

6    UNITED STATES OF AMERICA,        )
                                      )
7                    Government,      )
                                      )
8           v.                        ) No. 6:14-cr-00482-MC-1
                                      )
9    DANIEL STEPHEN JOHNSON,          )
                                      )
10                   Defendant.       )
     ─────────────────────────────────)

11

12

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                  EUGENE, OREGON

15              TUESDAY, APRIL 24, 2018

16                  PAGES 1 - 71

17

18

19

20

21                  Kristi L. Anderson
                    Official Federal Reporter
22                  United States Courthouse
                    405 East Eighth Avenue
23                  Eugene, Oregon 97401
                    (541) 431-4112
24                  Kristi_Anderson@ord.uscourts.gov

25

```
 1    APPEARANCES OF COUNSEL:

 2    FOR THE GOVERNMENT:

 3    Jeffrey S. Sweet
      United States Attorney's Office
 4    405 E. Eighth Avenue, Suite 2400
      Eugene, OR 97401
 5    541-465-6771
      Fax: 541-465-6917
 6    Email: jeff.sweet@usdoj.gov

 7    Lauren E. Britsch
      U.S. Department of Justice
 8    Criminal Division
      1400 New York Ave NW, 6th Floor
 9    Washington, DC 20530
      202-514-2220
10    Fax: 202-514-1793
      Email: lauren.britsch@usdoj.gov

11
      Ravi Sinha
12    United States Attorney's Office
      1000 SW Third Ave, Suite 600
13    Portland, OR 97204
      503-727-1014
14    Fax: 503-727-1117
      Email: ravi.sinha@usdoj.gov

15

16    FOR THE DEFENDANT:

17    Craig E. Weinerman
      Office of the Federal Public Defender
18    859 Willamette Street, Suite 200
      Eugene, OR 97401
19    541-465-6937
      Fax: 541-465-6975
20    Email: craig_weinerman@fd.org

21    Lisa A. Maxfield
      Pacific Northwest Law LLP
22    1255 NW Ninth Avenue, No. 11
      Portland, OR 97209
23    503-222-2661
      Fax: 503-222-2864
24    Email: lamaxfield@pacificnwlaw.com

25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

09:16:36   1                        PROCEEDINGS

2                    TUESDAY, APRIL 24, 2018

3            THE CLERK:  United States District Court for the

4    District of Oregon is now in session, the Honorable Michael

5    J. McShane presiding.

6            Now is the time set for Criminal Case 14-00482,

7    United States of America versus Daniel Stephen Johnson,

8    pretrial conference.

9            THE COURT:  All right.  Thanks, folks.  I

10   apologize, once again, for having to listen to me under

11   these circumstances, but if you can't hear me, please ask me

12   to repeat myself.

13           We left off yesterday talking about instructions

14   on Counts 1 through 6, and I have sent both sides proposed

15   instructions.

16           Let me start with the government, maybe your

17   thoughts on combining the attempt with the completed offense

18   in Counts 1 through 6.

19           MS. BRITSCH:  Good morning, Your Honor.  I think

20   the government agrees that that is a fine way to approach

21   combining both the completed offense and attempted offense,

22   and we agree with the court's instructions on that point.

23           THE COURT:  The attempt on Count 8, that seems

24   very confusing to me.

25           MS. BRITSCH:  Yes, Your Honor.  We apologize for

09:24:40   1   the confusion.  I think the government initially indicted

2   that way.

3        The court may recall there was some ambiguity in

4   the model jury instructions for the Ninth Circuit on the

5   elements of that offense.  The court has already addressed

6   that in a prior order on our motion.  So now that that issue

7   is clarified, we don't intend to proceed on the attempt

8   theory.

9        We think the attempt theory is sometimes used in

10   cases where, for example, somebody has the intent to abuse a

11   child, perhaps shows up at the airport, and is stopped

12   before he gets on the plane.  But obviously that's not the

13   scenario we have here, so we agree with the court that the

14   attempt instruction isn't necessary and is not applicable

15   here.  We apologize for any resulting confusion.

16        THE COURT:  All right.  Thanks.

17        All right.  For the defense.

18        MR. WEINERMAN:  Well, Judge, that's our problem

19   with the instruction, obviously.

20        THE COURT:  I know.

21        MR. WEINERMAN:  Our problem is that we still feel

22   it's deficient in not requiring the mens rea that we have

23   asserted that it should.

24        So, you know, I understand the court's ruling, but

25   I just want to make sure our record is clear that we do

09:25:44   1   believe that there should be an instruction as to the mens

2   rea that -- and preferably that Mr. Johnson traveled with

3   the intent or the dominant primary purpose of engaging in an

4   illicit sexual act.

5          Now the court, if I understand the court

6   correctly, is not going to instruct the jury in the actual

7   instructions on Counts 1 through 6 regarding the commercial

8   sex act aspect.  You know, the -- the statute has two ways.

9   Most of the courts, including the Ninth Circuit, have upheld

10   the commercial sex act prong.  But there are some courts

11   that have not upheld the other, noncommercial prong, if I

12   could use that term.

13          So we would prefer that the judge -- that you, I

14   am sorry, instruct the jury that the offense -- in the

15   instructions that they have to find that the offense

16   involved commerce in order for them to convict.

17          I know the court is apparently going to put

18   something in the verdict form about that, but we think the

19   jury should be instructed that -- in fact, we submitted a

20   proposed instruction, and I am recalling it requires that

21   the government prove that there was money or gifts or other

22   property exchanged for illicit sexual conduct.  So we think

23   that would be a good way of instructing the jury as to the

24   commerce sex offense prong of the statute.

25          THE COURT:  All right.  And you may be well

09:27:21   1   correct in your assessment of what the law is.  I know

2   there's a lot of splits among the circuits in whether the

3   statute can survive without a commercial sex act.

4           My feeling, I think I expressed it in the e-mail

5   last night, is that what Congress is trying to do is stop

6   the market for child sex in foreign commerce in another

7   country, and that, in and of itself, is enough for it to

8   survive a challenge.

9           So we will instruct on commercial activity and

10   then add the interrogatory.  And if they unanimously agree

11   to that, the case would fall under the *Clark* case in any

12   event.  If they don't, you know, you have preserved your

13   issue that they needed more.

14           MR. WEINERMAN:  So the court is not going to tell

15   the jury they have to unanimously agree on the same theory

16   of 2423(c) liability, either commercial or noncommercial.

17   They are just not going to be instructed at all about that,

18   but there will be a question or interrogatory of some sort

19   in the verdict form?

20           THE COURT:  Yes.  I mean, I will give them an

21   instruction on what commercial activity is or a commercial

22   sex act, I think is what we would describe.

23           MR. WEINERMAN:  Right.

24           THE COURT:  In terms of the unanimity, we may want

25   to --

09:28:57

1                   (Reporter interrupted.)

2        THE COURT:  Unanimity, we are going to have to

3  figure out how to capture that in the verdict form.

4        All right.  With regard to, I think,

5  Mr. Weinerman, you wanted some time to talk to your client

6  about your defenses in light of my preliminary rulings on

7  the evidence.

8        So where are we with that?

9        MR. WEINERMAN:  Judge, where we are, and we do

10  have a question -- first of all, we appreciate very much the

11  time and the thought put into the preliminary rulings.  And

12  we have taken them to heart, and we are not going to pursue

13  the defense that -- my understanding is the court would be

14  more inclined to let in much of the 404(b) other act

15  evidence if we pursue that defense.  So we are not going to

16  allege that -- by calling Detective Harrison and other

17  witnesses that Detective Harrison contaminated, poisoned,

18  tainted witnesses by telling -- telling things, saying

19  things to witnesses that tended to influence their -- their

20  testimony and cause them to be biased against Mr. Johnson.

21  So we are not going to pursue that.

22        THE COURT:  All right.

23        MR. WEINERMAN:  We do have a question, though.

24  And I know we get into this opening the door.  If we are

25  going to do that, we want to make sure we are not going to

09:30:29   1   open the door.  I always like to say that the Federal Rules

2   of Evidence do not --

3                    *(Reporter interrupted.)*

4           MR. WEINERMAN:  The Federal Rules of Evidence do

5   not have a provision calling for the concept of opening the

6   door, but I know it's something that is commonly relied upon

7   by judges to make evidentiary rulings, so I know we have to

8   deal with the opening-the-door theory.

9           So we don't want to open the door.  But we do, if

10   the court will permit us, have some just general questions

11   to make sure that we don't open the door and have the court

12   change its preliminary ruling not to allow much of the 404

13   other act evidence.

14           THE COURT:  Right.  So if you are not going to

15   pursue that defense, my thought is nothing about -- nothing

16   that occurred in the United States in Yamhill or Lincoln

17   County would come into evidence, including the testimony of

18   the two Jaeger brothers.

19           I understand that there's an alternative theory

20   that their testimony should come in under 413 or 414, but

21   balancing the limiting factors, those acts seem distant in

22   time.  They date back to 1992.  In two of the acts

23   Mr. Johnson himself was a minor.  In the one act in which he

24   was a young adult --

25                    *(Reporter interrupted.)*

09:31:54    1          THE COURT:  In the one act in which Mr. Johnson

2    was a young adult and was alleged to have abused Kevin

3    Jaeger, it involved drinking and sexual contact.

4          So because they are distant in time and not

5    similar in nature, my fear is that the jury will give undue

6    weight to those acts in determining what occurred in the

7    charges before us.

8          So because of that distance in time and

9    dissimilarity in 403 weighing factors -- as I weigh those

10    factors under 403, I think the prejudicial effect outweighs

11    the probative value.

12          The government has other evidence to corroborate

13    the child molestation that occurred in the counts alleged.

14    That other evidence, though, of course, is other acts of

15    sexual abuse against the same victims listed in the

16    indictment and other children in the Hope Transitions during

17    that same period of time.  Under *LeMay*, that would come in

18    under 413 or 414 because they are similar in nature; close

19    in time.

20          The statements -- or the government is also

21    introducing that evidence for other counts in which they

22    have to prove his purpose for travel, which would be --

23    which isn't specific to any one of the child victims.

24          So the abuse that occurred, the other acts that

25    occurred in Cambodia would come in.  The acts that occurred

09:33:55    1    in the United States would not.  The only reference, then,

2    to what occurred in the United States would be that he had a

3    warrant for his arrest, but we would not go into what the

4    nature of that warrant was.

5            So does that answer the majority of your

6    questions?

7            MR. WEINERMAN:  Yes, that does answer the

8    question.

9            I actually have two clarifications that we are

10    seeking.

11            The images that we have been, you know, debating

12    since the motion hearings, the overridden images, what --

13    since we are not going to be presenting the defense that we

14    said in our trial memo, what's the court's ruling on that?

15            THE COURT:  Well, again, a lot of it depends on

16    what kind of -- if and what kind of character evidence you

17    may be presenting at trial.  If you have people taking the

18    stand to say that he's always sexually appropriate around

19    children, I think you are going to be hammered with every

20    one of those photographs.

21            MR. WEINERMAN:  We don't intend to do that, Judge.

22            THE COURT:  Okay.

23            MR. WEINERMAN:  The only evidence we are bringing

24    in relates to what his purpose was and what his intent was

25    in going to Cambodia, which I think we have laid out in the

09:35:14    1    trial memo.  It has nothing to do with being sexually

2    appropriate with children but, you know, what he did,

3    charitable work and that sort of thing.  So --

4              THE COURT:  All right.  Then my thought is, is

5    that there is one photograph that at least appears to

6    corroborate the testimony of one of the victims.

7    Mr. Johnson took a photo of him on the iPhone during a

8    period in which they were having anal sex.  The fact that

9    there is a similar photograph on the iPhone I think

10    corroborates that testimony, and I would allow in that

11    single image at this time.

12              MR. WEINERMAN:  And Judge, before -- would the

13    court -- one of the things I did ask is when we were here on

14    the motion to suppress we did not have the photos in front

15    of us.  So -- and counsel brought them to court yesterday.

16    And I know we are just dealing with one photo, but we would

17    like to take a look at that photo and see if there's any

18    arguments that we can make that it doesn't depict what

19    everybody seems to think it does and that it's overridden to

20    such an extent that it shouldn't come in.

21              So we would really like to have that photo in

22    front of us when we are making those arguments.

23              THE COURT:  All right.

24              MR. SWEET:  Your Honor, we have a notebook for the

25    defense as well.  So we can -- when we have that argument,

09:36:37  1    we'll bring that back up, along with the other images.

2              THE COURT:  Okay.  And you can reraise that issue

3    if we need to look at it further.

4              MR. WEINERMAN:  All right.  It's simple.  It's

5    down to one photo now, so we can, you know, make whatever

6    arguments because it's been a while.  I have seen them

7    twice, once in a large version and once it was just a

8    thumbnail, which wasn't really of good quality.  So we would

9    like to take another look at it.

10             THE COURT:  All right.

11             MR. SWEET:  Your Honor, it's available at any time

12   if Mr. Weinerman or Ms. Hay wants to come -- excuse me --

13   Ms. Maxfield wants to come and see them.

14             MR. WEINERMAN:  And I appreciate that, but I would

15   prefer having it in court while we are in session outside

16   the presence of the jury so we can make our record.

17             MR. SWEET:  Sure.

18             And, of course -- I am sorry.  I didn't mean to

19   make those exclusive.  We'll bring that to court as well.

20             The only other question I had, Your Honor, on that

21   is the court in its preliminary opinion said if a defense

22   expert testifies that Mr. Johnson's behavior was culturally

23   appropriate, then they could be impeached.

24             And I think would it also depend on what

25   Mr. Roloff said, if anything, in terms of what the other

09:37:41  1   photos as well.

2          Would that fall under what the court was talking

3   about, depending on -- so that that could also result in the

4   photos being admitted?

5          THE COURT:  Right.  I mean, I can imagine a lot of

6   ways this case could go where those photos are going to

7   become relevant.  And I think I listed in the preliminary

8   order, you know, certain kinds of character evidence:

9   Reputation for appropriateness around children, lack of

10  interest in the male children, culturally appropriate

11  behavior around children.

12         And that's why I want to take a wait-and-see to

13  see if that evidence in fact does open the door.  I know

14  it's not a term that the defense likes, but evidence is

15  always changing.  We don't always know exactly how the

16  defense witnesses are going to specifically testify.  But I

17  can see many ways in which the photos would come into

18  evidence, just depending on how it's presented.

19         MR. SWEET:  Thank you, Your Honor.

20         MR. WEINERMAN:  And the government has our -- we

21  have a cultural expert, and the main areas that we think are

22  relevant -- a lot of the witnesses that the government is

23  going to call, people who are affiliated with churches who

24  were funding Hope Transitions Center, they are going to

25  testify, it is my understanding, that they deemed some of

09:39:05   1    the things they saw to be inappropriate; specifically, kids

2    giving adults massages and people sharing beds.  And in

3    Cambodia that's not unusual.  That's what our cultural

4    expert says, that children commonly give adults massages;

5    that it's culturally appropriate.

6            So that is the type of testimony we would be

7    bringing in.  Certainly, if that is going to change the

8    court's ruling on the admissibility of all of the images or

9    even one, then we certainly would like to know that.  I know

10   the court maybe needs to hear the testimony first, but maybe

11   we could go outside the presence of the jury on that one

12   aspect.

13           THE COURT:  Well, if you keep it very general --

14           MR. WEINERMAN:  Okay.

15           THE COURT:  -- you are probably in safe territory,

16   but the minute you want your expert to draw a conclusion

17   that your client's specific behavior was culturally

18   appropriate --

19           MR. WEINERMAN:  Right.

20           THE COURT:  -- I think that's going to open the

21   door to questions:  Would you still think this is culturally

22   appropriate if you knew he had these pictures on his phone?

23           MR. WEINERMAN:  Okay.

24           THE COURT:  The answer obviously is going to be,

25   "God, no."

09:40:24

1           So it's how you -- you are going to have to limit

2      it to a very general cultural experience.

3           MR. WEINERMAN:  All right.  Thank you.

4           THE COURT:  Okay.  Other things we need to talk

5      about by way of evidence?

6           MR. SINHA:  No, Your Honor.

7           THE COURT:  Okay.

8           MR. SWEET:  And I am sorry, Your Honor.  Was that

9      just regarding the evidence or was that a more open

10     question?

11          THE COURT:  I guess it was specific to the motions

12     in limine on evidence.

13          Is there any on other things?

14          MR. WEINERMAN:  Yeah, I do think we have some.

15          Yes.  And this is in no particular order.

16          It -- I am -- there are named victims in Counts 1

17     through 6.  The government seems to be taking the position

18     that they don't have to name a victim in Counts 7 and 8.  We

19     find that troubling.

20          I don't know how a jury can be instructed whether

21     Mr. Johnson is guilty or not guilty when the government

22     doesn't name a specific victim, and that's what they seem to

23     be doing in Count 7.

24          I am not sure if it's the entire universe of kids

25     in Cambodia that they say were the subject of his traveling

09:41:34    1    with the purpose and intent of committing an illicit sexual

2    act or a specific individual, but it creates a lot of

3    problems.  It's vague, and it doesn't require a jury to

4    unanimously agree who the victim was.

5           So it seems to me that statute, 2423(b), requires

6    the government to name a victim.  And if they are not going

7    to name a victim, then the jury has to be given some

8    guidance, including they have to unanimously agree or else

9    the count is duplicitous.  It, in one count, alleges

10   multiple offenses.  And in this instance, "multiple" meaning

11   in the -- perhaps the dozens.  And I don't see how we can go

12   forward without a victim being named on that count.

13          And then on Count 8, I always thought that the

14   named victim was going to be LS XXXXX, but there may be one

15   other person, VS XXXXXXXXXXXXX, I believe, who may have been

16   under 12 at the time.  It's not clear to me.

17          But I think the government needs to elect on both

18   those counts a specific victim or else the counts shouldn't

19   go forward.

20          MR. SINHA:  So, Your Honor, the -- you know, we

21   don't -- we don't choose a specific victim on charges under

22   2423(b) And sometimes under charges 24 -- or 2241(c).  And

23   the reason is that the action in the crime doesn't involve a

24   specific victim.  It's just traveling across an

25   international boundary from the United States with regards

09:43:08   1   to 2423(b) or traveling across a state line, you know, both

2   with the requisite intent.

3            And so one can imagine and there are in fact cases

4   where we are charging someone with the charge contained in

5   Count 7 who has outwardly evinced the intent to travel

6   abroad to have sex with children.  But since he hasn't

7   arrived yet, he doesn't know which specific children he

8   wants to have sex with.  So we wouldn't be able to name a

9   victim because we would have no idea.

10            It would be, on some level, analogous to saying

11   that someone is possessing drugs with the intent to

12   distribute them.  We don't have to show who specifically

13   they wanted to distribute them to.  It's the intent, and

14   then the action in the instance is the travel.

15            So I think the court addressed this in its bill of

16   particulars ruling, and I think that's consistent with the

17   law with regard to the level of specificity that the

18   government has to show.

19            I do agree with Mr. Weinerman that there is a

20   concern with regards to Count 7 and 8 that may implicate

21   duplicity.

22            And so there -- again, the action in these counts

23   is the travel.  And so what we would suggest to the court

24   and to counsel, respectfully, is that we'll submit a special

25   unanimity instruction for those counts that allows the jury

09:44:31

1    or that instructs the jury to agree unanimously on a

2    specific trip.  They don't need to agree on a specific

3    victim because that's not an element of the crime, but they

4    do need to agree on a specific trip for each count.

5              So that would be our suggestion.

6              THE COURT:  All right.  I agree with the

7    government that they are not required to name a specific

8    victim in Count 7 and 8.  The statutes that cover those two

9    counts are really inchoate crimes punishing a substantial

10   step towards the commission of the act.

11             The only thing that the government has to prove is

12   they traveled either across state lines or traveled to a

13   foreign country with a specific intent to engage in sexual

14   acts with minors but not with a specific minor.  It's just

15   not what Congress intended.

16             MR. WEINERMAN:  Well, how does the court feel

17   about the unanimity instruction, then?

18             I mean, we --

19             THE COURT:  That's fine on a single trip, yeah.

20             MR. WEINERMAN:  Single trip.

21             So the court -- it's fine on both counts.  The

22   government does not have to specify -- the jury does not

23   have to unanimously agree as to which particular victim,

24   only a particular trip.

25             THE COURT:  Correct.

09:45:56

1          All right.  Other things from the defense?

2          MR. WEINERMAN:  Yes.  We have an objection to a

3    couple of the government's voir dire questions.  Let me find

4    it and I will -- whenever the court is ready, I

5    can (indicating) --

6          THE COURT:  Okay.

7          MR. WEINERMAN:  So it would be on Page 2, Question

8    6 or 7, which seemed to be -- to have the same objection

9    that the government made.  And the court's concerned about

10   conditioning jurors as to the credibility of a particular

11   witness.  6 seems to talk in terms of conditioning the

12   jurors about children telling the truth about important

13   matters.  And No. 7, it almost presupposes that their

14   witnesses who are minors have experienced trauma and they

15   behave in a certain way.

16         So it just seems like these are more like the

17   conditional questions that the court has ruled the defense

18   shouldn't be permitted to ask, and the government shouldn't

19   be able to ask similar conditional questions either.

20         THE COURT:  I think you can ask them about any

21   experiences they have but not about expectations with regard

22   to trauma.  I don't think Question 6 goes towards the

23   qualifications or bias of jurors.

24         So I will strike 6 and 7.

25         MR. SWEET:  Your Honor, may I follow up with one

09:47:37　1　question?

2　　　　　　　THE COURT:  Yeah.

3　　　　　　　MR. SWEET:  I believe yesterday when we covered

4　the defense questions, there are 55.

5　　　　　　　THE COURT:  Right.  There's one I needed to get

6　back to.

7　　　　　　　MR. SWEET:  That's on page 8.

8　　　　　　　And that question is, "Do you believe that

9　witnesses who are teenagers or young adults would never

10　lie?"  I don't believe I have that one marked as being

11　struck by the court.

12　　　　　　　THE COURT:  I can strike that one.

13　　　　　　　MR. WEINERMAN:  Which number was that, counsel?

14　　　　　　　MR. SWEET:  55 on Page 8.

15　　　　　　　*(Court conferred with law clerk.)*

16　　　　　　　THE CLERK:  I think that was yesterday we talked

17　about -- I think you asked to strike 48 yesterday.

18　　　　　　　MR. SWEET:  That's correct.  I did not ask to

19　strike 55 yesterday.  And I do think it is fairly similar to

20　the government's question 6.

21　　　　　　　THE COURT:  It is.  I did want to clarify.

22　　　　　　　MS. MAXFIELD:  Your Honor, can I jump in here and

23　just ask a question since I think I will be doing the voir

24　dire.

25　　　　　　　I imagine that this is going to be sort of a

09:48:51    1    hybrid between federal court and state court, but typically

2    I wouldn't just read questions off a sheet because the jury

3    will be comatose.

4              THE COURT:  Right.

5              MS. MAXFIELD:  In fact, if that's going to happen,

6    I would ask the court to read the questions off the sheet

7    and not us.

8              I am wondering if we'll have a little bit of -- as

9    long as we are within the subject matter and we know where

10    the lines are --

11              THE COURT:  Yes.

12              MS. MAXFIELD:  -- if there is some freedom in how

13    we approach this and maybe follow-ups from the

14    questionnaire.

15              THE COURT:  Right.  I don't want it to be a C-span

16    congressional kind of thing.  I expect you to move around

17    and have a conversation within the confines of these

18    questions.

19              You will have the questionnaires.  So the idea is

20    we'll bring in -- rather than -- I think it's too much to

21    talk to all 50 people in different parts of the courtroom

22    with the public sitting among them.

23              So we'll bring in groups of -- how many did I say?

24              MR. SWEET:  16, Your Honor.

25              THE COURT:  16 we can fit easy.

09:49:47

1      You are going to have a conversational series of
2  questions with them.  You may have individual questions
3  based on their questionnaires.  If some of them say, "I
4  don't really want to talk about that in front of the
5  people," when we are done with the group questioning we'll
6  send them to the jury room and bring them out individually
7  if we need to.
8          MS. MAXFIELD:  Okay.
9          THE COURT:  But, yeah, I am not expecting you just
10 to read questions to each of them individually.  Make it
11 conversational.  Have them raise their hands and talk.  So
12 very much more like state court, I think.  Other than when
13 they come in, me reintroducing you and asking them just to
14 state their names, where they are from, that's about my
15 involvement.
16         MR. WEINERMAN:  So we have some other --
17         THE COURT:  And I did want to clarify.  I did mean
18 to strike question 48 on Page 7.  I don't think I actually
19 got to that yesterday.  I had meant to earlier.
20         MR. WEINERMAN:  Question 48 on the defense
21 proposed?
22         THE COURT:  Yeah.  Yes.
23         MR. WEINERMAN:  All right.
24         So we do have some other issues we'd like to bring
25 up.

09:50:59    1        So getting back to what opens up the door and what

2   doesn't open up the door, we have represented, and I think

3   it -- and it's true that Detective Harrison told Karla

4   Comstock that Mr. Johnson had sexually abused the Lincoln

5   County alleged victims.

6        Okay.  I am going to say it this way:  Detective

7   Harrison told Karla Comstock that the FBI had discovered

8   that in the summer of 2013 Mr. Johnson flew to the United

9   States with three boys and then wired money to Hope

10  Transitions Center, and that influenced the testimony of the

11  person that she told that to, which I believe was eventually

12  BT XXXXXXX.

13       So without getting into the specifics, the

14  question we have, are we opening up the door if we question

15  the church witness regarding what he or she told Cambodian

16  kids about Mr. Johnson?

17       So, again, there are these things out there that

18  Mr. Johnson brought kids over and the kids are unaccounted

19  for, that he sexually abused kids in the United States, and

20  there's some other things that he said.

21       So the question is we are not -- we don't even

22  have to ask the question in terms of what Detective Harrison

23  told the person, but if a witness like Karla Comstock, who

24  is a supporter of the Hope Transitions Center and sponsored

25  many -- some of the kids there and helped, whether we would

09:52:41   1    be permitted without opening up the door to ask her whether

2    she told such things to any of the witnesses.

3         MR. SWEET:  Your Honor, the -- I think it's

4    interesting because at some point the defense could

5    essentially, without saying this is our defense, through a

6    series of questions to witnesses, basically back into the

7    same position without saying our defense is Detective

8    Harrison tainted all these witnesses.

9         But by the same token, I do understand why they

10   would want to ask Karla Comstock and a few others,

11   potentially, "When you were being interviewed and you were

12   told this information, did that change what you said or did

13   that affect information you provided?"

14        And so I do think it's a little bit of a tricky

15   question just because there is probably a point to which it

16   is -- it is appropriate that they be able to ask

17   Ms. Comstock, "Was what you provided, the information

18   provided, influenced by questions you were asked or the

19   information you were given?"

20        I think it is difficult until we sort of hear it

21   to actually know how repetitive it is, how it's done and how

22   it's presented.  And so I think it might have to be

23   something that the court would decide on at that point.

24        THE COURT:  So is the testimony that Ms. Comstock

25   would say that she told the boys in Cambodia that

09:54:11   1   Mr. Johnson had done things against other boys in the United

2   States?

3           MR. WEINERMAN:  Well, the main thing that -- well,

4   not the main thing, but one of many things that she was told

5   is that in the summer of 2013, Mr. Johnson flew to the

6   United States with three boys, I already told the court, and

7   then wired money back to Hope Transitions Center, a

8   significant amount of money, and then told her that the

9   three -- and then told the witnesses, some of the Cambodian

10   witnesses -- BT XXXXXXX, for example, and other witnesses

11   that the government is going to call that the kids are

12   unaccounted for, suggesting that they were actually

13   purchased off the streets of Cambodia.

14           So basically, without using the words "sex

15   slavery," suggesting that kids were basically taken off the

16   streets in Cambodia, flown to the United States, and they

17   are unaccounted for.

18           That is what she was told, and then she in turn

19   told other witnesses who are going to testify for the

20   government, again, other church sponsors of the Hope

21   Transitions Center and, I believe, PE XXXXXX, one of the

22   government's other act witnesses, I believe BT XXXXXXX, one

23   of the alleged victims, and I believe one other alleged

24   victim whose name is escaping me, but I believe there's two.

25   SO XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX, I think is how you spell

09:55:46    1    his last name.

2              THE COURT:  Okay.  So she is not talking about

3    events that occurred in Yamhill County or Lincoln County.

4    She is talking about a suggestion that --

5              MR. WEINERMAN:  Right.

6              THE COURT:  -- Mr. Johnson is taking kids into I

7    guess what would be the sex slave industry and done

8    something with them in the United States.

9              I think you can go into that.  I am not sure what

10    door it would open to -- I mean, they can ask her where she

11    got that information from, I suppose --

12              MR. SWEET:  And, Your Honor, I --

13              THE COURT:  -- and whether she believed it at the

14    time, but.

15              MR. SWEET:  I apologize.  I didn't know if you

16    were done.

17              THE COURT:  No.  Go ahead.

18              MR. SWEET:  I believe Detective Harrison, when he

19    did interview at least Karla Comstock and potentially others

20    would ask a question about this kind of information or maybe

21    even make a statement.  And so -- and I think some of those

22    statements, I think the defense is correct, and I don't know

23    who it was passed on to, but some of that information would

24    kind of get through or be relayed on to other people.

25              So I don't think the government's position is that

09:57:00   1   every question that they ask a witness such as Karla

2   Comstock in terms of were you told this, did that influence

3   you --

4          THE COURT:  Sure.

5          MR. SWEET:  -- did that impact what you said, I

6   don't think our position would be that any question like

7   that would open the door.

8          But I do think if there was at some point -- at

9   some point they could essentially cross a line that would

10  become Detective Harrison did it, as the defense, being sort

11  of it's resurrected.

12         MR. WEINERMAN:  I think if we were going to get

13  into that we would scrupulously avoid identifying the source

14  as Detective Harrison.

15         THE COURT:  All right.  I think you can ask

16  generally what you have just described without opening any

17  great doors.

18         MR. WEINERMAN:  Can I just check my notes here,

19  Judge, to see if there was anything else?

20         I am not suggesting that we do this now, but I

21  think probably both sides have some objections to exhibits.

22  And I don't know if the court is willing to maybe hear those

23  on Friday while the jury is filling out the questionnaire

24  because we have to make some -- we have to file an amended

25  exhibit list because we are going to withdraw some of our

09:58:09  1   exhibits.  I don't know if we really need to do that now,

2   but obviously the court decides that.

3          THE COURT:  Well, why don't you folks confer.

4          MR. WEINERMAN:  Yes.

5          THE COURT:  I know that after the jury orientation

6   there is a presentation in here for high school students

7   that will go probably through lunch.  But I can certainly

8   spend some time, probably Friday afternoon, going through

9   exhibits if you need some rulings on them pretrial.

10          MR. WEINERMAN:  Yes.

11          THE COURT:  Okay.

12          MR. SWEET:  We appreciate that, Your Honor.  Then

13   that would allow us to use exhibits in opening.

14          If counsel doesn't have anything -- do you have

15   anything else, Mr. Weinerman?

16          MR. WEINERMAN:  One moment.

17          I think that's it for now.

18          MR. SWEET:  Your Honor, I have two things.

19          One, the defense and the government have discussed

20   switching sides during trial, and we wanted to seek the

21   court's permission for that.  The marshals were fine with

22   that.  We discussed that with Mike Bryant and said that

23   basically we would sit there and they would sit over here,

24   if that's acceptable to the court.

25          THE COURT:  Any objection?

09:59:23  1          MS. MAXFIELD:  Your Honor, we would like to test

2    drive because I don't think we are going to be able to see

3    the witnesses from over there, and our client certainly

4    wouldn't be able to.  So maybe at the break we could try it

5    out.

6          THE COURT:  Okay.  I think the concern, I assume,

7    is that you are afraid your alleged victims are in too close

8    a proximity to Mr. Johnson when they walk up to the witness

9    stand.

10          MR. SWEET:  Walk up, yeah, Your Honor, and even

11    just testifying they would be basically in the direct line

12    of sight.  I mean, they would be basically looking at

13    Mr. Johnson, and so--

14          MS. BRITSCH:  And for the same reason Ms. Maxwell

15    is concerned about sitting here, that if we are sitting here

16    questioning, for example, one of the children --

17          MS. MAXFIELD:  They already did a test drive.

18          MS. BRITSCH:  -- we may not be able to -- the

19    child may not be able to see us sufficiently.

20          THE COURT:  Well, I don't have any rules about you

21    having to sit at counsel table.

22          MS. BRITSCH:  Okay.

23          THE COURT:  So I would expect that both sides,

24    when the children are testifying, especially if they are

25    particularly shy or quiet, that you not question them from

10:00:25    1    this far away and that you get up.

2            So I guess my preference would be that you switch

3    just because there's not a way to bring people around this

4    way.

5            And, Mr. Johnson, I am not suggesting that --

6    anything by this other than we are dealing with children who

7    believe certain things, whether they are correct or not, and

8    they have they may have an emotional response to you, and

9    I'd like to limit that as much as possible.  So one way of

10    doing that would be to switch tables.

11            And if we need to get taller chairs on the witness

12    stand, we can do that.  But I am expecting that as attorneys

13    you will move about and move closer.  I mean, don't move so

14    close that they are intimidated but close enough where it's

15    conversational with them.

16            MR. SWEET:  Thank you, Your Honor.

17            MR. WEINERMAN:  I think we have something else we

18    want to talk to the court about.

19            MS. MAXFIELD:  Your Honor, I want to address two

20    issues from the court's ruling.  The first is with respect

21    to Dr. Goodman.

22            And the court is correct.  We are not quarreling

23    with her credentials at all, but we are quarreling with

24    whether the science that she relies upon matches up with the

25    facts in this case because I think that everything -- every

10:01:47  1   study that she cites, and I think really almost all the

2   studies that exist, study western cultures and really have

3   nothing to do with a Southeast Asian culture or Cambodian

4   culture in particular.

5          And we believe that the science is so mismatched

6   that there should be a *Daubert* hearing in which we can sort

7   out with Dr. Goodman why it is she thinks that she can take

8   the science that she has relied upon and apply it to this

9   culture.

10          The court's ruling didn't address that, and we

11   think it's one of the more important arguments that we made.

12          THE COURT:  All right.

13          MR. SINHA:  Your Honor, I think -- you know, I

14   don't know if it is as apparent from her CV.  I think

15   Dr. Goodman is frankly among the world's foremost experts on

16   this area.  She has read and studied a great number of -- I

17   mean, she has written, I think, over 200 articles on

18   subjects related to this.

19          THE COURT:  Right.

20          MR. SINHA:  And in the course of that and winning

21   a series of national and international awards has read the

22   literature that exists.

23          You know, *Daubert* doesn't require a perfect

24   knowledge of a subject area.  And insofar -- you know, it

25   doesn't require that the exact thing that she is opining on,

10:02:57   1    which in this instance is going to be obviously not case

2    specific, it's going to be general, general things that

3    occur with regards to sex abuse, you know, as noticed in her

4    expert notice.

5         So she is not going to be talking about these

6    victims.  She is obviously not going to be talking about the

7    defendant.

8         Insofar as they think there's a dissimilarity or

9    some tension between the research that's been conducted

10   pretty much across the world on these subjects and what

11   would happen with Cambodian victims, they perhaps can

12   cross-examine her on that, but I don't think it's a reason

13   for a *Daubert* hearing.  I don't think it's anything that

14   would undermine the court's *Daubert* ruling.

15        THE COURT:  I guess I would hate to get to

16   cross-examination after she testifies only to find out her

17   saying, "I don't know if any of this would apply to the

18   cultural situation in Cambodia."

19        MR. SINHA:  Sure.

20        THE COURT:  So I think it's probably worth our

21   time, before she testifies, for you to ask her at least some

22   questions about the applicability of her understanding of

23   the science and child sex abuse in general to Cambodian

24   culture.  And if she could answer that there are some

25   universal generalities that could be made about child sex

10:04:16    1    abuse in any country or that she is aware of the cultural

2    issues in Cambodia and similar foreign countries to be able

3    to apply this kind of general knowledge and skill that she

4    has, then I allow it in.  If she says, "I have no idea if it

5    applies to Southeast Asian culture," then there would be

6    some, obviously, difficulties having her testify.  So why

7    don't we handle that right before she testifies.

8         MS. MAXFIELD:  There's one other issue with

9    respect to Goodman, and that has to do with the horror

10    stories that she told in the *Chivoski* trial.

11                    *(Reporter interrupted.)*

12         MS. MAXFIELD:  Pardon me?

13         The horror stories that she told in the *Chivoski*

14    trial.

15         And we laid out one of the horror stories that had

16    us concerned.  We certainly wouldn't want that to be

17    repeated in our case, where she takes -- she just kind of

18    goes on paragraph after paragraph after paragraph describing

19    a pretty chilling set of factual circumstances that underlie

20    a study that she did that really have nothing to do with the

21    study and nothing to do with our case; instead would just

22    kind of be prejudicial and harmful to our client.

23         And so we would just like a preemptory ruling

24    where the government warns the witness, because she loves

25    these stories, that she is not allowed to go into a really

10:05:37    1    detailed account that talk about the facts of an unrelated

2    criminal prosecution.

3             THE COURT:  That does seem reasonable that she not

4    go into lengthy facts about unrelated cases but still keep

5    her statements down to assisting the jury in trying to -- by

6    giving them, I guess, her expertise in evaluating certain

7    subjects such as child sex abuse.

8             But launching into long stories of dramatic abuse

9    on other children, you are probably going to hear me sustain

10   some objections.

11            MR. SINHA:  I will speak to her, Your Honor.

12   Thank you.

13            MS. MAXFIELD:  Okay.  The only other issue, Your

14   Honor, that I had for the court has to do with the rape

15   shield notice.  And I think the court may have misunderstood

16   a couple of things:  Number one, what we are asserting; and

17   number two, how important it is to the case.

18            With respect to -- the court says that with

19   respect to the conversation that our client had with minor

20   1, are we allowed to -- when they are adults now, are we

21   allowed to say their names in court?  Because it's tough for

22   me to keep track of them.

23            MR. SWEET:  We don't have an issue with that, Your

24   Honor.

25            MS. MAXFIELD:  Okay.

10:06:53
1    There's a conversation that is alleged to have
2    occurred between our client and BT XXXXXXX, who I believe is
3    minor 1.  That conversation is very, very specific.  It is
4    referenced by BT XXXXX in his 302s, and it occurs a day
5    before BT XXXXX leaves the orphanage.
6        And he asserts with the government that there's a
7    conversation with my client in which he confronts
8    Mr. Johnson about sexually abusing children, and then he
9    references a Facebook conversation that he has with my
10   client to support his account of what occurred.
11       And, in fact, this is a conversation that occurred
12   orally.  Then there's follow-up in the Facebook account, and
13   then there's conversation that occurs after that.
14       I want to give the court a copy of the Facebook
15   reference that BT XXXXX has anchored his account of what
16   occurred before.  And if the court takes a second to read
17   it, you will see that it's ambiguous what was discussed.
18       THE COURT:  Okay.  I guess I am not understanding,
19   though, why you can't cross-examine this particular witness
20   with regard --
21       MS. MAXFIELD:  I need to get closer to the court.
22   I am sorry.
23       THE COURT:  I am sorry.
24       I don't understand why you cannot cross-examine
25   this particular witness by asking him, "Was it your

10:08:50   1   conversation about punishment of children?" without going

2   into the fact that there were sexual activity going on

3   between the boys.

4        MS. MAXFIELD:  Well, I think -- if he's going to

5   talk to the court or to the jury about the conversation at

6   all and suggest to the court that my client made an

7   admission of sexually abusing children at the end, we ought

8   to be able to go into the details of what was discussed.

9        There is corroboration in other Facebook entries

10   where BT XXXXX talks about the fact that there had been an

11   issue of older boys forcing sex on younger boys, and he puts

12   that on Mr. Johnson's lap, says it's his fault that that

13   occurs.

14        But Mr. Johnson has a very different account of

15   what occurred in that dispute that leads to BT XXXXX leaving

16   the center.

17        THE COURT:  Right.  But I don't know how your

18   bringing that out --

19        MS. MAXFIELD:  Pardon?

20        THE COURT:  Unless your client testifies, how is

21   it that you are going to get out that account?

22        MS. MAXFIELD:  Well, we are not saying that our

23   client's not going to testify, but how -- if I am not

24   allowed to deal with the specifics of what he would say to

25   contrast what this witness is going to say on

10:10:01   1    cross-examination, how will I get it out -- are we just

2    going to hold BT XXXXX here until the defense case is

3    finished and then bring him back up to address those

4    specific issues, including finding the parts from Facebook

5    that would corroborate Mr. Johnson's account?

6              What he doesn't say in that Facebook exchange is,

7    "Mr. Johnson, you have sexually abused children."  But

8    that's what he tells the FBI that the account is about.  We

9    are saying that that's not what it's about.

10             THE COURT:  Right.  You can cross him with this.

11             MS. MAXFIELD:  I can cross him with this?

12             THE COURT:  I don't see why you wouldn't be able

13   to cross some of this Facebook account.  This doesn't

14   reference -- I thought we were -- maybe I am confused about

15   what issue we are raising.  I thought you were raising

16   issues around the prior sexual activity between the children

17   in the Hope Transitions Center.

18             MS. MAXFIELD:  What we are saying is that the

19   conversation that occurred, from Mr. Johnson's perspective,

20   was a battle about whether he was too hard on kids who had

21   been caught touching each other or been accused of touching

22   each other and that he had been harsh in a way that BT XXXXX

23   found offensive.

24             That would be the conversation from his

25   perspective, and it's consistent with this Facebook supposed

10:11:29  1    confrontation that BT XXXXX has with our client.

2         We shouldn't be handcuffed on cross-examination on

3    the specifics of what they actually said to each other,

4    especially since it all ends with the supposed admission of

5    our client.

6         THE COURT:  I don't see anything in my rulings to

7    prevent you from introducing this document, showing it to

8    the witness.

9         MS. MAXFIELD:  But I can't ask the witness if what

10   Mr. Johnson said or what they -- whether the subject of that

11   conversation had to do with children touching each other

12   sexually?  I can't confront him with that?

13        THE COURT:  I think you can limit it to his --

14   that they are unhappy with his discipline of children,

15   but -- well, what's the government's view of this?

16        MS. BRITSCH:  Your Honor, I think that is our

17   position that the defense is essentially -- you know, that

18   this conversation was about something else, and that

19   something else is the harsh discipline of children.  And the

20   reasons underlying that discipline aren't relevant to laying

21   out that cross-examination.

22        And I think our other issue is right now -- I

23   mean, this is pure speculation.  They haven't put any facts

24   into the record, and perhaps they will later, that that in

25   fact, you know, is what this conversation is about.  And so

10:12:47

1   we don't believe that they can just get up there and

2   cross-examine BT XX without any foundation and say wasn't

3   this conversation about sexual activity that hasn't been

4   established by the facts in the record.

5          So both for that reason and, you know, the reasons

6   that we have already outlined in our 412 response that the

7   underlying sexual activity or alleged sexual activity of the

8   kids is not admissible and isn't necessary for them to form

9   this line of cross-examination based on the punishment.

10         MS. MAXFIELD:  I think that that would leave us

11   with BT XXXXX being able to provide a detailed account of a

12   conversation, his own detailed account, and us without the

13   ability to probe whether those details are correct and

14   question on cross-examination whether his -- his version of

15   events isn't the truer version.

16         And it doesn't really matter which kids were

17   sexually acting out with each other, but BT XXXXX is

18   alleging that this was a conversation about his sexual

19   abuse, and he's saying, no, that's not true.  It doesn't

20   matter which kids were involved.

21         THE COURT:  Right.  But, Ms. Maxfield, you don't

22   get to say, "My client says this is the way the conversation

23   went down."

24         MS. MAXFIELD:  No.

25         THE COURT:  "Do you agree with that?"

10:13:54  1              MS. MAXFIELD:  No.

2              THE COURT:  And ask him to say no.

3              MS. MAXFIELD:  No, but I should be able to ask,

4      did he say this and did you say that and did he say this and

5      did you say that.

6              THE COURT:  Well, I think you can, to a degree,

7      ask all that.  You can certainly use this document.  It has

8      no reference to prior sex acts of the children within Hope

9      Transitions.

10              It seems to me the focus is on their unhappiness

11      with the discipline that's been -- that Mr. Johnson has

12      doled out because they had broken rules.  I don't think it

13      matters what rule we are talking about.

14              So I will ask that you limit your

15      cross-examination to that.

16              MS. MAXFIELD:  I guess, then, alternatively, I

17      would move to exclude BT XXXXX's testimony regarding this

18      conversation.

19              THE COURT:  All right.  I will overrule that

20      objection.

21              MS. MAXFIELD:  The second conversation has to do

22      with the supposed confrontation by Mr. Sopheak Vanna.

23              Which way is the -- is it Mr. Sopheak or

24      Mr. Vanna?

25              MR. SINHA:  It's really Vanna.

10:15:11   1        MS. MAXFIELD:  I'm going to call him Mr. Sopheak

2   or Pastor Sopheak.

3        Pastor Sopheak talked to the FBI about a

4   conversation that he had, I believe in November of 2013,

5   after someone, and I am not -- it's not clear to me whether

6   it was -- which minor it was that came to him; that he then

7   confronted Mr. Johnson with respect to the accusation.

8        When Sopheak, who does not speak fluent English,

9   he is being questioned in English by the FBI, but when he is

10   not being led by the FBI agent to say yes or no and he's

11   actually able to expand on his own -- do we -- I am trying

12   to find that transcript.  We have like three versions of a

13   transcript.

14        And I actually had a sound guy, who used to be the

15   drummer for Iggy Pop, try to clean up some of what's being

16   said on the streets in Cambodia.

17        And we believe that the government's transcript is

18   incorrect; that when he's finally allowed to tell his own

19   account of what it is he goes to Mr. Johnson with that he

20   says -- okay.

21        So the FBI agent says, "And what did ES XXX, what

22   did he hope that you would be able to tell Daniel?"

23        And we believe that what he says next is,

24   "Because -- because ES XXX -- we had the rule for boys, you

25   know, like to" -- and then we can't understand.  And then

10:16:59   1    "hold," can't understand, "like a boy and a boy, you know,

           2    like, or playing," unclear.

           3         Then the interpreter says, "Daniel set a rule that

           4    boys and boys could not hold each other and could not play

           5    with each other, penis and stuff. And that's why I go talk

           6    to Daniel."

           7         Now, I want to be able to talk to him about this

           8    specific statement that he made to the FBI about his purpose

           9    in talking to my client.

          10         THE COURT: So it's my understanding that he is

          11    going to testify that he confronted Mr. Johnson about

          12    Mr. Johnson's abuse of boys. This is a very different

          13    conversation.

          14         MR. SWEET: Your Honor, Pastor Sopheak actually

          15    wrote a chat -- had a chat with BT XXXXXXX where he spelled

          16    out -- it's Government's Exhibit 194, if I could hand it to

          17    the court. He actually spells out the subject of his

          18    conversation with Mr. Johnson and what it was about. It's

          19    194.

          20         MS. MAXFIELD: I got that one memorized.

          21         MR. SWEET: And we have a longer version of that

          22    as well, Your Honor, as does the defense.

          23         When Pastor Sopheak testifies, obviously we'll

          24    hear what he is going to say. I think the defense will

          25    hear -- thank you -- what he has to say about what he said

10:18:29  1    to Mr. Johnson and if potentially there was another

2    conversation as well.

3            But I think the conversation as described on this

4    dated Facebook post is explicitly clear, as is what follows

5    it.

6            And so --

7            THE COURT:  Well, a lot of it depends on how he

8    testifies.  If he testifies the conversation with

9    Mr. Johnson was a confrontation of Mr. Johnson's activity

10   with the boys, then the statement that you have,

11   Ms. Maxfield, does appear to be a prior inconsistent

12   statement if it's the same conversation.

13           MS. MAXFIELD:  Well, it could be a -- did the

14   court say a prior inconsistent statement?

15           THE COURT:  Yes.

16           MS. MAXFIELD:  Okay.  I missed the "in."  So it

17   would be appropriate cross-examination.

18           THE COURT:  Yes.  And then we have prior

19   consistent statements that would also be coming in.

20           MR. SWEET:  And if I may, just so I am clear what

21   we are talking about, counsel's discussing the transcript

22   from the interview of Pastor Sopheak with Dan Garrabrant.

23           Is that what you are going from?

24           MS. MAXFIELD:  Yes.  Yeah.

25           MR. SWEET:  Okay.

10:19:35    1          MS. MAXFIELD:  And I can send you the cleaned

2    up -- it's cleaner.

3          MR. SWEET:  We'd appreciate that.  Thank you.

4          THE COURT:  So, yes, I think that's appropriate.

5    I mean, we need to determine what was the essence of a

6    conversation.

7          MS. MAXFIELD:  Thank you, Your Honor.

8          THE COURT:  All right.

9          Go ahead.

10          MR. WEINERMAN:  Well, Judge, you gave me some

11    time, so I thought of some more things to bring up.

12          THE COURT:  Okay.

13          MR. WEINERMAN:  I think it's just one more.

14          So this is in regards to the court's ruling on the

15    titles that everybody gets a chance to use.  And obviously

16    child abuse and defendant and victim, you know, we

17    understand all that.

18          We remain very concerned, though, about the

19    government -- some of the FBI monikers that I assume the

20    government would bring out when the witness hits the stand.

21          For example, I believe one of the witnesses is

22    going to say he's attached to the Violent Crimes Against

23    Children Section, and another may say that he is attached to

24    the Sexual Assault Felony Enforcement, SAFE, Team.  It just

25    seems to me that those are extremely not only prejudicial,

10:20:50

1    but they tend to vouch for the testimony of alleged victims

2    who come up.  You know, they are kids, and why would the

3    FBI, who is a Violent Crimes Against Children Section agent,

4    it just seems to me it's extremely prejudicial and vouches

5    for the testimony of the witnesses and just creates this

6    image of a legitimate government entity that is out there to

7    protect kids all over the world.

8              And it seems we should not be creating that image

9    and just have jurors listen to testimony without wondering

10   why would they be in these very imposing sections if what

11   they were doing was not correct, right, and such.

12             So that's our concern --

13             THE COURT:  Right.

14             MR. WEINERMAN:  -- about that.

15             And just one last thing.  The continued attempts

16   of the government to call this child sex tourism, in one of

17   my motions I submitted what the definition is.  There is no

18   legal definition.  The UN, I believe -- and I am

19   paraphrasing it -- describes it as people going on organized

20   trips where they pay a -- the trip organizer.  Then they

21   wind up rendezvousing with kids and paying the kids for sex.

22             This is not what this case is about, and the

23   government shouldn't be able to label it as such.

24             THE COURT:  I agree that it does not sound like

25   typical child sex tourism.  It sounds like allegations of

10:22:25   1    sexual abuse in a foreign country.

2              Can we limit the specialized units to having them

3        introduce themselves; then simply asking them, "Do you work

4        with a unit that specializes in child sex abuse?"

5              And then let -- I think it is important that they

6        be able to testify about their special training and

7        knowledge, but some of these titles do get a bit

8        far-fetched.  I mean, we might as well have a unit that says

9        We Only Prosecute Guilty People Unit and have them testify

10       to that.

11             So let's keep the titles to just a leading

12       question:  Do you work in an area, a specialty area of child

13       sex abuse?

14                  MR. SINHA:  Okay.

15                  THE COURT:  I do think that kind of leads me to

16       one question for the defense.  You had one expert who was

17       testifying about things that I was struggling with.

18             All right.  On -- I mean, I didn't understand the

19       importance of age verification techniques, the difficulties

20       and obstacles to an investigation of child sex tourism

21       crimes in Cambodia, recordkeeping regarding public records

22       and vital statistics.

23             And is any of that an issue in this case that we

24       need an expert?

25                  MR. SINHA:  You know, the only one, I think, would

10:24:03  1    be the last one, and that would regard one of the victim's

2    passport.

3             But real candidly, Your Honor, I think that we are

4    fine with the court's ruling that we'll get into what I

5    think is listed as D here and avoid the other three.

6             And insofar as that issue comes up, we would, with

7    the court's permission, just approach and see if that is

8    appropriate at that time.

9             MR. WEINERMAN:  So A through D, you are not going

10    to get into?

11             MR. SINHA:  I am sorry.  A through C, as in car.

12    And then my understanding is the court's ruling is that we

13    can get into D.  So that's what we would do.

14             THE COURT:  Anything else from defense?

15             MR. WEINERMAN:  I don't think so.

16             Anything else?

17             MS. MAXFIELD:  No.

18             MR. WEINERMAN:  No, Judge.

19             THE COURT:  Okay.  I thought you had one more

20    thing, and we jumped.

21             MR. SINHA:  The only other thing that I have, Your

22    Honor, is the venue.  It's really just the special -- or,

23    rather, just the verdict form.  And I think we briefed it on

24    Sunday afternoon, basically saying, you know, the way that

25    Counts 1 through 6 are indicted in the superseding

10:25:09   1   indictment is using a venue provision, 3238, for offenses

2   that are committed outside of the district.  That's included

3   in the language of those counts in the indictment.

4          When Mr. Johnson submitted their verdict form, it

5   uses a different venue provision for those six counts.  And

6   it's the same provision that applies to Count 7 and 8, but

7   we think it doesn't apply to 1 through 6.

8          So it's an early point at which to raise it, but,

9   you know, we just feel like we'll have a real problem if

10   we -- if jeopardy attaches and the court asks us to prove

11   venue because it's a provision that we haven't pled in the

12   indictment.

13          THE COURT:  Okay.  I am not sure if I understand

14   the issue entirely.  Is there no stipulation to venue?

15          MR. WEINERMAN:  No, we are not going to stipulate

16   to venue.  I understand the argument, and there are two

17   provisions that govern venue, and they can choose either

18   one.  What I am hearing is they have chosen 3238 as the

19   venue provision and not 3237.

20          So, you know, I submitted the verdict form.  I

21   stand by it and submit it.

22          THE COURT:  So what are you asking me to do?

23          MR. SINHA:  I am just asking for a pretrial ruling

24   that the venue provision that we indicted on and that

25   appears in the government's jury verdict form, which is 18

10:26:33

1    U.S.C. 3238, is the one that the court will instruct the

2    jury on.

3              THE COURT:  Yes.

4              MR. SINHA:  That's all.  Thank you.

5              THE COURT:  Okay.

6              MR. SWEET:  Your Honor, if I may, just one more

7    thing, just to briefly address some discovery matters that

8    the defense raised in their trial memo.

9              The most important to the defense I believe that

10   was listed down was access to the A files.  The court has

11   granted an order allowing them access to the A files.  ICE

12   has that order.  The A file of BT XXXXXXX is here for

13   counsel to review, and I have asked them to order for any of

14   the other witnesses that now have A files as well.

15             So -- and I will continue to work with counsel and

16   ICE to make sure that that happens expediently.  I believe

17   that's taken care of.

18             There was also a discussion for information

19   regarding benefits or potential benefits that the witnesses

20   are receiving.  We are compiling a list of that.  And

21   previous reports also will note money was provided for

22   transportation and money was -- you know, meals were

23   purchased.

24             So -- but we will -- again, some of that has been

25   provided, and additional information will be coming to the

10:27:42    1    defense regarding that.

2              And to the extent we have other things that are

3    being provided, whether it's backpacks while the victims are

4    here, something -- supplies, we will note that and get that

5    to the defense as well.

6              There was also a question regarding payments to

7    Apple.  The government's previously provided the defense

8    with the payments that were made by the FBI to a CHS.  I

9    know the defense has that.  We'll confirm that there was

10    nothing else separately going to Apple, but I believe that

11    one is addressed.

12             And we should be shortly receiving additional

13    notes, which the government will provide and discuss that

14    with the defense in terms of what is being provided and

15    what's not being provided so that if they have any issues

16    with that they can raise that with the court.

17             And, again, additional discovery is going over.

18    However, most of it is either something that has very

19    recently happened or, you know, we just got a batch of

20    transcripts which they had a previous version of -- excuse

21    me -- and this is just, you know, a new and improved

22    version.

23             So we do continue to work with the defense on

24    discovery.

25             I don't think there are any outstanding issues

10:28:56  1  that need to be addressed.  However -- and it's been a very

2  professional working relationship regarding that, but there

3  have been a lot of letters and discussions that we have had.

4        So to the extent that the defense feels like there

5  is anything which they believe they are missing or that they

6  have asked for and haven't received, we would welcome that

7  so that we can resolve that one way or another before we hit

8  Monday.

9        MR. WEINERMAN:  Well, Judge, something that did

10  come up very recently, yesterday, and I made a request to

11  counsel, and that is -- let me just give you a little

12  background.

13        BT XXXXXXX is minor No. 1, and he has been in the

14  United States since 2013.  He was communicating with

15  Mr. Johnson after -- well, before Mr. Johnson was arrested

16  and then for probably six months after he was arrested when

17  Mr. Johnson was awaiting trial in Cambodia.  And he was --

18  BT XXXXXXX was communicating with Mr. Johnson on a Facebook

19  account, which I believe is entitled BT XXXXXXX, right?

20        MS. MOSS:  Yes.

21        MR. WEINTRAUB:  And then suddenly in June of 2014,

22  I think he shut down that account and went into a new

23  account called BT'S FACEBOOKX, I believe.

24        And we believe there has been a lot of

25  communication between BT XXXXXXX and the other witnesses in

10:30:15  1    the case relating possibly to benefits that BT XXXXXXX has

2    received, and witnesses who are going to testify for the

3    government might have been either counseled or suggested

4    that they try to obtain such similar benefits in exchange

5    for their testimony.

6             The government doesn't have the BT'S FACEBOOKX

7    Facebook account.  They have given us the BT XXXXXXX

8    Facebook account, but that closed down, I believe in June of

9    2014.

10            So we think that any communications between BT

11   XXXXXXX and the other Cambodian witnesses, victims named and

12   unnamed, is potentially relevant on the issue of benefits

13   and such.  So we would like to find a way to be able to get

14   that.

15            I can think of a couple ways.  There's certain

16   limits on our ability to subpoena victims.  We have to get a

17   court order, I believe.

18            So what we would like to do is for the government

19   to accept a subpoena for BT XXXXXXX for that account or,

20   better yet, I think -- although that would be the fastest

21   way because BT XXXXXXX could, I think, work with Facebook

22   and get that to us or allow us to subpoena Facebook.

23            And we would limit the subpoena to just chats

24   between BT XXXXXXX and the named victims or the unnamed

25   victims who are the government's other act witnesses.  So we

10:31:43   1   would limit it.  We are not interested in intruding on his

           2   privacy, but we would limit it to that and, I suppose, the

           3   other government witnesses, the so-called church witnesses

           4   who communicated quite heavily with BT XXXXXXX in that

           5   period of December 2013 to June 2014 about BT XXXXXXX's

           6   attempt to get a visa, extend visas, be able to stay in the

           7   United States.  So we think that's all very relevant, and we

           8   would like to be able to get those chats from his BT'S

           9   FACEBOOKX Facebook account.

          10        So we are willing to do it the fastest way, the

          11   easiest way, and the best way.  But we think we should be

          12   able to get that information.

          13        MR. SWEET:  Your Honor, the government would like

          14   Mr. Johnson's Facebook communications with his brother or

          15   e-mail communications with his brother that we don't have,

          16   and those would also be very relevant.  But absent doing a

          17   search warrant for them, we can't get them.

          18        And so we asked BT XXXXXXX, back in the beginning,

          19   for his Facebook messages.  He gave us his Facebook account,

          20   and we provided that to the defense, both his communications

          21   with Mr. Johnson, and I think we pretty much just took his

          22   account, dumped it, and provided that to the defense.

          23        He is a victim.  They don't have a right to just

          24   subpoena any information they want from a victim.  If there

          25   are public postings by BT XXXXX, they are obviously welcome

10:33:09   1   to see those, or if people on the other end want to show

2   them those, that's fine as well.

3           And they can certainly ask BT XXXXX any questions

4   they want when he testifies as to benefits he's receiving or

5   other related information.  But to just subpoena a witness

6   for his private Facebook account is something that we can't

7   just subpoena.  I mean, we don't get Facebook through a

8   subpoena.  We get it through a search warrant.  So we

9   strongly oppose that, Your Honor.

10          THE COURT:  Is there anything -- is there anything

11  preventing the defense legally from serving him with a

12  subpoena duces tecum to bring in a copy of his Facebook

13  account?

14          MR. SINHA:  Let me have a look.

15          MR. SWEET:  Could we have just a moment on that,

16  Your Honor?

17          THE COURT:  Yes.

18          MR. SINHA:  So just off the bat, Your Honor, I

19  think there's a couple things.  I am sorry.

20          MR. WEINERMAN:  Nothing.  I am sorry.

21          MR. SINHA:  Off the bat, I think there's a couple

22  things.

23          There's special protections within Rule 17 about

24  subpoenaing records from child victims, and those are

25  incorporating the victims' rights codified in 31 -- 3771.

10:34:27

1       So I think that Congress has acted to kind of
2   preclude this type of thing.  The court would have to find a
3   special -- I think have to make a special order.

4       Also, you know, there's a lot of Rule 17
5   litigation, I think we have had some in this case, that the
6   government has kind of been on the sidelines for about using
7   subpoenas for a discovery device and using it to obtain
8   discovery, which is pretty much what this would be.  I mean,
9   they are using a subpoena to obtain materials that they want
10  to review in anticipation of trial.

11      So I think that they would be precluded both under
12  Rule 17 and under the Victims' Rights Act, 3771.  And the
13  Victims' Rights Act embodies the notion of preserving the
14  dignity and privacy of victims.  And so subpoenaing the
15  personal Facebook records of the victims seems to me to run
16  counter to that.

17      So I suspect that their -- I mean, we've -- given
18  a little bit of time, I think we could probably lay it out
19  better, but I think those are the two things that are going
20  to be in tension with their request.

21                  *(Reporter interrupted.)*

22      MR. SINHA:  That will be in tension with their
23  request.

24      MR. WEINERMAN:  So, Judge, there's just a couple
25  of things.  And I don't have the statute or the rule in

10:35:33  1  front of me, so I may be wrong in what I am saying.

2       BT XXXXXXX is an adult now.  He's -- I believe

3  he's 18, and he may even be older.  So I am not sure if he's

4  considered a child for purposes of Rule 17 or the other

5  provision, I think it's 3509.  And, again, I may be wrong

6  about that, but I remember reading 3509, and it defined

7  victims in terms of someone who is 18 -- under the age of

8  18, I believe.  I don't think that statute would protect

9  him.

10      As far as Rule 17, I think we just brought it up

11  here, so let me just read it to myself.

12      So, yes, counsel is correct.  Rule 17(c)(3)

13  requires us to get the court's permission if we were to

14  subpoena the Facebook account ourselves and, I suspect, if

15  we were to serve a subpoena on BT XXXXX through the

16  government for a Facebook account.

17      Let me just step back and say we have thousands of

18  pages of chats.  The chats were unbelievable in length

19  between BT XXXXXXX and other witnesses in this case, in

20  which the subject of visas and extending visas came up, and

21  potential benefits for being a witness for the government or

22  cooperating in the investigation.  That went on, again, from

23  December 2013 to June of 2014.

24      So this is not a fishing expedition.  There were

25  many, many chats between BT XXXXXXX and the people from the

10:37:28   1    church who were going to testify; four, five, six of them;

2    between BT XXXXXXX and other victims; in particular, SO

3    XXXXXXX, PE XXXXXXXXXXXXX, and others.

4              So just the extent of those and the thought that

5    they did not continue, particularly as trial was

6    approaching, and that witnesses were talking to each other

7    about the benefits that are provided under the United States

8    law to being able to obtain legal status in the United

9    States if you cooperated with the government in a child sex

10   abuse case, you know, we believe that if the pattern that

11   was demonstrated in the earlier chats which we have, it had

12   to continue.

13             It's not going out on a limb.  It's not a fishing

14   expedition to believe that that continued past June 2014,

15   maybe up to -- up to this very moment that, you know, the

16   kids communicate on Facebook on a daily basis, some on an

17   hourly basis.

18             So we believe that if that is happening, and we

19   think it is, and the pattern would suggest from the past

20   that it is going on, that we should be able to have those to

21   be able to question the witnesses about the benefits that

22   they either intend to obtain, apply for, or what their

23   expectation is in terms of benefits for testifying for the

24   government in this case.

25             MR. SINHA:  Can I respond, Your Honor?

10:39:00    1            THE COURT:  Yes.

2            MR. SINHA:  Sure.  So just as a starting point,

3    Your Honor, it seems to me that Rule 17(h), which precludes

4    a party from subpoenaing a statement of a witness or a

5    prospective witness pretty much explicitly precludes the

6    issuance of a subpoena under here because I think, as

7    Mr. Weinerman has described it, the thing that they are

8    seeking is exactly that is statements of the witnesses and

9    statements of prospective witnesses.  And Rule 17 isn't to

10   be used for that.

11           THE COURT:  What does (h) mean?  I took that to

12   mean that you are trying to subpoena an actual -- you are

13   trying to force the witness to give an actual statement.

14           MR. SINHA:  As opposed --

15           THE COURT:  As opposed to provide a statement,

16   which --

17           MR. SINHA:  Well, Your Honor, it seems to me that

18   the reference to 26.2 -- 26.2, which off the top of my head

19   I think is a reference to the *Jencks* Act prohibition, you

20   know, the *Jencks* Act -- so, you know, the second sentence,

21   Rule 26.2 governs the production of the statement, it seems

22   to me the reference to the *Jencks* Act here, which deals with

23   written statements, would perhaps say that it may be broader

24   than that.

25           You know, so it seems to me the mechanism through

10:40:19

1  which these statements are obtained by defense counsel is

2  that if they are in the government's possession, they are

3  obtained under the *Jencks* Act, including 26.2.

4       Here, the statements are not within the

5  government's possession, and, for a variety of reasons, we

6  don't believe that a Rule 17 subpoena to subpoena them from

7  the victim directly is appropriate, both because of the

8  language of Rule 17 and because of the right embodied in 18

9  U.S.C. 3771(a)(8), which counsels that the victims be

10  treated with fairness and respect for their dignity and

11  privacy.

12       And I will note that that prohibition and in fact

13  I think the prohibition of Rule 17 isn't limited to minor

14  victims or isn't limited to victims while they are still

15  minors.

16       MR. WEINERMAN:  I guess I will say this:

17       Mr. Johnson is charged with some pretty serious

18  offenses, and he's entitled to a fair trial and he's

19  entitled to defend himself.  And there is evidence out

20  there -- I mean, it just cannot be that because the

21  government doesn't have it that we can't obtain it so that

22  he can produce evidence in his favor, compulsory process

23  clause of the Sixth Amendment.

24       So there are ways to preserve the dignity of the

25  victims.  It -- a subpoena could be issued and returned to

10:42:02    1    the court.  It would be lengthy material.  I am not going

2    to -- you know, two, three years, four years of chats, that

3    would be significant.  But we really just realized yesterday

4    that this -- this account was closed, the first account, and

5    then the second account opened.

6         And it just seems to me that the benefits that a

7    witness is seeking or expecting or obtaining as a result of

8    testifying in a case, that that motive, that interest, that

9    bias needs to be brought out if Mr. Johnson is going to have

10   a fair trial and we believe there's evidence out there that

11   would prove that that is what the witnesses in this case

12   want and are seeking and expecting.

13        And there has to be a way for the defense to get

14   that information even if the court has to intervene and the

15   court has to look at it in -- before to make sure it is

16   relevant.

17        But this is not a fishing expedition.  That sort

18   of evidence was in the prior account, and we believe it's in

19   the new account that the witness obtained.

20        THE COURT:  All right.  So this is what I am going

21   to suggest, then, is that the defense prepare a third party

22   subpoena to Facebook for the records that you are seeking;

23   that you give notice to this particular witness, BT XXXXX?

24        MR. SINHA:  (Nodded affirmatively.)

25        THE COURT:  BT XXXXX will then have an opportunity

10:43:32  1    to move to quash before any order is granted, and, if need

2    be, the court can appoint counsel for him if -- if,

3    obviously, the U.S. Attorney is not comfortable standing in

4    that position.

5            At the same time, the U.S. Attorney's Office can

6    file a brief as to how 17(h) plays into this.  I am just not

7    convinced that (h) is so broad as to deny the defense the

8    ability to subpoena anything in which his statements have

9    been made within the context of social media.  But I

10   don't -- I don't know the history of that section or what

11   it's been applied to in the past.

12           So nothing will happen without further order of

13   the court, but we might as well get that process in place

14   where he's getting notice, you are applying for the order,

15   and we'll see what happens next by way of motion to quash.

16           MR. WEINERMAN:  So the court wants us to issue a

17   subpoena for the information we will be talking about --

18           THE COURT:  Well, I think you are issuing a motion

19   for the court to allow you to issue a subpoena.

20           MR. WEINERMAN:  Okay.  So the court wants a

21   motion.

22           THE COURT:  And then that motion has to be served

23   on BT XXXXX so that he has notice under Rule 17 so that he

24   can object.

25           MR. WEINERMAN:  I assume the government will

10:44:55   1   accept service on his behalf?

2           MR. SINHA:  Sure.  Sure.  Yes, we will, Your

3   Honor.

4           THE COURT:  Okay.

5           MR. SINHA:  I guess if I may just raise one

6   concern.

7           I don't -- I don't know, but I don't believe that

8   Facebook will provide content information, which is what

9   they are asking for, pursuant to a subpoena.

10          I know we have a right to subpoena them ourselves,

11  the government, under the Electronic Privacy Communications

12  Act, and they just won't give us stuff without a search

13  warrant.

14          So I am not sure if the subpoena, even if it's

15  granted, is the -- I don't know if that's the correct avenue

16  or not, but I am at least raising it so that we can look

17  into it.

18          MR. WEINERMAN:  So what I am hearing is we would

19  have to subpoena that information through BT XXXXXXX is what

20  I am hearing.  That Facebook -- it is indeed true that

21  Facebook would not honor the subpoena.

22          THE COURT:  So what I would do is prepare a motion

23  to allow for an order subpoenaing BT XXXXX to bring in these

24  records.  That will be served on him.  He will have notice.

25  He can move to quash.  The government can certainly move

10:46:18   1    under (h) to not allow the order to go through.

2              MR. SINHA:  And, Your Honor, just by

3    clarification, I suspect the government will end up standing

4    in the shoes of BT XXXXX, which we are allowed to under the

5    Victim Rights Act.

6              Is it okay if we -- we'd like, probably, to brief

7    other aspects of this as well.

8              THE COURT:  Right.

9              MR. SINHA:  Okay.

10             THE COURT:  That's what I am expecting in a motion

11   to quash.

12             MS. MAXFIELD:  Your Honor, can I ask one

13   additional with respect to content?

14             The Facebook chats that we have for BT XXXXX, he

15   has been kind of selective as to where they begin and where

16   they end, especially with respect to conversations that he's

17   had with my client.

18             We would -- we would like to add to that subpoena

19   a request that BT XXXXX produce the entire conversation

20   where he's given us partial conversations, and we can

21   identify them, but to ask him to give us what he cut off in

22   the first production.

23             MR. SWEET:  Your Honor, I think we are going to

24   object to that as strongly as we object to the other part.

25             And I will say, I mean, I don't know that there's

10:47:28

1   anything to show that he cut them off as opposed to he

2   provided us what he may have just had, and I believe it was

3   a download of his Facebook account is what we received and

4   what we provided.

5        So I don't think we can say that anything was cut

6   off.  It may not be complete just by what is saved or not

7   saved, and I think we had the same issue with Mr. Johnson's

8   potential, you know, Facebook account that we got through a

9   search warrant.  Sometimes things get deleted or -- so, but

10  I think we'll oppose all of that on the same grounds.

11       THE COURT:  The government has given you what they

12  have, right?  And if you want to, again, move for an order

13  that he produce more, I can't prevent you from moving for

14  that.  We'll have to take it up once he's served and make a

15  determination.

16       But I think we may want to at least ask him first

17  if there was more content that he did not disclose involving

18  those conversations.

19       All right.  Anything else for the government?

20       MR. SWEET:  Nothing.

21       MR. SINHA:  Nothing, Your Honor.

22       THE COURT:  Okay.  Any questions at all about

23  Friday?

24       And the idea is we will all be here, including

25  Mr. Johnson, in street clothes when all the jurors come up.

10:48:47   1   We'll do general introductions, kind of tell them a little

2   bit about the case, the timing, what the expectations are.

3            And then, you know, what I will probably do is --

4   Char.  Char, do we have a witness list?

5                 THE CLERK:  Pardon me?

6                 THE COURT:  Do we have a witness list?

7                 THE CLERK:  They filed witness lists.

8                 THE COURT:  Okay.  I may just ask, rather than me

9   struggle through the names of all the victims or all the

10  witnesses, ask each side if they would read out the names of

11  any potential witness.  The more important ones are if there

12  is anybody here locally, I think, so the jury could hear

13  those names.

14            And then I will ask the defense if there's any

15  additional witnesses they might be calling.  But then

16  everybody is going to go back down to the jury assembly

17  room, fill out the questionnaires, their picture will be

18  taken, put on the questionnaires so we can remember them a

19  little better, and then my staff will make copies for each

20  side to pick up on Friday afternoon.

21            I expect Monday the only thing we will be doing is

22  picking a jury.

23                 MR. SWEET:  Your Honor, in terms of exhibits, I

24  know that Your Honor said that there was something in this

25  courtroom at noon.

10:50:14    1       Would there be time after they leave and go down

2   to do the jury questionnaires to discuss that?

3       THE COURT:  Right after that there will be a group

4   of students doing a mock trial in here.  So it would be --

5       MR. SWEET:  Too close.

6       THE COURT:  -- probably after lunch.

7       Also, earlier I had asked if we could take the

8   Monday after Mother's Day off.  It turns out my mom doesn't

9   want me visiting that day, so we do not have to take that

10   day off.  I expect we'll go ahead and utilize that Monday.

11       MR. WEINERMAN:  So we are back to starting the

12   defense case on May the 14th?

13       THE COURT:  Yes.

14       MR. SINHA:  Your Honor, about that, may I ask, if

15   the government's case is going quickly and we feel like

16   there's going to be a gap between the government's case and

17   the defense case, just in terms of scheduling our witnesses,

18   is it -- if we run out of witnesses on Wednesday but we

19   think there's going to be adequate time before the defense

20   case starts on the 14th, can we ask the court to end early

21   or something like that?

22       THE COURT:  I am pretty flexible on that.

23       MR. SINHA:  Okay.

24       THE COURT:  I mean, I don't want to waste a whole

25   afternoon, but if we have to end early because of

10:51:21  1   scheduling, we can do that.

2              MR. SINHA:  And one other question.

3              The court said that we would appear with

4   Mr. Johnson in street clothes on Friday.  Will all of us be

5   in street clothes or will just Mr. Johnson be in street

6   clothes?

7              THE COURT:  I am not sure if I --

8              MR. SINHA:  Do you want this to be informal for

9   the jury questionnaire or --

10             THE COURT:  Oh, yeah.  I mean, I just don't want

11  him in his prison clothes.

12             MR. SINHA:  Okay.

13             MR. WEINERMAN:  If he wants to wear casual

14  clothes, we won't object.

15             MR. SINHA:  All right.

16             THE COURT:  All right.  Anything else?

17             MR. SWEET:  No, Your Honor.

18             MR. WEINERMAN:  No, Judge.  Thanks.

19             THE COURT:  We'll see everybody on Friday.

20             THE CLERK:  Judge.

21             THE COURT:  Yeah.

22             THE CLERK:  Are we going to have voir dire

23  reported?

24             THE COURT:  Do either sides want to have voir dire

25  recorded?

10:52:07   1          MR. SWEET:  Yes, Your Honor.

        2          THE COURT:  All right.  Yes.

        3          MR. ALLNATT:  Then the preliminary jury

        4  instructions were e-mailed out yesterday.

        5          MR. WEINERMAN:  I am sorry.  I just learned that,

        6  and I should have recalled this, that we are only authorized

        7  to pay for testimony, I think, arguments, opening statement

        8  but not voir dire, and we have an agreement here we have

        9  taken some time to hammer out where the parties are sharing

       10  the costs, so we can't agree to the voir dire.  I am not

       11  authorized to pay for the voir dire.

       12          Yes.

       13              (The reporter commented.)

       14          MR. WEINERMAN:  So we are not transcribing.  So

       15  there's no additional cost if you are recording it?

       16              (Reporter nodded affirmatively.)

       17          MR. WEINERMAN:  Then I am fine with that, Judge.

       18          THE COURT:  If there's anymore logistical

       19  questions, just please e-mail as a group to me and I will

       20  get back to you.

       21          And if you need any technical assistance before

       22  trial starts, how to use the monitor, the computer hookup,

       23  Ms. Pew can walk you through all that.

       24          THE CLERK:  What time Friday, Judge, do you want

       25  to meet here?

10:53:32  1            THE COURT:  9:00?

          2            THE CLERK:  I mean after in the afternoon.

          3            THE COURT:  Probably 1:30.

          4            THE CLERK:  1:30.  Okay.

          5            MR. WEINERMAN:  Can I ask, and I would -- this

          6    question is for Ms. Anderson, but she shouldn't be talking.

          7    She should be reporting.  Could we find out when the

          8    transcript of today's proceedings are going to be available?

          9                 (The reporter commented.)

         10            MS. MAXFIELD:  Give me the cost estimate.  I think

         11    we probably need to do this through CJA.

         12            MR. WEINERMAN:  You can just send it to me and I

         13    will get it to Ms. Maxfield.  So either way.

         14            Thank you.

         15            THE COURT:  All right.  We can go off the record.

         16            *(The proceedings were concluded this*

         17            *24th day of April, 2018.)*

         18

         19

         20

         21

         22

         23

         24

         25

10:54:21    1              I hereby certify that the foregoing is a true and

2       correct transcript of the oral proceedings had in the

3       above-entitled matter, to the best of my skill and ability,

4       dated this 25th day of April, 2018.

5

6       /s/Kristi L. Anderson
        _____
7       Kristi L. Anderson, Certified Realtime Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25