1                 UNITED STATES DISTRICT COURT

2                      DISTRICT OF OREGON

3          THE HON. MICHAEL J. McSHANE, JUDGE PRESIDING

4


5     UNITED STATES OF AMERICA,         )
6                         Government,   )
7                                       )
              vs.                       )    No. 6:14-cv-00482-MC-1
8                                       )
      DANIEL STEPHEN JOHNSON,           )
9                                       )
                         Defendant.     )
10    _____)

11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                     EUGENE, OREGON

16                 WEDNESDAY, MAY 9, 2018

17                    PAGES 892 - 982

18

19

20

21               Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
                 Official Federal Reporter
22               United States Courthouse
                 1000 SW 3rd Avenue, Room 301
23               Portland, Oregon 97204
                 (503) 326-8191
24               jill_jessup@ord.uscourts.gov

25

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE GOVERNMENT:

 3   Jeffrey S. Sweet
     United States Attorney's Office
 4   405 E. Eighth Avenue, Suite 2400
     Eugene, OR 97401
 5   541-465-6771
     Fax: 541-465-6917
 6   Email: jeff.sweet@usdoj.gov

 7   Lauren E. Britsch
     U.S. Department of Justice
 8   Criminal Division
     1400 New York Ave NW, 6th Floor
 9   Washington, DC 20530
     202-514-2220
10   Fax: 202-514-1793
     Email: lauren.britsch@usdoj.gov
11
     Ravi Sinha
12   United States Attorney's Office
     1000 SW Third Ave, Suite 600
13   Portland, OR 97204
     503-727-1014
14   Fax: 503-727-1117
     Email: ravi.sinha@usdoj.gov
15
     FOR THE DEFENDANT:
16
     Craig E. Weinerman
17   Office of the Federal Public Defender
     859 Willamette Street, Suite 200
18   Eugene, OR 97401
     541-465-6937
19   Fax: 541-465-6975
     Email: craig_weinerman@fd.org
20
     Lisa A. Maxfield
21   Pacific Northwest Law LLP
     1255 NW Ninth Avenue, No. 11
22   Portland, OR 97209
     (503) 222-2661
23   Fax: (503) 222-2864
     Email: lamaxfield@pacificnwlaw.com
24

25
```

1                          GENERAL INDEX

2    CHHOEURN SOPHEAK

3      (Through an interpreter)

4    Cross-Examination by Ms. Maxfield              912

5    Redirect Examination by Mr. Sweet             933

6    FORREST SCHOENING

7    Direct Examination by Mr. Sweet               941

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    TRANSCRIPT OF PROCEEDINGS

2                         (May 9, 2018)

3   (In open court; outside the presence of the jury:)

4              THE COURT:  All right.  Let's go on the record.  We

5   have some preliminary evidentiary matters to discuss.  I have

6   reviewed the government's motion to admit statements of

7   Gary Johnson pursuant to FRE 801(d)(2)(e).

8        Does The defense wish to be heard?

9              MR. WEINERMAN:  Yes, Judge.  We apologize for not

10  submitting something in writing, but it was a late filing.

11       So, Judge, our understanding -- and I just shared with

12  Counsel a case which maybe the Court should be familiar with.

13  Some of my arguments would be based on this case of United

14  States v. Ermoian, E-r-m-o-i-a-n, 752 F.3d at -- well, at 1165.

15  It's a case -- let me back up.

16       Our -- our belief is that for this -- for a chat or an

17  email between GaryDonna and somebody else, in which Mr. Johnson

18  is not a party to, is only admissible if the government can

19  show by preponderance of the evidence that there was -- that

20  the elements of the underlying offense, which seems to be

21  witness tampering, 18 U.S.C. 512, had been established.

22       So the first issue is is this an official proceeding?  And

23  when GaryDonna is having these chats with various people, other

24  than Daniel Johnson, they occurred at various times.  And I

25  think you have to look at what they were talking about and
```

1    when.  There were three proceedings going on.  There was a

2    Cambodian prosecution that was going on from on or about

3    January 2014.  The Court knows the result of that.  That was --

4    the trial verdict was entered in June of 2014 and then there

5    was an appeal, so there was still litigation going on and

6    attempts to deal with that.  We feel that a Cambodian

7    prosecution is not an official proceeding under United States

8    law.  The definition of "official proceeding" is set out in the

9    statute.  It's cited in the case cite I just mention to the

10    Court.  The *Ermoian* case.  I believe it's at

11    18 U.S.C. 1515(a)(1).  It lists a number of different

12    activities that constitute official proceedings.  And all of

13    them are proceedings before a tribunal, a court, an agency.  It

14    does not include investigations.

15        So I think the first thing the Court has to do is

16    separate.  Cambodian prosecution was not an official proceeding

17    under federal law.  Second, there's talk about what was going

18    on in Lincoln County.  The case that was pending there and

19    attempts to deal with that case is also not an official

20    proceeding under federal law.  It has to be -- there has to be

21    a nexus to a federal proceeding, not a state proceeding, not a

22    foreign proceeding.  So it is our belief that any chats that

23    dealt with attempts to deal with the Lincoln County case are

24    not admissible as well.  It has to be an official proceeding.

25        As the Court knows, the Lincoln County proceedings started

1   in August of 2013 and continue to this day.

2       The only proceeding that the Court, in our view, can allow

3   this co-conspirator chatting to come in is attempts to tamper,

4   influence, what have you, a federal proceeding, which this case

5   obviously is.  We have to concede that.  That did not start

6   until the indictment was returned in late August of 2014.

7       So I think the Court has to separate the three

8   proceedings, and the only chats that can conceivably come in

9   are ones that the government can establish by a preponderance

10  of the evidence all the elements of the offense by a

11  preponderance.  And that would only be as to the federal

12  proceeding, not to the Lincoln County proceeding or the

13  Cambodian proceeding.

14      And then the second point we would like to make is, as the

15  Court probably knows, the GaryDonna Facebook account covers

16  both Gary Johnson and Donna Johnson, neither of whom are going

17  to testify.  So it seems, to me, the government has -- the

18  government seems to be contending that there was a conspiracy

19  involving Gary Johnson and Daniel Johnson.

20      The government, in our view, would have to show that the

21  email originated from Gary Johnson, and we would acknowledge

22  that if it's clear that Gary Johnson is just forwarding Daniel

23  Johnson chatter information, that's one thing; but when that is

24  not the case, the government would have to make some showing,

25  we would contend, by a preponderance of the evidence, that it

1    was Gary Johnson involved in the chat and not Donna Johnson.

2         So for all those reasons, we think the Court has to take a

3    closer look at that.

4         And then the last thing is we believe that not all the

5    chats completely would fall into any exception that the Court

6    might find and that at some point 403 would have to come into

7    play.  The Federal Rules of Evidence.

8         Now, I'll just give one example.  There was a chat -- and

9    I can give the Court the specific information.  Chats cover a

10   number of different topics.  And even if the Court were to find

11   that it's admissible to show an attempt to influence a federal

12   proceeding, the chat also discusses the pending Lincoln County

13   case, and it mentions the detective.  And it seems to me that

14   that should be redacted.

15        Now, if the government is willing to agree with us on

16   that, we could work with them to redact.

17             THE COURT:  I'm not going to let any of the

18   Lincoln County stuff come in, so let's just make it clear on

19   that.  I don't want to go down that path.  I don't know how --

20   I'm assuming the government, although it may be in one of the

21   chats, is willing to redact those kinds of statements.

22             MS. POTTER:  Yes, Your Honor.  And just for the

23   record --

24             MR. WEINERMAN:  I'm done.  I can sit down.

25             MS. POTTER:  Oh, Amy Potter on behalf of the United

States.  I want to apologize to the Court because when I filed

this motion I did not realize that the exhibits were already --

Exhibit A is actually three exhibits on the exhibit list.  It's

169, 170, and 171.  I have been told by Counsel that they

already redacted the reference to Mr. Harrison.  So they do

intend that, and there's no intent to offer any of the

Lincoln County -- I simply had a different, frankly, version of

the chats that I was working from, and I apologize to the Court

for that.

In terms of Counsel's arguments, I actually think it

misstates law.  We don't -- we do not need to prove that it was

an intent to influence in the context of a federal proceeding.

We just need to prove a joint venture to do something, and it

doesn't even have to be illegal.  And here we have a joint

venture to influence witnesses.

And I think the cases are pretty clear on that.  I think

the *Layton* case, which is a case involving the Jonestown

massacre, involves a conspiracy to prevent the FBI from knowing

the conditions at the location -- or not the FBI -- I'm

sorry -- the House of Representatives from knowing the

conditions that the members of that group were living in.  So

that's nothing illegal to try and prevent them from doing that,

but they had all agreed, and so statements that were made --

again, nothing illegal -- were co-conspirator statements.

In terms of the requirement -- and that's also confirmed

1    by the Fifth Circuit case *El-Mezain*, which involves statements

2    made before Hamas was declared a terrorist organization, so it

3    could not be part of the conspiracy or part of any terrorist

4    acts.  But they were admitted, even though they were not

5    illegal at the time.

6         And I think in terms of distinguishing Donna versus Gary,

7    I actually think the *Lloyd* case is instructive on that, in

8    which they allowed the admission of statements made by someone

9    who was not even part of the conspiracy that simply went to the

10   overall conspiracy at issue there, which was a telemarketing

11   scheme.  So I don't think there's any requirement to prove.  In

12   fact, in the Fifth Circuit case, they allowed anonymous

13   statements.  So they had no idea who had made the statements

14   that were related to Hamas.  But they left them in anyway

15   because overall it showed a joint venture to promote this

16   activity and this information.

17        So I think all we have to prove is a preponderance of the

18   evidence to influence -- frankly, I don't even know that we

19   need to show influence of a witness, but a joint venture to get

20   Daniel's message to victims, whether he intended to influence

21   them or not, and I think that the evidence is pretty clear here

22   that we've done that.

23        So I don't think the issue of whether it's the Cambodian

24   proceeding, the Lincoln County proceeding, or this specific

25   proceeding is relevant for purposes of this analysis.

1          THE COURT:  Okay.  Well, I don't mean to tell the

2    government how to do your job.  I assume you've talked to your

3    appellate attorneys.  I mean, sometimes you get what you ask

4    for, and, of course, that builds a record that down the road

5    could -- you know, could cause some difficulties.  You know, I

6    personally think it's not a close call.  I just wonder if we

7    need to make it, given the evidence thus far in the case.

8        That being said, I think it's clear from the record that

9    Mr. Gary Johnson and Mr. Daniel Johnson had conspired to tamper

10   with witnesses.  To the extent that any of the statements are

11   being offered for the truth of the matter asserted, which

12   almost none of these statements are -- I'll talk about that in

13   a minute -- they are admissible as nonhearsay under

14   801(d)(2)(E).  Statements of Co-conspirators.

15       It's also clear that Mr. Gary Johnson is acting under the

16   direction of Daniel Johnson; in fact, it's very hard at times

17   to know, reading the Facebook messages, whether it's

18   Daniel Johnson and not Gary Johnson who's actually speaking.

19   So it is an opposing party's statement in aid in a

20   representational capacity through an agent.

21       And to the extent that the statements are being made to

22   prove the truth of the matter asserted, they could still come

23   in under 801(d)(2)(D).

24       But the reality is none of it is really classic

25   co-conspirator statements.  They're not statements being made

1    offered for the truth.  It's not like one co-conspirator is

2    going to the store and saying, "I need three horses and three

3    guns.  We're robbing the three o'clock train to Santa Fe."  I

4    mean, these statements are not made really to prove the truth

5    of the matter asserted in that context.  They're really

6    nonhearsay statements.  The statements are things like, you

7    know, "Let them know I'm praying for you.  Let them know I love

8    you.  Tell them to hush," you know, "Send money to" -- so and

9    so.  These statements aren't being offered for the truth.

10   They're simply being offered to show, I think, the pressure

11   that's being put on the children in terms of how they should

12   testify.

13        I mean, I think it has to be put in the context of the

14   defense in this case, which is every one of these children are

15   liars.  They've been manipulated by the police.  They've been

16   manipulated by APLE.  They've been manipulated by other

17   organizations.  Perhaps manipulated by lawyers.  They convinced

18   each other that they should lie so that that they can stay in

19   the United States and get visas, and it would simply be -- I

20   think it would be unfair not to present the entire picture of

21   the pressure that these children had been under by everybody,

22   the greatest of which is, quite frankly, Gary Johnson and

23   Daniel Johnson through these Facebook messages.

24        You know, what the defense wants to argue is the victims

25   have made inconsistent statements.  They have at times made

themselves unavailable for testimony because in the past they
would have denied the abuse, but the problem is that the
inconsistency and their hesitancy to testify is equally
explained by the pressure put on them by the two Johnson
brothers.

Also, it just seems to me this is no different than
fleeing from the police.  It's evidence of consciousness of
guilt.  If you're contacting consistently the victims who have
all testified they have been contacted.  They visited, of all
people, the very person who abused them in prison, there is an
ongoing narrative here of attempts to continue to manipulate
children, and it does evince, in my mind, clearly a
consciousness of guilt.

So I think it comes in certainly under the co-conspirator
nonhearsay rules, the agency rules, but I think more
significantly these are nonhearsay statements because they're
not being offered to prove the truth of the matter asserted but
to show the manipulation, the pressure that's been put on the
children to make themselves unavailable to change their
stories.

So in that context, it's simply admissible.  It's
nonhearsay.  So I'll allow it in.  Obviously, the government
has to establish through some witness how the exhibits were
seized and who they belong to and how they found them; but with
that foundation, it would be admissible.

1          MS. POTTER:  Thank you, Your Honor.  And so that's

2     169, 170, and 171.  It's my understanding the government also

3     has a new exhibit to offer.  305.  And so, Your Honor, if I

4     could present this to the Court.

5          THE COURT:  Yes.

6          MS. POTTER:  I believe, Your Honor, that that would

7     fall under this same theory and actually Mr. Angel has pulled

8     it up on the screen.  It's yet another message.  This one to

9     SO XXX.

10          THE COURT:  Looks like it's pretty clear.  It would

11    come -- consistent with the earlier ruling, it would come in.

12    That's 305.  Sorry.  I'm losing my voice again.

13       All right.  Anything else we need to talk about?

14          MR. WEINERMAN:  I think we need to talk about whether

15    anything about the lawsuit is admissible.  I don't know if this

16    is the time the Court wants to hear, but -- I know a little bit

17    of where the government might be going on this, but we believe

18    that the fact of the lawsuit and anything in it is just not

19    relevant to the proceedings here.  It's extremely prejudicial.

20    It opens up another whole Pandora's box in this case that will

21    need to be discussed.  The government doesn't need it, but, you

22    know, that's their call whether they want to inject that into

23    the proceedings, but it just seems to me that this is something

24    the Court should exercise its discretion and not allow to be

25    discussed.

1          THE COURT:  A couple of things on that case, which is

2    Daniel Stephen Johnson, Plaintiff, v. multiple defendants

3    beginning with the City of Toledo, Oregon.  It's Case

4    18-cv-738.  It is a case that looks -- you know, sometimes -- I

5    know this is hard to believe for people, but it was randomly

6    assigned to me, and I'll certainly take it under consideration

7    whether I should rule upon it.

8         You know, in looking at these cases, these pro se prison

9    litigation cases, I mean, typically these are subject to

10   sua sponte dismissal.  There's a number of issues, including

11   personal jurisdiction.  Immunity, the Heck doctrine, statute of

12   limitations, you know, the list goes on as to why this case

13   probably is not going to survive for much longer, whether it's

14   myself or another judge that enters a dismissal order.  That

15   doesn't save the fact that it's statements by Mr. Johnson.

16        We don't have to get into great detail about it now, but I

17   guess I would like some direction from the government on which

18   specific statements out of the complaint that you are hoping to

19   introduce.  Is this something you're just thinking about?  Is

20   it a place you really want to go?

21          MR. SINHA:  So, Your Honor, I think at this point we

22   would like a -- we're hoping to step very lightly with regards

23   to this lawsuit.  So I think the things we're interested in are

24   the sworn-in statements from Mr. Johnson.  Which he signed the

25   lawsuit under penalty of perjury that he is an Oregon resident

1    and that he's a citizen of the United States.  The residency,

2    obviously, is important to our venue under 18 U.S.C. 3238.  And

3    the citizenship is important to Counts 1 through 6.  Even

4    though we have a stipulation, we would just like to highlight

5    that.

6        The other thing --

7            MR. WEINERMAN:  Judge, could I -- sorry to interrupt

8    Counsel, but that is certainly is something that not only has

9    the evidence proven, but we're not contesting it.  And if it

10   makes a difference to the Court, we would be willing to

11   stipulate that he's a U.S. citizen and has been or was a

12   resident of Oregon.  So I don't think they need the lawsuit to

13   prove this.  I think there's ample evidence in the record that

14   that has been established.

15           THE COURT:  I agree with the defense.  If we can go

16   forward with the stipulation, that would be part of the

17   instructions.  So, I mean, the jury would be instructed to the

18   fact that Mr. Johnson is an Oregon resident and he's a citizen

19   of the United States.  If we can't agree on a stipulation,

20   we'll enter his statements.

21           MR. SINHA:  That makes sense.

22       Your Honor, I guess the only other thing that we had an

23   interest in, with regards to the lawsuit, is just the fact that

24   a lawsuit was filed.  And that's in light of the message

25   that -- it's Exhibit 305 where basically GaryDonna -- the user

1  of the GaryDonna account is telling SO XXX "Daniel is going to

2  sue the FBI."  Basically, "If you cooperate, we'll get some

3  money, and we'll share that money with you."

4      The fact that Daniel then did sue the FBI seems, to me,

5  significant with regards to that message.

6      So even if it was just testimony of an agent saying a

7  lawsuit has been --

8          THE COURT:  But you're not offering the statement for

9  the truth.  So you don't have to prove that he, in fact,

10  intended to or did, in fact, sue the FBI.  The reason you're

11  offering that is its impact on the particular victim, and, in

12  fact, he's trying to bribe them, it sounds like.  That, in and

13  of itself, is admissible, whether it's true or not and whether

14  he followed through or not.  And certainly then we get into

15  would he ever really get any money out of this particular

16  lawsuit, and even I would have to say at this stage he may get

17  an opportunity to replead or amend the lawsuit, but there's

18  just too many deficiencies in this particular suit.  And I did

19  spend some time last night with our pro se law clerk who's been

20  working on this with me, and my -- my only hesitancy in --

21  in -- in following through with my normal course of practice,

22  which would be to dismiss the case with leave to amend, is that

23  I -- I think it may make more sense, and I think Mr. Johnson

24  would feel that he's getting a fairer break if the judge who is

25  hearing his criminal case isn't the one who's dismissing his

1    civil case.

2         So I'll probably recuse, Mr. Johnson, on your civil case.

3    And I assume your case will then be transferred, I'm assuming,

4    to Judge Aiken, who would then review the case.

5              MR. SINHA:  Thank you.

6              THE COURT:  But, I mean, when I say there's

7    deficiencies, I mean, there's -- I mean, as plead, I just don't

8    see the case going anywhere, and I don't want to have to get

9    into those issues, too, of whether the lawsuit would have

10   resulted, then, in money that could have theoretically gone to

11   Mr. Johnson that he could have then paid off the victims.  So I

12   will not allow the fact of the lawsuit into evidence at this

13   time.

14             MR. SINHA:  Thank you, Your Honor.

15             THE COURT:  Okay.  Thank you.

16        Anything else we need to discuss?

17             MR. SINHA:  I think we have one last thing that

18   Mr. Johnson's counsel would like to raise.

19        Since we're not asking the Court to seal the hearing, but

20   since it's a sensitive personnel issue, I'm just asking for the

21   people with me from the government to at least step out, unless

22   it's -- if you would give us just a moment to get our people

23   out.

24             THE COURT:  Yes.

25                  (Pause-in-proceedings.)

1          MR. SINHA:  So, Your Honor, the issue is related --

2    and I'll let Mr. Weinerman or Ms. Maxfield take the reins, but

3    it's related to an in camera submission the government made to

4    the Court, I believe in early February, regarding a performance

5    improvement plan of one of our agents.  So my recollection is

6    that we submitted a motion for the Court to review the plan

7    itself in camera.  We also, alongside of that, submitted a

8    letter that we thought outlined what would be the disclosable

9    contents of the report.

10        The Court, as I recall, issued an -- reviewed the entire

11   report, reviewed the letter, issued an order saying the letter

12   can be disclosed, but the report itself need not be disclosed;

13   so my understanding, then, is that Mr. Johnson's counsel would

14   like to revisit that order.

15          THE COURT:  Okay.

16          MR. WEINERMAN:  Judge, what we're asking is as

17   follows:  There are documents that underline this letter dated

18   February 12, 2018, from the government to the defense.  And

19   they refer to them as critical elements, CEs, which underline

20   this letter about -- I don't want to -- I don't know if this is

21   considered a censure, an admonishment, but it's some indication

22   that an unacceptable performance level of this particular FBI

23   agent.

24        So there's underlying documents that we would like to look

25   at so we can decide for ourselves whether it's information that

impeaches the credibility of the witness in some way.   I
suspect the Court has seen the documents.   The Court may
already remember what they say.   But if the Court doesn't,
we're simply asking either that we be allowed to look at the
documents or that the Court look at them in camera and make a
ruling whether it's information that would be admissible on
cross-examination to impeach either the credibility of the
agent or perhaps, more importantly, impeach his professional
abilities and would indicate that he does not reach the
professional standards that one would expect of an FBI agent,
so that is -- that's our --

THE COURT:  Would somebody direct us to the filing
number if you have it?

MR. SINHA:  Sure.  Your Honor, I think that -- here,
I'll give -- the Court's order was Document 105.

DEPUTY COURTROOM CLERK:  104.  Document 104 is the
motion, but we don't have the -- I don't have access to the in
camera --

MR. SINHA:  Your Honor, we may -- we have a copy of
the materials, and it certainly makes sense, I think, in light
of now having heard the trial testimony, for the Court to take
a look at it.  So we're happy to provide it.

THE COURT:  I'll take a look at it again, and we can
get back to that at our next break.

MR. SINHA:  Thank you.

1    MR. SWEET:  Would the Court like that now,

2    Your Honor?  It'll take us two minutes to --

3    THE COURT:  Yes.

4    MR. SWEET:  Okay.

5                    (Pause in proceedings.)

6    MR. SWEET:  Sorry, Judge.

7    THE COURT:  That's okay.  Thank you for getting that.

8    MR. SWEET:  It is not signed, but it's what we were

9    provided, Your Honor.

10    THE COURT:  Who is our next witness?

11    MR. SWEET:  Pastor Sopheak is still on the stand,

12    Your Honor.  And just so the Court knows, one of our

13    witnesses -- one of our witnesses we won't be calling, so we

14    only have the rest of Pastor Sopheak and then three other

15    witnesses.  We are still -- very much think we're very much on

16    track.

17    THE COURT:  Okay.  Let's bring the jury in.  And if

18    you can bring in Pastor Sopheak, we can get him on the stand.

19                    (Jury present.)

20    THE COURT:  Please be seated, everybody.

21    Thank you, folks, for your patience with us this morning.

22    We were working on some legal matters.  But with that, we'll

23    return now to the cross-examination of Pastor Sopheak.

24    You're still under oath in the case.

25    THE WITNESS:  Yes.

Sopheak - X

1                           CHHOEURN SOPHEAK,

2    called as a witness in behalf of the Government, being

3    previously duly sworn, is examined and testified as follows:

4

5                          CROSS-EXAMINATION

6    BY MS. MAXFIELD:

7    Q.    Good morning, Pastor Sopheak.

8    A.    Good morning.

9    Q.    How is your tooth?

10   A.    It's okay.

11   Q.    I'm Lisa Maxfield, and I'm one of Daniel Johnson's

12   lawyers.  And I just wanted to ask you a few questions.

13   A.    Yes.

14   Q.    Khmer massage is part of your country's culture, isn't it?

15   A.    That, I didn't pay attention to; yes, but in Cambodia

16   there is massage.

17   Q.    And massage is very common in your country?

18   A.    In my own town.  Not hardly.  But I didn't pay much

19   attention to that fact.

20   Q.    You testified, though, about seeing Mr. Johnson get

21   massages many, many times?

22   A.    Yes.

23   Q.    You saw the kids massage his feet?

24   A.    Yes.  Yes.  Hand and feet.

25   Q.    And you saw the kids massage his back?

Sopheak - X

1   A.    (Witness nods.)

2   Q.    You saw him get massages in chairs?

3   A.    Like I said earlier, like in a teasing manner; you know,

4   jokingly.

5   Q.    And you saw him get massages while he was lying on his

6   bed?

7            THE INTERPRETER:  Counsel, can you repeat the key

8   part?  Can you please repeat that question?

9   BY MS. MAXFIELD: (Continuing)

10  Q.    Yes.  You saw him get massages while he was lying on his

11  bed?

12  A.    Yes.

13  Q.    And you knew that he paid kids for massages?

14  A.    Like I said earlier, you know, when the kids get

15  massage -- or give massages and I see that they usually get

16  money to buy things to eat.

17  Q.    Okay.  So it wasn't a secret that Daniel Johnson got

18  massages at the center?

19  A.    What do you mean, kind of, secret or --

20  Q.    Everyone knew he got massages, didn't they?

21  A.    Yes.  Yes.  They know.  But sometimes if you don't get to

22  see it, you don't know about it.

23  Q.    I'm not saying you saw every massage.

24  A.    Yes.

25  Q.    But you saw them often and -- go ahead.

Sopheak - X

1  A.   Yes, I did see it often.  Every time I went into his room,

2  I see the kids, you know, do massage; but not -- that is not to

3  say that every time I go I see -- every time I go I see -- I

4  see every time.

5  Q.   I understand.  But the massages didn't worry you at the

6  time, did they?

7  A.   No.

8  Q.   You also said that -- I want to talk a minute about

9  Daniel Johnson's room.  His was the only air-conditioned room

10 in the center; is that right?

11 A.   Yes.

12 Q.   He had the only room that was cool?

13 A.   (Witness nods.)

14 Q.   And at least in the last house there was a projector in

15 Daniel's room?

16 A.   Yes.

17 Q.   To watch DVDs and movies?

18 A.   (Witness nods.)

19 Q.   And so you saw boys in Daniel's room many times.

20 A.   Yes.

21 Q.   And, again, that was not a secret?

22 A.   No.  I see him in the bedroom with two or three kids, two

23 or three kids, or one kid.

24 Q.   Everyone knew?

25 A.   What do you mean "everyone knew"?  What do you mean by

Sopheak - X

1    that?  What, is that a question?

2    Q.   Yeah.  It wasn't hidden?

3    A.   Most -- most of the time -- every time the kids -- like,

4    most of the time the kids would go into Daniel's room to get

5    massages, and they would come back out and they would say, "Oh,

6    I just gave Daniel a massage."  Like I said earlier, most of

7    the time when I'm there, I'm seeing it, and when I'm not there,

8    I don't know if a massage happened or not.

9    Q.   Well, you knew that sometimes kids slept in his room, too,

10   didn't you?

11   A.   With regard to the kids sleeping in his room overnight?  I

12   do not know.  But mostly in the morning time I see them in the

13   bedroom and, in summary, there is one kid that is -- was --

14   with regard to SO XXX, that I know, because I can see the

15   bedroom -- in the bedroom -- oh, he lives in the same bedroom.

16   Q.   And that didn't worry you at the time either, did it?

17   A.   No.

18   Q.   I want to show you -- is it Defense Exhibit 604 or

19   Government Exhibit 604?  Defense?  Exhibit 604, page 4.  I

20   think this is already in.

21        Are you in that picture?

22   A.   Yes.

23   Q.   Which one are you?

24   A.   (Indicating.)

25   Q.   In the blue shirt?

Sopheak - X

1   A.    Correct.  I already made a mark, but that one -- this mark

2   now.  You enlarged it.

3   Q.    Is that the entryway to the last Hope Transition Center

4   house?

5   A.    Yes.

6   Q.    On the side of where the gentlemen are standing, do you

7   see, like, a red gate?

8   A.    Yes.

9   Q.    And that's a gate that locks from the inside?

10  A.    What do you mean lock on the inside?

11  Q.    Does that gate lock?

12  A.    Yes.  That -- that gate locks, and there's another door

13  also.

14  Q.    So there's --

15  A.    And you have to --

16  Q.    Sorry.  Go ahead.

17  A.    And you have to take a lock or a key to lock it.

18  Q.    And to unlock it, you would need to be on the inside of

19  the house, not the outside?

20  A.    Yes.  That's correct.

21  Q.    I want to show you Exhibit 604, page 6.  Page 6 -- oh, 7.

22  I'm sorry.  Page 7.  Do you recognize that room?

23            MS. MAXFIELD:  Is the jury able to see these?

24            THE JURY:  Yes.

25            THE WITNESS:  Recognized.

Sopheak - X

1   BY MS. MAXFIELD: (Continuing)

2   Q.   All right.   And can you tell me who's sitting there in

3   that room?

4   A.   Heang.

5   Q.   That computer there, that's the Acer computer?

6   A.   What do you mean "Acer"?

7   Q.   The brand.

8   A.   I do not know.   I didn't pay attention.

9   Q.   Okay.   If you look closely, do you see "Acer"?

10  A.   (No verbal answer given.)

11  Q.   That was the computer that was in the office at the

12  center?

13            THE COURT REPORTER:   I'm sorry.   I'm not getting

14  verbal answers.

15            THE WITNESS:   This computer, I don't know at that

16  time.   Sometimes Heang use it and other times there are other

17  people who use it.

18  BY MS. MAXFIELD: (Continuing)

19  Q.   So different people would use that computer?

20  A.   Yes.

21  Q.   You testified on direct that you met Mr. Johnson when you

22  were with Pastor Pilot?

23  A.   Yes.

24  Q.   And did you move into the Hope Transition Center with

25  Pastor Pilot?

Sopheak - X

1  A.    Yes.

2  Q.    And at that time Pastor Pilot had several children that

3  were in his care?

4  A.    Yes.

5  Q.    But the ministry mostly at that point was doing good works

6  out in the Cambodian countryside; is that right?

7  A.    Yes.   We -- we would -- we would go to do the ministry or

8  spread the good words in the provinces.

9  Q.    And are the provinces the rural areas of Cambodia?

10  A.    Yes.   It's very rural and most of the provinces are like

11  the farmers, rice agriculture area.

12  Q.    And then most of the people in the provinces are very

13  poor?

14  A.    Some.   Some are very poor.   Some are middle class.   It all

15  depends in the manners of where they live in the rural area

16  part of the province.

17  Q.    That makes sense.

18      But there was a time when Pastor Pilot left the center; is

19  that right?

20  A.    Yes.

21  Q.    He and his wife moved out?

22  A.    Yes.

23  Q.    And he left the children behind?

24  A.    He left the kids with Daniel.

25  Q.    So after Pastor Pilot left, then you each had new jobs,

Sopheak - X

1  didn't you?

2        THE INTERPRETER:  Counsel, I'm sorry.  I couldn't

3  hear you.

4  BY MS. MAXFIELD: (Continuing)

5  Q.   After Pastor Pilot left, you, Daniel Johnson, and

6  BT XXXXXXX each had new responsibilities?

7  A.   I am responsible for teaching the gospels to the kids.

8  Q.   And was that new?  Was Pastor Pilot in charge of that

9  before he left?

10 A.   I have to say a little bit longer.  I have to elaborate.

11      At the time before Pastor Pilot left, I did not know that

12 he left because I was in Prey Veng for two months.  You know, I

13 was checking out some building, and then I heard Pastor Pilot

14 had left the center, you know, where Daniel was.

15 Q.   Okay.  My question was -- oh, go ahead.

16 A.   After that -- after Pastor Pilot left and there was a role

17 for teaching the gospels to the children in the center.  So

18 there was a role that needed to be filled.

19 Q.   And you became the pastor for the children at that point?

20 A.   So if you're speaking about officially being anointed and,

21 you know, with the hands-on-the-head prayer, anoint and prayer,

22 that did not happen yet.  It's a little bit after a while.

23      Okay.  Like, in the second house, it was Daniel and the

24 kids who were the one who did the anointing and then prayers

25 and said that I am the pastor, the one that can teach them the

Sopheak - X

1    gospel.

2        So before that, I was teaching the gospel, the words of

3    God, but I was not appointed and had the prayer.  But

4    according -- if it was formally according to the Bible, you

5    have to be anointed and have the prayers in order that -- that

6    ritual has to be -- you have to go through that ritual in order

7    for you to have more power and for what you teach to -- to be

8    more -- to be more manifested.

9    Q.   Did you have other jobs at the center besides being the

10   person who taught the children the gospel?

11   A.   Take care of the kids.  So in addition to -- in addition

12   to the teaching of the gospel, I would help take care of the

13   kids.  And then on Saturday and Sunday I would go to the

14   provinces.  And when I did go to the provinces, I would check

15   on the churches and teach the gospel -- become an evangelist,

16   spread out the Good News.

17   Q.   So when you were at the center during the week, your job

18   was to be a gospel teacher and kind of a father figure to the

19   children; is that right?

20   A.   Well, I -- I don't know if that's right or wrong.  I just

21   know that, you know, I'm an adult.  You know, I help watch over

22   the kids, and, you know, take care of them.

23   Q.   But you didn't like to discipline the kids that much, did

24   you?

25   A.   I, like, when they do something wrong, I like for them to

Sopheak - X

1   read the verses from the Bible and then for them to recite the

2   verses from the Bible.

3   Q.    Usually, though, the discipline of the kids was left to

4   Mr. Johnson?

5   A.    Correct.

6   Q.    And BT XXXXXXX, after -- after Pastor Pilot left,

7   BT XXXXXXX had a new job too; is that right?

8   A.    Yes, there was a new role, and then -- but I don't know

9   exactly what -- how many roles he had.  I just know that he was

10  with BT XX.  And then exactly what he does, I don't know it;

11  but he has many other things that he did.

12  Q.    He was Daniel Johnson's assistant?

13  A.    (Witness nods.)

14  Q.    And Daniel Johnson --

15  A.    Correct.  I think that he is -- you know, he's, like, the

16  assistant, yes.

17  Q.    Sorry.  I got ahead of you.  I saw you nod.

18        And Daniel Johnson then became the director of the center?

19  A.    (Witness nods.)

20  Q.    And there were two -- two prongs of the ministry there.

21  One involving the children and one involving the good works out

22  in the provinces?

23  A.    What do you mean "prongs"?

24  Q.    Two roads.  Two tasks.

25  A.    After who left?

Sopheak - X

1  Q.   After Pastor Pilot left.

2  A.   Correct.  After Pastor Pilot left.  So he had to work

3  with, you know, helping the kids at the center and helping the

4  community and then also with spreading Good News, you know,

5  disseminating the gospels at the provinces.

6  Q.   And a lot of the good works that Hope Transitions did cost

7  money?

8       For example --

9            MS. MAXFIELD:  Oh, he -- I'm sorry.  He's nodding.

10  You didn't say "yes."  You just nodded.

11            THE WITNESS:  Yes.

12  BY MS. MAXFIELD: (Continuing)

13  Q.   Thank you.

14       And it was Daniel Johnson's job to raise that money?

15  A.   Yes.  He's the one to find the financial provider or

16  sponsor, and he has relationship with those people to -- you

17  know, to help with the financial part.

18  Q.   And Mr. Johnson would need to come to the United States a

19  couple of times each year to raise that money?

20  A.   That's correct.  He told me to go because he -- he's

21  leaving to go so that he can find help to get assistant to help

22  the kids in Cambodia.

23  Q.   So he would come to the United States to raise money to

24  help the Cambodian children?

25  A.   Yes.  He's -- he would always tell me.  He would always

Sopheak - X

1  say that.

2  Q.   And all the money that the children at the center lived on

3  was the money that Mr. Johnson raised here in this country?

4  A.   That, yes.  Correct.  He got assistance from the people

5  from the United States and some other organization too.

6  Correct.

7      When you said "organization," what are you talking about?

8  That's okay.

9  Q.   Okay.  So -- but he also needed to raise money to fund

10 many of the projects that happened out in the provinces; is

11 that right?

12 A.   (Witness nods.)

13 Q.   And some of those --

14      MR. WEINERMAN:  He said "bat," but she didn't say --

15      MS. MAXFIELD:  I know.  I know.  I'm sorry.

16      THE WITNESS:  Yes.

17 BY MS. MAXFIELD: (Continuing)

18 Q.   You talked about being in Prey Veng when Pastor Pilot

19 left.

20 A.   What?

21 Q.   You testified that you were in Prey Veng when Pastor Pilot

22 left.

23 A.   At that time is like I was in Prey Veng for two months.

24 Q.   And you said you were there looking at properties?

25 A.   Because at that time there was a lot of people that were

Sopheak - X

1   not happy because we're Christians, and they would throw rocks

2   or they would throw things at us, you know, when we were

3   around.  So, therefore, he asked me to go as -- to help out, to

4   help the teacher.  Pastor K-i-m, S-a-n -- to help

5   Pastor Kim San at the province.

6   Q.   I want to show you what's been marked as Defense Exhibit

7   616, page 2.  Do you recognize that?

8   A.   Recognize?  Yes.

9   Q.   And what is that?

10  A.   This is in Prey Veng.

11  Q.   One of the things that Daniel Johnson wanted to do with

12  you was to build this compound in Prey Veng?

13  A.   Correct.  This is the -- this is the design, you know.

14  It's a model design.  And we saw that, and we also want that

15  also.

16  Q.   So the plan was to build this entire compound for the

17  people in Prey Veng?

18  A.   What people in Prey Veng?

19  Q.   The Christians in Prey Veng?

20  A.   Yes.  Yes, for the Christians in Prey Veng.

21  Q.   And in order to build -- this was an ambitious project.

22  A.   (Indicating.)

23  Q.   You have to say it out loud.

24  A.   Yes.

25  Q.   And Mr. Johnson raised the money to buy all the land?

Sopheak - X

1    A.    Yes.

2    Q.    Let me show you what's been marked as Defense Exhibit 616,

3    page 119.  Do you recognize the person in that picture?

4    A.    I.

5    Q.    Who is that?

6    A.    It is me.

7               MS. MAXFIELD:  Is this published for the jury?  I'm

8    sorry.

9               A JUROR:  Yes.

10   BY MS. MAXFIELD: (Continuing)

11   Q.    What are you doing, Pastor Sopheak?

12   A.    So at that time we were in the middle of buying wood, you

13   know, to build the building, you know, for whatever parts --

14   whatever structure we need.

15   Q.    And you and Mr. Johnson and BT XXXXX and the kids at the

16   center needed the help from various church groups to build

17   these buildings; is that right?

18   A.    What kind of help?  What kind?  Energy or budget?

19   Q.    Both.

20   A.    Yeah, we have -- we have our fellow Christians who help

21   us, you know, in terms of the labor force.

22   Q.    Teams would come from the United States?

23   A.    Yes.  Yes.  The fellow Christians came, yeah, came to help

24   build.

25   Q.    And those Christian teams would stay anywhere between ten

Sopheak - X

1    days and two weeks to help?

2    A.    Most of the time, two weeks.    Most of the time, two weeks.

3    Mostly.

4    Q.    I want to show you what's been marked as

5    Defendant's Exhibit 710, page 1.

6              MR. SWEET:    No objection.

7              THE COURT:    All right.    It will be received.

8              DEPUTY COURTROOM CLERK:    Counsel, you already had a

9    710.    Is it the BT XXXXXX --

10             MS. MAXFIELD:    I have a 710?    I'm not the numberer.

11             THE WITNESS:    What is this?    What is this?

12             MS. MAXFIELD:    Well, it's something we'll talk about

13   in a minute, but right now we need to make sure we have the

14   numbers correct.

15             THE COURT:    We need to get it a number.

16             MS. MOSS:    Let's make this 720.

17             MS. MAXFIELD:    Let's make it 720.

18             THE COURT:    Okay.

19   BY MS. MAXFIELD: (Continuing)

20   Q.    Now, let me ask you to look at Exhibit 720, the exhibit in

21   front of you.    This is in English.    Do you read English?

22             THE INTERPRETER:    It's a little bit blurry.    The

23   interpreter thinks it's a little bit blurry.

24             THE WITNESS:    What's up with this?    Why do you want

25   me to read it?

Sopheak - X

1          THE COURT:  I don't want you to ask questions about

2    your questions.

3       Do you have a hard copy that we can give the translator to

4    read to --

5          MS. MAXFIELD:  You know, I do.  Is it too teeny?

6          THE WITNESS:  This is a schedule.

7    BY MS. MAXFIELD: (Continuing)

8    Q.    Pastor Sopheak, can I ask you a couple of questions about

9    that?

10   A.    Yes.  Yes.

11   Q.    When the Christian groups would come from the United

12   States, Mr. Johnson would need to organize their activities?

13   A.    That's correct.  He would have to organize the schedule

14   for the guests.

15   Q.    Is that what this is -- a very detailed schedule of what

16   the people would do when they were in Cambodia?

17   A.    Yes.  This is the schedule when, you know, for -- for

18   going to -- going out to visit, to -- to help the church to

19   help spread the Good News.  There's many other activities.

20   Q.    And Mr. Johnson was the person in charge of organizing all

21   those activities?

22   A.    Yes.  He's the one who organized this schedule.

23   Q.    I want to show you what's been marked as Defendant's 616,

24   page 170.  Do you recognize that?

25   A.    I think that's in Prey Veng.

Sopheak - X

1    Q.    Yes.   And in Prey Veng, you brought -- Hope Transitions

2    brought electricity into that Prey Veng compound; is that

3    right?

4    A.    Are you talking about in the whole Prey Veng city or just

5    in the center, the electricity to the center?

6    Q.    Well, two questions.   You brought it to the center?

7    A.    In the building.   In the church.

8    Q.    And by bringing electricity into the church, you were also

9    able to give electricity to many people in the village?

10   A.    No.   That, I do not think in that way because it is -- the

11   government, you know, it's their duty to put electricity for

12   all those villages.   Because in all those little villages and

13   in the quarters, part of the district, they all have

14   electricity.

15   Q.    I want to show you Defendant's Exhibit 616, page 2 again.

16        Was part of that plan to build a church in the Prey Veng

17   compound?

18   A.    Yeah, that's the plan.

19   Q.    Can you mark for us where the church would be?

20   A.    That's the church.   That's the bathroom.

21   Q.    I want to show you what's been marked as Defendant's

22   Exhibit 616, page 51.

23   A.    That's the church.

24   Q.    The church was completed; is that true?

25   A.    Yes.

Sopheak - X

Q.    And let's look at page 6 -- or Exhibit 616, page 2 again.

      Part of the plan was to build student housing on the
compound; is that right?

A.    What do you want me to show you?

Q.    Yes.  Could you show us where the student housing is?

A.    This is the -- that's for the kids center.  It's the kids
center.  This is the plans for the kids center.

Q.    So you called it the kids center?

A.    That's the plan for -- it's just a plan where you put for
the orphaned children.  This is the plan.

Q.    So let me show you what's been marked as Defendant's
Exhibit 616, page 238.  And is that the completed kids center
or student center?

A.    It completed the lower level, the second level.  But the
highest level, it was not.  I did not -- they did not put
the -- they did not put the ceiling yet.

Q.    So you're saying it got mostly finished and Mr. Johnson
got arrested?

A.    Yes.

Q.    Has it been finished --

A.    However --

Q.    -- since then?

A.    Are you asking just specifically this building or all the
buildings?

Q.    I'm asking about the -- what you call "the kids center"

Sopheak - X

1   and I called "the student center."

2   A.   Yes.

3   Q.   Do you know whether any students are living there --

4   any orphans are living there?

5   A.   Right now?

6   Q.   Uh-huh.

7   A.   No.   Only Pastor Kim San's family.

8            THE INTERPRETER:   Kim San is the same spelling.

9   K-i-m.   San, S-a-n.

10  BY MS. MAXFIELD: (Continuing)

11  Q.   Let's look at Exhibit 616, page 2 again.   Was there a

12  planned medical center in the compound?

13  A.   That one is where they want to have a clinic.

14  Q.   Let me show you what has been marked as Defense

15  Exhibit 616, page 193.   Is that the medical center?

16  A.   Yes.   Yes.

17  Q.   And that's what it looked like when Mr. Johnson was

18  arrested at the time of his arrest?

19  A.   It's still the same, yes.

20  Q.   Medical center hasn't been completed?

21  A.   Yes.

22  Q.   Pastor Sopheak, is this a congregation in Prey Veng that

23  you minister to on this compound?

24  A.   Can you make your question a little bit more clear?

25  Q.   Yeah.   Do you spread the gospel at this church in

Sopheak - X

1   Prey Veng -- the one you built?

2   A.    Yes.   I have done that in the Prey Veng church.   Yes, I

3   have done that in the Prey Veng church.

4   Q.    Do you go there a few times a year to preach to that

5   congregation?

6   A.    It's not two, three times a year.   It's -- I don't know

7   how many times a year.

8         Are you talking about in the past?   Are you talking about

9   before or right now?

10  Q.    Right now.

11  A.    Now I go once every two weeks.   And then you normally --

12  this week I go to Kampot Province, and the next week I go to

13  Pre Veng Province.   And now it's like I go more regularly to

14  Prey Veng Province because I want to go to the other small

15  towns and all the villages.

16  Q.    So in one week you go to the church in Prey Veng and

17  preach the gospel to that congregation?

18  A.    The Harvest Church.   So when I go to teach the gospel, I

19  go to the church; but when I go to disseminate the Good News, I

20  go to the Harvest Church.

21  Q.    And you said that then some -- the other week you were in

22  Kampot?

23  A.    Yes.   There's some weeks I go to Kampot.

24  Q.    And can I show you what has been marked as Defendant's

25  Exhibit 615, page 48?   Is that where you preach the gospel in

Sopheak - X

1    Kampot?

2    A.    Yes.

3    Q.    And that's also a church that was built by the Hope

4    Transition Center and Mr. Johnson?

5    A.    Yes.

6    Q.    Pastor Sopheak, is the property in Prey Veng and the

7    property in Kampot legally held in your name and the name of

8    BT XXXXXXX?

9    A.    In Kampot Province, in terms of the church, it does not

10   have -- it does not have my name.  It has four section.  Before

11   the church part has -- does not have my name, and the other

12   three parts has my name.

13   Q.    Prey Veng has your name?

14   A.    Yeah.  The one in Prey Veng has my name, but I would like

15   to elaborate or explain.  Before Prey Veng had my name.

16   Before.  Before.  Okay.  Before it has my name; however,

17   because of the government in charge of the land ownership came,

18   and it's called a land certificate, they own -- now only put

19   one person's name, which is Pastor Kim San.

20   Q.    So the land is no longer in your name?

21   A.    In the -- in the property, off the land, it does not have

22   my name.  However, because we only put the land in one person's

23   name because of our faith, but we believe --

24              THE INTERPRETER:  I said wait.  I cannot -- you know,

25   the translation.

Sopheak - ReD

1      THE WITNESS:  Because we believe in our faith, and we

2  want to be, you know, trustworthy of each other's fellow

3  Christians and then we -- so we have -- so we can do the

4  gospel-spreading, dissemination of the gospel, spreading the

5  Good News of the Lord.

6      However, related to the land certificate, he gave it to me

7  to -- for safekeeping.

8      MS. MAXFIELD:  Thank you.  I have no further

9  questions.

10      THE COURT:  Redirect?

11      MR. SWEET:  I just have one photograph for

12  Pastor Sopheak.  I'm going to just ask this be shown to

13  Pastor Sopheak.

14      Pull up Exhibit 98, please.  This is just to Counsel and

15  Pastor Sopheak at this point.

16      MS. MAXFIELD:  Objection.  Beyond the scope, I think.

17      THE COURT:  I'll allow it.  Go ahead.

18

19                  REDIRECT EXAMINATION

20  BY MR. SWEET:

21  Q.   Pastor Sopheak, there was a discussion of a film projector

22  in Mr. Johnson's room.  Are you familiar with Mr. Johnson's

23  room in the third house?

24      THE INTERPRETER:  Counsel, "third house"?

25      MR. SWEET:  Yes.

Sopheak - ReD

1          THE WITNESS:  Do you mean do I recognize his room?

2    BY MR. SWEET: (Continuing)

3    Q.    Yes.  Do you recognize it?

4    A.    Yes.

5    Q.    Is that a photograph of Mr. Johnson's bedroom at the third

6    location?

7    A.    Correct.  Correct.  That's it.

8    Q.    And did you see Mr. Johnson's bedroom on the day of his

9    arrest?

10   A.    I saw, yes.

11   Q.    And is the film projector that you discussed with

12   Ms. Maxfield visible in the center of this photograph?

13   A.    That's the projector right there.

14   Q.    So does that photograph generally depict Mr. Johnson's

15   bedroom around the time of his arrest?

16   A.    Yes.

17          MR. SWEET:  Your Honor, the government is not asking

18   that the photograph be published at this point, but we believe

19   a foundation has been laid for its admission.  We would ask

20   that it be admitted but not yet published.

21          MS. MAXFIELD:  We would ask the Court to withhold

22   ruling so we can have a chance to argue it.

23          THE COURT:  Okay.

24          MR. SWEET:  The government has no further questions

25   for Pastor Sopheak.

1          THE COURT:  Pastor Sopheak, thank you very much.

2    You're free to step down.

3          THE WITNESS:  It's over?

4          THE COURT:  Yes.

5          THE WITNESS:  Can I go home?

6          THE COURT:  Is he still under subpoena?

7          MR. SWEET:  He is, Your Honor.  We do not anticipate

8    we'll need to call Pastor Sopheak again, but until the

9    conclusion of the case, we ask to keep him under subpoena.

10          THE COURT:  Pastor Sopheak, it's possible you could

11    be re-called to the stand.

12      Okay.  Next witness.

13          MR. SWEET:  Thank you, Your Honor.  We do have our

14    next witness, but I believe the Court was reviewing one matter

15    that the parties needed to discuss.

16          THE COURT:  Okay.  Folks, I need to have a quick

17    discussion with the attorneys.  We'll take a morning break.

18                        (Jury not present.)

19          THE COURT:  All right.  I have reviewed the

20    disclosure order that I previously ordered turned over from the

21    government to the defense regarding the performance improvement

22    plan.  It was signed between Special Agent Schoening and his

23    supervisor.  And I have reviewed the performance improvement

24    plan.  It's my ruling that the disclosure letter covers all of

25    the relevant to the critical elements of the improvement plan

1    and it covers, with specificity, any reference in the plan to

2    Agent Schoening's performance in the Johnson case, and,

3    therefore, the -- the plan itself is not to be turned over.

4            MR. WEINERMAN:  Judge, would the Court mark that as a

5    Court's exhibit what the Court has reviewed and put it under

6    seal so that there's a record in case somebody wants to raise

7    this issue in the future?

8            THE COURT:  Yes.  All right.  So we will mark the

9    disclosure letter.

10       Char, is that already filed under seal?

11           DEPUTY COURTROOM CLERK:  It is not.

12           THE COURT:  It is not.  So the disclosure itself will

13   be Court Exhibit --

14           DEPUTY COURTROOM CLERK:  8.

15           THE COURT:  -- 8?

16           DEPUTY COURTROOM CLERK:  Yes.

17           THE COURT:  Then the performance improvement plan

18   will be filed under seal as Court Exhibit 9.

19           MR. WEINERMAN:  Judge, I noticed in the letter that

20   it refers to CE No. 2, CE No. 5, CE No. 8.  I assume those are

21   all separate documents, and I assume the Court has reviewed

22   those.  And if the Court's ruling is the same, we would ask

23   that those also be marked as Court's exhibit and filed under

24   seal.

25           THE COURT:  I have not received, I guess, what's

been -- what was referred to as the letter and the personal

improvement plan.  Critical elements numbers 2, 5, and 8, they

are referenced in the plan, but critical element 2 is organized

planning and coordinating; though, there is an outline of what

needs to be achieved to meet that.  Critical element 5 is

maintain high professional standards.  Critical element number

8 is intelligence.

     Certainly, those three areas are subject to

cross-examination, if you wish.

          MR. WEINERMAN:  Well, Judge, without the document, I

would be hesitant to -- to dive into it.  So if those -- all

I'm asking is if the Court has reviewed those and we don't --

the Court doesn't feel there's anything exculpatory and then

that they just, again, be made part of the record and filed

under seal.

          THE COURT:  It will be made part of the record.

     Anything the government wants in the record with regard to

those documents?

          MR. SINHA:  No, Your Honor.  My understanding, for

what it's worth -- and I don't have the document in front of

me -- is that what the Court has is the performance improvement

plan, and that the -- just to be clear, I think that's the

whole of the performance improvement plan.  I do know it

references the critical elements, but I don't think that

that's -- I think that that's just things that a federal

1  employee has, is critical elements of his or her employment.  I

2  don't think it's part of the performance plan, that I'm aware

3  of.  It's not a separate document, I guess, is what I'm saying.

4          THE COURT:  I don't have a separate document

5  outlining the standards or some sort of internal standards

6  document of either the Department of Justice or the FBI.  It

7  just references certain critical elements.  But in terms of the

8  particular critical elements, which I believe it's relevant to

9  the performance in this case, is critical element number 5,

10  which, I believe, is maintaining high professional standards.

11      I think that speaks for itself.

12          MR. WEINERMAN:  So is, then, if I were to ask him

13  whether he has been -- I'm searching for the right word --

14  disciplined -- I'll just use that word -- and maybe that's the

15  wrong word -- is the Court saying I can ask him whether he has

16  been disciplined -- sanctioned -- I'm not sure we can come up

17  with the correct description -- for not maintaining high

18  professional standards in his work in this case?

19          MR. SINHA:  So, Your Honor, I guess our position

20  is -- and I think it says this in the letter and in the motion,

21  and it may say this, frankly, in the performance improvement

22  plan -- this is not a discipline.  It's not a sanction.  It

23  really is just an internal -- an internal, you know,

24  performance.

25          THE COURT:  It's an improvement plan.

1          MR. SINHA:  Yes.

2          THE COURT:  I think they can ask, "Isn't it true that

3    based on your performance in the Johnson case, you had to meet

4    with your supervisor and come up with a plan to improve your

5    level of professionalism because of your investigation into the

6    Johnson case?"

7        That seems to cover it.

8          MR. WEINERMAN:  I'll make sure I get with the court

9    reporter and ask him the question just like that.

10         THE COURT:  Thank you.

11         MR. WEINERMAN:  Thank you.

12         THE COURT:  Is that going to be our next witness?

13         MR. SWEET:  He is, Your Honor.  And there are a

14   series of exhibits that -- a very -- probably 50, or so,

15   exhibits that we're going to be offering through Special

16   Agent Schoening.  I have a list for Ms. Pew.  The defense has a

17   list.

18       There are some of the exhibits that the defense is not

19   objecting to their admission, but because they're voluminous,

20   we want to give everybody a little time to make sure there's

21   nothing buried in there that is irrelevant.  So we're not going

22   to be asking the majority of them to be published to the jury

23   today.  We're just laying the foundation.  And then over the

24   next few days we'll sort through them.  But we will be moving

25   through those quickly.

1        And now that it seems we will have a stipulation for

2    residency, which I think we're drafting, we will -- the

3    government will shorten its section on residency and just --

4    and just seek to admit a whole bunch of documents.  So I don't

5    think -- I think we'll be done by -- the government will

6    certainly be done in 35 minutes or so.

7              THE COURT:  Okay.  Great.  Thank you.

8         All right.  Let's get the jury.

9              MR. SWEET:  Actually --

10             THE COURT:  Ten minutes maybe?

11             MR. SWEET:  Your Honor, if I can just update Special

12   Agent Schoening as to what we are and aren't talking about now?

13                         (Jury present.)

14             THE COURT:  Next witness for the government.

15             MR. SWEET:  The government calls Special Agent

16   Forrest Schoening.

17             THE COURT:  Step up to the witness stand and remain

18   standing for just a moment.  We'll have you sworn in.

19

20                       FORREST SCHOENING,

21   called as a witness in behalf of the Government, being first

22   duly sworn, is examined and testified as follows:

23

24             THE WITNESS:  Yes, I do, ma'am.

25             DEPUTY COURTROOM CLERK:  Please be seated.  State

Schoening - D

1  your name for the record, spelling your first and last.

2            THE WITNESS:  My name is Forrest Schoening.

3  F-o-r-r-e-s-t.  S-c-h-o-e-n-i-n-g.

4            THE COURT:  All right.  Mr. Sweet, go ahead, please.

5

6                      DIRECT EXAMINATION

7  BY MR. SWEET:

8  Q.   Tell us how you're employed.

9  A.   I'm a special agent with the Federal Bureau of

10  Investigation.

11  Q.   And how long have you been a special agent for?

12  A.   In August it will be 16 years.

13  Q.   And what did you do before joining the FBI?

14  A.   I was an intelligence officer in the United States Marine

15  Corps.

16  Q.   How long did you do that for?

17  A.   About six and a half years.

18  Q.   And what rank did you leave the Marine Corps?

19  A.   Captain, which is an O-3.

20  Q.   Before joining the Marine Corps, what did you do?

21  A.   I went to college.

22  Q.   Now, for the FBI, do you investigate a variety of cases

23  and crimes?

24  A.   Yes, I do.

25  Q.   Have you been involved in the investigation of

Schoening - D

1    Daniel Stephen Johnson for several years?

2    A.    Yes.    I opened the investigation, and I've been the case

3    agent ever since.

4    Q.    And have you written numerous reports and interviewed

5    multiple people?

6    A.    Yes.

7    Q.    Do you remember every detail of every report that you have

8    written in this case?

9    A.    No, I certainly don't.

10   Q.    Do you have with you some reports and documents that

11   you've written or reviewed in this case?

12   A.    Yes, I do.

13   Q.    And so if I ask a question that you don't recall the

14   answer to but you have a document for, please -- please ask and

15   let us know what you will be looking at, and we can discuss

16   using that to refresh your recollection.

17   A.    Okay.

18   Q.    So, first, I would like to ask you some questions

19   regarding Mr. Johnson's residency.    Have you had the

20   opportunity to look at some documents regarding what state he's

21   resided in?

22   A.    Yes, I have.

23   Q.    And what -- what did you determine, please?

24   A.    That he's a resident of Oregon.

25   Q.    Okay.    And I would like to turn you to Exhibit 220 and ask

Schoening - D

1  that this one be published, please.

2  A.    All right.

3  Q.    What is Exhibit 220, please?

4  A.    That's a printout of his Oregon driver's license.

5  Q.    For Daniel Stephen Johnson?

6  A.    Yes.

7  Q.    What is the issue date of the Oregon driver's license?

8  A.    4/14 of 2010.

9  Q.    And what is Mr. Johnson's date of birth, please?

10  A.    4/18 of 1978.

11  Q.    Okay.  Have you had the opportunity to review some

12  passport records of Mr. Johnson?

13  A.    Yes, I have.

14  Q.    And, specifically, were these applications for passports?

15  A.    Yes.

16  Q.    Were those sworn statements in those applications?

17  A.    Yes, they were.

18  Q.    And did they list an address in the applications?

19  A.    Yes, they did.

20         MR. SWEET:  I would like to pull up Exhibit 210,

21  please, and ask that that be published as well.

22         THE COURT:  It will.

23  BY MR. SWEET: (Continuing)

24  Q.    Let's go to page 8, please.  Special Agent Schoening, on

25  page 8, are you able to see a listed address on there?  We can

Schoening - D

1   expand it if --

2   A.   Yes.

3   Q.   And what is that address, please?

4   A.   63341 Shasta Road in Coos Bay, Oregon.

5   Q.   And is that the listed address for Daniel Stephen Johnson?

6   A.   Yes, it is.

7   Q.   And looking at the bottom of that, what is the date on

8   which that is signed?

9   A.   April 13th of 2010.

10  Q.   And this is an example of one of the documents that's

11  under oath?

12  A.   Yes.

13  Q.   And so did you review other applications or passports or

14  renewal of getting more pages added to your passport for

15  Mr. Johnson?

16  A.   Yes, I did.

17  Q.   And did you see the same address for 63341 Shasta Road in

18  Coos Bay, Oregon, listed for other years as well?

19  A.   Yes, I did.

20  Q.   And, specifically, did you see that for 2003?

21         THE COURT:  Mr. Sweet, I'll have you slow down just a

22  bit.  We're firing off a lot of quick questions.

23         MR. SWEET:  Thank you, Your Honor.  I'll do that.

24  BY MR. SWEET:  (Continuing)

25  Q.   And did you see that for the year 2003?

Schoening - D

1  A.    Yes.

2  Q.    2006?

3  A.    Yes.

4  Q.    2013?

5  A.    Yes.

6  Q.    Okay.  And Special Agent Schoening, have you also reviewed

7  financial records and credit card records for Mr. Johnson?

8  A.    Yes, I have.

9  Q.    And did those cover a period of several years prior to

10  Mr. Johnson's arrest?

11  A.    Yes, they did.

12  Q.    And did those records list an address for Mr. Johnson?

13  A.    Yes.

14  Q.    And do you recall what that address was?

15  A.    It's the same address that was on the passports and the

16  driver's license.

17  Q.    The Shasta Road address?

18  A.    Yes.

19  Q.    And did you specifically review Capital One records?

20  A.    Yes.

21  Q.    Citi credit card records?

22  A.    Yes.

23  Q.    Discover card records?

24  A.    Yes.

25  Q.    And Oregon Pacific Bank records?

Schoening - D

1  A.   Yes.

2         MR. SWEET:  Your Honor, the government would ask the

3  following exhibits be admitted:  Exhibit 220, 210, 177, 178,

4  180, and 186.

5         THE COURT:  Is there any objection, or do we need

6  time to review?

7         MR. WEINERMAN:  I think we need some time to review

8  just to make sure.

9         THE COURT:  Okay.  We'll do that, and we'll make a

10  ruling at a later time.

11  BY MR. SWEET: (Continuing)

12  Q.   And, Special Agent Schoening, do you know where

13  Daniel Stephen Johnson was born?

14  A.   In Oregon.

15  Q.   And do you recall what city?

16  A.   Dallas, I believe.

17  Q.   And have you also had the opportunity to review travel

18  documents for Mr. Johnson?

19  A.   Yes.

20  Q.   And, specifically, have you reviewed a copy of one of his

21  passports?

22  A.   Yes.

23  Q.   And was that a United States passport?

24  A.   Yes, it was.

25  Q.   And did you also review Customs and Border Patrol records,

Schoening - D

1   inspection records, relating to Mr. Johnson?

2   A.    Yes, I did.

3   Q.    And did those show that Mr. Johnson, when he was traveling

4   overseas, that he did so on a U.S. passport?  And I'm going to

5   list some years, please.  In 2002?

6   A.    Yes.

7   Q.    2003?

8   A.    Yes.

9   Q.    2005?

10  A.    Yes.

11  Q.    2006?

12  A.    Yes.

13  Q.    2009?

14  A.    Yes.

15  Q.    And 2014?

16  A.    Yes.

17            MR. WEINERMAN:  And then, Your Honor, those would be

18  Exhibits 181 and 183.  I understand that defense may need more

19  time, but those are also ones we would be asking to be

20  admitted.

21            THE COURT:  Folks, we won't show you all of the

22  documents at this time.  Some of them will likely be admitted,

23  and you'll have them to review during deliberations.

24            MR. SWEET:  Thank you, Your Honor.

25        And, Your Honor, at this time I would like to read in one

Schoening - D

1    of the stipulations that the parties reached regarding travel.

2            THE COURT:  All right.  Folks, the stipulation is

3    something both parties agree upon.  You can accept it and

4    should accept it as true.

5            MR. SWEET:  Your Honor, because it is lengthy and

6    detailed, I'll read the main paragraphs and a short example

7    from each below.

8        Stipulation:  The parties agree that Mr. Johnson's TECS,

9    T-E-C-S, records, airline records, passport and U.S. and

10   Cambodian immigration records, including records regarding

11   immigration status, travel, and entry and exit data may be

12   admitted and that the information contained in those records is

13   true and accurate.

14       Number two:  The parties agree that Mr. Johnson became a

15   United States citizen at birth and that he has remained a U.S.

16   citizen continuously and without interruption from the time of

17   his birth to present.

18       Three:  The parties agree and stipulate that Mr. Johnson

19   traveled in interstate and foreign commerce between the

20   United States and Cambodia between on or about the following

21   dates -- and I'm just going to read the first one --

22   November 28, 2005, departing the U.S. and then December 6,

23   2005, arriving in Cambodia.

24       The next paragraph says, "The parties further agree and

25   stipulate that Mr. Johnson was present within the District of

Schoening - D

1   Oregon and then traveled in interstate and foreign commerce

2   between the United States and Cambodia between on or about the

3   following dates" -- and reading just the first one -- "June 21,

4   2011, in Oregon; July 5, 2011, departed the U.S.; and then

5   July 7, 2011, arrived in Cambodia."

6   BY MR. SWEET: (Continuing)

7   Q.    Special Agent Schoening, have you reviewed the travel

8   dates I just listed as well as other travel dates as set forth

9   in that stipulation?

10  A.    Yes, I have.

11  Q.    And do you -- is it your understanding that those travel

12  dates are based off of various supporting records?

13  A.    Yes.

14  Q.    And have you had an opportunity to review those supporting

15  records?

16  A.    Yes, I have.

17          MR. SWEET:  And, Your Honor, this is a fairly long

18  list.  With the Court's permission, I'm just going to read it,

19  ask that none of this be published, and just slowly read it

20  into the record.

21          THE COURT:  Thank you.

22          MR. SWEET:  Thank you.

23  BY MR. SWEET: (Continuing)

24  Q.    Exhibit 173, AirAsia records; Exhibit 174, American

25  Airlines records; Exhibit 175, Asiana Airlines records;

Schoening - D

1    Exhibit 176, Cambodian entry and exit records; Exhibit 179,

2    trip itinerary; Exhibit 182, TECS records; Exhibit 184 TECS --

3    which is T-E-C-S, all caps -- person list; Exhibit 185 American

4    Airlines records; Exhibit 187, Cambodian travel history report;

5    Exhibit 188, Department of State passport details; Exhibit 189,

6    confirmation and itinerary; Exhibit 190, itinerary;

7    Exhibit 191, bus ticket; Exhibit 193, AirAsia records; and

8    Exhibit 223, Facebook IP records.

9         And, Your Honor, again, we would ask that those all be

10   admitted, and we can discuss those further.

11             THE COURT:  All right.

12   BY MR. SWEET: (Continuing)

13   Q.    Special Agent Schoening, I have what seems like a very

14   simple question, but is Cambodia a foreign country?

15   A.    Yes, it is.

16   Q.    And to get there, do you have to travel in foreign

17   commerce?

18   A.    Yes, you do.

19   Q.    And in order to travel from Oregon to Cambodia, do you

20   have to cross the state line?

21   A.    Yes.

22   Q.    Okay.  Could I ask you to speak -- I think the microphone

23   is actually -- it's a little silver dot.

24             THE COURT:  The large microphone is for the

25   translator, but the silver dot there is what is picking up your

Schoening - D

1  voice.

2          THE WITNESS:  Okay.

3          THE COURT:  Thank you.

4          THE WITNESS:  Thank you.

5  BY MR. SWEET: (Continuing)

6  Q.    Special Agent Schoening, did you travel to Cambodia in

7  December of 2014?

8  A.    Yes, I did.

9  Q.    And did you meet with Daniel Stephen Johnson when you were

10 in Cambodia?

11 A.    Yes.

12 Q.    Did you accompany Mr. Johnson from Cambodia to the United

13 States?

14 A.    Yes, I did.

15 Q.    And was the first location in the United States that you

16 and Mr. Johnson arrived at Portland, Oregon?

17 A.    Yes, it was.

18 Q.    Okay.  I would like to show you what's marked as

19 Exhibit 221, please.

20         MR. SWEET:  If that could -- we can -- if there's no

21 objection from the defense -- that's an itinerary -- I would

22 ask that 221 be published.

23         MR. WEINERMAN:  Just the one page?

24         MR. SWEET:  It is just one page.  It is just one

25 page.

Schoening - D

1          Counsel, do you have any objection to that?

2               MR. WEINERMAN:  Let me -- can we scroll up a little

3   more, so I can see the whole document?

4               MR. SWEET:  The top or the bottom, Counsel?

5               MR. WEINERMAN:  I want to see the bottom, please.

6          No objection.

7               THE COURT:  All right.  221 will be received.

8   BY MR. SWEET: (Continuing)

9   Q.   Special Agent Schoening, could you please walk us through

10  the itinerary, including the departure date, the cities that

11  you and Mr. -- cities or countries that you and Mr. Johnson

12  traveled to and then your arrival date?

13              MR. WEINERMAN:  Based on the stipulation, objection.

14  Relevancy.

15              THE COURT:  Overruled.

16         Go ahead.

17              THE WITNESS:  So we departed Phnom Penh on

18  December -- December 22nd of 2014.  We flew to Seoul,

19  South Korea, where we had about a 12-hour layover.  We departed

20  Seoul on December 23rd and flew to Vancouver, Canada.   I

21  believe the layover there was about two hours, maybe an hour

22  and a half, and then we flew from Vancouver -- on December 23rd

23  we departed Vancouver and flew into Portland, Oregon.

24  BY MR. SWEET: (Continuing)

25  Q.   So then your arrival date in Portland, Oregon, one more

Schoening - D

1  time, was?

2  A.    I'm sorry.  It was December 23rd of 2014.

3  Q.    Okay.  And were you -- was that -- was Portland, Oregon,

4  the first location in the U.S. that Mr. Johnson arrived after

5  leaving Cambodia?

6  A.    Yes.

7  Q.    Special Agent Schoening, going -- going back a bit, what

8  was the date that Daniel Johnson was arrested in Cambodia by

9  the Cambodians?

10  A.    That was December 9th of 2013.

11  Q.    And do you know if digital devices were seized from him at

12  that time?

13  A.    Yes.

14  Q.    And were -- did you also seize two digital devices from

15  Mr. Johnson when you met him in Cambodia?

16  A.    Yes.

17  Q.    Special Agent Schoening, did you subsequently obtain a

18  search warrant for the digital devices seized from Mr. Johnson?

19  A.    Yes.  For those and for the ones that I seized.

20  Q.    I'm going to ask you about some documents.  Did you review

21  the contents -- you and another agent review the contents of

22  those digital devices after the search warrant?

23  A.    Yes, we did.

24  Q.    And did you locate documents relating to Hope Transition

25  Center, the children staying there, that kind of thing?

Schoening - D

1    A.    Yes.

2    Q.    Okay.  I would like to show you Government's Exhibit 157,

3    please.  If there's no objection, I'll ask that that be

4    published.

5             MR. WEINERMAN:  No objection.

6             THE COURT:  It will be received and published.

7    BY MR. SWEET: (Continuing)

8    Q.    And, Special Agent Schoening, the green highlighting was

9    added by the government, but do you recognize this document?

10   A.    Yes.  It's a list of some of the individuals that were at

11   the orphanage.

12   Q.    And does it list dates, approximate dates, in which

13   children arrived and their age on arrival?

14   A.    Yes, it does.

15            MR. SWEET:  And Exhibit 159, please.

16   BY MR. SWEET: (Continuing)

17   Q.    Could you identify 159, please?

18   A.    It's another list or roster of some of the individuals

19   that were at the orphanage and their dates of birth.

20            MR. SWEET:  And then 158.  And if -- I believe with

21   no objection, I would ask that this be published, Your Honor.

22            MR. WEINERMAN:  One page?

23            MR. SWEET:  No.  It's --

24            MR. WEINERMAN:  Can we defer ruling on this one?

25   It's been a while since we read this one.

Schoening - D

1    THE COURT:  That's fine.

2    BY MR. SWEET:  (Continuing)

3    Q.   Let me ask you this, Special Agent Schoening, were there

4    several documents related to, sort of, the operation of

5    Hope Transition Center which you found as well?

6    A.   Yes.

7    MR. SWEET:  And, specifically, Exhibits 158 and 160,

8    I'll show you 160, since you just saw 158.  160 can just be to

9    Special Agent Schoening.

10    THE WITNESS:  Yes.

11    BY MR. SWEET:  (Continuing)

12    Q.   Okay.  And so for these documents we just discussed

13    regarding the boys' ages and the Hope Transition documents, do

14    you know where those were found?

15    A.   They were found on one of the digital devices.  The way

16    our system is set up, it's hard to sometimes go back and

17    remember which exact item; but I believe it was the computer.

18    Q.   And --

19    MR. SWEET:  At this point, Your Honor, so we don't

20    get too far ahead, I would ask that 221, 157, 159, 158, and 160

21    be admitted, understanding --

22    THE COURT:  I'll defer ruling until after defense has

23    had time to review.

24    BY MR. SWEET:  (Continuing)

25    Q.   Did you also locate, sort of, information sheets for the

Schoening - D

1   boys?  Sort of a summary for each boy for a sponsor?

2   A.    Yes.

3   Q.    I would like to show you -- I would like to show you an

4   example of one.

5           MR. SWEET:  195, please.  Let's go to -- let's try

6   202, please.

7       And if there's no objection, I would ask that that be

8   published, Your Honor.

9           MR. WEINERMAN:  No objection to this.

10          THE COURT:  All right.  202 will be published.

11  BY MR. SWEET: (Continuing)

12  Q.    Is that one of the sheets that we're talking about,

13  Special Agent?

14  A.    Yes, it is.

15  Q.    What is it that's on there, please?  What kind of

16  information is there?

17  A.    General information.  Name, date of birth, age, gender,

18  and then general subjects, like, you know, animals, I guess,

19  that they like, maybe.  Food, sports, cars.  Interests, I

20  guess, of the children.

21  Q.    Okay.  And did you find those for a series of the boys

22  involved with this case?

23  A.    Yes.

24  Q.    Okay.

25          MR. SWEET:  And, Your Honor, the government is

Schoening - D

1   offering for information sheets for the boys 195, 200, and 202

2   through 209.

3            THE COURT:  All right.  I'll defer ruling.  I'll give

4   the defense a chance to review it before they're admitted.

5   BY MR. SWEET:  (Continuing)

6   Q.   And, Special Agent Schoening, the majority of the

7   documents that we're discussing, the children's information

8   sheet, as well as the Hope Transition Center documents, is it

9   your recollection that they were on one of the computer --

10  either the computer or the laptop?

11  A.   Yes.

12  Q.   I'd like to show you Government's Exhibit 201.  Could you

13  identify that, please?

14  A.   That's a letter of recommendation that Mr. Johnson wrote

15  concerning BT XXXXXXXXX.

16  Q.   And I'd like to read --

17            MR. SWEET:  I would ask that this be published,

18  Your Honor.

19            MR. WEINERMAN:  That's fine.  No objection to this

20  one.

21            THE COURT:  All right.  It will be.

22  BY MR. SWEET:  (Continuing)

23  Q.   If we can zoom in on the top half of that, please, I'd

24  like to read a little bit of this and ask if this is correct.

25  Is this a letter from Daniel Johnson?

Schoening - D

1   A.    Yes.

2   Q.    "To Whom it May Concern:  I would like to share with you a

3   little bit about BT XXXXXXXXXXXXXXXX.  There are few young men

4   like this one.  BT XXXX is one of the most extraordinary young

5   men I have ever met.  From the day that I met him, I knew that

6   he had a higher calling.  BT XXXX is a respectful,

7   intellectual, bold, prompt, and a God-fearing man.  He is

8   humble and moldable, always eager to learn and willing --

9   willing to admit when he is wrong."

10      Is that -- is that accurate?  Is that what Mr. Johnson

11  wrote regarding BT XXXXXXX?

12  A.    Yes.

13  Q.    And what is the date on that, please?

14  A.    May 1st of 2013.

15  Q.    And, Special Agent Schoening, I would like to show you --

16  I would like to show you a board with some of the orphanage

17  locations on there.

18          MR. SWEET:  Your Honor, this is something that

19  Counsel has seen previously and I do not believe has any

20  objection to this being shown to the jury.

21          MR. WEINERMAN:  We may have some questions relating

22  to foundation that we would like to ask before it's admitted.

23  So questions in aid of objection.

24          THE COURT:  Okay.  Do you want to ask those now?

25          MR. WEINERMAN:  I think the better way is for Counsel

Schoening - D

1    to ask preliminary questions and when we feel we've reached

2    that point --

3                THE COURT:  Okay.  Go ahead and lay a foundation.

4                MR. SWEET:  If I may, then, Your Honor, just for --

5    so Special Agent Schoening can see it, can I set it up over

6    here?

7                THE COURT:  Yes.

8    BY MR. SWEET: (Continuing)

9    Q.   I'm sure there's a better way, but I think for a moment

10   this might -- can you see that Special Agent Schoening?

11   A.   Yes, I can.

12   Q.   So can you tell us what is on that board, please?

13   A.   There's a diagram for each location that -- or for three

14   locations that the orphanage had been operating out of, along

15   with the corresponding time frame, and then some photographs.

16   Q.   And so you're referring to Mr. Johnson's Hope Transition

17   Center Orphanage; is that correct?

18   A.   Yes.

19   Q.   And are you aware that it was at three different

20   locations?

21   A.   Yes.

22   Q.   And potentially more, but at least three different

23   locations that have been addressed in this case?

24   A.   Correct.

25   Q.   Okay.  And in terms of -- in terms of the dates for

Schoening - D

1  when -- the dates for each location, let's start with -- let's

2  start with the last date.  What -- where do you have location

3  three being active until?

4  A.    I believe that was the location that he was living and

5  working at when he was arrested.

6  Q.    Okay.  What's the date at which you have -- what's the

7  last date on there, please?

8  A.    The last date on the --

9  Q.    Yes.  The last date of which it shows location three

10 was -- was still --

11 A.    December of 2013.

12 Q.    Okay.  And is that the month in which Mr. Johnson was

13 arrested?

14 A.    Yes, it is.

15 Q.    Okay.  And what's the date that you show the orphanage

16 moving to location three?

17 A.    September of 2012.

18 Q.    Okay.  And had you reviewed -- looked at records, be it a

19 lease or other documents?

20 A.    Yes.

21 Q.    And in terms of location two, what do you have for the end

22 date of location two, please?

23 A.    August of 2012.

24 Q.    And what do you have as the start date for location two,

25 please?

Schoening - D

1   A.    July of 2011.

2   Q.    Okay.  And what do you have as the end date for location

3   one?

4   A.    June of 2011.

5   Q.    Do you recall what records it was -- what kinds of records

6   you reviewed in confirming those dates?

7   A.    There were a couple of documents that we found on the

8   computer.  And then I believe some Facebook records as well.

9   Q.    Okay.  Now, the first date, though, the start date for

10  location one, is that a date that you have come across

11  information for?

12  A.    I don't remember specific information on the start date,

13  but I think it's generally correct.

14  Q.    Okay.  Now, what about the diagrams?  How did you -- what

15  information do you have in the diagrams that are for each

16  location?

17  A.    Other than what's marked or what's marked?

18  Q.    Just what's marked, please.

19  A.    Just what the various areas are, whether it's a dining

20  room or a common area, then Mr. Johnson's bedroom.

21  Q.    And how is it that those diagrams came to be created?

22  A.    We interviewed.  And when I say "we," I interviewed some

23  and some other agents interviewed other people that were

24  familiar with orphanages, and they kind of sketched them out,

25  and we turned the sketches into diagrams.

Schoening - D

1   Q.   And have you shown those diagrams to other people, as

2   well, for corrections and clarifications?

3   A.   Yes.

4   Q.   And from that, do you believe you have information such

5   that you could indicate where Daniel Johnson's room was?

6            MR. WEINERMAN:  I'll object and ask that I be able to

7   ask some questions at this time.

8            THE COURT:  Go ahead.

9            MR. WEINERMAN:  So it's -- it's a little far for me

10  to see, but if I may approach, so I can see, Your Honor?

11           THE COURT:  Yes.

12           MR. WEINERMAN:  Thank you.

13     So we're talking now about the sketches on the top row of

14  this poster board; correct?

15           THE WITNESS:  Yes, sir.

16           MR. WEINERMAN:  And you have indicated -- I assume

17  you're the ones who have labeled the particular rooms and

18  buildings?  So, in other words, look at location three.  You've

19  indicated where certain places were.  Laundry, kitchen, TV

20  room, et cetera; correct?

21           THE WITNESS:  They were labeled when I was given the

22  diagram, sir, and I showed them to one of the witnesses, and he

23  made corrections.

24           MR. WEINERMAN:  So you didn't label them?

25           THE WITNESS:  Not originally, no.

Schoening - D

1      MR. WEINERMAN:  So would it be fair to say that for

2  all three of these locations the labels of where rooms were was

3  based on what somebody else told you?

4      THE WITNESS:  Yes.

5      MR. WEINERMAN:  You've never been in any of these

6  locations yourself?

7      THE WITNESS:  No, I haven't.

8      MR. WEINERMAN:  That's all the questions I have,

9  Judge.  I would object.  It's based on hearsay.

10      THE COURT:  Mr. Sweet?

11      MR. SWEET:  Well, Your Honor, I think we can probably

12  turn to the defense exhibits and get a lot of that information,

13  but we can wait until we do that to admit that, so that's fine.

14      In terms of the labels, I'm happy to wait until we can --

15  until we can supplement that.

16      THE COURT:  It seems we have plenty of witnesses that

17  were available and could clarify the accuracy of the diagrams

18  based on their residence in these three places.  So I think we

19  can get it in, but I think through this particular witness it

20  is hearsay.

21      MR. SWEET:  Absolutely.

22  BY MR. SWEET:  (Continuing)

23  Q.   And, Special Agent Schoening, I would like to -- we talked

24  a little bit about -- we've mentioned Facebook IP accounts.  Is

25  one of the things the FBI used to determine Mr. Johnson's

Schoening - D

1   travel IP addresses for activity off of his Facebook?

2   A.   Yes.

3   Q.   And did you obtain a search warrant for two of

4   Mr. Johnson's Facebook accounts?

5   A.   Yes, I did.

6   Q.   Okay.  And from that, did you obtain some of

7   Mr. Johnson's -- or many of Mr. Johnson's Facebook messages?

8   A.   Yes, I did.

9   Q.   And also voluminous Facebook IP data?

10  A.   Yes.

11  Q.   Did you also obtain a search warrant for what I'll call

12  the GaryDonna Johnson Facebook account?

13  A.   Yes.

14  Q.   And tell us, please, who are Gary and Donna Johnson?

15  A.   Gary is Mr. Johnson's brother, and Donna is Gary's wife.

16  Q.   Did you review the contents of those Facebook accounts as

17  well?

18  A.   Yes, I did.

19  Q.   From your review -- let me ask you this:  Are we talking

20  hundreds of pages, thousands of pages, in terms of the volume

21  of Mr. Johnson's -- Daniel Johnson's Facebook account, roughly?

22  A.   Just Mr. Johnson's?

23  Q.   More than 1,000; more than 5,000?

24  A.   It was probably 28- to 30,000 pages.

25  Q.   And from reading -- and did you read the vast majority of

Schoening - D

1   those messages?

2   A.    Yes and no.    I read a redacted version of the Facebook

3   records.

4   Q.    Okay.    And were you able to determine that Mr. Johnson was

5   often able to access and use Facebook while he was in jail in

6   Cambodia?

7   A.    Yes.

8   Q.    So there are a few messages I would like to -- I would

9   like to turn to.

10           MR. SWEET:    If I may, Your Honor, I'm going to take

11   that down since that hasn't been --

12           THE COURT:    Yes.

13   BY MR. SWEET:  (Continuing)

14   Q.    Before going into the content of some of these messages, I

15   do have a question for you, Special Agent Schoening.    Is it

16   true that based on your performance in the Daniel Johnson case

17   you had to meet with your supervisor to come up with a plan to

18   improve your level of professionalism because of your

19   investigation in the Johnson case?

20   A.    Yes.

21   Q.    And do you agree with that decision?

22   A.    No, I don't.

23   Q.    I'm going to show you some -- I'm going to show you some

24   Facebook chats, and I would like to turn your attention first

25   to 162.    Exhibit 162.

Schoening - D

1    MR. SWEET:  Your Honor, this is one I would ask, if

2 there's no objection from the defense, that it be published to

3 the jury.

4    MR. WEINERMAN:  Other than previously.

5    THE COURT:  With the previous objections, Exhibit 162

6 will be received.

7 BY MR. SWEET: (Continuing)

8 Q.   And, Special Agent Schoening, let me ask you, first, who

9 is Becca Norris?

10 A.   Becca Norris is a member of Calvary Baptist Church down in

11 Texas.

12 Q.   And how does she come up?  What is her role?

13 A.   She handled a lot of the donations and contributions and

14 money.

15    MR. WEINERMAN:  Objection.  This is based on hearsay,

16 based on contacts or discussions with Rebecca Norris.

17    THE COURT:  Overruled.  I think from his

18 investigation he can clarify who this individual is.

19 BY MR. SWEET: (Continuing)

20 Q.   And if you can just give a short summary of what her

21 connection was to the orphanage?

22 A.   Sure.  She -- she collected all the money that was donated

23 or offered and sent it to the ministry.

24 Q.   Okay.  And so did you review Facebook messages between

25 Daniel Johnson and Becca Norris?

Schoening - D

1  A.   Yes, I did.

2  Q.   And for Exhibit 162, what is the date, please, for the

3  start of this communication?

4  A.   05/26 of 2014.

5  Q.   So May 26, 2014, was that after Mr. Johnson was arrested?

6  A.   Yes.

7  Q.   So I'm going to read some of it and ask you if you know

8  who this is talking about.  So a message from Daniel Johnson.

9  "You rest and speak words of peace into SES XXX.  SES XXX is

10  being fed by BT XX, and BT XX is being fed by Karla."

11       From reviewing these messages, who do you believe Sopheak

12  is?

13  A.   Pastor Sopheak.

14  Q.   And BT XX?

15  A.   BT XXXXXXX.

16  Q.   And Karla?

17  A.   Is Karla Comstock.

18  Q.   And next, "But don't tell them that you know this because

19  they all don't know or understand what they're being led into.

20  The problem is they need to see it is hurting the body of

21  Christ.  The silence is Golden Rule needs to be spoken into

22  their hearts and spirits.  They are leaning on their own

23  understanding, yet they do not even understand."

24       Is that an accurate reading?

25  A.   Yes, it is.

Schoening - D

1   Q.   And in reviewing Mr. Johnson's Facebook communications

2   with various people, did you come across other messages in

3   which he would talk about the importance of not speaking out or

4   being silent?

5   A.   Yes.

6   Q.   I'd like to turn your attention to Government's

7   Exhibit 171.  And this is a redacted version, just the -- just

8   a second.

9              MR. SWEET:  So, Your Honor, what we've done is we've

10  taken the second page of Exhibit 171, which we discussed

11  earlier, we have redacted -- we have redacted out -- so a

12  fairly limited amount of text remains.  I'll give the defense

13  the opportunity to review that and make sure that is consistent

14  with their understanding.

15                    (Pause-in-proceedings.)

16              MR. WEINERMAN:  That's fine.

17              MR. SWEET:  I ask this be published to the jury,

18  Your Honor.

19              THE COURT:  Yes.

20              MR. WEINERMAN:  Exhibit number again?  171?

21              MR. SWEET:  This is 171.  Second page of 171.

22              MR. WEINERMAN:  Oh, it's double-sided.  I had both

23  pages, Judge.

24              THE COURT:  All right.

25  ///

Schoening - D

1  BY MR. SWEET: (Continuing)

2  Q.    Special Agent Schoening, let me ask you this:  What

3  Facebook account is this message from in Exhibit 171?

4  A.    It's from the GaryDonna Johnson account.

5  Q.    Okay.  And in reviewing the GaryDonna Johnson account, did

6  you see messages communicating with individuals in Cambodia

7  that are involved in this case?

8  A.    Yes.

9  Q.    And though this is only one message, did you see, you

10  know, a lot of messages, a few messages with people involved in

11  this case?

12  A.    Numerous messages.

13  Q.    Okay.  And did those messages sometimes identify who the

14  author was who was using the GaryDonna Johnson account?

15  A.    Yes.

16  Q.    And who did it identify that as?

17  A.    For the Cambodian individuals, it was usually or almost

18  always Gary.

19  Q.    So the person in the U.S. communicating with the

20  Cambodian -- the author for the GaryDonna Johnson account

21  communicating with Cambodian individuals was usually Gary?

22  A.    Yes.

23  Q.    Or "almost always Gary" I think you said.

24  A.    Yes.

25  Q.    Okay.  And was -- how could you determine that?

Schoening - D

1    A.    Just by the text.    A lot of times the other person would

2    say, "Hey, Bro," or sometimes they would say -- they'd put his

3    name in there.    Gary.

4    Q.    From your review of messages, did it appear that sometimes

5    messages were being relayed or copy-and-pasted from

6    Daniel Johnson through the Gary Johnson account?

7    A.    Yes.

8            MR. WEINERMAN:    Object as leading, and it calls for a

9    characterization.    The best evidence is the chats themselves

10    and not his interpretation of them.

11            THE COURT:    Overruled as to, you know, why he even

12    focused on these particular chats.

13        So go ahead.

14            THE WITNESS:    Yes.

15    BY MR. SWEET:  (Continuing)

16    Q.    So I would like to read a portion of the unredacted

17    portion from 171.    Well, let me ask you this:    Are there

18    misspellings in some of the chats from the GaryDonna Johnson

19    account?

20    A.    Yes.    Some of them.

21    Q.    Okay.    Would you see -- would you see the word "BT XX" pop

22    up fairly frequently with a capital "B"?

23    A.    Yes.

24    Q.    And just from context and from looking at other messages,

25    who do you believe BT XX to be?

Schoening - D

1  A.    BT XX.

2  Q.    Please tell me if this is correct.  "Please plan a visit

3  to BT XXX's family, along with Da Sothea.  Explain to BT XXX's

4  family that BT XXXX should return to Cambodia because he, and

5  he alone -- all caps -- is planning on testifying against me in

6  exchange for citizenship.  They need to know that I am in jail

7  because BT XXXX believe and is only thinking of himself.  He

8  needs to retract and return to Cambodia.  Offer them 10k as

9  though it's coming from Sinai -- it's from Sinai?"  Is that

10  correct?

11  A.    Yes.

12  Q.    So, first of all, who do you believe -- do you know who

13  Sinai is?

14  A.    It's Pastor Sinai.

15  Q.    And did you see other messages involving Pastor Sinai?

16  A.    Yes.

17  Q.    As far as you know, was Gary Johnson in jail during the

18  time of these chats?

19  A.    Not as far as I know.

20  Q.    I would like to turn your attention to Exhibit 224,

21  please.

22          MR. SWEET:  Your Honor, I would ask that this one be

23  published to the jury.  It's between Daniel Johnson and

24  SO XXXXXXX.

25          THE COURT:  It will be published and received.

Schoening - D

1    MR. SWEET:  224.

2   BY MR. SWEET: (Continuing)

3   Q.    So are you -- do you recall this -- do you recall this

4   chat?  If we need to -- let's expand towards the bottom, the

5   bottom three paragraphs.

6   A.    Yes, I do.

7   Q.    I would like to read it and then ask you a question.

8         So is the author from the -- the first expanded paragraph,

9   is that Daniel Johnson?

10  A.    Yes, it is.

11  Q.    Okay.  And what's the date that that message was sent,

12  please?

13  A.    5/26 of 2014.

14  Q.    And was Mr. Johnson in jail in Cambodia at that time?

15  A.    Yes.

16  Q.    And does it say, "I don't understand why Christian cannot

17  see they hurt all Christian when they speak bad and make more

18  problem.  God don't like this."  Is that correct?

19  A.    Yes.

20  Q.    Okay.  What did Mr. Johnson -- what's the next message

21  after that, please?

22  A.    Did you want me to read that?

23  Q.    Yes, please.

24  A.    It says it's from Daniel Johnson.  The recipient was

25  SO XXXXXXXXXXXXXXX.  It says, "Can you post that or write

Schoening - D

1  something like it and post?"

2  Q.    Sorry.  Can you say the last part louder again, please?

3  A.    Yes.  "Can you post that or write something like it and

4  post?"

5  Q.    And were those two messages sent close in time to each

6  other?  First, the suggested text and then the request?

7  A.    Yes.  About a minute apart.

8  Q.    Actually, just looking at it, I mean, it's --

9           MR. WEINERMAN:  Objection.  The document speaks for

10  itself.

11           THE COURT:  I'll allow him to ask questions about the

12  document.

13  BY MR. SWEET:  (Continuing)

14  Q.    So 13:01:50 is the first message?

15  A.    Yes.

16  Q.    13:02:05 seconds?

17  A.    Yes.

18  Q.    So approximately 15 seconds apart?

19  A.    Yes.

20           MR. SWEET:  I have one more of these.  Exhibit 286,

21  please.

22      Your Honor, this is one of the -- we have switched the --

23  the raw data is available as part of this exhibit, but a

24  streamlined version of the same text is what is depicted.  And

25  after Counsel has an opportunity to review it, I would ask that

Schoening - D

1   286 be published.

2            MR. WEINERMAN:  No objection.

3            THE COURT:  All right.  It will be published.  It's

4   already received.

5   BY MR. SWEET: (Continuing)

6   Q.   And, Special Agent Schoening, who is this message -- who

7   are these messages from and who are they to?

8   A.   From Mr. Johnson to SO XXX.

9   Q.   Okay.  And so this is fairly long.  So there are just

10  parts of this I would like to highlight.  Please tell me if

11  this is correct.

12       And what's the date of these chats, please?

13  A.   June 28th of 2014.

14  Q.   "I love you forever and nothing you or anyone can say or

15  do to change that will ever change my heart and feelings for

16  you.  I pray that you will come and see me and we can talk face

17  to face.  I have many things to tell you, but I refuse to do it

18  through electronics.  My heart is torn and broken for so many

19  reasons now.  Mostly because you are looking for any reason to

20  abandon me right now."

21       Going down below, "I love you so much, sweet son, and I

22  miss you.  My heart is bleeding while waiting to see you face

23  to face."

24       Below, "Waiting for the day I can be together with you

25  free so I can show you that I always -- I will always be by

Schoening - D

1   your side to walk with you, to help you stand when you are

2   weak, to catch you when you fall, to help you stand -- to help

3   stand you back up, to be there for you when no one else is, to

4   die for you if needed."

5       Are those correct so far?

6   A.   Yes.

7   Q.   And, finally, does it end, "I'm very destroyed.  You don't

8   talk with me like before, son.  I can feel you pulling away

9   from me, so I tried to honor your feelings and give you some

10  space.  My heart is as strong as ever for you and even if your

11  heart and mind changes from the words you have spoken to me,

12  mine never will change because what I told you is true

13  forever."

14      Is that correct?

15  A.   Yes.

16  Q.   And did you find multiple Facebook messages,

17  Special Agent Schoening, between Daniel Johnson and many of the

18  boys?

19  A.   Yes.

20          MR. SWEET:  Your Honor, given the volume, if I may, I

21  would just like to read the exhibit number, and I understand

22  ruling may need to be deferred, but just to lay the foundation

23  for their admission.

24          THE COURT:  All right.

25          MR. SWEET:  Exhibit 162, 165, 166, 167, 169, 170,

Schoening - D

1   171, 224, 276, 277 -- 277 through 289, 291, 293, 299, 304, and

2   that is -- those are the Facebook chats.

3   BY MR. SWEET:  (Continuing)

4   Q.   I only have a couple more things, Special Agent Schoening.

5        Have you reviewed on audio that is a recording of an

6   in-person conversation between Mr. Johnson and his relatives?

7   A.   Yes.

8   Q.   Okay.  And was that audio from January 21, 2015?

9   A.   Yes.

10  Q.   And do you recall if that audio is Exhibit 197?

11  A.   I believe so.

12       MR. SWEET:  Your Honor, we're not asking it be played

13  but just asking that that be admitted.

14       MR. WEINERMAN:  No objection --

15       THE COURT:  All right.  It will be received.

16       MR. WEINERMAN:  -- other than previously made.

17       DEPUTY COURTROOM CLERK:  What exhibit was that?

18       MR. SWEET:  197.

19  BY MR. SWEET:  (Continuing)

20  Q.   So wrapping up, Special Agent Schoening, did you interview

21  BT XXXXXXX as part of this investigation?

22  A.   Yes.  Several times.

23  Q.   And do you recall the date of your first interview with

24  him?

25  A.   April 17, I believe, of 2014.

Schoening - D

1   Q.   Feel free to check if that would help you.

2   A.   April 17 of 2014 was the first time I interviewed him.

3   Q.   April 17th of 2014?

4   A.   Yes.

5           MR. SWEET:  I just have one clerical clarification.

6   I said 304 for one of the last exhibits.  I should have said

7   305.  Not 304.  I apologize.

8   BY MR. SWEET: (Continuing)

9   Q.   Special Agent Schoening, where did you interview

10  BT XXXXXXX?

11  A.   At the Fry Road Nursery in Albany.

12  Q.   Did he know you were coming?

13  A.   No, he didn't.

14  Q.   Had you spoken with him before you went to the nursery?

15  A.   No.

16  Q.   Had he made any efforts to contact you?

17  A.   Not that I know of.

18  Q.   Okay.  And while working on this case, did you come across

19  a document which named or had BT XXXXXXX mentioned in it?

20  A.   It had him by his Cambodian name, which was BT XXXXXXXXX.

21  Q.   Okay.  Is that what led you to go talk with BT XXXXXXXXX

22  or BT XXXXXXX?

23  A.   Yes.

24  Q.   After speaking with BT XXXXXXX, did you later try to

25  figure out how he could stay in the U.S. to be available for

Schoening - D

1    trial?

2    A.    Yes, I did.

3    Q.    Okay.  Is that something a -- a process that you were

4    familiar with?

5    A.    No.

6    Q.    And did you reach out to Immigration and Customs

7    Enforcement about that?

8    A.    Yes, I did.

9    Q.    And did they put you in touch with someone?

10   A.    Yes.  An immigration attorney that they had worked with in

11   the past.

12   Q.    And then did you facilitate that immigration attorney

13   getting in touch with BT XXXXXXX?

14   A.    Yes.

15   Q.    And, Special Agent Schoening, when you first met

16   BT XXXXXXX on April 17th of 2014, did he talk to you about any

17   sexual abuse?

18   A.    Yes, he did.

19   Q.    Did he mention discussing sexual abuse by Daniel Johnson

20   to him?

21   A.    Yes.

22   Q.    And, in summary -- and summary is fine -- what did he say?

23   A.    That he -- I believe, initially, it was that he had been

24   abused five or six times.  He didn't go into too much detail as

25   far as the specific instances.  That was in a later interview,

Schoening - D

1  once he got a little bit more comfortable with me.  He also

2  stated that he was basically afraid of Mr. Johnson.  He was

3  afraid of retaliation.

4  Q.   And, Special Agent Schoening, I just have -- I just have

5  one last question.  There's one more Facebook chat that I would

6  like to -- I would like to bring up, and that is 305.

7        I'll give Counsel a minute, because we discussed this

8  earlier, but then I believe we --

9             MR. SWEET:  At this point, if we can just have it

10  published to Counsel.

11             MR. WEINERMAN:  No objection.

12             THE COURT:  All right.  It will be received.  It can

13  be read into the record if you wish.

14             MR. SWEET:  Thank you, Your Honor.

15  BY MR. SWEET:  (Continuing)

16  Q.   Special Agent Schoening, is this message from the

17  GaryDonna Johnson Facebook account to the SO XXXXXXXXXXXXXXX

18  account?

19  A.   Yes, it is.

20  Q.   What's the date, please?

21  A.   January 30th of 2015.

22  Q.   And does it say --

23             MR. SWEET:  And if this could be published to the

24  jury, please.

25             THE COURT:  Yes.  Sorry.  I thought it was.

Schoening - D

1  BY MR. SWEET: (Continuing)

2  Q.   Does it say, "Get a hold of BT XXXXX XXXXXXXXXXXX family.

3  Try to get them to talk BT XX into stopping what he's doing to

4  Daniel.  Let them know he can recant his accusations on Daniel.

5  It would be the right thing to do.  Also, our dad is very sick,

6  and he needs to see he's son.  This is killing him.  Thanks.

7      This would end this terrible action against Daniel for

8  good.  Then Daniel could have a solid case on suing FBI.  He

9  would be able to pay everyone back.

10     Also help BT XX gets out of Cambodian prison.  Because

11  when they get what they want, they will extradite him back.

12  This is a guarantee they never ever keep their promises.  This

13  could be a happy ending for everyone except the FBI.

14     Also pass on not to talk about the case about

15  Daniel unless it's Daniel's attorney."  Is that accurate?

16  A.   Yes.

17         MR. SWEET:  Thank you, Your Honor.  I have no further

18  questions.

19         THE COURT:  Excuse me.  Sorry, folks.

20     We will break, folks, for lunch until 1:15 at which time

21  we will have cross-examination.

22                 (Jury not present.)

23         THE COURT:  All right.  Anything we need to discuss

24  before we break?

25         MR. SWEET:  Nothing from the government, Your Honor.

1          MR. WEINERMAN:  Nothing.

2          THE COURT:  See everybody at 1:15.  Thank you.

3                    (Lunch recess taken.)

1                    C E R T I F I C A T E

2

3          United States of America v. Daniel Stephen Johnson

4                         6:14-cr-00482-MC-1

5                      TRIAL DAY 8, VOLUME 7A

6                        PAGES 892 - 982

7                          May 9, 2018

8

9          I certify, by signing below, that the foregoing is a

10   true and correct **REDACTED** transcript of the record, taken by

11   stenographic means, of the proceedings in the above-entitled

12   cause.  A transcript without an original signature, conformed

13   signature, or digitally signed signature is not certified.

14

15   /s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC

16   _____

     Official Court Reporter         Signature Date: 5/9/18
17   Oregon CSR No. 98-0346           CSR Expiration Date:  9/30/20

18

19

20

21

22

23

24

25