1          UNITED STATES DISTRICT COURT

2          DISTRICT OF OREGON

3     THE HON. MICHAEL J. McSHANE, JUDGE PRESIDING

4

5
UNITED STATES OF AMERICA,        )
6                                 )
                    Government,   )
7                                 )
          vs.                     )      No. 6:14-cv-00482-MC-1
8                                 )
DANIEL STEPHEN JOHNSON,           )
9                                 )
                    Defendant.    )
10    _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                  EUGENE, OREGON

16            TRIAL DAY 9, VOLUME 8B

17             MONDAY, MAY 14, 2018

18             PAGES 1107 - 1139

19

20

21

22                  Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
                    Official Federal Reporter
23                  United States Courthouse
                    1000 SW 3rd Avenue, Room 301
24                  Portland, Oregon 97204
                    (503) 326-8191
25                  jill_jessup@ord.uscourts.gov

```
 1

 2   APPEARANCES OF COUNSEL:

 3   FOR THE GOVERNMENT:

 4   Jeffrey S. Sweet
     United States Attorney's Office
 5   405 E. Eighth Avenue, Suite 2400
     Eugene, OR 97401
 6   541-465-6771
     Fax: 541-465-6917
 7   Email: jeff.sweet@usdoj.gov

 8   Lauren E. Britsch
     U.S. Department of Justice
 9   Criminal Division
     1400 New York Ave NW, 6th Floor
10   Washington, DC 20530
     202-514-2220
11   Fax: 202-514-1793
     Email: lauren.britsch@usdoj.gov
12
     Ravi Sinha
13   United States Attorney's Office
     1000 SW Third Ave, Suite 600
14   Portland, OR 97204
     503-727-1014
15   Fax: 503-727-1117
     Email: ravi.sinha@usdoj.gov
16
     FOR THE DEFENDANT:
17
     Craig E. Weinerman
18   Office of the Federal Public Defender
     859 Willamette Street, Suite 200
19   Eugene, OR 97401
     541-465-6937
20   Fax: 541-465-6975
     Email: craig_weinerman@fd.org
21
     Lisa A. Maxfield
22   Pacific Northwest Law LLP
     1255 NW Ninth Avenue, No. 11
23   Portland, OR 97209
     (503) 222-2661
24   Fax: (503) 222-2864
     Email: lamaxfield@pacificnwlaw.com
25
```

1                              GENERAL INDEX

2  DEFENDANT'S WITNESSES:                          PAGE:

3   BILLY DEAN ROBERTSON

4  (Continuing Direct Examination)

5   Direct Examination by Mr. Weinerman          1110

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Robertson - D

```
 1                 TRANSCRIPT OF PROCEEDINGS
 2                      (May 14, 2018.)
 3   (In open court:)
 4             THE COURT:  Bring our jury back in.  Do we have our
 5   witness?
 6                       (Jury present.)
 7             THE COURT:  Please be seated, everybody.  Good
 8   afternoon.  Let's return to the direct testimony.
 9             MR. WEINERMAN:  Thank you, Judge.
10
11                   BILLY DEAN ROBERTSON,
12   called as a witness in behalf of the Defendant, being
13   previously duly sworn, is examined and testified as follows:
14
15                    DIRECT EXAMINATION
16   BY MR. WEINERMAN:
17   Q.   We were talking, before we broke for lunch, about
18   Exhibit 616, page 132.  I believe you testified that you
19   recognize that as being part of the Prey Veng building complex.
20   A.   Yes.
21   Q.   All right.  So we talked about Kampot a bit.  We talked
22   about Prey Veng and what you did there.  Did you and your wife
23   loan out -- donate money to sponsor individual kids at Hope
24   Transition Center?
25   A.   I don't think so.  My wife may have on her own, but she
```

Robertson - D

1  pretty much handled that area.

2  Q.   All right.  Let me put up Government's Exhibit 157.

3       Now, this is a document kept by Mr. Johnson.  It was found

4  on his computer.  And if you look at the last column right on

5  top, there are a few entries that say, "Bill and Lona

6  Robertson, $50," which would have been individual contributions

7  to some of the kids.  So is -- is it possible that your wife

8  wrote out checks to sponsor individual kids and didn't consult

9  with you or didn't share that with you or maybe you forgot?

10 A.   Yes.  Yes, she did.  She had that honor.  She was vice

11 president.

12 Q.   All right.  All right.  Do you recall which -- which case

13 you may have sponsored?

14 A.   She may have mentioned it; but, you know, I was so busy in

15 those days I didn't pay much attention to their names.

16 Q.   Okay.  All right.  So when you were up at the churches --

17 I'm getting back to the churches -- were you there when they

18 were actually being built?

19 A.   In Cambodia?

20 Q.   Yes, sir, in Cambodia.

21 A.   Yes.  Yes.  Uh-huh.

22 Q.   So you saw people actually doing the physical labor?

23 A.   Yes.

24 Q.   Painting and drywalling and all of that?

25 A.   Yes.  Uh-huh.

Robertson - D

1  Q.    Okay.  So now I'm going to go back to Hope Transition

2  Center and some of the things you observed there.  So at the --

3  at the actual center where the kids live, was that similar to

4  other orphanages and centers that you observed in other

5  countries?

6  A.    Yes.  I believe so.

7  Q.    What did you observe Hope Transition Center doing for the

8  kids?

9  A.    Well, they had a big dayroom and the kids ran and played.

10 And then outside they -- they had games and ran and played, and

11 they were -- seemed to be pretty happy and free.

12 Q.    All right.  Were you there at mealtime?

13 A.    Yes.

14 Q.    All right.  So the kids were obviously fed?

15 A.    Yes.  Yes.  There was a cook there.

16 Q.    All right.  And what about the clothing they wore?  Can

17 you tell us what that looked like, in general?

18 A.    Yes.  I thought they were dressed very nice.

19 Q.    Okay.

20 A.    Very well.

21 Q.    Clean?

22 A.    Very clean.

23 Q.    All right.

24 A.    Very neat.

25 Q.    What was your general observation about the kids in terms

Robertson - D

1  of their behavior, if I could ask that?

2  A.    They seemed to be very happy.  Very happy.  They seemed to

3  idealize Daniel, and he would be so busy that he could -- you

4  know, he couldn't just sit down and talk to them much, but he

5  just would say, yes -- he'd call them by name and just -- I

6  just thought they were all very happy.

7  Q.    Well, let me ask you again about how Daniel behaved

8  towards the kids.  Did you have any concerns about some of the

9  things you saw?

10  A.    I -- truthfully, I thought he was a little strong in his

11  discipline with them verbally.  Verbal discipline.  And I

12  talked to him about it.  The older kids, the older boys, he

13  would scold them a little bit, but there -- nothing came of it.

14  It was just my opinion.

15  Q.    Did you make any suggestions to him about changes he might

16  make in that -- in that area?

17  A.    Yes, I did.

18  Q.    What did you tell him?

19  A.    Uh-huh.  I told him that he was coming down a little too

20  hard on those older boys.  He had so much going on and so many

21  kids pulling at him, but I understood why he did it.  But I --

22  I -- and he seemed to take it.  He seemed to understand, and he

23  said, "Well, I have to control them.  I can't -- I can't just

24  let them run amok," you know, or -- I forget his exact words.

25  Q.    In your opinion, did he need help?  Did he need additional

Robertson - D

 1   adults there to help him manage the place?
 2   A.   Yes, he did.  Yes, he did.  In fact, I advised him on
 3   various occasions that it was too much for him.  I said,
 4   "You -- you need some adults.  You need a couple here -- a mom
 5   and a dad -- that they can look to."  And then he, at that
 6   time, said, "Well, we have a full-time cook lady that's here."
 7        And I -- I think he was just doing the best he could do.
 8   Q.   All right.  I think you -- and correct me if I'm wrong.
 9   You said a few minutes ago that you thought the kids were
10   emotionally attached to him.  Is that what you said?
11   A.   Yeah.  They would run and jump on him and jump in his arms
12   and pull at him and hold his -- cling to his leg when he tried
13   to walk, the little ones, you know.  Just typical kids, I
14   thought.
15   Q.   All right.  So when you told him he needed some help with
16   the house parents and the other things, what was he doing at
17   the Hope Transition Center, that you observed, that you felt
18   took up so much of his time that he needed help?
19   A.   Well, he was supervising the construction, supervising the
20   sending out for supplies, getting orders with the meals and
21   doing everything.  And working with the older kids.  They would
22   get on the motorcycle and go -- go purchase whatever it was he
23   told them to go get, and it would just -- you know, a lot of --
24   a lot of work.  A lot of confusion, it seemed like.
25   Q.   So when you were on a mission and visited Hope Transition

Robertson - D

1  Center, did you consider him to be the host?

2  A.   Yes.

3  Q.   And what -- what did you observe that that involved, in

4  terms of the amount of time that -- that he devoted to hosting

5  mission groups that came through?

6  A.   Well, he didn't have a lot of time.  We just kind of

7  observed and joined in with whatever was going on.  And when he

8  wanted to take us out and show us some of the wells that they

9  were drilling, and that sort of thing, we would just wait and

10  get into the Jeep or the car or whatever and wait until he

11  could come and take us.  So that's what we did.

12  Q.   When you visited these outlying areas where the churches

13  were in Kampot and Prey Veng, Daniel would take you out there?

14  A.   Yes.

15  Q.   Or he was in a group that took you out there?

16  A.   Yes.

17  Q.   Do you recall how long it took for you to get out there?

18  A.   Not really.  Those bumpy roads, it seemed like forever,

19  but it was probably two or three hours.

20  Q.   Okay.  All right.  So the last area I want to talk to you

21  about is massages.

22  A.   Uh-huh.

23  Q.   What did you observe regarding the kids, the boys who were

24  there, regarding massages?  Tell us about that.

25  A.   Well, they kept -- kept wanting to massage our necks and

Robertson - D

1  our shoulders and our arms and our hands, and finally my wife

2  told them to stop and -- you know, stop.  Because they hurt.

3  They had such strong hands.  And this one little older boy, he

4  just kept hurting my neck and my shoulders, and it seemed like

5  they -- I think we gave them candy.  I think we gave them

6  little gifts for it and said, "That's okay.  That's okay."  And

7  they just kept on at it.

8       In fact, on one occasion I fled and went to a table and

9  scooted real close to the table so they -- and I said, "Don't.

10  Don't.  I've had enough.  Thank you."  So they didn't.

11  Q.   Was it your observation that this was something that they

12  wanted to do in exchange for some sort of gift?  Money, food,

13  something like that?

14  A.   Seemed like it to me.

15            MR. WEINERMAN:  Okay.  I have no further questions.

16            THE COURT:  Any cross?

17            MS. BRITSCH:  Thank you.  No questions, Your Honor.

18            THE COURT:  Thank you, Pastor.  You're free to go.

19            THE WITNESS:  Thank you.

20            THE COURT:  It's my understanding that we don't have

21  any further witnesses at this time.

22            MR. WEINERMAN:  Yes, Your Honor.  Our witness will

23  not get here until clearly after 5:00.

24            THE COURT:  Okay.  So, folks, we're going to break at

25  this stage for today.  We have one defense witness left.

Robertson - D

1    Let me just ask.  Will there be rebuttal witnesses, do you

2  think?

3         MR. SWEET:  Your Honor, it is possible; but if so, we

4  would expect it would only be one and that it would be brief.

5         THE COURT:  Okay.  So my expectation is we're going

6  to finish up the testimony tomorrow morning.  We have one more

7  witness from the defense, and, you know, it's very difficult to

8  time everything perfectly.  And this particular witness is

9  having to fly in.  Unfortunately, the flight is later today.

10  So we'll take her testimony in the morning, possibly some brief

11  rebuttal testimony from the government, and then I'll be

12  instructing you as to the law that applies to this case.

13    We'll be excusing our two alternate jurors, which is

14  always a little rough part of this because two of you have been

15  sitting on the case, listening to all the evidence, doing

16  everything you need to do, but only 12 of you can deliberate.

17    So the one thing I'll say about it is people often --

18  alternates are the ones who write letters later saying, "I

19  can't believe I had to go through all of this and I didn't get

20  to deliberate or give an opinion about the case."  I mean, if

21  you can imagine if we only had 12 jurors and any one of you,

22  you know, got sick, had a family emergency and had to leave,

23  this trial would have to start all over.  We have to have 12

24  jurors.  In a case like this, that involves especially, you

25  know, people having to fly from very far away and the costs

1    involved, it's just very important that we have more of you

2    than we actually need.  So in that respect, the alternates have

3    done us a great service.

4        We actually had intended on having three alternates.  As

5    you might recall, one of those alternates was very insistent he

6    wasn't coming upstairs.  So I just decided to move forward.

7        So the alternates will come tomorrow for the final

8    testimony and the closing arguments of the attorneys and at

9    that time you will be excused.  So I do apologize for, I guess,

10   the cruelty of that.  But it's been very important to all of us

11   to know that we were going to finish this case and not have to

12   do it all over again.

13       So we'll see everybody back here at 9:00.  I'm going to

14   continue working with the attorneys on issues around the

15   instructions that we'll give you, but you will hear closing

16   arguments tomorrow, and I do expect that there will be some

17   time for you to at least begin your deliberations.

18       With that, we'll see you all tomorrow morning at 9:00.

19                         (Jury not present.)

20           THE COURT:  Has everybody had a chance to go over the

21   draft of the instructions that we put together?

22           MS. BRITSCH:  Your Honor, the government has.

23           MR. WEINERMAN:  We have, as well, Judge.

24           THE COURT:  Okay.  Well, let's hear maybe from the

25   government.  I expect they will be briefer, so maybe I can hear

1    from them first as to any objections or exceptions or anything

2    that you want to convince me is missing.

3            MS. BRITSCH:  Your Honor, I think there are two --

4    only two issues that we had.  The first is that I don't believe

5    the Court's instruction included any instructions on venue, and

6    we do believe that there should be instructions -- two separate

7    instructions on venue.  One that applies to Counts 1 through 6

8    and one that applies to Counts 7 and 8.  We had proposed venue

9    instructions in our filing.  Document 199.  That was filed

10   right before trial started.

11       So those are the venue instructions that the government

12   would propose to Your Honor.

13           THE COURT:  Okay.  I mean, I think I took them out as

14   to the stipulation to venue.  I mean, I'll put them in if you

15   really think we need them there.

16           MS. BRITSCH:  I -- the stipulation largely covers the

17   venue issue.  I think the Court is right, but I think it

18   doesn't entirely cover the venue issue, and so we do believe,

19   particularly in light of the *Lukashov* case, where the Ninth

20   Circuit said it was error, though harmless, to not instruct on

21   venue, that a venue instruction should be included.

22           THE COURT:  Let's instruct on venue, then.

23           MS. BRITSCH:  Thank you, Your Honor.

24           THE COURT:  We'll include them.

25           MS. BRITSCH:  Then the other issue is just including

1  the dates for the conduct that is alleged in the indictment.

2  We would propose perhaps just adding a column on the Court's

3  chart on page 27 that has the alleged on or about dates for

4  each victim and then just including --

5              MR. WEINERMAN:  I'm sorry.  Counsel mentioned

6  page 27.  It's the Court's instruction?

7              MS. BRITSCH:  I believe so.

8              MR. WEINERMAN:  Because mine are not numbered.

9              THE COURT:  Mine aren't numbered either.  I'm sorry.

10  Because they came at me and I reorganized them.  I took all of

11  them --

12              MS. BRITSCH:  It's my understanding, Your Honor, it's

13  the instruction for Counts 1 through 6 of the superseding

14  indictment that has the chart.

15              THE COURT:  Right.

16              MS. BRITSCH:  This may be an earlier copy of the

17  Court's instructions.

18              THE COURT:  I have it.  I guess I was expecting from

19  the government you would fill in the names and nicknames and

20  get that back to us.

21              MS. BRITSCH:  Yes.  We can do that, Your Honor.

22              THE COURT:  Your proposal is to also add an on or

23  about date?

24              MS. BRITSCH:  Yes.  A column for each one.

25              THE COURT:  That's fine.

1      MS. BRITSCH:  Would you like us to just go ahead and

2  fill that out and then propose that to the Court?

3      THE COURT:  Yes.  If you can just email it to

4  Mr. Allnatt.

5      MS. BRITSCH:  All right.

6      THE COURT:  And include it in the instructions.

7      MR. WEINERMAN:  Is that going to be the date in the

8  superseding indictment?

9      MS. BRITSCH:  That's our proposal, Your Honor.

10      MR. WEINERMAN:  That's fine.

11      THE COURT:  All right.

12      MS. BRITSCH:  And the same with respect to the

13  substantive instructions for Counts 7 or 8.  Obviously, there

14  is not a chart for those, but just including the -- you know,

15  that Mr. Johnson is charged in Count 7 with the conduct on or

16  about the dates as alleged in Counts 7 and 8.

17      THE COURT:  All right.  So we would just need to add

18  maybe an element two.  "Mr. Johnson traveled in foreign

19  commerce from the United States to Cambodia on or about"?

20      MS. BRITSCH:  I think that's right, Your Honor.  I

21  think it's a date range in the indictment, so just between on

22  or about the dates in the indictment.

23      THE COURT:  Okay.  Do you know those dates right

24  offhand?

25      MS. BRITSCH:  I have the indictment in front of me.

1    For Count 7, that's between on or about June 23, 2011, and on

2    or about May 29, 2013.  It's the same dates for Count 8, as

3    well, Your Honor.

4              THE COURT:  All right.  So on Count 8, in element

5    one, "Mr. Johnson traveled across the state line between on or

6    about June 23, 2011, and May 29, 2013."

7              MS. BRITSCH:  That's correct, Your Honor.

8              THE COURT:  Okay.  I'll add that to the elements.

9              MS. BRITSCH:  Your Honor, two other smaller issues.

10   At different points in the instructions, I believe the Court

11   uses the term "indictment" and sometimes uses "superseding

12   indictment."  We don't necessarily have a preference as between

13   those two, but perhaps it should be consistent so as not to

14   confuse the jury.

15             THE COURT:  I think so.  We'll go through and delete

16   the word "superseding."

17             MS. BRITSCH:  I think that's fine with the

18   government, Your Honor.

19        Finally, as to the proposed verdict form -- and I believe

20   this is language the government proposed, so I apologize for

21   perhaps reversing our position.  But as to Count 8, for the

22   specific unanimity portion of it, we have, "You must find the

23   defendant crossed the Oregon state line with the requisite

24   intent."  We propose taking out the word "Oregon" and saying

25   "crossed a state line."  Instead of "the Oregon state line"

1   just say "a state line."  And I think otherwise it causes

2   confusion with the burdens of proof.

3        The Oregon portion is a venue preponderance standard;

4   whereas, the crossing a state line has to be proven beyond a

5   reasonable doubt.  So we think the Oregon portion of it will be

6   covered by the Court's venue instruction and need not be

7   included in the verdict form.

8             THE COURT:  Any objection to amending the verdict

9   form in regard to Count 8 as just "a state line" and deleting

10  the word "Oregon"?

11            MR. WEINERMAN:  That's fine.  "State line" is fine.

12            THE COURT:  Okay.

13            MS. BRITSCH:  That's all the government had,

14  Your Honor.

15            THE COURT:  The defense?

16            MR. WEINERMAN:  Yes.  We had a number of concerns.

17       The first one would be the instruction Testimony of

18  Witnesses' Compensation and Benefits.

19       That seemed to be taken from Ninth Circuit 4.9, but a

20  paragraph has been deleted, I believe.  That's the paragraph

21  that says, "In addition, you should examine the testimony of

22  these witnesses with greater caution than those of other

23  witnesses."  That is not in there, and that's part of the

24  instruction, and we believe that should be given.

25       That's -- that's Ninth Circuit Instruction 4.9.

1    I just went online the other day and printed it, if the

2    Court wants to see it.

3    THE COURT:  Okay.

4    MR. WEINERMAN:  I can show Counsel first.

5    THE COURT:  I always made it a practice not to start

6    highlighting to the jury what they should and should not do in

7    terms of the weight they wish to give to any evidence.

8    MR. WEINERMAN:  I just say that that's an instruction

9    that has been given for many, many years in the Ninth Circuit.

10   I realize that --

11   THE COURT:  Well, in state court it was the same.  It

12   was witness false in part, and it said that if you found they

13   were false in some part you should review the rest of their

14   testimony with caution, and it was ultimately upheld, even

15   though I always felt uncomfortable telling the Court what they

16   should and should not consider with caution.  But if it's --

17   MR. WEINERMAN:  Judge, I had submitted a different

18   instruction, not from the Ninth Circuit, from O'Malley, Grenig

19   and Lee, 15.06.  The government objected to that citing,

20   I believe, an unpublished decision, that if the Court gave the

21   Ninth Circuit Instruction 3 -- 4.9, the Court didn't have to

22   give the O'Malley, Grenig and Lee instruction.  But it seems to

23   me that the Court should give the whole instruction and not

24   just part of it.  And that, I suspect, is what the Ninth

25   Circuit also believed when they denied the request for the

15.06 O'Malley, Grenig and Lee instruction.

I can probably find that for you, Judge.

So, Judge, I submitted it.  It's my Instruction 29.  It's a mess because I put the initials of all the witnesses, and I have no problem with the Court not doing that and just say "witnesses."  But that's -- that's the one we submitted, which I think is pretty much verbatim Model Instruction 4.9.

THE COURT:  I have it here.  I have your instruction 21 statement -- or 29 statements of --

MR. WEINERMAN:  I can provide a copy if the Court wants.

THE COURT:  That will be helpful.

MR. WEINERMAN:  Does the Court want the Ninth Circuit instruction?  I have a copy of that as well.

THE COURT:  Yes.

MR. WEINERMAN:  I think I handed it to you.

It's been marked by Mr. Sweet, but nothing inappropriate.

THE COURT:  Okay.  Well, what's the government's position?  It may -- it does appear the Ninth Circuit endorses that language.  I'm -- I was initially uncomfortable with it.

MR. SINHA:  Well, Your Honor, we -- we happen to share the Court's feeling on this language.  We are not sure this specific instruction really fits the facts of the case.  I mean, I don't think it's immunity or accomplice or -- or even the benefits, I think, is pretty questionable with regards to

1   all but perhaps BT XXXXXXXX.  So we're not sure that this

2   instruction is kind of on all fours with what has come up in

3   this case, and we share the Court's feeling with regards to, I

4   think, the last sentence.

5        So with that, we prefer, you know, the Court's instruction

6   be based off of the Ninth Circuit pattern instruction as

7   opposed to the non-pattern instruction.  But if the Court wants

8   to alter that pattern instruction, I think it certainly makes

9   sense, given the testimony in this case, since that doesn't

10   seem to be exactly what that pattern instruction is addressing.

11             MR. WEINERMAN:  Judge, the only thing I would add is

12   that for these particular witnesses, the money they're getting

13   is significant.  Maybe not for a citizen of this country, but

14   based on the income levels and the fact that these witnesses,

15   many of whom are not employed, this is a pretty significant

16   benefit.

17        BT XXXXXXXX is, I think, obvious.  You know, the -- the

18   testimony was a little vague as to the others who had attorneys

19   and met with the attorneys and asked questions.  But it just

20   seems to me that they are receiving benefits or they're

21   certainly not ruling out wanting to obtain benefits such as

22   being able to go to school here.

23             THE COURT:  Okay.  I'll give the model instruction.

24   You know, I may add "It is up to you to determine how much

25   weight to give such testimony or such evidence."

1          Okay.  So I'll make that change.

2               MR. WEINERMAN:  I have some others, Judge, if you

3     give me a minute.

4               THE COURT:  All right.

5               MR. WEINERMAN:  So, Judge, we submitted two

6     instructions regarding whether Mr. Johnson testifies or not.

7     So I just trust the Court will pull the one that's not

8     applicable.

9               THE COURT:  Yes, I pulled that.

10              MR. WEINERMAN:  So this is now the Court's

11    instruction on Count 1-6, and I would ask the Court -- I assume

12    the Court is taking out "superseding" in that one.

13              THE COURT:  Yes.

14              MR. WEINERMAN:  I would recommend and ask the Court

15    to make the first sentence read as follows:  That Mr. Johnson

16    is charged in Count 1-6 of the indictment with traveling in

17    foreign commerce and engaging in illicit sexual conduct in a

18    foreign place.  That's what the statute says and seems to me

19    that all should be mentioned in that first sentence.  I know

20    the Court goes on and reads the elements.  Mr. Johnson is a

21    U.S. citizen.  He traveled in foreign commerce.  But it seems

22    to me the first sentence should also say that because it's

23    incomplete by just saying he's charged in engaging in illicit

24    sexual conduct.  It has to be traveling in foreign commerce and

25    engaging in illicit sexual conduct.

1   So we'd ask that that language be added to that first

2   sentence.

3           MR. SINHA:  So, Your Honor, the statute under which

4   he's charged is Engaging in Illicit Sexual Conduct in a Foreign

5   Place.  I think that's the title of 2423(c), and it's

6   differentiated from 2423(b), which is Travel with the Intent to

7   Engage in Illicit Sexual Conduct.  So I think Mr. Johnson's

8   counsel's request combines those two subsections of the statute

9   in trying to title it.

10   He is factually not charged with traveling and engaging in

11   illicit sexual conduct in Counts 1 through 6.  He's just

12   charged with in engaging.

13           THE COURT:  That's your second element in Counts 1

14   through 6 of your instruction that you forwarded.

15           MR. SINHA:  I think that's right, but it's not what

16   the crime is called.

17           THE COURT:  All right.

18           MR. WEINERMAN:  Judge, when he's done, I just want to

19   say one more thing.

20           THE COURT:  I'm going to add that language.  It

21   tracks the elements that the jury needs to find, and I don't

22   think it does anything to take away from the government's

23   argument.  The jury has to make that finding, you know.  What

24   the technical title of the charge is, is somewhat irrelevant.

25   The jury, they're not probably familiar with this charge the

1    way they would be with the more common kind of crime, so I'm

2    fine tracking the elements in the first paragraph with the

3    language proposed by the defense.

4            MR. WEINERMAN:  Judge, the next one would be the

5    Court's instruction on the elements of Count 7,

6    second-to-the-last sentence --

7            THE COURT:  Hang on real quick.  Since the government

8    is going to redo the instruction on Counts 1 through 6, could

9    you simply add that language?

10           MR. SINHA:  Yes, Your Honor.

11           THE COURT:  All right.  Thank you.

12       All right.  Go ahead on Count 7.

13           MR. WEINERMAN:  Count 7, next-to-the-last sentence,

14   the government must prove that he traveled for the purpose of

15   engaging in such conduct that that is the language of the

16   statute.  The statute doesn't say anything about intent.  And

17   it seems to me the Court should give the language of that

18   statute which says for the purpose of engaging as opposed to

19   with the intent to engage, which is not language in the

20   statute.

21           THE COURT:  So I guess I'm unclear what that is.  I

22   have that language in element three.  Mr. Johnson traveled for

23   the purpose of engaging in illicit sexual conduct.

24           MR. WEINERMAN:  Right.  And then the --

25           THE COURT:  Oh, I see.

1          MR. WEINERMAN:  And then at the end, the last

2    sentence, they -- the government -- or the Court talks about

3    intent to engage, which is not the language of the statute.

4    The language of the statute is travel for the purpose of

5    engaging in such conduct.

6          Count 8 talks in terms of intent, not --

7          THE COURT:  Okay.  The last sentence I have of that

8    instruction is "The government does not have to prove the

9    illicit sexual conduct is illegal in the country to which

10    Mr. Johnson traveled."

11          MR. WEINERMAN:  Oh, I'm looking at Count 7.  You're

12    looking at the second page.  I'm sorry, Judge.  I'm referring

13    to the bottom of the first page.  I'm sorry.  I didn't make

14    that clear.

15          THE COURT:  Oh, okay.  I think we should keep the

16    same language but that he traveled with the purpose as opposed

17    to intent.  That tracks the elements we're asking them to find.

18    So I'll make that change.

19          MR. WEINERMAN:  Then, Judge, I do have a comment

20    about the second page of the instruction.  The Court goes on to

21    instruct that the government doesn't have to show that

22    Mr. Johnson traveled in foreign commerce for the sole and

23    exclusive purpose of engaging in illicit sexual conduct.

24          I know that language, I believe, comes from the *Lukashov*

25    case, in which the jury wasn't instructed similar to that, so

1    the -- the point that I would like to make in -- oh, I'm sorry.

2    This is -- let me.  This may be -- no, this is Count 7.  Yes.

3    Count 7, which charges 2423(b), uses the word "the."  That the

4    person travels in interstate or foreign commerce for the

5    purpose of engaging in illicit sexual conduct.

6        So we believe that "the" means "the" and that the

7    government doesn't get a conviction with this dominant

8    motivating language.  The government has to prove that the

9    purpose -- in other words, the only purpose in traveling was to

10   engage in sexually -- illicit sexual conduct.  Because if

11   Congress wanted to allow conviction for a motivating purpose,

12   they would have used the word "of" not "the."

13            THE COURT:  Okay.  I mean, I understand the argument.

14   It's just -- it's not the law.  Both interstate and foreign

15   commerce, the courts have consistently held that there could be

16   dual motives for the travel as long as the act itself is not

17   merely incidental to travel.

18            MR. WEINERMAN:  And then I think I have two more

19   comments on the instruction.  The next one is the Count 8

20   instruction, and I believe that's -- the statute is 2241(c), so

21   the language that is used in the second line of this is

22   "Mr. Johnson is charged in the indictment with aggravated

23   sexual abuse."

24       Now, I know that's the caption that is given to describe

25   this offense, but that term is not used in the actual language

1  of the statute.  So subsection (c) simply says it's a crime to

2  cross state lines with intent to engage in a sexual act with a

3  person who has not attained the age of 12 years.

4      So we're asking the Court to strike the aggravated sexual

5  abuse language.  It doesn't -- it's a title of the offense, but

6  it's not the actual language of the offense.  And the Court

7  should use the language of the statute, the language that's in

8  the first and second line of subsection (c) of 2241, and not

9  the caption Aggravated Sexual Abuse.

10          THE COURT:  There's so many.  The term "manslaughter"

11  doesn't appear anywhere in the elements of manslaughter.  It's

12  the name of the crime.

13      Does the government have any strong feeling about it?

14          MR. SINHA:  No, Your Honor.  I think whatever the

15  Court would like to do.  I guess the change would be to change

16  it to say "Mr. Johnson is charged in Count 8 of the indictment

17  with traveling across the state line with an intent to engage

18  in a sexual act with a person who is less than 12 years old"

19  would be my understanding of what Mr. Weinerman is asking.

20          MR. WEINERMAN:  That's correct.

21          MR. SINHA:  So we would be fine with that.

22          THE COURT:  Okay.  I'll make that change.

23          MR. WEINERMAN:  And then I think I have one more

24  comment on the instruction.  The Unanimous Agreement

25  instruction.  I don't know if I have the latest version of

1    this.  If my memory serves me correct, another instruction may

2    have come.  But in any event, I'm wondering if the number of

3    trips is accurate.  The way I read the ones that we stipulated

4    to, I thought there were six trips from the United States to

5    Cambodia for Count 7.  At least the last time I looked at the

6    travel stipulation, I think there were six different dates.

7    Perhaps we can look at this together.

8            THE COURT:  There's only five listed in the verdict

9    form.

10            MR. WEINERMAN:  I could be wrong on that, Judge.

11            THE COURT:  If we're only giving five trips to the

12    jury to decide --

13            MR. WEINERMAN:  So I'm just looking at the

14    stipulation I think we entered into, which we have six on --

15    then there's five.  So maybe we're just using the -- sorry for

16    the confusion.

17        I may have just one concern to express about the verdict

18    form.  I think it's similar to the instruction concern that we

19    have, and that is the verdict says, as to Count 1, "Engaging in

20    illicit sexual conduct."  We would ask that the verdict form

21    say, as to Count 1, "Traveling in foreign commerce and engaging

22    in illicit sexual conduct" to include that other element in

23    there.

24            THE COURT:  I'm sorry.  On which count?

25            MR. WEINERMAN:  That would be the -- the first

1    verdict form which covers, I think, Counts -- well, it's the

2    same language for the first six counts.  It talks in terms of

3    engaging and doesn't include the element of traveling in

4    foreign commerce.  Counts 1 through 6.

5                THE COURT:  Okay.  So you are wanting in the language

6    of the Count 1, instead of just saying "engaging in illicit

7    sexual conduct," Count 1, that Mr. Johnson traveled in foreign

8    commerce from the United States to Cambodia to engage in

9    illicit sexual conduct?

10                MR. WEINERMAN:  Yes.  We're asking the Court to -- to

11    instruct the jury that as to Count 1, traveling in foreign

12    commerce and engaging in illicit sexual conduct in a foreign

13    place with minor boy number one, and, again, this -- this will

14    apply to the first six counts.  All -- the language in the

15    first six verdicts all have the same language.  They talk in

16    terms of engaging without mentioning traveling in foreign

17    commerce and engaging in illicit sexual conduct.

18                THE COURT:  I'm willing to add that language.

19                MR. SINHA:  We're fine with that, Your Honor.  We

20    just want to make sure -- I think this is what Mr. Weinerman

21    said -- that it's traveled and engaged in illicit sexual --

22                THE COURT:  Right.  So it should read, "Count 1.

23    Traveling in foreign commerce and engaging in illicit sexual

24    conduct in a foreign place."

25                MR. WEINERMAN:  Then, Judge, I have a similar concern

1  about the verdict for Count 7.  Again, they use the "with

2  intent to engage in" language instead for "travel for the

3  purpose of engaging," and that would be consistent with the

4  instruction that the Court is going to give on Count 7.

5                THE COURT:  All right.  That will read "for the

6  purpose of engaging."

7                MR. WEINERMAN:  And similar, in Count 8, as to

8  Count 8, instead of aggravated sexual abuse crossing a state

9  line, with intent to engage in a sexual act with a person under

10 the age of 12 years.

11               THE COURT:  All right.  We'll change that language as

12 well.

13               MR. WEINERMAN:  We found just one -- I think one typo

14 in the instruction that the Court distributed on defendant's

15 decision not to testify.  The third line, before Mr. Johnson,

16 the word "the" should be stricken.

17               THE COURT:  All right.  We'll strike that.

18               MR. WEINERMAN:  And that's all of our objections.

19               THE COURT:  Okay.

20               MR. SINHA:  I just had one other point to raise with

21 the Court, if I could, please.

22      Your Honor, there's a defense in the statute of 18

23 2423(g).  I -- my sense is it's not in these instructions, and

24 I don't believe that Mr. Johnson's counsel has requested an

25 instruction on it.  The basic story is that if the offense

1    conduct is based on a commercial sex act, if Mr. Johnson could

2    prove by clear and convincing evidence that he believed the

3    person was not under 18 or was over 18, that would be a defense

4    to some of those charges.  I don't think it's applicable to

5    this case, and so I can understand why nobody has requested it.

6    I just would like to make a record that we all agree it doesn't

7    need to be --

8              THE COURT:  Nobody has requested it, and it does not

9    seem to be relevant to this case.

10        All right.  So I will finish up those edits with

11   Mr. Allnatt.  We'll get from the government a new instruction

12   on Counts 1 through 6 with the chart filled out and the new

13   language.  Then I'll send that out to everybody to check for

14   any -- anything we've missed or any typos that need to be

15   corrected.

16        It's usually my practice to give the legal instructions

17   before closing argument.  I don't think that's particularly

18   novel anymore, so that's what I plan on doing.

19        I'll reserve the deliberation instructions until after

20   closing.

21        Okay.  Anything else we need to discuss?

22              MR. SWEET:  Your Honor, I believe the parties are

23   going to discuss exhibits amongst ourselves after this.  Would

24   the Court prefer us to meet a little bit earlier tomorrow so we

25   can go over any remaining issues we have and then be ready to

1   start at 9:00?  I'm not sure how much we have to go over.

2             MR. WEINERMAN:  Well, it looks like we may not be

3   talking to our expert until 7:00 a.m. tomorrow, so I would

4   prefer not to cut too much time out of that if at all possible.

5             THE COURT:  My thought is this:  We can finish the

6   expert and take a break, and if there are some conflicts in

7   terms of what exhibits are in and out, we can resolve them

8   then.

9             MR. SWEET:  Thank you.

10            THE COURT:  All right.  Okay.  All right.  Thank you

11  very much.

12            MR. WEINERMAN:  Thank you.

13            THE COURT:  See everybody in the morning.

14       Oh, I do want to clarify just one thing.  Mr. Weinerman,

15  I'm assuming, then, at some point -- I want to make sure you

16  preserved your record by excepting to the language --

17            MR. WEINERMAN:  Yes.

18            THE COURT:  -- of the instructions as to the counts.

19            MR. WEINERMAN:  You know, Judge, I think my

20  recollection is judges in the past, before -- after reading all

21  the instructions, calls counsel up to a sidebar before sending

22  the jury out to begin deliberations and asking if there are any

23  exceptions.  If the Court feels comfortable with that --

24            THE COURT:  Okay.  I usually send the jury out and

25  then ask if there's any exceptions, and at that time you can

1    make your record that there should have been additional

2    elements to be sent to the jury.

3         So if it's not clear on the record, I want you to preserve

4    all arguments raised earlier in your motion to dismiss until a

5    later time.  We'll take exception to the instructions.

6              MR. WEINERMAN:  I'm just looking.  I think there's

7    some language that some people interpret that has to happen.

8    After the jury is actually instructed and before you send them

9    out.  I may be wrong, but I'll take a look.

10             THE COURT:  Okay.  We can -- tell them not to start

11   deliberating yet.  I know you're not going to make your

12   exceptions in front of them, but I don't know how else we're

13   going to record your argument.

14        All right.  Thank you.

15                   (Trial Day 9 was adjourned.)

16

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2

3        United States of America v. Daniel Stephen Johnson

4                      6:14-cr-00482-MC-1

5                  TRIAL DAY 9, VOLUME 8B

6                    PAGES 1107 - 1139

7                      May 14, 2018

8

9            I certify, by signing below, that the foregoing is a

10   true and correct **REDACTED** transcript of the record, taken by

11   stenographic means, of the proceedings in the above-entitled

12   cause.  A transcript without an original signature, conformed

13   signature, or digitally signed signature is not certified.

14

15   /s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC

16   _____

     Official Court Reporter        Signature Date: 5/14/18
17   Oregon CSR No. 98-0346          CSR Expiration Date:  9/30/20

18

19

20

21

22

23

24

25