1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF OREGON

3                        EUGENE DIVISION

4          THE HON. MICHAEL J. McSHANE, JUDGE PRESIDING

5

6

7    UNITED STATES OF AMERICA,        )
                                      )
8                    Government,      )
                                      )
9            v.                       ) No. 6:14-cr-00482-MC-1
                                      )
10   DANIEL STEPHEN JOHNSON,          )
                                      )
11                   Defendant.       )
     _____)

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                     EUGENE, OREGON

16                 TUESDAY, MAY 8, 2018

17             VOLUME 5A - MORNING SESSION

18                 PAGES 742 - 821

19

20

21

22                         Kristi L. Anderson
                           Official Federal Reporter
23                         United States Courthouse
                           405 East Eighth Avenue
24                         Eugene, Oregon 97401
                           (541) 431-4112
25                         Kristi_Anderson@ord.uscourts.gov

1    APPEARANCES OF COUNSEL:

2    FOR THE GOVERNMENT:

3    Jeffrey S. Sweet
     United States Attorney's Office
4    405 E. Eighth Avenue, Suite 2400
     Eugene, OR 97401
5    541-465-6771
     Fax: 541-465-6917
6    Email: jeff.sweet@usdoj.gov

7    Lauren E. Britsch
     U.S. Department of Justice
8    Criminal Division
     1400 New York Ave NW, 6th Floor
9    Washington, DC 20530
     202-514-2220
10   Fax: 202-514-1793
     Email: lauren.britsch@usdoj.gov

11

12   Ravi Sinha
     United States Attorney's Office
13   1000 SW Third Ave, Suite 600
     Portland, OR 97204
14   503-727-1014
     Fax: 503-727-1117
15   Email: ravi.sinha@usdoj.gov

     FOR THE DEFENDANT:
16
     Craig E. Weinerman
17   Office of the Federal Public Defender
     859 Willamette Street, Suite 200
18   Eugene, OR 97401
     541-465-6937
19   Fax: 541-465-6975
     Email: craig_weinerman@fd.org
20
     Lisa A. Maxfield
21   Pacific Northwest Law LLP
     1255 NW Ninth Avenue, No. 11
22   Portland, OR 97209
     (503) 222-2661
23   Fax: (503) 222-2864
     Email: lamaxfield@pacificnwlaw.com

24

25

744

1                              WITNESS INDEX

2    WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

3    VS XXXXXXXXXXXXX      755     778      785        789
                                           790
4    Brian Poole          792     811

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        PROCEEDINGS
 2                  TUESDAY, MAY 8, 2018
 3           THE COURT:  Morning, everybody.
 4           MR. SINHA:  Morning, Your Honor.
 5           THE COURT:  I understand there was a preliminary
 6  matter we were going to discuss.
 7           MR. SINHA:  Yes, Your Honor.  I think it regards
 8  the one image of potential child pornography that the court
 9  allowed.
10           THE COURT:  Correct.
11           MR. SINHA:  And so I think Mr. Johnson's counsel
12  has an issue he would like to raise.
13           MS. MAXFIELD:  Good morning, Your Honor.  Lisa
14  Maxfield appearing with Mr. Johnson.
15           I was not here on exhibit day, so I am kind of
16  getting filled in from both sides.
17           It is my understanding that the government intends
18  to introduce a photograph that the government maintains
19  would corroborate or support the testimony of VS XXXX
20  XXXXXXXX.  It's my understanding that when VS XXXX was
21  interviewed by the FBI -- and I think other people as
22  well -- he described a photograph that's taken during anal
23  sex.  And he describes a photograph that depicts his butt
24  and the defendant's penis in his butt.  He's very clear that
25  you can see hair in the photograph.  And the other thing
```

09:06:24   1    that he is very clear about is that there's no face in the

2    photograph.

3              The government intends to introduce a photograph

4    that includes no hair -- again, it's this overlay -- but

5    also includes a face.  I think what the government believes

6    is that based on the court's ruling, if the witness

7    describes a photograph being taken, that that's a sufficient

8    foundation to introduce any photograph.

9              We believe that the witness should be examined

10   outside the presence of the jury for us to determine, first

11   of all, what he remembers seeing in the photograph as

12   clearly and with as much detail as possible.  And then I

13   think we need to determine -- and I am still listening to

14   them saying they don't want to show this photograph to him.

15   And if that's the case and the court rules that that's the

16   route we are going to go, then I think that the inability to

17   show him the photograph is something that should work

18   against the government and not against Mr. Johnson.

19             But I think that when we are done with the

20   testimony, that what he describes is not going to match the

21   exhibit that the government wants to introduce.

22             THE COURT:  All right.  It's been quite a while

23   since I have looked at the exhibits and so, to be honest, I

24   don't remember what it looks like.  Let me take a look at

25   it.  My understanding is it is not necessarily the witness

09:07:46   1   who will be testifying -- the photograph is not necessarily

2   a photo of him but would corroborate his testimony that

3   Mr. Johnson took photos during anal sex.

4           MR. WEINERMAN:  And Judge, while you are looking

5   at the photograph --

6           THE COURT:  Could I ask, has the government

7   clarified with the witness whether this is him or not?

8           I mean, obviously if it's -- that would be -- I

9   don't think we would be having an argument if it were him.

10   But I am assuming that the government is moving to introduce

11   this to corroborate his testimony that pictures were taken

12   during anal sex.

13           MR. SWEET:  To answer the court's first question,

14   we have not shown VS XXXXXXXXXXXXX this picture, Your Honor,

15   and we very much do not want to.  He -- I think he's been

16   having a tough time with this, and to -- we haven't

17   discussed the existence of this photograph with him.  And we

18   very much so do not want to show it to him and let him know

19   that what may or possibly may not be a picture of him being

20   sodomized exists.

21           So to answer the court's question, we have not.

22           A couple quick things to clarify.

23           First, VS XXXX described the picture was taken on

24   Mr. Johnson's white iPhone.  This image was found on

25   Mr. Johnson's white iPhone.  He described it as -- I

09:09:34

1    disagree that VS XXXX described the picture as showing a

2    hairy penis.  I believe he just said that Mr. Johnson's

3    sexual equipment is hairy.

4         He did say, when asked if -- did you see your face

5    in the picture, he said no.  And the picture showed -- it

6    only showed my butt in which he put his sex organ.

7         Your Honor, I don't know how long he had to look

8    at the photo or how many photos exactly were taken, but that

9    is not the clearest picture of anyone's face in the photo.

10   It's a half of a face.

11        So, again, the government cannot say definitively

12   that is VS XXXX in this photo with Mr. Johnson.  We have

13   what we have.

14        But the sex act that VS XXXX describes, the

15   photographing of it on the white iPhone, the recovery of

16   this picture, which even the defense's experts agrees

17   appears to be a scrotum at the bottom with a small

18   triangle -- well, this is me adding this -- a small triangle

19   of flesh next to the scrotum and a boy's face or human's

20   face at the top, it appears to be consistent, your Honor,

21   and we believe it should be admitted.

22        We very much believe that VS XXXX should not be

23   required to identify this to do so.

24             THE COURT:  Okay.

25             MS. MAXFIELD:  Your Honor, VS XXXX tells FBI

09:10:57

1    Martha that there's a single photograph taken.  She asks him

2    specifically whether there was more than one photograph.  He

3    tells FBI Martha that there was only one.

4         Then when asked to describe it, he says his sex

5    organ is hairy.  "His sexual equipment is hairy.  His sexual

6    equipment is hairy."

7         And then she asks him again what he would see in

8    the picture.  And he says -- she says, "Did you see your

9    face in the picture?"

10        Answer:  "No."

11        "Tell me what the picture shows."

12        And he said, "It only showed my butt, in which he

13   put his sex organ.  The picture only shows my butt with his

14   penis in, with his sexual thing in."

15        So we have a single picture.  He describes

16   Mr. Johnson's equipment being hairy, and then he describes

17   the fact that his sex organ is in his butt.  And he is very,

18   very clear about the fact that his face is not in the

19   picture.

20        THE COURT:  I am not disagreeing that this may not

21   be a picture of the witness, but I have never ruled that

22   they had to establish that this is a picture of the witness.

23        The defense, the best I can understand, is none of

24   this happened.  This child is lying because he wants to get

25   some benefit.  He wasn't sexually abused.  No photos were

09:12:18   1   taken.

2              And yet, there are photos on the phone that

3   corroborate the fact that sexual photos were taken on this

4   phone.  And that does seem to corroborate the testimony of a

5   boy who is saying, "I was sexually abused and photographs

6   were taken during anal sex by Mr. Johnson with his phone."

7              And, lo and behold, here is a picture.

8              MS. MAXFIELD:  That's not the inference the

9   government is going to ask them to draw.

10             THE COURT:  That's the only inference I think they

11  can draw, not that it is the witness himself.

12             MS. BRITSCH:  We intend to admit this photo

13  through a computer forensics examiner who will simply talk

14  about the technical aspects of the photo today, and I don't

15  think we intend to ask the jury at this time to draw any

16  inference.

17             MR. WEINERMAN:  What the heck?  I might as well

18  weigh in a little bit.

19             So, Judge, I guess I would just go back to the

20  basics, 403, which allows the court to exclude evidence.

21  And I am not trying to be pedantic.  I know the court knows

22  the rule.

23             But besides undue prejudice, it talks about

24  confusing the issues, misleading the jury, undue delay,

25  wasting time, and needlessly presenting cumulative evidence.

09:13:27    1    You know, it seems to me that this photograph -- first of

2    all, it's overwritten by -- almost 90 percent of it is not

3    there.  And it takes, to me, a bit of imagination to say

4    that this shows a sexual act.  Reasonable people might

5    disagree.  But when 90 percent of the photograph is not

6    there, it is going to take a little imagination.

7            So why risk misleading the jury, confusing the

8    jury, wasting time?  If this does not corroborate the one

9    incident that this witness says occurred when an iPhone was

10    taken -- and the description that Ms. Maxfield just read is

11    not corroborated by this this photograph.  If the court is

12    saying it in general corroborates, corroborates what and who

13    and when and how?

14            THE COURT:  It corroborates the testimony of a

15    witness you are accusing of lying and making up a story that

16    includes photographs on a phone.

17            MR. WEINERMAN:  And I would also point out to the

18    court that there's going to be a stipulation that -- and I'm

19    sure counsel will correct me if I am wrong -- that APLE

20    reported to the FBI that there were no photographs taken.

21    And one of the witnesses who is the subject of that

22    statement is this witness, VS XXXX.

23            So, you know, again, we just have so much

24    conflicting information.  And for this one photograph to

25    come in, it just seems to me it's classic 403 and the court

09:14:56   1    shouldn't allow it.

2         THE COURT:  Well, I wouldn't say it's -- you know,

3    I did balance the 403 concerns when I disallowed the

4    government from bringing in all the photographs, which, when

5    viewed as a whole, appear, I think in most people's

6    imagination, to be a series of pornographic child photos.

7    And I felt that that was unduly prejudicial.

8         But this one photo I think does corroborate a

9    witness whose veracity is being challenged by confirming

10   that in fact there is one photo on Mr. Johnson's phone that

11   suggests -- maybe my imagination is greater than yours,

12   Mr. Weinerman, but it suggests that the photos were taken

13   during sex acts.

14        So I am allowing one photo in.  I mean, I came

15   very close to allowing them all in, but I think the defense

16   has changed enough to still convince me that all the photos

17   at this stage do not come in.

18        But this one exhibit can be introduced following

19   the testimony of the witness through the forensic expert.  I

20   think it's a tough argument if you are not going to ask the

21   witness himself, "Is this you?"  It's a tough argument for

22   you to make at closing that this in fact is the witness.

23        All right.  Okay.  In terms of scheduling today, I

24   have a longtime -- Char, this exhibit is about to fall, so I

25   will hand that to you.

09:16:47

1    I scheduled a quick meeting with a federal judge

2    who is visiting from the Eastern District of New York, who

3    is a very close friend of mine.  He is flying in at 12:30,

4    so sometime early afternoon.  One option is to take a late

5    lunch if we have witnesses who can go into the lunch hour.

6    But I do want to try to accommodate Judge Block and have a

7    moment to visit with him.

8         Probably about one o'clock -- well, maybe he is

9    being overly optimistic.  Getting here about 1:00, probably

10   1:30.  So we will be taking a short break.  I will try to

11   keep it short, but I do want people to know that's going on

12   this afternoon.

13        So who is our first witness?

14        MR. SINHA:  It's actually VS XXXXXXXXXXXXX, Your

15   Honor.

16        THE COURT:  Okay.  If you want to get him, we'll

17   get the jury.

18        MR. SINHA:  Oh, Your Honor, just to be clear, I

19   was just going to ask, could we inquire as to whether

20   defense counsel is going to show VS XXXXXXXXX this photo

21   because we would ask them not to.  I guess I don't know if

22   we can stop them or not.

23        MR. WEINERMAN:  Mr. Sinha must be a mind-reader

24   because we are talking about that right now.

25        THE COURT:  I don't think I can stop them from

09:18:00
1    doing that.  I mean, is there -- do we have some counselor

2    on the wings who can go over this with him in advance of his

3    testimony?

4              MR. SINHA:  We could take a break, and I could go

5    in with an agent and try to talk to him about it and we

6    could try to get an answer.  I guess that's right.  If we

7    could do that after he testifies.

8              THE COURT:  We can do that.  So before cross, I

9    guess I'd like him to look at it without being traumatized

10   on the stand, maybe he can just at least digest the fact

11   that he is going to have to talk about it.

12             All right.  Okay.  Let's bring in the witness and

13   we'll bring in the jury.

14                        *(Jury in.)*

15             THE COURT:  And if you can just continue standing

16   after I tell everybody else to sit down, we are going to

17   have you sworn to tell the truth.  And then you will be

18   asked to state your name and spell your name.

19             Are you having any difficulty understanding the

20   translator?

21             THE WITNESS (By the interpreter):  No.

22             THE COURT:  All right.  Please be seated,

23   everybody.

24             All right.  If the government -- if you could go

25   ahead and introduce who we are calling as a witness, and

*VS XXXXXXXXXXXXX – 5/8/2018*
*Direct Examination by Ravi Sinha*
755

09:20:37   1   we'll have you sworn in.

2           MR. SINHA:  Your Honor, the government's next

3   witness is VS XXXXXXXXXXXXX.

4           THE COURT:  All right.  Ms. Pew, please go ahead.

5           THE CLERK:  Would you please raise your right

6   hand.

7                    *(The witness was sworn.)*

8           THE CLERK:  Could you please state your name for

9   the record.

10          THE WITNESS (By the interpreter):  VS

11   XXXXXXXXXXXXX.

12          THE CLERK:  Can you spell your first and your

13   last.

14          THE WITNESS (By the interpreter):  In Cambodia?

15          MR. SINHA:  Yes.

16          THE CLERK:  Be seated.

17          THE COURT:  You can have a seat.

18                    **DIRECT EXAMINATION**

19   BY MR. SINHA:

20   Q.   So good morning, VS XXXX.

21          MR. WEINERMAN:  Judge, I am sorry to interrupt

22   again, but could we move the volume up a little bit.

23          THE COURT:  Yes.  VS XXXXXXXX, if you could move a

24   little closer towards the microphone.

25          JUROR:  And I didn't hear his name.

09:21:52  1          THE COURT:  All right.  His name is VS XXXX.

2          Could you spell it for us, VS XXXXXXXXX.

3          MR. SINHA:  Sorry, Your Honor.  I think the way

4    that we have been spelling it is VS XXXXXXXXXX, and then

5    last name VS XXXXXXXXXXXX.

6          THE COURT:  Thank you.

7          All right.  And VS XXXX, if you don't understand

8    any question, please ask Mr. Sinha to clarify.  Okay?

9          MR. WEINERMAN:  Judge, can we ask that the water

10   pitcher be moved as well.  It's kind of blocking.

11         MR. SINHA:  May I approach, Your Honor?

12         THE COURT:  Yes.

13         MR. WEINERMAN:  Thank you.

14   BY MR. SINHA:

15   Q.   Okay.  So good morning, VS XXXX.

16         Let's start here:  Outside of being known as

17   VS XXXX, do you have of any nicknames at all?

18   A.   (By the interpreter) No.

19   Q.   Do people sometimes call you VSX or VS X?

20   A.   (By the interpreter) Yes.

21   Q.   Okay.  And so tell me, VS XXXX, where were you born?

22   A.   (By the interpreter) Pream Ro.

23   Q.   Okay.  And is that in Cambodia?

24   A.   (By the interpreter) Yes.

25   Q.   Is this your first trip outside of Cambodia in your

09:23:25   1   life?

2   A.   (By the interpreter) Yes.

3   Q.   VS XXXX, I am going to show you what's been marked as

4   Exhibit 150.

5           MR. SINHA:  I believe this has been admitted.  I'd

6   ask for this and all of the other exhibits which I think

7   have been admitted to be published.

8           THE COURT:  All right.

9   BY MR. SINHA:

10   Q.   So VS XXXX, when this comes up, you are going to see it

11   on a little screen down in the corner here on the left.  I

12   am going to try to zoom up on it a little bit.

13           So do you know what this is?

14   A.   (By the interpreter) Passport.

15   Q.   Okay.  And is it your passport?

16   A.   (By the interpreter) Yes.

17   Q.   Okay.  And the date of birth on this passport, it looks

18   like it's XXXXXXX, 2002.  Is that your date of birth?

19   A.   (By the interpreter) Yes.

20   Q.   Okay.  Is the year correct?

21   A.   (By the interpreter) The year is not correct.

22   Q.   What's your actual year of birth?

23   A.   (By the interpreter) 2000.

24   Q.   Okay.  Do you know why the year on this passport is not

25   right?

09:24:49    1    A.    (By the interpreter) Because the date of the birth

2    certificate was incorrect.

3    Q.    The birth certificate was incorrect.

4          VS XXXX, where you grew up and where you were born

5    in Cambodia, was it very rural?

6    A.    (By the interpreter) Yes.

7    Q.    Did people keep very -- did the government in that part

8    of the country keep very precise records about when people

9    were born?

10    A.    (By the interpreter) Not very accurate.

11    Q.    And was it your understanding that in that part of the

12    country people's birth records were sometimes the wrong

13    birth date on them?

14    A.    (By the interpreter) Yes.

15    Q.    Okay.  And so just so I am clear, is your actual birth

16    date the same month, XXXXX, and the same day, the XXX, but

17    the year is 2000?

18    A.    (By the interpreter) Yes.

19    Q.    And so VS XXXX, where you grew up, what did your

20    parents do?

21    A.    (By the interpreter) Farmers.

22    Q.    Both of them were farmers?

23    A.    (By the interpreter) Yes.

24    Q.    And are they still farmers?

25    A.    (By the interpreter) Not anymore.

09:26:22
```
1    Q.   How come?

2    A.   (By the interpreter) They are old and they are sick, so

3    they cannot work anymore.

4    Q.   And do you live out there with them now?

5    A.   (By the interpreter) Yes.

6    Q.   Okay.  And what do you do out there?

7    A.   (By the interpreter) I help them with work here and

8    there.

9    Q.   Okay.  And do you have a job of your own?

10   A.   (By the interpreter) Not yet.

11   Q.   Do you have any siblings, VS XXXX?

12   A.   (By the interpreter) Yes, I have one older sister.

13   Q.   Okay.  Do you have any other siblings at all?

14   A.   (By the interpreter) No, I don't.

15            MR. WEINERMAN:  Again, I am sorry to interrupt.  I

16   apologize again, but we are having a difficult time hearing

17   the witness speak.

18            THE COURT:  VS XXXX, if I could have you just

19   speak up a little bit louder.

20   BY MR. SINHA:

21   Q.   So -- so you said you had one sister; is that right?

22   A.   (By the interpreter) Yes.

23   Q.   And about how old is your sister?

24   A.   (By the interpreter) Nineteen years old.

25   Q.   Okay.  So VS XXXX, one of the things I want to talk to
```

09:28:00   1   you about is the time that you lived at Hope Transitions

2   Center.

3           Do you know what period of time I am talking

4   about?

5   A.   *(Nodded head.)*

6   Q.   Okay.  And was that about 2011 until the end of 2013?

7           Is that a yes?  I am sorry.

8   A.   (By the interpreter) Yes.

9   Q.   Okay.  So VS XXXX, could you just tell us, how did you

10   end up moving from the province where you lived with your

11   parents to the Hope Transitions Center?

12   A.   (By the interpreter) Through the church.

13   Q.   Okay.  What happened?

14   A.   (By the interpreter) I asked him to live there.

15   Q.   Okay.  So was this a church in your -- in the province

16   where you lived?

17   A.   (By the interpreter) Yes.

18   Q.   Okay.  And did somebody from Hope Transitions Center

19   come out to that church?

20   A.   (By the interpreter) Yes.

21   Q.   Okay.  And what -- what were they coming out to your

22   church to do?

23   A.   (By the interpreter) To spread the good news.

24           MS. MAXFIELD:  Your Honor, I am having a tough

25   time hearing everyone.  I think because the witness is

09:29:52    1    speaking softly, everyone else is speaking softly.  So if

2    we could --

3            THE COURT:  All right.  If Mr. Sinha and the

4    translator could raise their voice a little bit.  Thank you.

5    BY MR. SINHA:

6    Q.    So this person came out to your church to spread the

7    good news, the Word?

8    A.    (By the interpreter) Yes.

9    Q.    And did they talk -- did this person talk to people

10   about maybe coming out to live at Hope Transitions Center?

11   A.    (By the interpreter) Yes.

12   Q.    Okay.  And did they talk to you about that?

13   A.    (By the interpreter) Yes.

14   Q.    When they talked to you about moving to Hope

15   Transitions Center, was that something you thought you would

16   like to do?

17   A.    (By the interpreter) Yes.

18   Q.    And why was it that you thought that you might like to

19   move, you know, far away from home to Hope Transitions

20   Center?

21   A.    (By the interpreter) I wanted to learn English.

22   Q.    Why was learning English something you wanted to do?

23   A.    (By the interpreter) My mom wanted to learn.

24   Q.    So you wanted to learn English to help your mom learn

25   English?

VS XXXXXXXXXXXXX - 5/8/2018
*Direct Examination by Ravi Sinha*
762

09:31:33    1    A.    (By the interpreter) My mom wanted me to learn so I can

2    know a lot so I could help her.

3    Q.    Oh, okay.  I am sorry.  I misunderstood.

4            Why is learning English and knowing English in

5    Cambodia a good thing?

6    A.    (By the interpreter) Because knowing a lot of English,

7    it's easier to find employment.

8    Q.    It's good for getting a job?

9    A.    (By the interpreter) Yes.

10   Q.    So had you stayed out living with your parents in the

11   province, would you have had the opportunity to go to school

12   and learn English?

13   A.    (By the interpreter) No.

14   Q.    Okay.  And so Hope Transitions Center gave you an

15   opportunity to learn English?

16   A.    (By the interpreter) Yes.

17   Q.    So it sounds like, from what we have talked about, you

18   lived at Hope Transitions Center for about two years.

19           Does that seem about right?

20   A.    (By the interpreter) Yes.

21   Q.    And while you were there, were you going to school?

22   A.    (By the interpreter) I did.

23   Q.    Okay.  VS XXXX, what types of things did you study in

24   school?

25   A.    (By the interpreter) Khmer language and English.

VS XXXXXXXXXXXXX - 5/8/2018
*Direct Examination by Ravi Sinha*
763

09:33:24

1  Q.    And even though you speak some English, am I right in

2  understanding you have agreed to talk to us through an

3  interpreter because that's your native language?

4  A.    (By the interpreter) Yes.

5  Q.    Okay.  So VS XXXX, what was an average day like for you

6  during the couple years you lived at Hope Transitions

7  Center?

8         What types of things did you do?

9  A.    (By the interpreter) You go to school, and then after

10  that you come home and do household chores.

11  Q.    Okay.  And what types of chores did you do?

12  A.    (By the interpreter) Sweeping the house.

13  Q.    Okay.  And did you have worship services during the

14  day?

15  A.    (By the interpreter) Yes.

16  Q.    Okay.  And when you weren't doing chores and you

17  weren't at worship services and you weren't at school, what

18  types of things did you like to do?

19  A.    (By the interpreter) Nothing else.

20  Q.    Did you play any sports or anything?

21  A.    (By the interpreter) Yes, soccer.

22  Q.    Soccer.  Okay.

23         So VS XXXX, I am going to show you some pictures,

24  and I want to just ask you if that's you in them, and I want

25  to get a sense as to when they are.  Okay?

VS XXXXXXXXXXXXX – 5/8/2018
*Direct Examination by Ravi Sinha*
764

```
09:35:07   1   A.   (By the interpreter) Yes.
           2           MR. SINHA:  Okay.  So, Your Honor, with the
           3   court's permission, I would like to show the witness and
           4   have the following published to the jury.
           5           THE COURT:  All right.  We can do that.
           6           MR. SINHA:  1 through 17 -- excuse me, 11 through
           7   17.  So let's start with 11, please.
           8   BY MR. SINHA:
           9   Q.   So VS XXXX, who is this person that I am looking at?
          10           THE COURT:  It isn't up yet.
          11   BY MR. SINHA:
          12   Q.   Oh, I am sorry.
          13   A.   (By the interpreter) That's me.
          14   Q.   Okay.  And was this what you looked like during the
          15   time that you were living at Hope Transitions Center?
          16   A.   (By the interpreter) Yes.
          17   Q.   And do you know where the photo was taken?
          18   A.   (By the interpreter) I don't remember.
          19   Q.   Okay.  Let's look at Exhibit 12, please.
          20           Who is this person?
          21   A.   (By the interpreter) That's me.
          22   Q.   And was this also taken around the time that you were
          23   living at Hope Transitions Center?
          24   A.   (By the interpreter) Yes.
          25   Q.   Let's look at Exhibit 13, please.
```

*VS XXXXXXXXXXXXX - 5/8/2018*
*Direct Examination by Ravi Sinha*
765

09:36:28  1              All right.  Now, there are three people in this

2      photo.  Are you one of these three people?

3      A.   (By the interpreter) Yes.

4      Q.   And can you figure out which -- can you tell me which

5      one of the three you are, please?

6      A.   (By the interpreter) The middle one.

7      Q.   Who are the other two kids in this photo, if you know?

8      A.   (By the interpreter) I don't remember.

9      Q.   Okay.  Was this photo also taken around the time that

10      you were at Hope Transitions Center?

11      A.   (By the interpreter) Yes.

12      Q.   Okay.  Let's look at 14, please.

13              Well, VS XXXX, I think I can guess that this is

14      you from the name, but am I right about that?

15      A.   (By the interpreter) Yes.

16      Q.   Okay.  And was this while you were living at Hope

17      Transitions Center?

18      A.   (By the interpreter) Yes.

19      Q.   Okay.  Let's look at Exhibit 15, please.

20              Okay.  So is this also you and also while you were

21      living at Hope Transitions Center?

22      A.   (By the interpreter) Yes.

23      Q.   How about 16, please.

24              Okay.  Who is this and where was it taken, if you

25      know?

*VS XXXXXXXXXXXXX - 5/8/2018*
*Direct Examination by Ravi Sinha*
766

09:38:04    1    A.    (By the interpreter) That's me, and we were at the

2    ocean or sea.

3    Q.    Okay.  And was this while you were living at Hope

4    Transitions Center?

5    A.    (By the interpreter) Yes.

6    Q.    Okay.  And then the last one I am going to show you is

7    17, please.

8              And VS XXXX, is this a photo of you while you were

9    living at Hope Transitions Center?

10    A.    (By the interpreter) Yes.

11    Q.    Okay.  So during the time that you were living at Hope

12    Transitions Center, where did you sleep at night?

13    A.    (By the interpreter) In the room at the -- upstairs.

14    Q.    And during that period did you ever give anyone

15    massages?

16    A.    *(Nodded head.)*

17    Q.    Is that a yes?

18    A.    (By the interpreter) Yes.

19    Q.    And I know it's tough to remember because we all nod

20    and shake our heads, but I think the court or I will

21    probably ask you to say your answers, if you would, please.

22    A.    (By the interpreter) Yes.

23    Q.    Okay.  So VS XXXX, you said that you did give people

24    massages while you were at Hope Transitions Center.

25              Who did you give massages to?

09:39:51  1    A.    (By the interpreter) Daniel.

2    Q.    Okay.  And is that Daniel Johnson?

3    A.    (By the interpreter) Yes.

4    Q.    Can you tell me, what part of Daniel Johnson did you

5    massage?

6    A.    (By the interpreter) Back.

7    Q.    Were there other parts?

8    A.    (By the interpreter) No.

9    Q.    VS XXXX, I want to talk to you about some uncomfortable

10   subjects.  Okay?

11   A.    (By the interpreter) Yes.

12   Q.    Do you know what I am going to talk to you about?

13   A.    (By the interpreter) Yes.

14   Q.    Okay.  So I want to talk to you about Daniel Johnson

15   and you and things that he may have done.

16         MR. WEINERMAN:  Judge, I am sorry.  We can't hear

17   the interpreter and not so much the witness either.

18         THE COURT:  You are going to have to raise your

19   voices a little bit more, please.

20         THE WITNESS (By the interpreter):  Yes.

21   BY MR. SINHA:

22   Q.    Could you tell me about the first time that Daniel

23   Johnson ever did anything to you that made you feel

24   uncomfortable?

25   A.    (By the interpreter) It's hard to say.

09:41:55  1   Q.   I know.  So VS XXXX, let me ask you this:  Was there a

2   time that you were in Daniel's bedroom with him and LS X was

3   there?

4   A.   (By the interpreter) Yes.

5   Q.   Okay.  And were you guys at that time watching, like, a

6   movie or video slides?

7   A.   (By the interpreter) Yes.

8   Q.   Okay.  And did LS X fall asleep before you did or after

9   you did?

10   A.   (By the interpreter) Before.

11   Q.   Okay.  VS XXXX, what happened after LS X fell asleep?

12   A.   (By the interpreter) Daniel violated me.

13   Q.   Okay.  How did he violate you?

14   A.   (By the interpreter) He made me suck his penis.

15   Q.   And was that his penis in your mouth?

16   A.   (By the interpreter) Yes.

17   Q.   Okay.  And was he wearing a condom?

18   A.   (By the interpreter) No, he didn't.

19   Q.   Was that the only time that Daniel made you suck his

20   penis?

21   A.   (By the interpreter) Many times.

22   Q.   When Daniel made you suck his penis, did Daniel come?

23   A.   (By the interpreter) Yes.

24   Q.   Were there times when Daniel sucked your penis?

25   A.   (By the interpreter) Yes.

09:44:38   1   Q.   Did that happen a few times or a lot of times?

2   A.   (By the interpreter) Two to three times.

3   Q.   And when Daniel sucked your penis, did you come?

4   A.   (By the interpreter) No, I didn't.

5   Q.   Were there times when Daniel touched his -- your penis

6   with something other than his mouth?

7   A.   (By the interpreter) No.

8   Q.   Were there ever times when Daniel touched your penis

9   with his hand?

10   A.   (By the interpreter) Yes.

11   Q.   And when that happened, was that the skin of his hand

12   touching the skin of your penis?

13   A.   (By the interpreter) Yes.

14   Q.   When that happened and Daniel was touching your penis

15   with his hand, did you ever come?

16   A.   (By the interpreter) Never.

17   Q.   Did him touching your penis with his hand ever cause

18   you to become aroused?

19   A.   (By the interpreter) Yes.

20   Q.   Okay.  Was there times during the time you lived at

21   Hope Transitions Center when Daniel made you touch his penis

22   with your hand?

23   A.   (By the interpreter) Can you repeat your question,

24   please.

25   Q.   Were there times when Daniel made you touch his penis

VS XXXXXXXXXXXXX - 5/8/2018
*Direct Examination by Ravi Sinha*
770

09:46:41

1    with your hand?

2    A.   (By the interpreter) Yes.

3    Q.   Were there -- were there ever times when Daniel put his

4    penis in your body anywhere other than your mouth?

5    A.   (By the interpreter) Yes, in the butt.

6    Q.   How often did that happen?

7    A.   (By the interpreter) Two to three times.

8    Q.   When Daniel put his penis in your butt, did you try to

9    stop him?

10   A.   (By the interpreter) I tried.

11   Q.   Were you able to stop him?

12   A.   (By the interpreter) I couldn't.

13   Q.   Was he much bigger than you at that time?

14   A.   (By the interpreter) Yes.

15   Q.   When Daniel put his penis in your butt, did he put

16   anything on it before he did that?

17   A.   (By the interpreter) He -- he applied lubrication.

18   Q.   To his penis or to your butt?

19   A.   (By the interpreter) On his penis.

20   Q.   When Daniel put his penis in your butt, how did it

21   feel?

22   A.   (By the interpreter) Painful.

23   Q.   VS XXXX, when these things were happening to you, did

24   you feel like you could make Daniel stop doing them to you?

25   A.   (By the interpreter) No.

09:49:22

1    Q.    What did you think would happen if you tried to stop

2    Daniel from doing these things to you?

3    A.    (By the interpreter) I don't know.

4    Q.    Were you scared of Daniel?

5    A.    (By the interpreter) Yes.

6    Q.    What types of things -- what types of things were you

7    scared he would do?

8    A.    (By the interpreter) I was afraid that he would

9    continue to violate.

10   Q.    And you mean continue to violate you?

11   A.    (By the interpreter) Yes.

12   Q.    When Daniel was doing these things to you, did he ever

13   say anything to you about it?

14   A.    (By the interpreter) He told me not to tell anyone

15   else.

16   Q.    Did he tell you that just once or did he tell you that

17   repeatedly?

18   A.    (By the interpreter) Every time.

19   Q.    VS XXXX, when Daniel was doing these things to you and

20   he finished, did he ever give you anything afterwards?

21   A.    (By the interpreter) He gave money.

22   Q.    He gave you money after -- afterwards.  Did you

23   understand that part of the reason you were getting the

24   money was because he had violated you?

25   A.    (By the interpreter) Yes.

VS XXXXXXXXXXXX - 5/8/2018
*Direct Examination by Ravi Sinha*
772

09:51:57

1    Q.    VS XXXX, when did Daniel -- what stopped -- let me

2    start again.

3              What happened that stopped Daniel from violating

4    you?

5    A.    (By the interpreter) The police arrested him.

6    Q.    Okay.  And was he -- was he violating you all the way

7    up until the time of his arrest?

8    A.    (By the interpreter) Yes.

9    Q.    And was he violating you the whole two-year period that

10   you lived at Hope Transitions Center?

11   A.    (By the interpreter) Yes.

12   Q.    VS XXXX, when Daniel was having anal sex with you,

13   what -- where did that take place in the Hope Transitions

14   Center?

15   A.    (By the interpreter) In his room.

16   Q.    And when that was happening, where were you in the

17   room?

18   A.    (By the interpreter) On the bed.

19   Q.    And how were you positioned on the bed?

20   A.    (By the interpreter) Laid down.

21   Q.    Okay.  And were you laying on your stomach or were you

22   laying on your back?

23   A.    (By the interpreter) On my stomach.

24   Q.    And where was Daniel positioned?

25   A.    (By the interpreter) Kneeling down.

09:54:19   1   Q.   So he was -- was he behind you?

2   A.   (By the interpreter) Yes.

3   Q.   Okay.  And were you laying flat on your stomach or were

4   you on your hands and knees?

5   A.   (By the interpreter) On my hands and knees.

6   Q.   Okay.  VS XXXX, during these instances in which Daniel

7   was having anal sex with you, do you ever recall him taking

8   any photographs of that happening?

9   A.   (By the interpreter) He did.

10   Q.   Okay.  And did you ever see any of the photographs that

11   he took?

12   A.   (By the interpreter) Yes.

13   Q.   And do you -- do you know, how was he holding the

14   camera when he took those photographs?

15        INTERPRETER LIM:  I think the interpreting

16   didn't --

17        MR. SINHA:  I can reask the question a better way.

18        INTERPRETER LIM:  But the answer, he used the --

19   his telephone.

20   BY MR. SINHA:

21   Q.   Okay.  What kind of phone was it that he was using?

22   A.   (By the interpreter) An iPhone.

23   Q.   Do you remember what color it was?

24   A.   (By the interpreter) White.

25   Q.   And when he was using this iPhone to take photos of you

09:56:28   1   while having anal sex with you, do you know how he was

2   positioning the phone?

3   A.   (By the interpreter) He took still photos.

4   Q.   Okay.  Do you know if your face was visible in those

5   photos?

6   A.   (By the interpreter) No.

7   Q.   Do you know if the angle from which the photos were

8   taken would have been such that Daniel's scrotum was

9   visible?

10   A.   (By the interpreter) You can see.

11   Q.   His scrotum?

12   A.   (By the interpreter) Yes.

13   Q.   In the photos that he took and then showed you, did it

14   look like Daniel was taking the photo from behind both of

15   you so you were in front of him and he was behind you, and

16   then was the photo taken from behind him?

17   A.   (By the interpreter) From above.

18   Q.   Okay.  And the photo that you recall seeing was taken

19   from above the two of you?

20   A.   (By the interpreter) You only see his thing and me.

21   Q.   And by "his thing," do you mean his genitals?

22   A.   (By the interpreter) Yes.

23   Q.   And so is that his penis and his scrotum?

24   A.   (By the interpreter) Yes.

25   Q.   VS XXXX, in the instances in which Daniel Johnson made

09:59:21    1    you suck his penis, where were his hands when that was

2    happening?

3    A.    (By the interpreter) Pushing my head.

4    Q.    During this period, VS XXXX, were you aware of Daniel

5    Johnson sexually abusing any of the other boys at the

6    orphanage?

7    A.    (By the interpreter) I -- I did know.

8    Q.    Okay.  I want to talk to you about the day of the

9    arrest.

10    A.    (By the interpreter) Yes.

11    Q.    Do you recall, on the day of the arrest, speaking to

12    people from either the Cambodian National Police or an

13    organization called APLE?

14    A.    (By the interpreter) I don't remember.

15    Q.    You don't remember whether you did or didn't?

16    A.    (By the interpreter) Correct.

17    Q.    Okay.  Do you remember about a year after the arrest

18    speaking to a woman with the FBI named Martha?

19    A.    (By the interpreter) Yes.

20    Q.    Okay.  And do you remember talking to Martha about some

21    of these uncomfortable things?

22    A.    (By the interpreter) Yes.

23    Q.    VS XXXX, I think I only have a few more questions for

24    you.  But if it's okay, I would like to take just one

25    minute, please.

```
10:01:42   1    A.    (By the interpreter) Yes.
           2              MR. SINHA:  Thank you, Your Honor.
           3                  (Government counsel conferred.)
           4    BY MR. SINHA:
           5    Q.    So VS XXXX, I just have a few more questions for you.
           6              VS XXXX, how do you -- as you sit here today, how
           7    do you feel about Daniel Johnson?
           8    A.    (By the interpreter) I don't have any feeling.
           9    Q.    Are you testifying today because you want to become --
          10    you want to move to the United States or somebody from the
          11    United States government has given you money or anything
          12    like that?
          13    A.    (By the interpreter) I just want to say the truth of
          14    what he did to me.
          15    Q.    Is that the only reason why you are testifying today?
          16    A.    (By the interpreter) Yes.
          17              MR. SINHA:  Your Honor, at this time I will pass
          18    the witness, but I would ask the court for a brief break in
          19    between.
          20              THE COURT:  All right.  Folks, let's take a quick
          21    break.  We'll have you return to the jury room.  We'll be
          22    out 10 or 15 minutes.
          23                        (Jury out.)
          24              THE COURT:  Has the defense decided whether they
          25    are going to inquire about the photo?
```

10:04:30    1          Has the defense decided whether they are going to

2    inquire about the photo on cross?

3          MR. WEINERMAN:  I still need to talk to

4    Ms. Maxfield.  So the answer to the court's question is no,

5    not yet.

6          THE COURT:  Okay.  I will leave it up to you folks

7    whether you want to spend some time with him with the photo

8    privately, talk to him about it or not.

9          MR. SINHA:  Thank you, Your Honor.  Is it okay if

10   we tell him just about the break?

11         THE COURT:  Yes.

12         MR. SINHA:  Thanks.

13                        *(Recess.)*

14         THE COURT:  All right.  We can go on the record.

15         MR. WEINERMAN:  Judge, the answer to the court's

16   question is no, we are not going to ask him about whether --

17   we are not going to ask him anything about what's depicted

18   in the exhibit.

19         THE COURT:  Okay.  All right.  Why don't we bring

20   the witness in and we'll get the jury.

21                     *(Sound feedback.)*

22         THE CLERK:  Does anybody have a cell phone?

23         MR. WEINERMAN:  Yeah, I do.  Sorry.  Apologies.

24         MR. SWEET:  And Your Honor, if we may, one thing,

25   just to be clear, the image is admitted so that through the

10:23:47   1   next witness that we are going to call, that's something

2   that can come in through him, then?

3            THE COURT:  Yes.

4            MR. SWEET:  Thank you.

5            THE COURT:  All right.  We are going to have

6   Mr. Johnson's attorney ask you some questions.  All right.

7            And we should be done pretty quick.  Are you doing

8   okay?

9            THE WITNESS (By the interpreter):  Yes.

10           THE COURT:  Okay.

11                        *(Jury in.)*

12           THE COURT:  All right.  Please be seated.

13           Cross-examination.

14                    **CROSS-EXAMINATION**

15   BY MS. MAXFIELD:

16   Q.   Good morning, VS XXXX.

17   A.   (By the interpreter) Morning.

18   Q.   I am over here.

19           I am Lisa Maxfield, and I am one of the lawyers

20   representing Mr. Johnson.

21   A.   (By the interpreter) Yes.

22   Q.   You talked just a minute ago about a photograph that

23   was taken.  Do you remember talking to the Cambodian police

24   and some people from APLE on the day of Daniel's arrest?

25   A.   (By the interpreter) Yes.

10:26:27   1   Q.   Do you remember telling those people that there were no

2   photographs taken?

3   A.   (By the interpreter) I don't remember.

4   Q.   Do you remember the day that the Cambodian police came

5   to arrest Daniel Johnson?

6   A.   (By the interpreter) I don't remember.

7   Q.   Do you remember anything?

8   A.   (By the interpreter) I don't remember.

9   Q.   Do you remember how many police came?

10   A.   (By the interpreter) I don't remember.  There were

11   many.

12   Q.   There were many?

13   A.   (By the interpreter) Yes.

14   Q.   And were the children at the center, the kids at the

15   center frightened when the police came?

16   A.   (By the interpreter) Yes.

17   Q.   And you were frightened too; is that right?

18   A.   (By the interpreter) Yes.

19   Q.   The Cambodian police are scary?

20   A.   (By the interpreter) Yes.

21   Q.   When the police came, did they make you sit or stand in

22   a certain area?

23   A.   (By the interpreter) Yes.

24   Q.   You weren't free to walk around as you chose?

25   A.   (By the interpreter) We couldn't.

10:28:23   1   Q.   And -- but the police wanted to question you?

2   A.   (By the interpreter) Yes.

3   Q.   After you talked to the Cambodian police, you were

4   taken away from the center?

5   A.   (By the interpreter) Yes.

6   Q.   You did not get to go back to your home?

7   A.   (By the interpreter) Yes.

8   Q.   You didn't get to see your mom and dad?

9   A.   (By the interpreter) Correct.

10   Q.   Your mom and dad were very upset that they couldn't see

11   you?

12   A.   (By the interpreter) True.

13   Q.   And were you taken to an orphanage that was run by the

14   authorities?

15   A.   (By the interpreter) Yes.

16   Q.   About a month after Mr. Johnson was arrested, did your

17   mom petition the Cambodian court to have you returned to

18   your home?

19   A.   (By the interpreter) Yes.

20   Q.   But you didn't get to go home, did you?

21   A.   (By the interpreter) Correct.

22   Q.   A few months after Mr. Johnson's arrest, your father

23   talked to you about what happened with Daniel Johnson?

24   A.   (By the interpreter) Yes.

25   Q.   And you told your dad that "D" had done nothing wrong?

10:30:34

1    A.    (By the interpreter) Yes.

2    Q.    How long were you -- did you stay in the orphanage?

3    A.    (By the interpreter) I don't remember.

4    Q.    Would it have been a year?  Two years?

5    A.    (By the interpreter) Two years.

6    Q.    When you left the orphanage, you finally got to go back

7    home?

8    A.    (By the interpreter) Yes.

9    Q.    And when you were back home, did the authorities bring

10   you a new bike?

11   A.    (By the interpreter) Yes, they did.

12   Q.    And did they also pay for some repairs on your parents'

13   home?

14   A.    (By the interpreter) Yes.

15   Q.    About a year after Mr. Johnson was arrested, do you

16   remember going to Phnom Penh to talk with FBI Martha?

17   A.    (By the interpreter) Yes.

18   Q.    And who took you to Phnom Penh, do you remember?

19   A.    (By the interpreter) I don't remember.

20   Q.    It wasn't your parents?

21   A.    (By the interpreter) Maybe my mom.

22   Q.    And did the questioning by FBI Martha take place at the

23   office of the Cambodian police?

24   A.    (By the interpreter) Yes.

25   Q.    And the Cambodian police were watching the FBI

10:32:58

1    interview from another room?

2    A.    (By the interpreter) Yes.

3    Q.    About two years after Daniel Johnson was arrested, do

4    you remember a man named Martin coming to your home village?

5    A.    (By the interpreter) Yes.

6    Q.    And did Martin ask your parents if he could talk with

7    you?

8    A.    (By the interpreter) Yes.

9    Q.    And you and Martin went inside a church to talk?

10   A.    (By the interpreter) Yes.

11   Q.    Was it a Christian church?

12   A.    (By the interpreter) Yes.

13   Q.    And you didn't want to tell a lie inside the church?

14   A.    (By the interpreter) Yes.

15   Q.    And you told Martin that you had exaggerated and told

16   lies when you talked to the FBI?

17   A.    (By the interpreter) Yes.

18   Q.    You talked with a lot of lawyers over the last couple

19   of days; is that right?

20   A.    (By the interpreter) Yes.

21   Q.    Before you came to the United States, did you have a

22   chance to talk with any lawyers?

23   A.    (By the interpreter) No.

24   Q.    Do you have a personal lawyer?  A lawyer who represents

25   you?

VS XXXXXXXXXXXXX - 5/8/2018
Cross-Examination by Lisa Maxfield
783

10:35:15

1   A.   (By the interpreter) I do.

2   Q.   And did that lawyer call you on the telephone while you

3   were in Cambodia?

4   A.   (By the interpreter) No.

5   Q.   Was the lawyer American?

6   A.   (By the interpreter) Yes.

7   Q.   And have you talked with the lawyer since you have been

8   here in the United States?

9   A.   (By the interpreter) Yes, I did.

10  Q.   Where did you meet with the lawyer?

11  A.   (By the interpreter) At the hotel.

12  Q.   Who was there when you met with the lawyer?

13  A.   (By the interpreter) Myself and a few of my friends,

14  about two to three of my friends.

15  Q.   Do you remember who your friends were who were there?

16  A.   (By the interpreter) CC X, SO XXX, LS X and myself.

17  Q.   Did you talk with the lawyer about being able to live

18  in the United States?

19  A.   (By the interpreter) No.

20  Q.   Have you talked to anyone about living in the United

21  States?

22  A.   (By the interpreter) No.

23  Q.   Since you have been here in the United States, has the

24  FBI given you any money?

25  A.   (By the interpreter) They did.

10:37:37

1   Q.   How much?

2   A.   (By the interpreter) I don't remember.

3   Q.   Do you still have some left?

4   A.   (By the interpreter) Yes.

5   Q.   Do you know how much money you have left?

6   A.   (By the interpreter) I don't know.

7   Q.   Let me just ask you this:  The court -- this part's no

8   fun, but have you had a chance to do anything fun while you

9   have been here?

10   A.   (By the interpreter) Yes.

11   Q.   Can you tell me some of the fun things you have done so

12   far?

13   A.   (By the interpreter) Telling you, right?

14   Q.   Pardon?

15   A.   To tell you, correct?

16          Meaning am I telling you?

17   Q.   Oh, I guess I am asking you, tell all of us what fun

18   things you have done so far.

19   A.   (By the interpreter) Playing soccer and also going out.

20   Q.   Where did you get to go?

21   A.   (By the interpreter) We went to the mountains.

22   Q.   Do you know how much longer you will be here in the

23   United States?

24   A.   (By the interpreter) I don't know.

25         MS. MAXFIELD:  I have no further questions.  Thank

10:40:08   1   you.

2              THE COURT:  Any redirect?

3              MR. SINHA:  Yes, Your Honor, if I may, please.

4              Actually, Your Honor, if I can just have one

5   moment.

6              THE COURT:  Sure.

7              *(Government counsel conferred.)*

8                      **REDIRECT EXAMINATION**

9   BY MR. SINHA:

10  Q.   All right.  SO XXX, I don't have a lot of questions for

11  you.  I just have a few.  Excuse me.

12             VS XXXX, I don't have a lot of questions for you.

13  I just have a few.

14             So VS XXXX, Ms. Maxfield asked you about getting a

15  bicycle in Phnom -- excuse me -- in Cambodia.

16  A.   (By the interpreter) Yes.

17  Q.   Okay.  And she said that the authorities gave you that

18  bicycle.

19  A.   (By the interpreter) Yes.

20  Q.   But I don't really know what the word "authorities"

21  means.  Who gave you the bicycle?

22  A.   (By the interpreter) Hagar organization.

23  Q.   Okay.  And is that a charitable organization for

24  victims of sexual abuse?

25  A.   (By the interpreter) Yes.

10:41:35

1    Q.    And do you know why they gave you a bicycle?

2    A.    (By the interpreter) I don't know.

3    Q.    Is Hagar giving you a bicycle in Cambodia the reason

4    why you are testifying here today?

5    A.    (By the interpreter) No.

6    Q.    Now, it sounds like, VS XXXX, you at one point talked

7    to your dad about some of the things that Daniel did to you.

8         And you also talked to Mr. Johnson's investigator,

9    a man named Martin; is that correct?

10   A.    (By the interpreter) Yes.

11   Q.    VS XXXX, are these -- the things that we have talked

12   about today with you, that I have talked to you about today,

13   are those things easy for you to talk about or are those

14   hard things to talk about?

15        INTERPRETER LIM:  I think the interpreter goofed.

16   Okay.  Can you repeat the question again, please.

17   BY MR. SINHA:

18   Q.    Sure.  So the times -- today we have talked about a lot

19   of times in which Daniel Johnson sexually abused you.

20        And I have asked you a lot of questions about

21   those things, and you have answered my questions.

22        But are those topics that you like to talk about

23   or are those topics that you don't like to talk about?

24   A.    (By the interpreter) I -- I don't want to talk about.

25   Q.    And are those topics that you want to talk to your

10:43:52   1    father about?

2    A.   (By the interpreter) No.

3    Q.   Are those topics that you wanted to talk to Martin

4    about?

5    A.   (By the interpreter) No.

6    Q.   Okay.  So I guess what it comes down to is the things

7    that you told Martha when you talked to her and she was

8    interviewing you, were those things really things that

9    Daniel Johnson did to you?

10    A.   (By the interpreter) Yes.

11    Q.   Did you make any of those things up?

12    A.   (By the interpreter) It was the truth.

13    Q.   And is what you have told us here today the truth?

14    A.   (By the interpreter) It is the truth.

15    Q.   VS XXXX, today is not the first day that you testified

16    in court; is that correct?

17    A.   (By the interpreter) Correct.

18    Q.   And you actually testified in court in Cambodia about

19    the things that --

20            MS. MAXFIELD:  Beyond the scope, Your Honor.

21    Objection.

22            THE COURT:  It's beyond the scope.  This is a new

23    area.

24            MR. SINHA:  Could we approach, please?

25            THE COURT:  Yes.

*VS XXXXXXXXXXXX - 5/8/2018*
*Redirect Examination by Ravi Sinha*
788

10:45:43

1          *(Discussion at sidebar; not reported.)*

2          THE COURT:  I will overrule the objection if you

3     could reask the question.

4     BY MR. SINHA:

5     Q.   So VS XXXX, I was talking to you about having testified

6     in a proceeding involving Daniel Johnson in Cambodia.

7          Do you know what I am talking about?

8     A.   (By the interpreter) Yes.

9     Q.   And when you testified in that case in Cambodia, did

10    you testify that Daniel Johnson had sexually abused you?

11    A.   (By the interpreter) Yes.

12    Q.   Was that the truth when you said that?

13    A.   (By the interpreter) The truth.

14    Q.   VS XXXX, I am going to jump back to one other quick

15    question.

16          I think Ms. Maxfield had said that the authorities

17    replaced your mother's house's roof?

18          INTERPRETER LIM:  Counselor, did you say

19    "replace"?

20    BY MR. SINHA:

21    Q.   Repair, I am sorry, is a better word.

22    A.   (By the interpreter) They didn't.

23    Q.   Okay.  Did somebody help your mother with her roof?

24    A.   (By the interpreter) No.

25    Q.   I may just have misunderstood.  Did somebody help

10:48:53   1   repair your parents' home?

2   A.   (By the interpreter) We fix it ourselves.

3   Q.   Okay.

4          MR. SINHA:  So Your Honor, what I'd ask the court

5   to do, and I think Mr. Johnson's counsel doesn't have an

6   objection to this, is we are going to -- we'd like to play

7   part of the forensic interview with VS XXXX.  We have

8   transcripts for the jury.

9          THE COURT:  Okay.

10          MR. SINHA:  But we believe that he could be

11   excused, unless the defense has additional questions, so he

12   doesn't have to sit through it.

13          THE COURT:  Any objection to the witness being

14   excused?

15          MS. MAXFIELD:  No, but I have one more question.

16          THE COURT:  Okay.  Go ahead.

17                    **RECROSS-EXAMINATION**

18   BY MS. MAXFIELD:

19   Q.   The authorities who just repaired your parents' roof,

20   they actually built a new roof on a new house; isn't that

21   right?

22   A.   (By the interpreter) Yes.

23          MR. SINHA:  Could I ask one additional question,

24   Your Honor?

25          THE COURT:  Sure.

10:50:16   1                        __REDIRECT EXAMINATION__

2    BY MR. SINHA:

3    Q.   VS XXXX, who are the authorities that did that?

4    A.   (By the interpreter) I don't know.

5              MR. SINHA:  Okay.  That's all I had, Your Honor.

6              THE COURT:  All right.  VS XXXX, thank you very

7    much.  You are free to go.

8              MR. SINHA:  So, Your Honor, if I may, I wish to

9    perhaps introduce the video clips.

10             THE COURT:  Yes, if you could, when it was taken,

11   who was present.  And Ms. Pew is handing out copies for the

12   jurors, so.

13             MR. SINHA:  So, Your Honor, I would note that the

14   transcript has been marked and I would ask for it be entered

15   as Court Exhibit 7.

16             THE COURT:  All right.

17             MR. SINHA:  This is an excerpt from a forensic

18   interview conducted in Phnom Penh, of VS XXXX.  The

19   participants are Martha Finnegan, an FBI forensic

20   interviewer; Roath, spelled R-O-T-H [sic], who is a

21   translator; VS XXXX.

22             The interview took place on November 14th of 2014,

23   and it is Exhibit No. 268A, as in apple.

24             THE COURT:  All right.  It will be received.

25               *(The video was played; not reported.)*

*VS XXXXXXXXXXXXX - 5/8/2018*
*Redirect Examination by Ravi Sinha*
791

11:10:11    1            THE COURT:  All right.  Do we have another witness

2    for the government?

3            MS. BRITSCH:  Yes, Your Honor.  The government

4    calls Brian Poole.

5            MR. WEINERMAN:  Judge, we have a stipulation.  I

6    think we have agreed to read it into the record now.  It is

7    one of the court's exhibits, Court Exhibit 1.

8            THE COURT:  All right.

9            MR. WEINERMAN:  If I may.

10            THE COURT:  Yes.  And if you want to introduce

11    what the exhibit is before you read it.

12            MR. WEINERMAN:  Well, we -- it's a stipulation.

13            THE COURT:  Okay.

14            MR. WEINERMAN:  It's a court's exhibit, not a

15    defense or a government exhibit.

16            THE COURT:  All right.

17            MR. WEINERMAN:  So I will just read it.

18            "On January 6th, 2013, FBI Special Agent Jeff

19        Yesensky spoke with an APLE employee regarding

20        Daniel Johnson.  The APLE employee did not have

21        copies of the Cambodian National Police interview

22        reports with LS XXXXX, VS XXXXXXXXXXXXX, CC

23        XXXXXX, SO XXXXXXX, and ES XXXXXXXX, but had been

24        briefed on the case.  To the APLE employee's

25        knowledge, none of the alleged victims had

11:11:11   1        disclosed that Daniel Johnson had taken explicit

2        images of them."

3             THE COURT:  Okay.  Folks, a stipulation is just

4    facts that both parties agree upon that you can accept as

5    true.  And I believe we'll have the stipulations that are

6    included in this case sent to you in the jury instructions.

7             All right.  Mr. Poole, if you'd like to step

8    forward to the witness stand here to my left.  You can go

9    ahead and step up the stairs next to the witness chair and

10   remain standing for just a moment.  You will be sworn in.

11            THE CLERK:  Please raise your right hand.

12                 *(The witness was sworn.)*

13            THE CLERK:  Please be seated.  State your name for

14   the record, spelling your first and last.

15            THE WITNESS:  It's BT XX R. Poole, B-R-I-A-N,

16   Poole, P-O-O-L-E.

17            THE COURT:  All right.  Thank you.

18            Ms. Britsch.

19            MS. BRITSCH:  Thank you, Your Honor.

20                 **DIRECT EXAMINATION**

21   BY MS. BRITSCH:

22   Q.   Good morning, Mr. Poole.

23   A.   Good morning.

24   Q.   Where do you work?

25   A.   I work for the FBI, Federal Bureau of Investigation, in

11:12:17    1    Pocatello, Idaho.

2    Q.    And what is your role with the FBI in Pocatello?

3    A.    I am a forensic examiner, a computer forensic examiner

4    with the CART unit, Computer Analysis Response Team.

5    Q.    And how long have you been a computer forensic

6    examiner?

7    A.    I have been a computer forensic examiner for 22 years.

8    Q.    And in general, what does a computer forensic examiner

9    do at the FBI?

10    A.    A computer forensic examiner examines devices,

11    electronic devices, including hard drives, cell phones, USB

12    drives, digital cameras.

13    Q.    Are those devices that are generally seized as evidence

14    in FBI investigations?

15    A.    Yes, they are.

16    Q.    And before you became a computer forensic examiner,

17    were you working at the FBI?

18    A.    Yes.

19    Q.    And what was your role before that?

20    A.    I was a network computer operator, and before that I

21    was a mainframe computer operator.

22    Q.    And can you tell us a little bit about your education,

23    please.

24    A.    Yes.  I have an associate's degree in data processing

25    from Idaho State University and also a Bachelor's of

11:13:21   1   Business Administration with an emphasis in computer

2   information systems from -- also from Idaho State

3   University.

4   Q.   And do you have any training or certifications related

5   to computer forensic examination?

6   A.   Yes.  I have been certified in Windows computers,

7   Mac -- Macintosh computers, cell phones, digital cameras,

8   and Linux computers.

9   Q.   And as part of your work with the FBI, do you do

10   regular on-the-job training related to computers?

11   A.   Yes.  I averaged about two or three training classes a

12   year throughout the 22 years I have been a forensic

13   examiner.

14   Q.   And can you say approximately how many digital devices

15   you reviewed as a computer forensic examiner with the FBI?

16   A.   I would say around a thousand over the 22 years.

17   Q.   And can you explain for us what is the process of

18   conducting a computer forensic examination?

19   A.   It varies on the device.  For a hard drive, we take an

20   image of the hard drive.  That is a bit-for-bit copy of the

21   hard drive.  We first write-protect it so that nothing can

22   be written to the original evidence, and then we copy it

23   over to another piece of media; generally a hard drive,

24   another hard drive or a server storage system.  And in the

25   process we also do an MD5 hash verification on it.  And a

Brian Poole - 5/8/2018
Direct Examination by Lauren Britsch
795

11:14:56  1    hash verification is like a digital fingerprint for a

2    computer system.

3    Q.    Okay.  And then step back for a second.  So you

4    mentioned this is how you deal with a hard drive, correct?

5    A.    Correct.

6    Q.    Would that be, for example, a hard drive you find in a

7    computer or an external hard drive that you might plug into

8    a computer?

9    A.    Either one.

10    Q.    Okay.  And you said you make an image which is a

11    bit-for-bit copy; is that correct?

12    A.    That's correct.

13    Q.    Can you explain what a bit-for-bit copy is?

14    A.    It takes, like, every piece of data of the -- of the

15    hard drive, and it copies it over to another medium.

16    Q.    And so could you say it's an exact copy?

17    A.    Yes.

18    Q.    And then you mentioned write-protecting it so that you

19    don't write to the original device.  Does that mean

20    essentially that you don't make changes to the original

21    evidence when you make your bit-by-bit copy?

22    A.    That's correct.

23    Q.    And you mentioned MD5 hash verification.  Can you walk

24    us through that and what the purpose of that is, please.

25    A.    Yeah.  The MD5 hash verification is a mathematical

*Brian Poole - 5/8/2018*
*Direct Examination by Lauren Britsch*
796

11:15:59  1  formula that calculates based on the bits and the bites of

2  the other computer.  And it spits out a 32-character value,

3  mathematical value based on this formula.

4         And then at the end of our examination we run that

5  again on the copy that we have made to verify that nothing

6  has changed during our examination.  So those values should

7  match up at the end of the examination.

8  Q.   And that's how you verify that your bit-by-bit copy is

9  an exact copy of the original evidence?

10  A.   Yes.

11  Q.   And so that's the process for making a copy of a hard

12  drive, correct?

13  A.   Yes.

14  Q.   Can you explain how copying or extracting data from

15  cell phones is different than the process you just

16  described?

17  A.   Yes.  Most cell phones, smart phones these days, will

18  not let you do an exact bit-for-bit copy due to security

19  reasons.  So we perform an extraction process, either a

20  logical file or physical process.  The physical is the

21  bit-for-bit copy.  And most smart phones, like I said, will

22  not let you do that these days.

23  Q.   So you said you make a logical copy?

24  A.   Either a logical or a file system copy.

25  Q.   And what is a logical copy?

11:17:22    1    A.    A logical copy basically gets just the media or texts

2    or e-mails.  It doesn't get the file system or hidden files.

3    Q.    So it essentially just gets files that we as the user

4    of a cell phone would be able to see?

5    A.    That's correct.

6    Q.    And is there another type of file system extraction?

7    A.    Yes.

8    Q.    And what additional information can you get with a file

9    system extraction?

10    A.    The file system extraction gets the actual file system,

11    hidden files, and generally operating system files that the

12    normal user can't see.

13    Q.    Would that include deleted files in some cases?

14    A.    In some cases.

15    Q.    And Mr. Poole, have you ever been qualified as an

16    expert in computer forensics or cell phones in federal court

17    before?

18    A.    Yes, I have.

19    Q.    And was that in 2008?

20    A.    It was around 2008.  I am not sure of the exact year.

21            MS. BRITSCH:  Your Honor, at this time the

22    government would move to qualify Mr. Poole as an expert in

23    the field of forensic examinations of digital devices,

24    including computers and cell phones, please.

25            THE COURT:  Any objection?

11:18:29    1                    MR. WEINERMAN:  No.

            2                    THE COURT:  All right.

            3                    MS. BRITSCH:  Thank you, Your Honor.

            4    BY MS. BRITSCH:

            5    Q.   Mr. Poole, as part of this case, did an FBI agent

            6    provide you with digital devices that had been seized from

            7    Mr. Daniel Johnson?

            8    A.   Yes.

            9    Q.   And was one of those devices a white iPhone?

           10    A.   Yes.

           11    Q.   And I am going to show you what's been marked as

           12    Government Exhibit 304 just for identification.  I am going

           13    to ask you to take a look at this, please.

           14                    What is Government Exhibit 304?

           15    A.   That is an iPhone containing my item number and my

           16    initials.

           17    Q.   And do you recognize that iPhone as one you examined as

           18    part of the investigation of Daniel Johnson?

           19    A.   Yes.

           20    Q.   And do you put your initials on it so that you can

           21    identify it later as the same iPhone?

           22    A.   Yes.

           23    Q.   And is that the same reason you have an item number on

           24    it?

           25    A.   Yes.

*Brian Poole - 5/8/2018*
*Direct Examination by Lauren Britsch*
799

11:19:23

1  Q.   And what color is that iPhone, please?

2  A.   It is white.

3  Q.   Now, on this iPhone, did you perform an extraction?

4  A.   Yes.

5  Q.   And can you explain what type of extraction you

6  performed.

7  A.   I performed two types of extractions.  First I did the

8  logical extraction, and then I did a file system extraction.

9  Q.   And were those the two types of extractions you just

10 described for us with regards to cell phones?

11 A.   Yes.

12 Q.   And as part of that extraction, did you find a

13 thumbnail image on the iPhone that you provided to the FBI

14 agent in this case?

15 A.   Yes.

16 Q.   And can you explain for us what a thumbnail image is,

17 generally.

18 A.   A thumbnail is a smaller image, generally to look -- so

19 that you can look at a number of images together and quickly

20 scroll through many of the images so you don't have to

21 scroll through one by one of the individual photos.

22 Q.   And are thumbnail images often automatically created by

23 the cell phone?

24 A.   Yes.

25 Q.   And those are created from actual photos that are on

11:20:33    1    the phone; is that correct?

2    A.    Yes.

3    Q.    And are those the small images we see when we open up

4    our photo album and we scroll through and there's little

5    tiny boxes?

6    A.    That's correct.

7    Q.    I am going to ask you to take a look at Government

8    Exhibit 222, please.

9              THE CLERK:  What exhibit was that?

10             MS. BRITSCH:  222.

11             MR. WEINERMAN:  Has that been admitted?

12             MS. BRITSCH:  It has not yet.  I am going to ask

13    him to lay a foundation, if that's all right, Your Honor.

14             MR. WEINERMAN:  Can we publish it to counsel now?

15             THE COURT:  Yes.

16             MS. BRITSCH:  May I just hand counsel a copy, Your

17    Honor?  We haven't put it on the digital system.

18             THE COURT:  Okay.

19             MS. BRITSCH:  And, Your Honor, I believe the court

20    has a copy from this morning, but if the court does not, I

21    can provide one.

22             THE COURT:  I don't have it currently, but --

23             MS. BRITSCH:  I have one for the court.

24    BY MS. BRITSCH:

25    Q.    Mr. Poole, do you recognize the image in Government

11:21:34   1   Exhibit 222?

2   A.   Yes, I do.

3   Q.   And is that a thumbnail image that you extracted from

4   the white iPhone?

5   A.   That is correct.

6           MS. BRITSCH:   Your Honor, at this time we'd move

7   to admit Government Exhibit 222.

8           THE COURT:   All right.   Over objection that was

9   previously stated on the record, I will allow the exhibit.

10           MS. BRITSCH:   Thank you, Your Honor.

11           And at this time I would like to hand out copies

12   to the jury.   I don't know if Ms. Pew would like to do it,

13   but we have hard copies, one for each juror.   And if the

14   court would let us, I would like to hand it out for as short

15   amount of time as possible and re-collect them from the jury

16   as soon as we are done talking about it.

17           THE COURT:   Okay.

18           MS. BRITSCH:   And for the record, I just note it's

19   approximately 11:24 a.m. as we are handing out these photos.

20   BY MS. BRITSCH:

21   Q.   And now, Mr. Poole, when we look at this thumbnail

22   image, it looks a little funny.   It appears that there are

23   two photos, one pasted on top of the other; is that correct?

24   A.   Yes.

25   Q.   And is there any way for an expert to basically unglue

Brian Poole - 5/8/2018
Direct Examination by Lauren Britsch
802

11:23:16   1    these photos?

         2    A.   Not easily.  The picture that looks like it's

         3    underneath would not be a full picture if you took it apart.

         4    Q.   And can you explain why this thumbnail image looks this

         5    way, the two photos pasted one on top of the other?

         6    A.   Looking through the Internet and doing research, I have

         7    never seen this happen before.  But looking through the

         8    Apple website, through the discussion groups, I came across

         9    several complaints about a glitch that was on the operating

        10    system of iPhones from about Version 4 through Version 7.

        11    And the glitch has -- is what it does is it has an active

        12    file, a current photo that overlays over the top of a

        13    deleted photo.

        14    Q.   And the version you mention, is that the operating

        15    system version or iPhone itself version?

        16    A.   The operating system version.

        17    Q.   And would that operating system version been around at

        18    the time of the iPhone version we have in front of you?

        19    A.   That's correct.  The iPhone had version 6, 6.1, I

        20    believe.

        21    Q.   Okay.  So you said it's basically a programming glitch?

        22    A.   Yes.

        23    Q.   And so you mentioned active photo and deleted photo.

        24    Can you explain with respect to this thumbnail which one

        25    would be the active photo and which one would be the deleted

*Brian Poole - 5/8/2018*
*Direct Examination by Lauren Britsch*
803

11:24:42  1  photo?

2  A.    Yes.  The active photo is the foot that's on top of

3  this overlaid photo, which is a deleted photo that is

4  underneath.

5  Q.    So the photo on top was still on the phone; is that

6  correct?

7  A.    That's correct.

8  Q.    The photo underneath had been deleted.  Is that what

9  you are saying?

10  A.    Yes.

11  Q.    And were you able to determine, with respect to the

12  photo of the foot on top, any dates associated with when it

13  had been taken?

14  A.    Yes.  From my examination, it looked like the photo was

15  taking -- taken on July 1st of 2013.

16           MR. WEINERMAN:  Could I ask him to repeat that

17  again, Judge.  I didn't hear him.

18           THE COURT:  Yes.  Could you repeat that.

19           THE WITNESS:  The photo that's on top was taken on

20  July 1st of 2013, by the iPhone.

21  BY MS. BRITSCH:

22  Q.    And are you able to determine when the photo on the

23  bottom had been taken?

24  A.    No.

25  Q.    Can you say whether the photo on the bottom existed on

11:25:39   1   the phone before the top photo was created?

2   A.   Yes, it existed on the phone before the top photo was

3   created.

4   Q.   And were you also able to determine from your

5   examination of the iPhone when the iPhone had been

6   activated?

7   A.   I believe the iPhone was activated on June 24th of

8   2012.

9   Q.   And can you say that the bottom photo was deleted

10   sometime after that June 2012 date?

11   A.   That's correct.  That's what it looks like.

12   Q.   So those dates, then, are between June 2012 when the

13   phone was activated and then when the photo on top was

14   taken, July 1st, 2013?

15   A.   Yes.

16          MS. BRITSCH:  Your Honor, at this time I would

17   like to collect the copies of the photo from the jury,

18   please.

19          THE COURT:  All right.

20          MS. BRITSCH:  I will note for the record that it

21   is approximately 11:29.

22          Thank you.

23   BY MS. BRITSCH:

24   Q.   Mr. Poole, did you also examine a computer and external

25   hard drive seized from Mr. Daniel Johnson?

Brian Poole - 5/8/2018
Direct Examination by Lauren Britsch
805

11:27:01

1    A.    Yes.

2    Q.    And did you conduct those examinations by making

3    forensic copies with the process you described for us

4    earlier?

5    A.    Yes, I did.

6    Q.    And were you able to make an exact forensic copy of

7    both of those devices?

8    A.    Yes.

9    Q.    And were you able to verify the hash value to ensure

10    that those hash values matched and it was an exact copy?

11    A.    Yes.

12    Q.    I am going to ask that Government Exhibit 157 be pulled

13    up, please.

14          Do you recognize Government Exhibit 157 on your

15    screen?

16    A.    It's not on my screen.

17    Q.    One minute.  I am asking Ms. Pew to do too many things

18    at once.

19    A.    Yes.

20    Q.    And do you recognize that as a document that you found

21    on an Acer desktop seized from Mr. Daniel Johnson?

22    A.    I believe it was the Acer, yes.

23          MS. BRITSCH:  And Your Honor, I'd move at this

24    time that this document be admitted, please.

25          THE COURT:  All right.  It will be admitted.

11:28:00    1          MS. BRITSCH:  And I'd ask that it be published to

2    the jury, please.

3    BY MS. BRITSCH:

4    Q.   And were you able to determine from your examination

5    that this document was created or copied to the computer on

6    February 24th, 2013?

7    A.   I can't remember the exact date, but --

8    Q.   Did you create a spreadsheet or document that would

9    have the date on it?

10    A.   Yes.

11    Q.   Would it refresh your recollection if I showed you that

12    document?

13    A.   Yes.

14          MS. BRITSCH:  Your Honor, may I approach the

15    witness and show him the spreadsheet with the date?

16          THE COURT:  Yes.

17          MS. BRITSCH:  Thank you.

18    BY MS. BRITSCH:

19    Q.   I believe Government 157 is a document entitled

20    "Ministry Children Directory."

21    A.   Yes.  It was either copied or created on that computer.

22    Actually, probably 2 of -- or February 15th of 2013.

23    Q.   Okay.  And when you say created or copied, does that

24    mean, for example, the user could have created that document

25    on that computer or downloaded it from an e-mail or

Brian Poole - 5/8/2018
Direct Examination by Lauren Britsch
807

11:29:18  1   something like that on that date to the computer?

2   A.   That's correct.

3   Q.   And can we please look at Government Exhibit 159.

4        Do you see Government Exhibit 159 on your screen?

5   A.   Yes.

6   Q.   Is that a document that you discovered in your

7   examination of the external hard drives seized from

8   Mr. Daniel Johnson?

9   A.   Yes.

10       MS. BRITSCH:  Your Honor, at this time we move for

11  Government Exhibit 159 to be admitted, please.

12       THE COURT:  Objection?

13       MR. WEINERMAN:  No objection, Judge.

14       THE COURT:  All right.  It will be received.

15       MS. BRITSCH:  Thank you, Your Honor.

16  BY MS. BRITSCH:

17  Q.   And I believe this is the document titled "Birthday

18  Names."

19  A.   That's correct.

20  Q.   And do you know -- can you tell us a date when this

21  document was created or copied to the external hard drive?

22  A.   Yes.  According to my spreadsheet that I have created,

23  it was either created or copied about the -- August 28th or

24  29th of 2013.

25  Q.   Now, were these two documents and other document images

11:30:31   1    and videos provided to the case agent for review based on

2    your examination?

3    A.    Yes.

4    Q.    On the computer that you examined, the Acer desktop,

5    did you find any cleaning software on that computer?

6    A.    Yes, I did.

7    Q.    And can you explain for us what cleaning software is.

8    A.    Well, in this instance, CCleaner was on this computer.

9    And CCleaner goes through and deletes your Internet history

10   files.  It goes and wipes or scrubs your deleted files.  It

11   has the ability to do that.  And it can also delete or scrub

12   your installation files and temporary files.  It just cleans

13   up your computer.

14   Q.    And how does that compare to a user just deleting files

15   on their own?

16   A.    A normal user just deletes files with the operating

17   system.  The data is still there.  It's just the markers

18   that get deleted.

19   Q.    So does this delete more or less than what a normal

20   user would delete just on their own?

21   A.    This deletes more.

22   Q.    And were you able to determine a date when that

23   CCleaner software was installed and downloaded onto

24   Mr. Johnson's computer?

25   A.    Yes.

11:31:48   1   Q.   And was that date November 24th, 2013?

2   A.   That's correct.

3   Q.   And were you able to determine a time when that was

4   downloaded on the computer?

5   A.   Yes.  I believe just after eight o'clock Cambodian

6   time.

7           MS. BRITSCH:  Okay.  May I have one moment, Your

8   Honor?

9           THE COURT:  Yes.

10   BY MS. BRITSCH:

11   Q.   Mr. Poole, I have just a couple more questions about

12   the cleaning software and, in this case, CCleaner.

13           Do you often encounter cleaning software on

14   computers --

15           MR. SWEET:  Your Honor, I believe there's a

16   question from a juror.

17           MS. BRITSCH:  I apologize.  I am sorry.

18           JUROR:  What was the date, again?

19           MS. BRITSCH:  I will ask the witness.

20           Is that okay, Your Honor?

21           THE COURT:  Yes.

22   BY MS. BRITSCH:

23   Q.   Mr. Poole, you mentioned the date the CCleaner was

24   downloaded.  Could you reiterate that date for us again,

25   please.

11:32:45  1    A.    That was November 24th of 2013.

2    Q.    And I would just ask you to reiterate the time again,

3    please.

4    A.    It was just after 8:00 p.m.  8:03 or 8:04 p.m.

5    Q.    And was that Cambodian time?

6    A.    Yes.

7    Q.    And was that because the computer was last used in

8    Cambodia?

9    A.    Yes.  The time and date -- the time zone was set for

10   Cambodian time.

11   Q.    And back to the cleaning software, unless there are

12   other questions from the jury.

13           CCleaner and other cleaning software, is that

14   something you encounter regularly in the course of your work

15   as a forensic examiner for the FBI?

16   A.    I wouldn't say it's on every computer, but -- not even

17   the majority of computers, but we do find it frequently.

18   Q.    And generally what is the purpose of cleaning software?

19   What is it used for?

20   A.    It's just to clean up your computer.  It deletes your

21   Internet history to cover your tracks sometimes, or it's

22   just to clean up your computer to make it faster.

23               *(Government counsel conferred.)*

24   BY MS. BRITSCH:

25   Q.    And Mr. Poole, if you deleted a photo or video or any

11:34:02    1    other file from your computer and then ran CCleaner on your

2    computer, would it go in and permanently delete that deleted

3    file?

4    A.    With some options, yes.  To go through and wipe or

5    scrub the unallocated space, it does go through and delete

6    all the deleted data.

7    Q.    And if the cleaning software did go through and do

8    that, would you as a computer forensic examiner be able to

9    recover those files?

10    A.    No.

11            MS. BRITSCH:  No further questions, Your Honor.

12            THE COURT:  All right.  Cross.

13                    **CROSS-EXAMINATION**

14    BY MR. WEINERMAN:

15    Q.    So kind of start backwards.

16            So your testimony is it's not uncommon and not

17    unusual to see CCleaner software, correct?

18    A.    The majority of computers that we see does not have

19    that software on there.

20    Q.    But in -- as opposed to what you see in general, the

21    general public, it's quite common for people to use

22    CCleaner, correct?

23    A.    I see it sometimes, yes.

24    Q.    And it allows -- it frees up space on someone's hard

25    drive to delete files, delete things that a person no longer

11:35:13   1    wants anymore, correct?

2    A.    Yes, it can be used for that.

3    Q.    Would you say it would be cheaper than buying an

4    external hard drive?

5    A.    Yes.  The software is free.

6    Q.    Right.  You can download that for free, correct?

7    A.    Right.

8    Q.    So I have a few questions for you about the two photos

9    that were glued together --

10   A.    Yes.

11   Q.    -- as you put it.  And I want to try to use the same

12   terminology that you used, so let me look at my notes here.

13             So we have the active photo, the one that was on

14   top?

15   A.    Yes.

16   Q.    And the deleted photo.  And that was underneath,

17   correct?

18   A.    Yes.  Yes.

19   Q.    The photo underneath, there was no metadata associated

20   with that photo; is that correct?

21   A.    That's correct.

22   Q.    Metadata being information that would automatically

23   accompany the photo?

24   A.    Yes.

25   Q.    Such as the date and time it was taken?

11:36:27    1    A.    Right.

2    Q.    And the location?

3    A.    That's correct.

4    Q.    And the -- the software is sophisticated enough that it

5    would tell you city and country very often?

6    A.    Well, sometimes, if it has metadata with it or XF data,

7    yes.

8    Q.    All right.  But we don't have that in this situation --

9    A.    No.

10    Q.    -- for the deleted photo, correct?

11    A.    Not for the photo underneath, no.

12    Q.    All right.  So we don't know when that photograph was

13    taken?

14    A.    No.

15    Q.    We don't know if it was taken before or after

16    June 24th, 2012?

17    A.    No, because it could have been copied from something

18    else.

19    Q.    Right.  So it could have been not taken by whoever had

20    this -- this iPhone.  It could have been taken by someone

21    completely different, correct?

22    A.    Yes.

23    Q.    And we can't tell from this iPhone whether Mr. Johnson

24    purchased it new or purchased it used, correct?

25    A.    No.

11:37:29   1    Q.   We can't?

2    A.   No, we can't.

3    Q.   And the photo under the -- the deleted photo, we can't

4    tell who took it, correct?

5    A.   That's correct.

6    Q.   And we can't tell, again, when it was taken, correct?

7    A.   That's correct.

8    Q.   And we can't tell how it got on the phone, correct?

9    A.   Correct.

10    Q.   And we don't know where it was taken, correct?

11    A.   That's correct.

12    Q.   And we don't know when the underneath -- the deleted

13    photo, when it was deleted, correct?

14    A.   That's correct.

15    Q.   And you used a term, I believe, "date of creation."

16         Do you remember using that term?

17    A.   Yes.

18    Q.   And that doesn't tell us any of the questions I just

19    asked you a few seconds ago?

20    A.   No.  That was about the photo that was on top.

21    Q.   Okay.  So we have more information about the photo on

22    top, the active photo, correct?

23    A.   Right.

24    Q.   So all we can really -- all you can really say -- well,

25    one of the things you can say about this is someone sought

11:38:38   1    to delete the deleted photo.  And due to a glitch in the

2    system, it deleted part of the photo but not all of it?

3    A.    Well, it deleted the photo, but it kept part of the

4    thumbnail.

5    Q.    Right.  So by that you mean the bordering piece on top

6    and on the bottom, correct?

7    A.    That's correct.

8    Q.    And in this deleted photo, although we don't have it in

9    front of us, would you say it would be fair to say that at

10   least 80 percent of the deleted photo was no longer

11   available?

12   A.    Yes.

13   Q.    So in other words, the active photo of the foot

14   occupied approximately 80 percent of the space for that

15   particular photo?

16   A.    I would say about that percentage, yeah.

17          MR. WEINERMAN:  Thank you.  I have no further

18   questions.

19          THE COURT:  Any redirect?

20          MS. BRITSCH:  No, Your Honor.

21          THE COURT:  All right.  Thank you very much,

22   Mr. Poole.  You are free to go.

23          Next witness for the government.

24          MR. SINHA:  Your Honor, if we could, given the

25   hour, I think there are a couple things we might like to

11:39:55   1   raise with the court --

2          THE COURT:  Okay.

3          MR. PUHL:  -- before we put the next witness on

4   and proceed to this afternoon's witnesses.

5          Could we perhaps take a break early for lunch and

6   just speak to the court?

7          THE COURT:  All right.  Let's do that.

8          Folks, we will break at 11:40.  So let's go ahead

9   and start back up at one o'clock this afternoon.

10                 *(Jury out.)*

11          THE COURT:  Be seated.

12          All right.  For the government.

13          MR. SINHA:  Thank you, Your Honor.  So the next

14   witness for the United States is Deputy United States

15   Marshal Brett Collyer.

16          Deputy Collyer is someone who we are just calling

17   to basically talk about the mechanics of how per diem and

18   witness fees are paid.  So he's not someone, honestly, that

19   we really -- we expect to be very short.  He is not someone

20   that we expected to call at the beginning of trial.  As a

21   result of that, we didn't go through our normal time frame

22   and normal process of submitting --

23              *(Reporter interrupted.)*

24          MR. SINHA:  *Henthorn*, H-E-N-T-H-O-R-N, and *Giglio*

25   G-I-G-L-I-O, requests to the marshals service and haven't

11:41:40  1  had a chance to get them back.

2        So what we have done so far is we have had a --

3  one of our colleagues has had a thorough conversation about

4  those issues with Deputy Collyer.

5        With the court's permission, over lunch, I myself

6  will have a thorough conversation with him about that.  We

7  don't believe that there are any issues, but I at least want

8  to put on record that that's what we have done and what we

9  haven't done.  And if Mr. Johnson's counsel would like us to

10  try to delay putting him on so that we can do a formal

11  inquiry, you know, we could try to do that.

12        THE COURT:  Is he going to testify just in general

13  as to how payments are made to witnesses and what the per

14  diem amounts are that are paid to witnesses?  Or is he going

15  to speak specifically to providing these particular

16  Cambodian witnesses and victims their per diem payments?

17        MR. SINHA:  It will just be generally, Your Honor.

18  I mean, I think the closest that we would come to anything

19  specific is I anticipate asking him whether it's possible

20  for witnesses to get an advance on their per diem if they

21  are traveling, you know, in from a long distance but nothing

22  specific about these witnesses.

23        THE COURT:  All right.  Does the defense have any

24  objection or concerns about the testimony of Marshal --

25  Deputy Marshal Collyer?

*Colloquy*

818

11:42:54    1        MR. WEINERMAN:  Well, Judge, as the court will

2    recall, we entered into -- well there's this judicial notice

3    that was read to the jury.  It seems to me that that covers

4    it.

5            But if there's new information that they intend to

6    elicit from this witness, that's one thing, but if it's

7    really just repeating what's in the judicial notice, which

8    is, I think, a verbatim copy of the federal regulation, then

9    it just seems to me it's not relevant.

10           THE COURT:  Well, we certainly did cover it in the

11   judicial notice.  However, it really -- I don't think the

12   notice really talks about, I guess, how the payments are

13   transferred or who makes the payments or -- you know, is it

14   a check?  Is it cash?  Is it -- or what's considered when

15   making a $500 payment, maybe, which may cover, you know, an

16   advance, so.

17           And it certainly seems to be a central part of the

18   defense, and I think the government should have an

19   opportunity to address it with a live witness.

20           So I don't see any problems with him testifying at

21   one o'clock.

22           MR. SINHA:  Thank you, Your Honor.

23           THE COURT:  All right.  Any other issues we need

24   to discuss?

25           MR. SINHA:  I don't think so, Your Honor.

*Colloquy*

819

11:44:08   1          THE COURT:  Okay.  I am working on instructions.

2     I do hope to, you know, get some -- probably need to get a

3     better sense once the defense begins, but I think there may

4     be some specific ones I may have you look at later to

5     clarify some of the language.

6          MR. SINHA:  Your Honor, I guess if the court is

7     looking at instructions, the only thing that I recall us

8     wanting to raise with the court at some point is on the

9     court's offense-specific instructions where the court

10    defines what a commercial sex act is.  I think in accordance

11    with 18 U.S.C. 1591 -- I think maybe the definition is maybe

12    1596.  The court's language, I think, gets to the same

13    place, but it doesn't exactly track the statute as to -- I

14    think it's "for which anything of value is given" or

15    something -- something -- that specific phrase.

16          THE COURT:  What's the statute I should be looking

17    at?

18          MR. SINHA:  It's -- here, we can grab it.  I think

19    it's 15 -- it's right around 1591.  It might be 1596.

20          MR. WEINERMAN:  1591.

21          MR. SINHA:  I am sorry.  It is 1591.

22          THE COURT:  Okay.

23          MR. SINHA:  So we would ask that the court's

24    instruction please track the language in the statute on

25    that.

11:45:38   1                THE COURT:  All right.  I will take a look at it.

2                MR. SINHA:  Thank you.

3                THE COURT:  All right.  Thank you.  We'll be in

4     recess until one o'clock.

5                          *(Recess.)*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

11:45:45    1            I hereby certify that the foregoing is a true and

2       correct transcript of the oral proceedings had in the

3       above-entitled matter, to the best of my skill and ability,

4       dated this 8th day of May, 2018.

5

6       /s/Kristi L. Anderson
        _____
7       Kristi L. Anderson, Certified Realtime Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25