Page 154

1                  UNITED STATES DISTRICT COURT

2                      DISTRICT OF OREGON

3          THE HON. MICHAEL J. McSHANE, JUDGE PRESIDING

4

5    UNITED STATES OF AMERICA,    )

6                  Government,    )

7          vs.                    )  No. 6:14-cr-00482-MC-1

8    DANIEL STEPHEN JOHNSON,      )

9                  Defendant.     )

10

11            REPORTER'S TRANSCRIPT OF PROCEEDINGS

12                      EUGENE, OREGON

13                  Wednesday, May 2, 2018

14                  Day 3, Morning Session

15             Volume 3A   PAGES 154 - 204

16

17

18

19

20

21              DEBORAH COOK, RPR, CSR.
              OFFICIAL COURT REPORTER
22              405 East 8th Avenue
                   Suite 2130
23              Eugene, Oregon 97401
                 (541) 431-4162
24          Deborah_Cook@ord.uscourts.gov

25

```
1        APPEARANCES OF COUNSEL:

2        FOR THE GOVERNMENT:

3        Jeffrey S. Sweet
         United States Attorney's Office
4        405 E. Eighth Avenue, Suite 2400
         Eugene, OR 97401
5        541-465-6771
         Fax: 541-465-6917
6        Email: Jeff.sweet@usdoj.gov

7        Lauren E. Britsch
         U.S. Department of Justice
8        Criminal Division
         1400 New York Ave NW, 6th Floor
9        Washington, DC 20530
         202-514-2220
10       Fax: 202-514-1793
         Email: Lauren.britsch@usdoj.gov
11
         Ravi Sinha
12       United States Attorney's Office
         1000 SW Third Ave, Suite 600
13       Portland, OR 97204
         503-727-1014
14       Fax: 503-727-1117
         Email: Ravi.sinha@usdoj.gov
15
         FOR THE DEFENDANT:
16
         Craig E. Weinerman
17       Office of the Federal Public Defender
         859 Willamette Street, Suite 200
18       Eugene, OR 97401
         541-465-6937
19       Fax: 541-465-6975
         Email: Craig_weinerman@fd.org
20
         Lisa A. Maxfield
21       Pacific Northwest Law LLP
         1255 NW Ninth Avenue, No. 11
22       Portland, OR 97209
         (503) 222-2661
23       Fax: (503) 222-2864
         Email: Lamaxfield@pacificnwlaw.com
24
                         * * * * *
25
```

Page 156

1                          WITNESS INDEX

2                                          Page/Line;

3            LS XXXXX
       DIRECT EXAMINATION (Continuing)      163      4
4      BY MR. SINHA
       CROSS EXAMINATION                    174      5
5      BY MS. MAXFIELD:
       REDIRECT EXAMINATION                 183     12
6      BY MR. SINHA
       RECROSS EXAMINATION                  200      3
7      BY MS. MAXFIELD:

8

9                     EXHIBIT OFFERED INDEX

10        NONE

11
                      EXHIBIT RECEIVED INDEX
12
          NONE
13

14

15

16

17

18

19

20

21

22

23

24

25

Page 157

PROCEEDINGS

Wednesday, May 2, 2018, at 9:11 a.m.

1

2

3    THE COURT:  We will go on the record.  I've received

4    from the government a request for judicial notice regarding

5    per diem rates, witness fees, my understanding is theres no

6    objection.

7    MR. WEINERMAN:  No, Judge, as long as it's clear

8    from the way it says to the jury that they are getting $99 a

9    day, so there's no confusion whether they are getting it.  I

10   think they get something for $49 and something for $50, and

11   as long as they know the correct math of the total of $99 is

12   clear, we have no objection.

13   THE COURT:  I think it's clear.  In the -- how do

14   you want to present that to the Jury?

15   MR. SINHA:  Your Honor, we would ask that the Court

16   read it to the jury when they come in this morning, and then

17   provide it to them for deliberations.  I think there's a

18   pattern instruction on the 9th Circuit, but I am not sure

19   it's applicable here because I think this is like a

20   legislative fact, rather than adjudicative fact.

21   MR. WEINERMAN:  Judge, I haven't been in this

22   situation recently, but I'm not sure the jury actually gets

23   documents that are not an exhibit.  I think when you take

24   judicial notice or you stipulate, the judge reads the

25   stipulation or judicial notice, and that's it.  It doesn't go

1    back as a document.  It's not an exhibit.

2          THE COURT:  Well, I mean, generally we send

3    stipulations back, and this is really -- judicial notice is

4    really a stipulated fact.  So I prefer to send it back, if

5    for the only reason I am going to be reading it to them, and

6    my voice is still not that great.  And I would like to make

7    sure that they understand what fact is being noted here.

8          So I will work with Mr. Allnatt about what

9    specifically to send back.

10          Any other preliminary matters to discuss?

11          MS. BRITSCH:  Your Honor, one matter, the defense

12    raised at the end of yesterday that the information from

13    SO XXX's attorney is potentially Brady, under Kyles and its

14    progeny.  So I think we need to address that.  The 9th

15    Circuit has said in a couple of cases that essentially when

16    there's no promise by the government to a witness, it's not

17    Brady material.

18          And that's primarily in the context of sentence

19    leniency where cooperating witnesses later on receive a

20    sentencing reduction.  But the 9th Circuit and other courts

21    have said as long as there's no promise from the government

22    before that witness testifies, that's not Brady.  And that

23    applies here.

24          And it's clear from Mr. Weinerman's questioning of

25    the witness yesterday and his answers that there's been no

Page 159

1   promise from the government of a visa or other citizenship,

2   so I don't think any other information from SO XXX's attorney

3   would be Brady in this scenario.

4           MR. WEINERMAN:  Well, Judge, I think it's relevant

5   whether he has an expectation that he's going to be allowed

6   to stay in the United States.

7           I'm going to continue to reach out directly with his

8   attorney and find out what I can.  And I am not accusing

9   anyone of any wrongdoing, but it seems to me that these

10  witnesses can get up there and say, deny or say, I don't

11  know.  And then the next thing we know after they are done

12  here, they are going out and they are trying to stay in the

13  United States.

14          And I hope the Court will give me a little more

15  leeway for future witnesses to explore that, because I have

16  no indication that the government itself, the US Attorney's

17  office or the FBI, has promised them anything.

18          But I think any discussions that anybody from the

19  government has had with any of these witnesses about staying

20  here, about applying for visas, should be disclosed to the

21  defense.

22          And the government has, I believe, one witness, CCXX

23  XXXX asked if he could stay or apply for a green card, and

24  the government provided me a report.

25          So I am just saying expectations of the witness is

1  relevant.  And if the government is aware of expectations,
2  then I think the government should disclose that.  I think
3  that is Brady --
4        MS. BRITSCH:  Your Honor, the defense counsel had
5  ample opportunity to ask the witness about his expectations,
6  and the witness answered those questions.  And for the
7  record, we have inquired of everyone on the trial team
8  whether they have had any discussions with the witnesses
9  about those issues, or made any promises.  And nobody from
10 the US Attorney's office or FBI has made any promises related
11 to visa or citizenship.
12       There's one FBI agent we haven't had a chance to
13 ask.  We will ask him today about that specific issue, as
14 well.  And the witness, BT XXXXXXX is material.  His A file,
15 everything related to his visa, has been disclosed to the
16 defense.
17       THE COURT:  Thank you.  I do agree with the defense
18 that if the government is aware of any promises that have
19 been made by a government actor, or even a third party to --
20 any promise to assist in providing a visa or providing some
21 kind of residency in the United States for the witnesses in
22 exchange for their testimony, the government needs to
23 disclose that.  I think they have been doing that.
24       I mean, the only evidence so far is from SO XXX
25 which he testified an attorney spoke to him.  He doesn't

Page 161

1   remember the attorney's name.  He didn't keep the attorney's
2   card.  He asked the attorney if he could go to school in the
3   United States, and it doesn't sound like there was any
4   follow-up conversation regarding that.

5           So the defense can continue to inquire about --
6   well, with each of the alleged victims whether any promises
7   have been made, whether they are making any attempts to
8   remain in the United States now that they are here, or now
9   that they have testified.

10          It may be that the government is going to want to
11  put on whatever this organization is to clarify for the jury
12  what their role is with victims.  It's unclear to me, and
13  it's unclear to the jury, I think, what this program is,
14  Hagar, whether they were simply advocates for children of
15  sexual abuse, or if they provide other kinds of services like
16  immigration services.

17          I think it's probably unlikely, but it may be
18  possible.  But obviously, one of the jurors had a question
19  about who this organization was, and what they do.  We may
20  want to have some clarification on that subject.

21          MR. WEINERMAN:  Judge, hopefully my last thoughts on
22  this are as follows.  SO XXX is, I think, done as a witness,
23  although technically I don't think he's been excused.  Maybe
24  the Court did and I just --

25          THE COURT:  I haven't excused any of the witnesses.

Page 162

1          MR. WEINERMAN:  My understanding is all the

2     witnesses are going to remain until May 20th.  So that's

3     almost three weeks.  It seems to me if the government becomes

4     aware between now and the end of the trial that SO XXX is

5     making some efforts to stay in the country, however he's

6     doing it, whether applying for a certain type of visa, I

7     think the government has to disclose that.  The government

8     can't wall themselves off from that.

9          So if it comes to the attention of the government

10    between now and the end of the trial that SO XXX is

11    proceeding in that direction, that has to be disclosed to the

12    defense even though SO XXX is done as a witness.

13          THE COURT:  I agree.  If that becomes known to the

14    government, they need to let the defense know.

15          MS. BRITSCH:  We agree, Your Honor.

16          THE COURT:  We will bring the jury back in.  And we

17    have LS X.

18                         (JURY IN.)

19          THE COURT:  We're going to return to the testimony

20    of witnesses, so go ahead.

21

22                         LS XXXXX,

23     produced as a witness, having been previously duly

24        sworn, was examined and testified as follows:

25

Page 163

1       (NOTE:  Unless otherwise indicated, all answers

2   represented by "A" and "THE WITNESS" will be answers given by

3   the witness through the interpreter after translation.)

4            DIRECT EXAMINATION (Continuing)

5   BY MR. SINHA:

6   Q   Good morning.  Thank you for coming back to speak to us

7   today.  I don't have a lot of questions for you, but I do

8   have some.  So we will go through those questions and then

9   Mr. Johnson's attorneys will have a chance to ask you some

10  questions.

11          Do you understand?

12  A   Yes, I do.

13  Q   The first thing I want to do with you is go through some

14  photographs, and talk to you a little bit about them.  So I

15  am going to ask for Exhibits 1 through 10 to be brought up on

16  the screen in order.  And we will go through them one by one.

17          MR. SINHA:  I believe these have been admitted and I

18  would ask the Court to publish them.

19          THE COURT:  They may be published.

20  Q   BY MR. SINHA:  So LS X, we're looking at Government

21  Exhibit 1.  And who is the person in this photograph?

22  A   It's my picture.

23  Q   Do you know about how old you were, about?

24  A   Five or six years old.

25  Q   Let's look at Exhibit No. 2.  Do you know the people in

1   this picture?

2   A    I do.

3   Q    So LS X, this is going to be kind of fun.  You can touch

4   this screen, and it will make a mark.

5           So will you touch each one of these people on the

6   screen and tell us who they are, please?

7   A    This one is Tola.

8   Q    And that's the person in the orange shirt?

9   A    Yes.  This one is me.

10   Q    That's the smallest person, in the striped shirt?

11   A    Yes.

12   Q    Who else?

13   A    And the other two, I don't remember anymore.

14   Q    So you have identified two orange shirts.  You have

15   identified the tallest person and the shortest person; is

16   that right?

17   A    Yes.

18   Q    Let's look at Exhibit 3.  LS X, who is this?

19   A    That's me.

20   Q    How old are you in this photograph?

21   A    Five to six years old.

22   Q    Where was this photo taken?

23   A    At the organization.

24   Q    And when you say at the organization, what organization

25   are you referring to?

1    A    It was Hope Organization.

2    Q    And when you -- we're going to talk a little bit about

3    where the Hope Orphanage was, but did you live with the Hope

4    Organization at three different locations?

5    A    Yes.

6    Q    So let's go to the next exhibit.  This is Exhibit 4.

7    Who are these two people?

8    A    My older brother and me.

9    Q    What are you wearing in this photograph?

10   A    Gray and white.

11   Q    And do you know about how old you guys were in this

12   photograph?

13            THE INTERPRETER:  I am sorry.  The interpreter says

14   gray and white, but it's gray and blue.

15            THE WITNESS:  About five to six years old.

16   Q    BY MR. SINHA:  That's how old you were?

17   A    Yes.

18   Q    And where were you guys living at this time, if you

19   recall?

20   A    It was at the same place.  It was the first place.

21   Q    And LS X, I think earlier yesterday, when we talked

22   about your age and when you moved to Hope, we thought it was

23   closer to when you were about seven years old.

24   A    Yes.

25   Q    Is it possible in these photographs that were taken when

1  you were living at Hope, that you were closer to seven years

2  old?

3  A    Yes.

4  Q    Let's go to the next exhibit, Exhibit 5, please.

5        So LS X, who is this and when was this?

6  A    It's my picture during Christmas.

7  Q    Where were you living at this time?

8  A    That was also at the first house.

9  Q    And about how old were you in this photograph, if you

10 know?

11 A    The same thing, maybe five, six, or seven.

12 Q    Let's go to the next exhibit, please.  Okay, LS X, is

13 this you, as well?

14 A    Yes.

15 Q    About how old were you in this photograph?

16 A    Maybe between eight and 10.

17 Q    And you were living at the Hope Transition Center at

18 this time?

19 A    Yes.

20 Q    Let's go to Exhibit No. 7, please.  Who are these two

21 young men?

22 A    It's me and a friend of mine.

23 Q    And about how old were you in this photograph?

24 A    Eight, nine or 10.

25 Q    And so this was also taken during the period that you

Page 167

1  were living at the Hope Transition Center?

2  A    Yes.

3  Q    Let's go to the next photograph.  How about this

4  photograph?  How old were you in this photograph?

5  A    That one, maybe I was nine, 10, or 11.

6  Q    But that is you in the photo?

7  A    Yes.

8  Q    Let's go to the next photograph, please.  Who is this?

9  A    That's me.

10  Q    And about how old were you in this photograph?

11  A    12 or 13.

12  Q    But you were still living at Hope Transition Center

13  during this time, or you were gone, I guess?

14  A    Yes.

15  Q    Let's go to the next one, please, 10.  And then finally,

16  this is you as well, correct?

17  A    Yes.

18  Q    I am going to show you three pictures of the Hope

19  Transition Center, next.

20        MR. SINHA:  In the first one, 271, I would ask that

21  it be brought up and published to the jury, please.

22        THE COURT:  All right.

23  Q    BY MR. SINHA:  Was this the first, second or third

24  location that you were with the Hope Transition Center?

25  A    That was the first house for me.

Case 6:14-cr-00482-MC   Document 282   Filed 11/02/18   Page 15 of 51

1  Q    How about Exhibit 272, please.  This one, and the next

2  one will be published, please.

3             Is this the second or third house?

4  A    Second house.

5  Q    And then finally, the third one, Exhibit 139, please.

6  This seems like -- is this the third house?

7  A    Yes.

8  Q    So LS X, yesterday we talked about some difficult

9  subjects, and I am not going to ask you a lot of questions

10  about those today.  I just have a couple of follow-up

11  questions.

12            Yesterday you told us about incidences in which

13  Daniel Johnson had sexually abused you, pretty much during

14  the time you were at Hope Transition Center.

15  A    Yes.

16  Q    Following those instances in which he abused you, did he

17  ever give you any food or money or gifts?

18  A    Yes.

19  Q    What did he give you?

20  A    Sometimes cookies, and sometimes money.

21  Q    Was that in the bedroom where the abuse was taking

22  place?

23  A    Yes.

24  Q    And how soon after the abuse did he give you money or

25  give you cookies?

Page 169

1   A    Sometimes immediately, sometimes a little bit after.

2   Q    Did you understand that the money or the cookies that he

was giving you was, in part, because of what he had just done

4   to you?

5   A    Yes.

6   Q    So a better way for me to ask that question is, was

there a connection between --

8          MS. MAXFIELD:  Objection; calls for speculation and

9   legal conclusion.

10         THE COURT:  He can testify as to his understanding.

11  Q    BY MR. SINHA:  So what I would like to ask, LS X, did

you understand there to be a connection between the abuse and

the money and cookies that Daniel was giving you immediately

afterwards?

15  A    Would you repeat that, please?

16  Q    Sure.  Did you understand the money and the cookies that

Daniel gave you after the abuse to be as a result of the

abuse?

19  A    Yes, I do.

20  Q    LS X, when Daniel was abusing you throughout this

period, and I think you said it was a few times a week, were

you ever scared that something bad might happen if you didn't

submit to him abusing you?

24  A    Yes.

25  Q    What types of things were you scared of?

1   A    Like he did something to me, like police or something.

2   Q    When you say he would do something to you like the

3   police, can you explain that a little bit more?

4   A    Because of what happened, it happened, the same thing

5   over and over again, then it could cause the police to come

6   over.  And then the police would ask -- and asking questions

7   in depth.

8   Q    And were you scared that you were going to get in

9   trouble?

10  A    Yes.

11  Q    Were you scared of having to tell the police what had

12  happened?

13  A    Yes.

14  Q    Were you ever scared that if you didn't submit to Daniel

15  Johnson abusing you, Daniel Johnson would do you any physical

16  harm?

17          MR. WEINERMAN:  Objection; leading.

18          THE COURT:  Overruled.

19          THE WITNESS:  At times, yes.

20  Q    BY MR. SINHA:  What physical harm did you think he might

21  do?

22  A    He pulled your hair.

23  Q    Did he do anything else?

24  A    No.

25  Q    Did you ever see him physically harm any of the other

1  boys at Hope Transition Center?

2  A    No, I haven't seen that.

3         MR. SINHA:  Your Honor, if I could have just a

4  moment, please.

5  Q    BY MR. SINHA:  So LS X, I have a couple questions for

6  you.  When Daniel Johnson was abusing you throughout this

7  period that you lived at Hope Transition Center, how did you

8  feel about Daniel Johnson?

9  A    At times you didn't like him.  And at times you loved

10 him like your father.

11 Q    And why were the reasons that you loved him like a

12 father?

13 A    Because he provided food, and schooling.

14 Q    And when you didn't like him, what were the reasons that

15 you didn't like him?

16 A    Because he violated me, and he sexually abused me.

17 Q    And as you sit here today, how do you feel about him?

18 A    I feel kind of like nervous.

19 Q    I can understand that.  Why do you feel nervous?

20 A    I don't know.  I just feel scared.

21 Q    Are you -- as you sit here today, are you angry about

22 Daniel Johnson?

23 A    No, I don't --

24 Q    Have you forgiven him for what he's done to you?

25 A    Yes.

1  Q    LS X, why is it that you have been willing to come here

2  and testify today?

3  A    Because I want to come and testify, and I want it to be

4  over fast.

5  Q    What are you going to do once you are done testifying

6  and the case is over?

7  A    Going back to Cambodia, and then continue my schooling,

8  just like usual.

9  Q    And are you excited about going back to Cambodia?

10  A    Yes.

11  Q    Why are you excited about going back there?

12  A    I get to continue my schooling, because I have been here

13  and I have been not going to school for about a month now.

14  Q    Have you enjoyed your time in the United States?

15  A    Yes.

16  Q    LS X, has anyone talked to you about applying to live in

17  the United States permanently?

18  A    No.

19  Q    Is your testimony today motivated in any way by wanting

20  to live in the United States permanently?

21  A    Well, I want to stay.

22  Q    But are you testifying today because you want to stay?

23          THE INTERPRETER:  Counsel, if the interpreter could

24  ask you to rephrase the question, because the word

25  "motivation" did not quite translate correctly.

Page 173

1       MR. SINHA:  Okay.

2   Q   BY MR. SINHA:  Does your testimony today have anything

3   to do with wanting to stay in the United States?

4   A   I still don't understand.

5   Q   When you talked to the Cambodian National Police in

6   2013, and you told them that Daniel Johnson sexually abused

7   you, did you tell them that because you wanted to eventually

8   move to the United States?

9   A   No.

10  Q   Why did you tell them that?

11  A   Because it was the truth, and on top of that, they were

12  asking the same questions over and over again, and I -- to

13  make me answer.

14  Q   When you spoke to FBI Martha in 2014 and you told her

15  that Daniel Johnson sexually abused you, did you tell her

16  that because you wanted to move to the United States?

17  A   No.

18  Q   Why did you tell her that?

19  A   Because I want it to be over, and because it is the

20  truth.

21  Q   And then when you spoke to us yesterday and you told us

22  that Daniel Johnson abused you, did you tell us that because

23  you wanted to stay in the United States?

24  A   No.

25  Q   Why did you tell us what happened?

Page 174

1    A    Because I want this story to be over.

2         MR. SINHA:  One second.  Thank you, LS X.

3         Your Honor, I will pass the witness.

4         THE COURT:  All right.  Cross.

5

6              CROSS EXAMINATION

7    BY MS. MAXFIELD:

8    Q    Good morning, LS X.  I am Lisa Maxfield, and I represent

9    Mr. Johnson.  Do they call you LS X or Luke?

10   A    LS X.

11   Q    LS X, do you remember the day that the Cambodian

12   National Police came to Hope Transition Center?

13   A    I don't.  I don't remember.  I don't remember very well.

14   Q    That's sort of vague in your memory?

15   A    Correct.  I don't remember very well.

16   Q    Do you remember how many police came?  Was it many

17   police or just a few?

18   A    Many.

19   Q    And do you remember whether some of the children were

20   afraid?

21   A    Majority of us who knew what was going on, we were

22   afraid.  But the younger ones, they didn't know, so they were

23   just running around playing.

24   Q    So the older kids who understood the seriousness were

25   afraid?

Page 175

1    A    Yes.

2    Q    And when you talked to the Canadian National Police, how

3    many police officers talked to you --

4            THE INTERPRETER:  Counsel, you said Canadian.

5            MS. MAXFIELD:  I made them Canadian.

6    Q    BY MS. MAXFIELD:  When you talked to the Cambodian

7    National Police, how many police officers questioned you?

8    A    Four or five people.

9    Q    Four or five people at the same time?

10   A    So it was like there were three of them, so two would

11   walk around, arranging different things.  And then one would

12   ask.

13   Q    But they were all there with you, when you were being

14   questioned?

15   A    Yes.

16   Q    Did the police separate you from your brother, ES XXX?

17   A    Yes, they separated us.

18   Q    Did they separate you from any other children?

19   A    Yes, they did.  But some of the children were with me.

20   They separated us, and they came with me to live at another

21   organization.

22   Q    Let's talk about while you were still being questioned

23   by the police.  You said that they asked you questions again

24   and again and again.  Did that happen at the Hope Transition

25   Center?

1    A    Yes.

2    Q    So they asked you -- they would not stop questioning you

3    until you told them that you had been touched?

4    A    Yes.

5    Q    That was the only way to make the questioning stop?

6    A    Yes.

7    Q    And after all the questioning, it was late at night; is

8    that true?

9         THE INTERPRETER:  I am sorry, Counsel.  Did you say

10   after?

11   Q    BY MS. MAXFIELD:  Yes, was it late at night by the time

12   the questioning was finished?

13   A    Yes.

14   Q    And after the questioning, did they put you on a bus and

15   take you to a new place to live?

16   A    Yes.

17   Q    Did you get to say goodbye to your brother?

18   A    No, I didn't get to.

19   Q    When you were living at the new place, your brother was

20   not there; is that true?

21   A    Correct.

22   Q    And while you were living at the new center, your

23   brother was not allowed to visit you?

24   A    Yes.

25   Q    They kept you and your brother separated for over two

Page 177

1   years, didn't they?

2   A    Yes.

3   Q    Did anyone else in your family get to visit you at the

4   center?

5           THE INTERPRETER:  The interpreter was clarifying if

6   an aunt and uncle.

7           THE WITNESS:  My family members did not, but my mom

8   and aunt came to see me.

9   Q    BY MS. MAXFIELD:  How many times did your mom and your

10  aunt come to see you?

11  A    Once or twice a month, according to the time that they

12  had.

13  Q    At Hagar, did they give you food?

14  A    Yes.

15  Q    And did they give you good shelter?

16  A    Yes.

17  Q    And did they let you go to school and pay for your

18  school?

19  A    Yes.

20  Q    Did the people at Hagar give you any money?

21  A    No.

22  Q    Did they give you any gifts?

23  A    Yes, they gave me one.

24  Q    What was that?

25  A    Cologne and some stuffed animals.

Page 178

1    Q    Was that for Christmas or your birthday?

2    A    They were for Christmas.

3    Q    Did you remember going to talk to, I believe you called

4    her FBI Martha?

5    A    Yes, I do recall.

6    Q    When you went to talk to FBI Martha, did your teacher

7    from Hagar go with you?

8    A    Yes.

9    Q    Did she sit in the room with you when FBI Martha asked

10   you questions?

11          THE INTERPRETER:  I am sorry, Counsel.  Did you say

12   "he" or "she"?

13   Q    BY MS. MAXFIELD:  Was your teacher a she or a he?  Let's

14   start there.

15          MR. SINHA:  Could we approach and talk about

16   something real quickly, please?

17          THE COURT:  Yes.

18          (Bench Conversation)

19                  (Brief recess taken from 9:55 a.m.

20                  to 9:56 a.m.)

21          THE COURT:  Can you ask the question?

22   Q    BY MS. MAXFIELD:  Well, let's go back to the question.

23   Your teacher from Hagar who went with you to see Martha, or

24   FBI Martha, was that a man or a woman?

25   A    There were men and women.

1  Q    Two?

2  A    Yes.

3  Q    So you had two teachers from Hagar with you?

4  A    Some of them were not teachers.  They were attorneys.

5  Q    They were attorneys?

6  A    There was an interpreter, too.

7  Q    So in the room with you was FBI Martha, your teacher

8  from Hagar, a translator or interpreter; is that true?

9  A    My teacher did not go in with me.  Just myself, and FBI,

10 and interpreter.

11 Q    You have talked with lots of lawyers over the last few

12 days; is that true?

13 A    Yes.

14 Q    Before you came to the United States, did you talk with

15 any lawyers?

16 A    Yes.

17 Q    Did you have a personal lawyer, or someone who was just

18 your lawyer that you talked with?

19 A    I spoke with.

20 Q    Do you remember that lawyer's name?

21 A    I don't remember his name.

22 Q    Did that lawyer call you on the phone, or meet with you

23 in person?

24 A    In person.

25 Q    And did Hagar pay for that lawyer?

1  A    I wouldn't know that.  I don't know anything about the
2  payment.
3  Q    Was that lawyer from the United States?
4  A    Yes.
5  Q    And when you talked with that lawyer, did you talk to
6  him about maybe moving to the United States?
7  A    Yes, I did.
8  Q    And have you talked with that lawyer since you have been
9  here, or another lawyer since you have been here in the
10 United States about staying here?
11 A    I did.
12 Q    Do you think there's some chance that you will be able
13 to stay?
14 A    I hope, but I don't think I can.
15 Q    You lived at Hagar for a little over two years; is that
16 right?
17 A    Almost two years.
18 Q    And then did you get to live with your brother, ES XXX?
19 A    No, I didn't.
20 Q    You never lived with ES XXX after Daniel's arrest?
21 A    Correct.
22 Q    Who do you live with now?
23 A    I am currently living with the Water of Life
24 Organization.
25 Q    And are there any people in this case who live with you?

1  A    I don't understand your question.

2  Q    Yeah.  Well, are any of the kids that you used to live

3  with at Hope Transition Center living with you now?

4  A    You mean now, as in the US?

5  Q    Oh, no.  In Cambodia.

6  A    No.

7  Q    When you talked with FBI Martha, do you remember telling

8  her that you wanted to come to the United States to go to

9  school to be a doctor?

10 A    Yes, I did tell her that.

11 Q    Is that still your hope?

12 A    Yes.

13 Q    Before you got on the airplane to come here, did the FBI

14 give you $150 cash?

15 A    Yes, they did.

16 Q    And then last week, did you get $500 more?

17 A    Yes.

18 Q    And do you expect to get $500 again this week?

19 A    Yes.

20 Q    And do you expect to get $500 every week until you go

21 home?

22 A    Yes.

23 Q    Do you know when you will be flying home?

24 A    I don't know.

25 Q    When you lived at Hope Transition Center, were there

DIRECT EXAM CONTINUING — LS XXX

Page 182

1 rules for the children?

2 A    Yes, there were.

3 Q    And were some of those rules, you can't sneak out?

4 A    You could leave.  I mean, you could go out, but you just

5 couldn't go out too far.

6 Q    And did you need to let the people in charge know where

7 you were going?

8 A    Yes.

9 Q    And were there other rules about no fighting?

10 A    Yes, there was a rule.

11 Q    And no stealing?

12 A    Yes.

13 Q    And no lying?

14 A    Yes, there was.

15 Q    And sometimes the punishments were stand against a wall?

16 A    Yes.

17 Q    And sometimes for the more serious breaking of the

18 rules, were you hit with a belt?

19 A    Yes.

20 Q    There was a time before Daniel was arrested when you got

21 in serious trouble with Daniel for stealing some money?

22 A    Yes.

23 Q    Do you remember that?

24 A    I remember.

25 Q    And on that time you were punished more seriously; is

Page 183

1  that right?

2  A    Yes.

3  Q    And he hit you several times with a belt?

4  A    Yes.

5  Q    And that was just before Mr. Johnson was arrested; is

6  that right?

7  A    Yes.

8        MS. MAXFIELD:  I have no further questions.  Thank

9  you.

10       THE COURT:  Redirect.

11       MR. SINHA:  Yes, Your Honor, thank you.

12

13               REDIRECT EXAMINATION

14  BY MR. SINHA:

15  Q    So LS X, thank you for speaking with us.  I only have a

16  handful more questions.

17       So the first thing I want to talk to you about is

18  when you spoke to the Cambodian National Police officer, and

19  also when you spoke to the people from the organization that

20  is APLE, A-P-L-E.

21       That was the day on which Mr. Johnson was arrested,

22  wasn't it?

23  A    Yes.

24  Q    And was it prior to that day that you told Pastor

25  Sopheak that Daniel was abusing you?

DIRECT EXAM CONTINUING — LS XXX

Page 184

1  A    Before that day.

2  Q    And I think you testified yesterday that it was a

3  couple -- or two or three weeks before Mr. Johnson's arrest

4  that you had told Pastor Sopheak that Daniel was abusing you;

5  is that correct?

6  A    Yes.

7  Q    And I think you also said yesterday that prior to Daniel

8  being arrested, you had told your brother ES XXX that Daniel

9  was abusing you; is that correct?

10  A    Yes.

11  Q    And when the people from the Cambodian National Police

12  and APLE talked to you, did you feel pressured to make up

13  lies about Daniel Johnson?

14  A    No.

15  Q    Were there people who told the Cambodian National Police

16  and APLE that Daniel Johnson had not abused them?

17       MS. MAXFIELD:  Objection; personal knowledge.

18       THE COURT:  Rephrase the question.

19  Q    BY MR. SINHA:  Sure.  Do you know if there were people,

20  kids at the orphanage, who told the Cambodian National Police

21  that Daniel had not abused them?

22  A    I didn't know, because they interviewed us separately,

23  one individual at a time.

24  Q    And when you say that they asked you the same question

25  over and over again, and I think you said something like

1    that's the only way they would stop asking, do you mean that

2    the way to make them stop asking was to tell them the truth

3    about Daniel Johnson, or do you mean that the way to make

4    them stop asking was to make up lies about Daniel Johnson?

5    A    There were times that I told a lie, but there were times

6    that I told the truth.  But I just didn't tell all of it,

7    just sparingly.

8    Q    What was the lie that you told the Cambodian National

9    Police?

10   A    I lied.  I said that he did good, he did good deeds and

11   things like that.

12   Q    Was that not true?

13   A    Not true.

14   Q    I want to talk to you a little bit about the

15   organization Hagar.  Do you know what kind of organization

16   Hagar is?

17   A    I do.

18   Q    What kind of organization is Hagar?

19   A    It is an organization to receive minors who have been

20   raped, violated.

21   Q    And what types of things does Hagar do for those minors?

22   A    Each minor has a counselor.

23   Q    And what does the counselor do?

24   A    Therapy, asking you questions, encouraging you, talking

25   to you, asking you questions.

1  Q    Okay.  And what do you understand the purpose of those

2  things to be?

3  A    They want to counsel you, they just want to know how you

4  are feeling regarding those issues.

5  Q    And when you started working with Hagar, how long after

6  Daniel Johnson's arrest was that?

7  A    I don't understand your question.

8  Q    I am sorry.  I will ask it again.  Do you know how long

9  after Daniel Johnson's arrest Hagar started providing you

10  with services?

11  A    Almost a year.

12        MR. SINHA:  Your Honor, if I could confer with

13  defense counsel for a moment.  Just one moment.

14                (Discussion off the record between

15                  Mr. Sinha and Ms. Maxfield.)

16        MR. SINHA:  Your Honor, I think we have a quick

17  matter to bring up with the Court.

18        THE COURT:  Let's go ahead and take a brief break.

19  We will be in recess for 12 to 15 minutes.

20                (JURY OUT.)

21        THE COURT:  LS X, you can be excused for a moment,

22  if you will step out into the hallway.

23        MR. SINHA:  So, Your Honor, the thing that I raised

24  with Ms. Maxfield, and I want to make sure we're staying on

25  the right side of everything before I ask it, is I would like

Page 187

1   to ask the witness about his participation in the Cambodian

2   prosecution of Mr. Johnson.

3           Because, I think, we want to dispel any implication

4   that the services he's receiving from Hagar are as a result

5   of his participation in the United States case.

6           So yesterday when Mr. Weinerman was cross-examining

7   SO XXX, he asked SO XXX whether SO XXX had testified at the

8   trial of Mr. Johnson.  And we have already got out the fact

9   of the arrest.  And if I take -- I think the motion in limine

10  that Mr. Johnson's counsel followed, it was about entering

11  the conviction.

12          So we have no intention of obviously entering the

13  conviction, or even the fact of conviction.  But the jury is

14  aware that Mr. Johnson was arrested, they are aware that

15  there was a trial in which he could have testified.  And I

16  think that Hagar support that he received has nothing to do

17  with our case.  It was all predating our case, to my

18  knowledge.

19          So what I would like to be able to do is ask if he

20  participated in the Cambodian prosecution, and if, unlike

21  SO XXX, he testified at trial.

22          MS. MAXFIELD:  I believe that's beyond the scope of

23  my cross-examination.  I was very careful not to talk to this

24  witness about anything that happened at the Cambodian trial.

25          I don't remember the conversation that he's talking

1    about that happened between SO XXX and Mr. Weinerman, and

2    perhaps he's better able to address the specifics of that.

3              THE COURT:  My concern, Ms. Maxfield, is that your

4    cross-examination certainly suggests that LS X is developing

5    his facts based on an interest in moving to the United

6    States, and not in telling the truth in order to prosecute

7    Mr. Johnson.

8              Factually, he has testified in another proceeding

9    that has nothing to do with him coming to the United States.

10   I assume he testified consistently, that Mr. Johnson abused

11   him.  And it seems to me, based on your defense, that he's

12   making this up in order to come to the United States, the

13   government can rebut that with, in fact, he said the same

14   story, made the same statements of abuse in a Cambodian

15   prosecution.  So I will allow the testimony.

16             MR. WEINERMAN:  So I want to supplement the record,

17   Judge, since we're getting to the opening the door thing.

18   Part of the discovery is a translation of the trial verdict

19   in the Cambodian case.  And I think a reasonable

20   interpretation of the translation is that SO XXX testified in

21   that trial that there was no wrongdoing, or it says something

22   to the effect -- it's not in front of me, so I don't want to

23   be held to saying exactly what the document says.

24             But the document says, in essence, that SO XXX

25   either testified that Daniel Johnson did not abuse him or he

1  withdrew previous accusations.  So that was the point of me

2  asking SO XXX yesterday that question to see if he would

3  admit that he did testify in that case.

4          We're dealing with a translation, but I think a

5  reasonable interpretation of it is that he did testify and

6  did testify in an exculpatory fashion as to Daniel Johnson.

7  He denied it.  He said, I didn't testify.  So I left it at

8  that, and accepted his answer.

9          So that was the point in bringing that up.  I didn't

10  pull that out of whole cloth.  There's a document that I

11  think a reasonable interpretation of it would suggest that he

12  did testify, and he withdrew any previous allegations of

13  sexual abuse.  But that was the purpose of bringing that

14  question up, not what the government is claiming now has

15  opened up the door to them inquiring about what is happening

16  with Hagar.

17          THE COURT:  Again, the relevance is that the defense

18  is alleging that he is making up the accusation in order to

19  come to the United States.  When, in fact, he made an

20  accusation in a Cambodian Court that isn't connected to any

21  motivation that the defense is alleging.  So I think we can

22  keep it somewhat limited.

23          I don't want the conviction coming in from the

24  Cambodia Court.  I have already ruled on that.  But I think

25  he can be asked if he previously testified in a Cambodian

DIRECT EXAM CONTINUING — LS XXX

Page 190

1   Court, if the abuse occurred, did he testify consistently

2   with what you are telling us now.

3          The problem, I think, is listening to SO XXX is that

4   what they consider testimony is very different than the

5   proceeding that they are going through today.  But being

6   asked questions in open court, my guess is that they made

7   statements that were given to the judge prosecutor who

8   considered them.

9          But it's unclear to me that -- what that testimony

10  looks like.  So I think it probably would be more appropriate

11  that, did you make a statement to the Cambodian Court about

12  being abused.

13         MR. SINHA:  Thank you, Your Honor.

14         THE COURT:  I just don't know what that -- maybe

15  explore what that looks like, but I don't know if that's all

16  that significant.

17         MR. SINHA:  I don't want to misstate something to

18  the Court.  I suppose I don't know the extent to which the

19  FBI may have communicated with Hagar at any point in this.

20  So I -- my point was basically that we think Hagar would be

21  supporting these victims regardless of the FBI and Federal

22  prosecution, and I believe that's true.  But I don't know, I

23  suppose, just to be clear with the Court.

24         I have two other things I was hoping to raise with

25  the Court.  One, we would ask the Court in terms of the

1  judicial notice of fact, we would ask if you could instruct

2  the jury after Mr. LSX steps down.

3          THE COURT:  I plan on doing that.

4          MR. SINHA:  And the other one is, there's a forensic

5  interview of Mr. LSX that's about 37 minutes long -- about

6  40 minutes long.  And we think he's been asked -- we would

7  like to play it as a prior consistent statement, and then I

8  will --

9          MS. MAXFIELD:  I am not impeaching him with any

10  prior inconsistent statement.  I don't think I have opened

11  the door to them introducing the interviews that are

12  consistent --

13          THE COURT:  Your cross-examination is certainly

14  aimed at suggesting to the jury he has a strong motivation to

15  lie to come to the United States, and I think that's enough

16  to bring in consistent statements.

17          MR. WEINERMAN:  Judge, again, would it be a

18  40 minute interview?  I mean, there's not 40 minutes worth of

19  statements.  At a minimum, the government should have to

20  bring forward just the actual consistent statement, and

21  that's it.  This is a long-ranging interview that covers a

22  lot of different subjects, and I would suspect that the prior

23  consistent statement would take up a minute or two.

24          MR. SINHA:  So Your Honor, I think, if it were not

25  the case that they asked Mr. LSX about the people who were in

1    the room with him and tried to, I think, imply that there was

2    some coercive aspects or there were people influencing him in

3    the course of this interview, I think we're fine going

4    forward playing clips.

5             But for Mr. LSX, one, we think it's important

6    because we're talking so much about the forensic interview,

7    for the jury to see the entire forensic interview, because

8    it's going to be so much, we think it's an issue in the

9    expert testimony, and with the other witnesses.

10            And two, with him, they seem to have called into

11   question the environment in which this interview took place,

12   so we don't think it's sufficient to tell the complete story

13   of the interview to just play a clip.

14            THE COURT:  I agree.

15            MS. MAXFIELD:  But it needs to be made clear to the

16   jury that this is not the interview that we discussed.  He

17   and I discussed a very different interview with Cambodian

18   National Police.  And then I simply asked him who was present

19   in the interview with Martha from the FBI.  And I didn't ask

20   about any content or whether he was questioned repeatedly.

21   These are separate interviews.

22            THE COURT:  I understand.

23            MR. SINHA:  With the Court's permission, I will lead

24   him into making sure that that is clear.  And one last

25   logistics question, we have the interview.  It's in English

1  with the translator, but we also have translations that have

2  been provided to Mr. Johnson's counsel.  What we hope to do

3  is hand out the written translations in case the jury wants

4  to follow along, because they have a hard time hearing

5  things.  And then we will take them back afterward.  And I

6  would like for Mr. LSX --

7         THE COURT:  Any objection to having the jurors read

8  it?

9         MR. WEINERMAN:  There's various translations, so it

10 would be good to know which one they are using.  So we may

11 not like one, but may not have an objection to the other.  It

12 depends.

13        THE COURT:  We will take a look at that, and take it

14 up before we play it.

15        MR. SINHA:  We could put an agent on to play this so

16 Mr. LSX is not sitting up there listening to this again.  But

17 if Mr. Johnson's counsel would agree, because we would just

18 ask for it to be played.  I can introduce it through him, but

19 we just ask that we play it after he's left the stand.  That

20 would be my request.

21        THE COURT:  It occurs to me, recross on statements

22 that were made -- he may have to come back to the stand.

23        MR. SINHA:  Sure.  Okay.  Sure.

24        THE COURT:  Any objection to Mr. LSX being off the

25 stand while the tape is being played?  You can recall him for

1    recross on what you hear.

2             MS. MAXFIELD:  I am going to have to look at this,

3    Judge.  I didn't know we were going down this road.  So you

4    are saying that you don't want him to sit in while you are

5    playing this?

6             MR. SINHA:  I don't want -- I don't -- we don't want

7    him to be sitting up there while we play this video.

8             MS. MAXFIELD:  And what you are suggesting is that I

9    simply have a chance to bring him back to ask questions about

10   this once it's played?

11            THE COURT:  It makes some sense to have him listen

12   to it if you are going to ask questions about it.

13            MR. SINHA:  We will have him stay there, then.

14            THE COURT:  All right.  Recess for ten minutes, and

15   take a look at the transcription and see if you have any

16   objection to that being handed to the jury.

17                       (Brief recess taken from 10:28 a.m.

18                        to 10:47 a.m.)

19            MR. WEINERMAN:  I have been told -- it takes us

20   awhile.  I have been told that there's nothing inflammatory

21   that would be subject, let's say, to a 403 objection in this

22   tape recording.  But as we're going through it, we will read

23   ahead, and if there is something that we feel should not be

24   played for the jury, a portion of it, we would like

25   permission to at least raise that concern with the Court

1   before it's played and they hear it.

2          THE COURT:  Have you had time to go through it yet?

3          MR. WEINERMAN:  Well --

4          THE COURT:  Let's finish that up, and see if there's

5   an area that you object to.

6          MS. MAXFIELD:  (Reading document.)

7          MR. WEINERMAN:  We're going to share it, Judge.

8          MS. MAXFIELD:  We're on different standings.

9                  (Brief recess taken from 10:48 a.m.

10                  to a 10:55 a.m.)

11         MR. WEINERMAN:  I think it would be best for the

12  Court to identify the parties in there.  So Martha, I think,

13  is the FBI agent, and then there's Roth, who is the

14  interpreter.  I think the jury should know who that is.

15         THE COURT:  We have some questions for LS X before

16  we --

17         MR. SINHA:  Yes, Your Honor.

18         THE COURT:  Okay, bring the jury in.

19                  (JURY IN.)

20         THE COURT:  Please be seated.  Mr. Sinha.

21  Q   BY MR. SINHA:  So LS X, I just have a handful more

22  questions for you.  So thank you for sitting with us all day

23  this morning.

24         One thing I wanted to ask you about was your

25  participation in the Cambodian case against Mr. Johnson.  And

Page 196

1  so as I understand it, on the day of Mr. Johnson's arrest,

2  you talked to the Cambodian National Police and told them

3  that Mr. Johnson had sexually abused you.

4  A    Okay.

5  Q    In the Cambodian case was there a point at which you

6  also provided testimony to a Court in the prosecution?

7  A    I spoke.

8  Q    You spoke to a Court in Cambodia?

9  A    Yes.

10 Q    And did you talk to them about Mr. Johnson sexually

11 abusing you?

12 A    Yes.

13 Q    And what did you tell them?

14 A    I said like what he had done to me.

15 Q    And are those the same things that you have told us when

16 you talked to us about it yesterday?

17 A    Yes.

18 Q    And LS X, you talked a little bit about the organization

19 Hagar.  Do you know if Hagar was helping the -- do you know

20 if Hagar got involved with you as part of the Cambodian case?

21 A    Yes.

22 Q    Do you know if it matters at all to Hagar what happens

23 in the American case?

24      MS. MAXFIELD:  Objection; based on personal

25 knowledge.

1       THE COURT:  Sustained.

2   Q   BY MR. SINHA:  Has anyone from Hagar ever indicated to

3   you that your status with the organization would change if

4   the American case didn't go forward?

5   A   Can you ask that again?

6   Q   Sure.  Has anyone at Hagar ever told you that if the

7   American prosecution of Mr. Johnson ended, or if you didn't

8   participate, they would no longer help you?

9   A   No.

10  Q   What about Water of Life?  That's where you are living.

11  Did anyone at Water of Life tell you that if the American

12  case didn't go forward or you didn't participate in it, you

13  would get kicked out?

14  A   No.

15  Q   Do you believe that you staying at Water of Life has

16  anything to do with the American case?

17  A   I don't understand.

18  Q   Do you believe that you staying at Water of Life will

19  only continue if you participate in the American case?

20  A   No.

21  Q   So LS X, the next thing I want to talk to you about is

22  we talked about some money that you were given before you got

23  on the plane, and then also when you arrived in the United

24  States.

25          Did anyone -- what do you understand that money to

1  be for?

2  A    It was for food.

3  Q    How are the prices of food in America, compared to the

4  prices of food in Cambodia?

5  A    A lot more pricey than Cambodia.

6  Q    Have you used some of that money to buy food?

7  A    Yes.

8  Q    What about the money that you got before getting on the

9  plane?  Was that also for food?

10  A    It was for something to eat at the airport -- airports.

11  Q    And has anybody ever told you how much money you will

12  receive -- let me start again.

13       Prior to Ms. Maxfield asking you, did you ever know

14  how much money you were going to receive while you were in

15  the United States?

16  A    They did tell me, and they said it was like $50 a day,

17  or something like that.

18  Q    So I have just a couple of more questions for you.  The

19  next thing I am going to do is I am going to show you what

20  has been marked as Government's Exhibit 241 A, as in apple.

21       MR. SINHA:  And I want to tell the Court,

22  Exhibit 241 is a forensic interview of Mr. LSX that occurred

23  in 2014 with an FBI forensic interviewer named Martha

24  Finnigan.  The reason there's an "A" after the exhibit number

25  is because there were points in the room where everyone

1    except LS X left, and he was sitting there in silence.

2            So to try to cut it down a little bit, we have cut

3    out those portions.  But I can represent to the Court that we

4    haven't cut out any portions where anyone was talking to

5    LS X.

6            THE COURT:  There's a third person mentioned that

7    looks like a translator.

8            It's spelled "Roth," but may be pronounced

9    differently.

10           MR. SINHA:  It's spelled R-O-T-H.  My understanding

11   is that it's pronounced "Rohat," but that's the third person

12   in the room.  He's a translator to help translate the English

13   into Khmer.

14           THE COURT:  We will play the exhibit.  And folks,

15   Ms. Pew will hand out what is a transcription of the

16   interview to assist you in reading along with the exhibit

17   that is played.  You will not get to keep the transcript, but

18   it is there to help you understand the video.

19           MR. SINHA:  Your Honor, if this is not being

20   published to the jury, I would ask that it be published.

21           THE COURT:  We are publishing it, correct.

22                   (Video Played.)

23           MR. SINHA:  Thank you, Your Honor.  The government

24   passes this witness.

25           THE COURT:  Any follow-up questions based on the

Page 200

1  video?

2         MS. MAXFIELD:  Just a couple.

3

4                    RECROSS EXAMINATION

5    BY MS. MAXFIELD:

6  Q    LS X, have you spent all the money on food?

7         MR. SINHA:  Objection; beyond the scope.

8         THE COURT:  Overruled.

9         Go ahead.

10        THE WITNESS:  Yes, I have.

11 Q    BY MS. MAXFIELD:  It's all gone?

12 A    No, not all of it, because I shared with my older

13 brother.

14 Q    Okay.  Did your older brother get some money, too?

15 A    Yes.

16 Q    When we listened to the tape, Martha asked you whether

17 you got any gifts after Daniel touched you, and you said

18 this:  "He gave on Christmas, but when he did that he didn't

19 give."

20 A    At times I received them, but sometimes I didn't.  So

21 sometimes he gave me money, sometimes he gave me cookies.

22 Q    And the only other thing I wanted to talk to you about,

23 and maybe this is because I goofed.  You talked to two FBI

24 agents; is that right?

25 A    Yes.

Page 201

1   Q    One was FBI Martha, the person we just listened to, and

2   the other person was FBI Daniel; is that right?

3   A    Daniel, I didn't get to speak to him very much, because

4   as soon as Martha walked in, he left.

5   Q    Okay.  Did you go to talk to the FBI two different

6   times?

7   A    Yes.

8   Q    I want to play a clip for you and ask you if it helps

9   you remember something.

10          MS. MAXFIELD:  Could you play ID 1902?

11          MR. SINHA:  I object, Your Honor.  It's beyond the

12   scope.

13          THE COURT:  It's beyond the scope, and I don't know

14   if it would play -- to refresh his memory on something, if we

15   play it in front of the jury.

16          MS. MAXFIELD:  I wonder if -- it's not in Khmer, so

17   I don't know how to do it.

18   Q    BY MS. MAXFIELD:  Let me ask you this, do you remember

19   speaking with Agent Dan --

20          MR. SINHA:  I object to the content of this

21   question.  He can be refreshed on whether he spoke to him,

22   but the content of their conversation, I don't think he

23   said -- I don't know where we are with that in regards --

24          THE COURT:  I will have to hear the question first

25   before I can rule.

1    Q    BY MS. MAXFIELD:  Do you remember telling Agent Daniel

2    that -- you told him you wanted to live in the United States?

3    A    I am not quite sure.

4              MS. MAXFIELD:  Well, I am not going to keep you here

5    over lunch.  We will leave it right there.  Thank you.

6              THE COURT:  Thank you very much.  You can be excused

7    at this time.  You could be called back later as a witness,

8    so please be available.

9              THE WITNESS:  Yes.

10             THE COURT:  Folks, I will read to you what is a

11   judicially noticed fact, so this is a fact that you can

12   accept as true in the case.

13             In accordance with Title 28, Section 1829 of the

14   United States Code, Any fact witness for either party must be

15   paid a $40 witness fee for each day they attend trial, and

16   for each day necessarily occupied going to and returning from

17   the place of attendance.  The same familiar law requires that

18   in addition to travel-related witnesses, fact witnesses must

19   be paid a subsistence allowance.  The subsistence allowance

20   paid to any fact witness in this case will be the current

21   Federal per diem rate for Eugene, Oregon, of $59 a day.

22             So folks, we're going to break for lunch.  We'll

23   have you back at 1:15, and we will resume at that time with

24   our next witness.

25             (JURY OUT.)

DIRECT EXAM CONTINUING — LS XXX

Page 203

1        THE COURT:  Okay.  We're recessed until 1:15.

2                    (Proceedings concluded at

3                    11:55 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 204

STATE OF OREGON   )

                  )ss

COUNTY OF YAMHILL)


          I, Deborah L. Cook, RPR, Certified Shorthand
Reporter in and for the State of Oregon, hereby certify that
at said time and place I reported in stenotype all testimony
adduced and other oral proceedings had in the foregoing
hearing; that thereafter my notes were transcribed by
computer-aided transcription by me personally; and that the
foregoing transcript contains a full, true and correct record
of such testimony adduced and other oral proceedings had, and
of the whole thereof.

          Witness my hand and seal at Dundee, Oregon, this
2nd day of May, 2018.


/s/ Deborah L. Cook, RPR, CSR

_____
DEBORAH L. COOK, RPR
Certified Shorthand Reporter
OREGON CSR #04-0389
CALIFORNIA CSR #12886
WASHINGTON CSR #2992