Page 435

1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF OREGON

3        THE HON. MICHAEL J. McSHANE, JUDGE PRESIDING

4

5    UNITED STATES OF AMERICA,    )

6                 Government,     )

7         vs.                     )  No. 6:14-cr-00482-MC-1

8    DANIEL STEPHEN JOHNSON,      )

9                 Defendant.      )

10

11           REPORTER'S TRANSCRIPT OF PROCEEDINGS

12                  EUGENE, OREGON

13                Friday, May 4, 2018

14                Day 5, Morning Session

15             Volume 4A - PAGES 435 -508

16

17

18

19

20

21              DEBORAH COOK, RPR, CSR
                OFFICIAL COURT REPORTER
22              405 East 8th Avenue
                  Suite 2130
23              Eugene, Oregon 97401
                  (541) 431-4162
24          Deborah_Cook@ord.uscourts.gov

25

Page  436

1       APPEARANCES OF COUNSEL:

2       FOR THE GOVERNMENT:

3       Jeffrey S. Sweet
         United States Attorney's Office
4       405 E. Eighth Avenue, Suite 2400
         Eugene, OR 97401
5       541-465-6771
         Fax: 541-465-6917
6       Email: Jeff.sweet@usdoj.gov

7       Lauren E. Britsch
         U.S. Department of Justice
8       Criminal Division
         1400 New York Ave NW, 6th Floor
9       Washington, DC 20530
         202-514-2220
10      Fax: 202-514-1793
         Email: Lauren.britsch@usdoj.gov
11

12      Ravi Sinha
         United States Attorney's Office
         1000 SW Third Ave, Suite 600
13      Portland, OR 97204
         503-727-1014
14      Fax: 503-727-1117
         Email: Ravi.sinha@usdoj.gov
15

16      FOR THE DEFENDANT:

17      Craig E. Weinerman
         Office of the Federal Public Defender
         859 Willamette Street, Suite 200
18      Eugene, OR 97401
         541-465-6937
19      Fax: 541-465-6975
         Email: Craig_weinerman@fd.org
20

21      Lisa A. Maxfield
         Pacific Northwest Law LLP
         1255 NW Ninth Avenue, No. 11
22      Portland, OR 97209
         (503) 222-2661
23      Fax: (503) 222-2864
         Email: Lamaxfield@pacificnwlaw.com
24
                     * * * * *
25

Page 437

1                            WITNESS INDEX

2                                         Page/Line

3       FOR THE GOVERNMENT
              SES XXXXXXXXXXXXXX        447      8
4       DIRECT EXAMINATION (Continuing)  447     16
        BY MR. SWEET
5       CROSS EXAMINATION               451      3
        BY MS. MAXFIELD:
6
              CC XXXXXX                  460     14
7       DIRECT EXAMINATION              461     11
        BY MS. BRITSCH
8       CROSS EXAMINATION               489     18
        BY MR. WEINERMAN:
9

10

11

12

13                    EXHIBIT OFFERED INDEX

14      EXHIBIT 274 OFFERED             483     11

15                    EXHIBIT RECEIVED INDEX

16      EXHIBIT 27, 28, RECEIVED        464     23
        EXHIBIT 88 RECEIVED             476     20
17      EXHIBIT 106 RECEIVED            477     10
        EXHIBIT 103 RECEIVED            478      4
18      EXHIBIT 112 RECEIVED            478     15
        EXHIBIT 113 RECEIVED            479      6
19      EXHIBIT 274 RECEIVED            483     14

20

21

22

23

24

25

DEBORAH COOK, OFFICIAL COURT REPORTER
deborah_cook@ord.uscourts.gov

Page 438

PROCEEDINGS

Friday, May 4, 2018, at 9:08 a.m.


1
2
3
4          THE COURT:  Good morning, everybody.
5          MS. BRITSCH:  Good morning, Your Honor.
6          THE COURT:  Are we ready for the jury?
7          MR. SWEET:  If we could have a minute to discuss a
8    few things, Your Honor.  One, just to alert the Court, the
9    government learned the witness from yesterday, SES XXXXX,
10   wanted to speak to the government.  So Ms. Maxfield, myself,
11   and an interpreter went to talk with him to see if there was
12   something significant.  Both of us are satisfied it was not.
13        We do have a copy of the transcript from yesterday's
14   proceedings.  There was something that all the parties are
15   checking on to see exactly what was said, because the
16   government would like to address that with a motion to limit
17   potential line of cross, and we're finding that now.
18        And finally, Your Honor, there was one very short
19   additional line of questioning, which I did want to get into
20   with Mr. SESX.  And I realize I ended my questioning.  I am
21   asking for permission to reopen my direct briefly.
22   Understanding that if they object, I may have to call him
23   back later for this, so for efficiency --
24        THE COURT:  I am pretty flexible on reopening it.  I
25   would give it some recross, even though I typically don't,

Page 439

1    but I'll allow both sides -- because there's been a lot of

2    difficulties with understanding through the translator

3    exactly what is said.  I am trying to be flexible.

4            MR. SWEET:  I will keep that brief.

5            MS. BRITSCH:  If I may address one issue that is

6    relevant to our second witness.  The government's proposed

7    Exhibit 274 has been provided to the defense and the Court.

8    I understand at this time defense is going to object on 403

9    grounds to some parts of that exhibit, so I wanted to alert

10   the Court so the Court has time to review it.  And that will

11   be for the second witness, CC XXXXXX.

12           MR. WEINERMAN:  Judge, I am sorry.  I am ready to

13   make my case on that.

14           THE COURT:  Go ahead.

15           MR. WEINERMAN:  So, Judge, you had the exhibit in

16   front of you.

17           THE COURT:  Yes.

18           MR. WEINERMAN:  I am objecting not to the text, I am

19   objecting to the Photoshop photographs of Mr. CCXX, Mr. CCXX

20   XXXX.  Apparently those were Photoshopped by Mr. Johnson, and

21   e-mailed to CC XXXXXX.  So I will read the numbers at the

22   bottom of the page, so 263, 265, 266, 268, 270, and 271, and

23   272.

24           And the basis is 403 -- the text of the Facebook

25   chats clearly make the government's case that Mr. Johnson was

Page 440

1   trying to contact CC XXXXXX and wanted him to visit him in

2   prison, and was encouraging, and said all sorts of things, he

3   loved him and all the rest.

4           I think the photographs start to get into the area

5   of kind of a disturbing, very prejudicial characterization of

6   what Mr. Johnson was doing -- disturbing, weird, some of

7   these photographs just are very strange, very weird.

8           And subject to a jury taking them the wrong way, I

9   mean, they are going to hear a lot of testimony.  Mr. CCXX

10  XXXX is going to talk about having been sexually violated by

11  Mr. Johnson.  So this seems to be unnecessary, and it will

12  confuse the issues and might get the jury to decide this

13  thing on an improper basis.

14          So we don't think the government needs it.  We think

15  it's extremely prejudicial.  The probative value is limited.

16  And the government proves the relationship and Mr. Johnson's

17  infatuation, if you want to call it that, with Mr. CC XXXXXX

18  by the text and all the other evidence, and they don't need

19  these photographs.

20          THE COURT:  I will overrule the objection.  I think

21  the photographs do go towards -- I think as counsel stated,

22  somewhat of an infatuation with the particular witness, which

23  I understand is prejudicial, but not unduly prejudicial.

24  It's very probative to one of the key issues in the case.  I

25  think it also certainly suggests by sending the photos that

Page 441

1  there's some continued grooming that is going on.  That is at

2  the heart of the case, so the objection to the photographs

3  will be overruled.

4          MS. BRITSCH:  Thank you, Your Honor.

5          MR. SINHA:  So I think the next thing we were hoping

6  to raise with the Court is yesterday during testimony, the

7  government's last witness, SES XXXXX, mentioned about there

8  being rules put in place to stop adults -- to stop people

9  from touching each other in their private areas while at the

10  orphanage.

11          And my understanding is that Mr. Weinerman has

12  considered that that might open the door to leave the Court's

13  prior 412 ruling.  So if the Court would allow me, I have a

14  transcript of yesterday that I would like to talk about.

15          May I approach?

16          THE COURT:  Yes:

17          MR. SINHA:  So this is on page 430, and I believe

18  Mr. Sweet's question starts at line 10.

19          THE COURT:  (Reading document.)

20          MR. SINHA:  So, Your Honor, our position is that we

21  don't believe that this opens the door.  I think the Court's

22  ruling recognized that what was important from Mr. Johnson's

23  perspective is the notion that Mr. Johnson put in place

24  strict rules, that the boys didn't like those strict rules,

25  and that would be a reason for them to be biased.

Page 442

1        This doesn't seem particularly to apply to the boys

2   insofar as Mr. SESX appears to be talking about adults to the

3   adults.  And even insofar as it's ambiguous, I don't think it

4   changes the animating factors of the Court's prior ruling.

5   Mr. Johnson could before, and could now, continue to argue

6   that there was strict rules.

7        The content of the rules as it applies to the

8   victims' sexual behavior, I don't think is relevant, and I

9   think is precluded by 412, and by the things that have caused

10  412 to be adopted, which is it would needlessly embarrass the

11  victims for no particular purpose.

12       THE COURT:  Okay.

13       MS. MAXFIELD:  My position is -- My understanding of

14  the Court's 412 ruling, as I recall, I explained to the Court

15  that there's a -- the government is going to present evidence

16  of a confrontation that supposedly occurred between my client

17  and Pastor Sopheak.  When Pastor Sopheak was interviewed by

18  the FBI, he talked about this rule where he said Daniel set a

19  rule about boys not being able to touch each other's penises

20  and not being able to sleep with each other, and that's what

21  I went and talked to Daniel about.  Which is consistent with

22  what my client would say on the witness stand.

23       I believe that this corroborates our account of what

24  occurred there.  And the Court told me I could question

25  Pastor Sopheak about that exchange with the FBI, and what

Page 443

1   that meant.

2          THE COURT:  Correct.  That's certainly a prior

3   consistent statement, and I think that would come in.

4          With regard to crossing this witness about other

5   children having sexual contact -- and my ruling has been that

6   that has to be limited.  Looking at this transcript,

7   Mr. Sweet did not ask a very broad question.  He narrowed it

8   specifically to touching of Daniel Johnson.  The witness went

9   a little, obviously, further, and talked about a rule that

10  prevented touching between the different children in the

11  house.

12         I think still the heart of the defense is that the

13  children were punished for breaking rules, and therefore,

14  falsifying the allegations of sexual abuse.  But I think the

15  key to that is there's been some over discipline for breaking

16  rules.  I don't think we need to go into the fact that the

17  children themselves were behaving sexually with each other.

18         So I can have you cross examine him on Mr. Johnson's

19  response to the children breaking his rules, but I want to

20  stay away from the fact that the children were in some way

21  sexually active with each other.

22         MS. MAXFIELD:  My proposed line of questioning, and

23  it sounds to me like part of it has been taken out, but I

24  wanted to talk to him about whether there was a rule, whether

25  that was a rule that he actually printed on a big sign, and I

Page 444

1    don't know where that sign went.  Whether there were times

2    that the rule was broken, not with specific children, and

3    what punishment was imposed.

4         THE COURT:  I don't think whether it was -- well,

5    all right.  I will allow you that in your line of

6    questioning, but without going into, were the kids in fact --

7    any particular kids, or the extent of how often things were

8    occurring between the children, that there were rules.  One

9    of the rules had to do with the kids touching each other, was

10   that rule broken, and what was the response.  All right.

11        MR. WEINERMAN:  Judge, one other thing, sorry this

12   just came up.  So this is now getting back to the testimony

13   of CC XXXXXX, C-C-X-X.  CC XXXXXX has made many different

14   disclosures to many different people in -- initially after

15   the arrest in 2013, he made some limited disclosures to

16   either Cambodian National Police or APLE or both, of

17   touching.  And then he was interviewed by the FBI forensic

18   examiner on November 9, 2014, where he made a little further

19   disclosure, said there was touching, skin to skin, and to

20   genitals.

21        Then he went and made disclosures recanting that to

22   a defense investigator twice, and to the FBI.  And this was

23   in 2015 and 2016.  And that brings us now to March 21st,

24   2017, where he was back saying that Daniel Johnson sexually

25   abused him, and for the first time got into more graphic

Page 445

1   things like anal rape, and things of that nature.

2          The government wants to play a 30-minute videotape

3   of Mr. CC XXXXXX's forensic interview with the government.

4   We believe it's appropriate on the issue of him saying anal

5   rape for the first time, and being able to explain why he

6   came forward for the first time, but it seems to me the

7   government should not be allowed to play the entire tape

8   under these circumstances.

9          It's in essence allowing him to testify twice.  Once

10  on the stand, in which he can explain the inconsistencies and

11  why he said what to who.  But to again, right after that,

12  allow the government to play a 30-minute videotape where he's

13  essentially going to be repeating everything he says in his

14  testimony, it seems to me the Court should not allow it.  All

15  of this is not a prior consistent statement, because it

16  happened on March 21st.  And the things that happened before

17  really don't qualify as prior consistent statements.

18         So we think the Court should limit the government to

19  the one page of the transcript and the tape in which he says

20  for the first time to anybody that there was anal rape.

21         MS. BRITSCH:  Your Honor, we have clipped this video

22  down.  It is 30 minutes, but it's not the entire interview.

23  We clipped it down to what we believe is relevant, and he

24  will testify to everything that is in this video so it would

25  be a prior consistent statement.

Page 446

1          We only intend to offer it on redirect after

2    Mr. Weinerman presumably cross examines him on these multiple

3    statements.  This video and transcript includes his

4    explanations for those statements, and the further sexual

5    abuse that he suffered from Mr. Johnson.

6          It is long, but I don't believe it is needlessly

7    long, and I believe it would all be a prior consistent

8    statement.

9          THE COURT:  Let's take it up after cross, and if I

10   could have a copy of the transcript that would help.

11         MS. BRITSCH:  Certainly, Your Honor.  And Your

12   Honor, for the record, we did redact a portion of the

13   transcript.  I discussed this with defense counsel.  It's on

14   the bottom of page 28.  There's some questions where CC X

15   inquires whether this has happened to boys in the United

16   States.  I believe the discussion is about sexual abuse

17   generally, but it could have been interpreted to be specific

18   to Mr. Johnson so that's been redacted from the transcript

19   and the video.

20         THE COURT:  Thank you.  All right.  Bring in the

21   jury.

22                    (JURY IN.)

23         THE COURT:  Please be seated, folks.  Happy Friday.

24   We're at the final day of this week.  We're going to return

25   to our previous witness, if we could bring him in, and

DIRECT EXAM CONTINUING - SES XXXXXXXXXXXXXXX

Page 447

Mr. Sweet is going to ask a few more questions.

1

2          MR. SWEET:  Thank you.  We recall SES XXXXX.

3          THE COURT:  Mr. SESX, you can have a seat in the

4    witness stand, and you are still under oath in this case.  I

5    will have Mr. Sweet ask you some additional questions, and

6    then Mr. Johnson's attorney will ask you some questions.

7

8                    SES XXXXXXXXXXXXXXX,

9    produced as a witness, having been previously duly sworn, was

10   examined and testified as follows:

11         THE WITNESS:  Yes, sir.

12         (NOTE:  Unless otherwise indicated, all answers

13   represented by "A" and "THE WITNESS" will be answers given by

14   the witness through the interpreter after translation.)

15

16                DIRECT EXAMINATION (Continuing)

17       BY MR. SWEET:

18   Q    Good morning, SESX.

19   A    Good morning.

20   Q    SESX, when you were at the last location, where did you

21   sleep?

22   A    I sleep in the second level.

23   Q    And who else slept in the second level?

24   A    I don't remember at all.  I do remember some.

25   Q    Were they adults or boys?

DIRECT EXAM CONTINUING - SES XXXXXXXXXXXXXXX

Page 448

1  A    It's a combination of kids, young, small one and big

2  one.

3  Q    Was it sort of a dorm room on the second floor?

4  A    Yes.

5  Q    What kind of beds were they?

6  A    Bunk beds.

7  Q    Bunk beds?

8  A    Yes.

9  Q    Was there a night when something happened in that room?

10 A    Yes, there was a night that an incident occurred, but

11 that day -- that night I just came back from the province.  I

12 did not recall exactly whether I came from province of Prey

13 Veng or Kampot, but most of the time I came from Prey Veng

14 province.

15       But that night he was looking -- nighttime he was

16 looking for the kids, but I don't know in what manner he was

17 looking at them for, to get a massage -- for them to get a

18 massage or --

19 Q    So do you know about what time it was?

20 A    I don't remember the hour, but it was around 10, 11, 12,

21 but it's within the time period of 10 to 12.

22 Q    And were -- so who came into the room?

23 A    What room?  Who came to what room?  What are you --

24 Q    So we're talking about what you saw that night, right?

25 A    Yes.  Yes.

Page 449

1    Q    Were you in the bunk room on the second floor?

2    A    Yes.

3    Q    And where were you in that room?

4    A    I was sleeping on my bed.

5    Q    And were the lights in the room on or off?

6    A    Off.  It's already at least -- it's already 10:00.  Any

7    time after 10:00 we have to turn off the lights.

8    Q    And who came into the room where you were sleeping with

9    the lights off?

10   A    D came into the room looking for the kids.  I don't know

11   whether it was for massage or what, but D came into the room.

12   Q    When you say D, is that Daniel Johnson?

13   A    Yes.

14   Q    And how did he see if the lights were off?

15   A    He has a flashlight that he carried with him.

16   Q    So what did you see him do in the room with the

17   flashlight?

18   A    He's just looking around for the person -- what I meant

19   to say, he's just looking for the person he wants to find.

20   Q    And did he find someone?

21   A    Yeah.  He found that person, but I don't know who or

22   which of the person that he found.  At that time I was

23   already -- like, I fall asleep, you know, briefly, and I was

24   also very, very sleepy.

25   Q    Once he found a person, what did he do?

Page 450

1   A    He lift -- he grab and lift and put like a cradle

2   manner, or over his shoulder to his bedroom.

3   Q    Did he take -- so are you saying he took a person out of

4   the room and back to his bedroom?

5            MS. MAXFIELD:  Objection; calls for speculation.

6            THE COURT:  Could you repeat the question?  I am

7   sorry.

8            MR. SWEET:  I am basically echoing his words, and

9   clarifying.

10  Q    BY MR. SWEET:  Did he take a person and carry the person

11  out of the room that you were in?

12           MS. MAXFIELD:  Objection; as to the last part.

13           THE COURT:  If he can answer it, I don't know.  But

14  I'll overrule the objection.

15           THE WITNESS:  Yes.

16  Q    BY MR. SWEET:  Was the person he carried out of the room

17  a large person or a small person?

18  A    Small.  A small person of average size, not too small

19  like a child.

20  Q    Like your size, SESX?

21  A    No.  No, sir.

22  Q    Like one of the younger boys' size?

23  A    Yes.

24           MR. SWEET:  Thank you.  I have no further questions,

25  but Ms. Maxwell might.

CROSS EXAMINATION - SES XXXXXXXXXXXXXXXX

Page 451

1        THE COURT:  Cross-examination.

2        MS. MAXFIELD:  Thank you, Your Honor.

3

4                    CROSS EXAMINATION

5   BY MS. MAXFIELD:

6   Q   Good morning, SESX.  We met yesterday, and then again

7   this morning.  I am Lisa Maxfield, and I am one of the

8   lawyers representing Daniel Johnson.

9   A   Yes.

10  Q   Did you have a chance to talk with anyone last night

11  about your testimony, or your day in court?

12  A   Not -- no.

13  Q   You testified yesterday about a rule in the house

14  regarding older boys touching each other.  Do you recall that

15  testimony?

16  A   Yes.

17  Q   And was this a rule that was written?

18  A   Yes.

19  Q   And was it written and printed on signs that were about

20  this big (indicating)?

21  A   Yes.

22  Q   And this big would be like two 8 by 11 sheets?

23  A   Yes.  But it's -- that paper might be bigger than that,

24  bigger, because it's -- you have to write pretty big.  Or

25  yeah, but it's about this size, because there's so many

1   rules.

2   Q    There are more rules?

3   A    Yes.

4   Q    Did you actually go to the print shop to have all the

5   rules printed?

6   A    I am not the one who went to there, but I just saw that

7   they are posted on the wall.  There were so many rules.

8   Q    And were those rules posted on walls on every level of

9   the center?

10  A    Yes.  On the first level and the second level and, at

11  other places, also.  Yes.

12  Q    I want to talk to you a little about the last house.

13  And I would like to show him Government Exhibit 139.

14  A    Yes.

15  Q    Is that what you are talking about when you talk about

16  the last house?

17  A    Yes.

18  Q    And did the center occupy both sides of that building,

19  or one side?

20  A    Only the one house.

21  Q    And before you got into the center, or the grounds of

22  the center, was there a gate out to the main street?

23  A    Yes.

24  Q    And was that a gate that locked?

25  A    Yes.

Page 453

1    Q    Was that gate locked each night?

2    A    Yes.

3    Q    And was that a gate that was about ten feet tall?

4    A    Yes, perhaps there is a path for cars to enter into, and

5    then also there's a passage for a person walking into.

6    Q    So were there two gates or one?

7    A    There's two doors.  One is for the car to enter in, and

8    the other one is -- a smaller one is for motorcycles, or

9    bicycle, or people walking through.

10   Q    And were all those entryways locked at night?

11   A    Yes.  It is a rule in there.  It's in that rule of the

12   paper.  The door must be closed and locked around 10:00,

13   9:30 -- 9:30 or 10:00, and around that time.

14   Q    Who was in charge of locking those gates?

15   A    If you are speaking in terms of the last house, it would

16   be Sambo who is one in charge of locking up that.  And it

17   might be other people who has access to that, but I am not

18   sure.

19   Q    Let me show you what's been marked as -- gosh, you guys,

20   I need better bifocals -- Defense Exhibit 604.

21            A JUROR:  We can't see that.

22            THE COURT:  Can you publish that?

23            COURT CLERK:  I am.

24            MS. MAXFIELD:  Page 7, I am sorry.  There was a

25   page --

Page 454

1   Q    BY MS. MAXFIELD:  That's the breezeway that sits on the

2   side of the compound; is that right?

3   A    Yes.  Yes.  That's on the bottom, the lower part.

4   That's in the area of the kitchen, or a place where you

5   eat -- the dining area.

6   Q    So you had an outdoor kitchen and an outdoor dining

7   area?

8   A    Yes.  Yes.  Yes.

9   Q    Let me ask you this.  Can you see what's been marked as

10  the same number, and I don't know what page we're at -- page

11  4?  Now, is that the entryway into the center?

12  A    Yes.

13  Q    On either side of the men who are standing there, you

14  will see a red metal structure?

15  A    Yes.  There's -- on to the other side a little bit,

16  there's a swing, and there's like a little fish pond and

17  stuff like that that we keep.

18  Q    Well, I want to talk to you about that red structure.

19  Is that another gate that closes to block access to the

20  center?

21  A    That's not -- oh, the one that -- the metal thing where

22  the arrow is pointing?  Yes, that is a door.  And then

23  there's a glass that is behind that red door.

24  Q    We're going to get there in a minute.  First, I want to

25  talk about that red gate.  Does that red gate close and lock

Page 455

1   at night?

2   A    I am not certain.  I am not clear about the red door,

3   the red gate.  But I know, mostly, they close the glass door

4   and the front gate door is locked.

5   Q    So behind that gate you are talking about a glass door

6   that was also locked at 9:30 at night?

7   A    Yes.

8   Q    And those locks were locked from the inside of the

9   center, not the outside; is that right?

10  A    Yes.

11  Q    The dorm that you were in on the second floor -- let me

12  ask you this:  Were there two rooms up on the second floor

13  where there were bunks?

14  A    Yes.  Yes.

15  Q    One of them was a smaller room, one larger?

16  A    Yes.  Yes, because on the second floor there's one room

17  that is, you know, it's designated for a bedroom, and the

18  other one is more like an open area.  But we use it as a

19  bedroom.  We put bunk beds in there, so that's how it is on

20  the second floor.

21  Q    So in the smaller room, the one that's blocked off, not

22  the open area, can you see from that room into the open area

23  of the dorm?

24  A    Yeah.  Like a balcony on the bigger room, there is a

25  glass that you can see each other -- in front where the patio

Page 456

1    or the porch area, you can see each other through the glass.

2    Q    All right.  So let me show you -- can we look at 604,

3    page 7, again?  How about Government Exhibit 107?  Why don't

4    we just head there.

5              You are talking about a patio that surrounds the

6    second level?

7    A    Yes, but I -- when I look at this picture, looking at

8    the size of the room it doesn't seem like it reflects the

9    second half -- the last house, I am sorry.  The last house.

10   But I don't exactly recall.  I don't remember.

11   Q    Let me back up a little bit and ask a couple of

12   questions, okay.

13             You talked about a balcony that surrounds the second

14   floor dormitory.

15   A    Yes.

16   Q    And to get into that second floor dormitory, you have to

17   be out on a balcony?

18   A    Yes.

19   Q    And there's a single entry from that balcony into the

20   dormitory?

21   A    Yes.  In that room there's a door, and there's only one

22   passage to go into that room.

23   Q    When you go in the entryway, was there a fellow who

24   slept there named Mott?

25             THE INTERPRETER:  Counsel, can you repeat the

1    question?

2    Q    BY MS. MAXFIELD:  When you come right into the entry,

3    right off the balcony in the dormitory area, was there a

4    fellow who slept there named Mott?

5    A    A fellow named Mott.  I don't remember him too well.

6    Q    Do you remember if there was someone who slept right

7    near the entry to protect the entryway?

8    A    Perhaps, I do not remember about that point.  However,

9    mostly, according to what I remember and with my ways of

10   going in and out, I hardly see anybody waiting there at that

11   entry clearly.

12   Q    Do you remember a man named Mott?

13   A    Yes, I recall -- I remember a person named Mott.

14   Q    And did Mott sleep up on the second floor?

15   A    Yes.  Yeah.  Mott also sleep on the second level, yes.

16   Q    But Mott did not sleep in that big dormitory area that

17   you are talking about?

18   A    Yes.  Yes, I think if I can go back to what I can

19   remember now, there might be three rooms.  The one, you know,

20   there's the small room, my room, and then that area where

21   there's a patio-porch area.

22         And the bedroom that's right next to the passage to

23   that big -- the other big room, is like -- can sleep about

24   three -- three to four people at the most, but it's a small

25   room.

Page 458

1    Q    You did not sleep in the little room?

2    A    I did not sleep in the little room.

3    Q    In the first -- this new room that we're talking about,

4    was there a bunk set up right by the door?

5    A    Yes, there is bunk beds.

6    Q    And is that where Mott slept?

7    A    I saw Mott and his friend, and maybe another person, but

8    I don't remember their names because they all the new people.

9    And I mostly -- I go in and out -- I come and go through the

10   provinces, and I don't stay there all the time.

11   Q    I understand.  When the other doors were locked, were

12   the entries into this main dormitory also locked?

13   A    I don't recall exactly.  Mostly sometimes it's locked,

14   and sometimes it's not.  If it is locked, it's in delay --

15   the hours that were locked was not the regular scheduled

16   hours, much later.  Because the people who protect the doors,

17   they spend time studying.

18            So when they are into their studying, they lock the

19   door at a later time.  I do not know whether Mott was the one

20   who's in charge of holding the keys.  I just know that Sambo

21   is the one in charge of the keys most of the times.

22   Q    But the keys that we're talking about fit the front gate

23   going into the compound?

24   A    Yes.

25   Q    Those same keys fit the door into the building on the

Page 459

1   ground level?

2   A    Yes.  Because it's in a key ring.

3   Q    And then Sambo would have also had keys to go into that

4   dormitory once the doors were locked at night?

5   A    Yes.

6   Q    And do you recall that those doors were locked at night

7   at the same time as the lights went out?

8   A    Like I said, mostly the person guards the door.  They

9   are busy, so it's always at a later time.  However, most of

10  us around 10:00 or 9:30, we request that the lights be turned

11  off -- or we ask the lights be turned off because we're tired

12  and want to go to sleep.  Yes.

13  Q    But we agree that Mott guarded that door?

14  A    I do not know whether Mott has -- I do not know whether

15  Mott -- do I not know whether Mott's role is to guard the

16  door.  I just know he has a room next to it.

17       MS. MAXFIELD:  I have nothing further, thank you.

18       The COURT:  Any redirect?

19       MR. SWEET:  Your Honor, thank you.  The government

20  has no further questions for this witness.

21       THE COURT:  Thank you very much, sir.  You are free

22  to go.  Appreciate your time.

23       THE WITNESS:  May I step down now?

24       THE COURT:  Yes, you may.

25       MS. BRITSCH:  We will be using the same translator

Page 460

1    for the next witness.  Does she need a break, or are we good

2    to continue?

3            THE INTERPRETER:  I am fine, but when you ask a

4    question, give me a chance to drink something.

5            MS. BRITSCH:  The United States calls CC XXXXXX,

6    please.

7            Your Honor, may we have one minute before the

8    witness comes?

9            THE COURT:  Yes.  Folks, if you want to stretch in

10   place, that's fine.

11           Sir, if you would like to step up to the witness

12   stand.  Go ahead and remain standing for just a moment.

13   Ms. Pew is going to swear you to tell the truth.

14

15                        CC XXXXXX,

16   produced as a witness, having been first duly sworn, was

17   examined and testified as follows:

18           THE WITNESS:  Yes.

19           COURT CLERK:  Please be seated.  State your name for

20   the record, spelling your first and last.

21           THE WITNESS:  My name is CC X, C-C-X-X -- and

22   nickname.  CC XXXXXX, C-C-X-X, X-X-X-X.

23           MR. WEINERMAN:  Judge, could we have Mr. CC X speak

24   into the microphone?

25           THE COURT:  Sir, there's a microphone in front of

Page 461

1    you.  If you could move up towards it, we would appreciate

2    it.

3              THE WITNESS:  Yes.

4              MS. BRITSCH:  The other translator is available if

5    the testimony goes on too long, and we need to switch.  Thank

6    you.

7         (NOTE:  Unless otherwise indicated, all answers

8    represented by "A" and "THE WITNESS" will be answers given by

9    the witness through the interpreter after translation.)

10

11                  DIRECT EXAMINATION

12    BY MS. BRITSCH:

13    Q    Good morning, CC X.

14    A    Yes.

15    Q    How old are you?

16    A    19 years old.

17    Q    And when is your birthday?

18    A    The month of the XXXXX, the XXXX, 1998, the year.

19    Q    I am going to ask you to take a look at Government's

20    Exhibit 153.  It will be on the screen to your left.  Do you

21    recognize this?

22    A    Yes.

23    Q    And is that your passport?

24    A    Yes.

25    Q    And the birth date on the passport says XXXXXX, 1998.

DIRECT EXAMINATION - CC XXXXXX

Page 462

1   Do you see that?

2   A    Yes.

3   Q    Is that birth date correct?

4   A    Yes.

5   Q    So your birthday is XXXXXX, 1998?

6   A    Yes.

7   Q    Thank you.  And CC X, where are you from?

8   A    I live in Prey Veng.

9   Q    Is that a province in Cambodia?

10  A    Yes.

11  Q    And do you have a family in Prey Veng?

12  A    Have.

13  Q    And who are the members of your family?

14  A    My mom.

15  Q    Do you have any brothers or sisters?

16  A    Yes.

17  Q    How many?

18  A    Four.

19  Q    And are you the youngest, or the oldest, or somewhere in

20  the middle?

21  A    I have the youngest, and then after the youngest it's I.

22  Q    And do you have a father, CC X, in Cambodia?

23  A    I have; however, he left us since we were small.

24  Q    And do you live in Prey Veng now, CC X?

25  A    Yes.

Page 463

1  Q    And are you studying something there?  You can take a

2  minute, CC X.  There's some water there.

3           Are you okay, CC X?

4  A    Yes.

5  Q    And if you need a break, just let me know, okay?  Can

6  you tell me if you are studying in Prey Veng right now?

7  A    No.

8  Q    Were you studying to be an auto mechanic?

9  A    Yes.

10  Q    And where is that?

11  A    In Phnom Penh.

12  Q    And CC X, what do you do for fun?

13  A    Kickballs.

14  Q    Do you like to play volleyball, too?

15  A    Yes.

16  Q    And what about soccer?

17           MR. WEINERMAN:  Objection; relevancy.

18           THE COURT:  Overruled.  Let's just have some basic

19  questions before --

20           THE WITNESS:  I like it.

21  Q    BY MS. BRITSCH:  CC X, did you ever live in a place

22  called Hope Transition Center?

23  A    Yes.

24  Q    Was that in Phnom Penh, Cambodia?

25  A    Yes.

Page 464

1   Q    How old were you when you started living there?

2   A    12 years old.

3   Q    How did you end up living at Hope Transition Center?

4   A    At first I meet him in my town.

5   Q    And when you say "him," who are you referring to?

6   A    Daniel.

7   Q    Is that Daniel Johnson?

8   A    Yes.

9   Q    You said you met him in your town.  Is that Prey Veng?

10  A    Yes.

11  Q    What were you doing at that time when you met him?

12  A    I was helping someone work on a bathroom.

13  Q    And at some point did you move to Phnom Penh with Daniel

14  Johnson?

15  A    Yes.

16  Q    And that was at Hope Transition Center?

17  A    Yes.

18  Q    I am going to ask you to look at a few photos, please.

19  First is Government's Exhibit 27.

20       MS. BRITSCH:  And, Your Honor, these are about five

21  photos.  I don't believe defense has any objection to them.

22       THE COURT:  They will be published.

23                  (**EXHIBIT 27, 28, RECEIVED**.)

24  Q    BY MS. BRITSCH:  Do you recognize this photo, CC X?

25  A    Yes.

DIRECT EXAMINATION - CC XXXXXX

Page 465

1    Q    Is that you?

2    A    Yes.

3    Q    Do you remember where that photo was taken?

4    A    The first house.

5    Q    Is that the first house of Hope Transition Center?

6    A    Yes.

7    Q    And about how old are you in this photo?

8    A    12.

9    Q    Would you please look at Government Exhibit 28?  Is that

10   also you?

11   A    Yes.

12   Q    Where was that photo taken?

13   A    In the second home.

14   Q    And that's the second home of Hope Transition Center?

15   A    Yes.

16   Q    And Government Exhibit 29, is that also you?

17   A    Yes.

18   Q    And who is with you in that photo?

19   A    Younger.

20   Q    Do you know that person's name?

21   A    Yes.

22   Q    What is his name?

23   A    Khachai.

24   Q    And where was that photo taken?

25   A    At a beach -- at an ocean.

Page 466

1   Q    And was that taken during the time you were living at

2   Hope Transition Center?

3   A    Yes.

4   Q    Government Exhibit 30, please.  Is that you?

5   A    Yes.

6   Q    What is going on in this photo?

7   A    Baptism.

8   Q    And who is baptizing you?

9   A    The pastor.

10  Q    And was this -- did this baptism happen while you were

11  living at Hope Transition Center?

12  A    Yes.

13  Q    Do you recognize anyone else in this photo?

14  A    Yes.

15  Q    Can you tell us who?

16  A    Daniel.

17  Q    And can you touch the screen -- if you touch it, it will

18  make a mark where Daniel is, please?

19  A    (Complies.)

20  Q    Do you know the names of anyone else in this photo?

21  A    I don't recall.

22  Q    And Government Exhibit 31, please.  Is that you?

23  A    Yes.

24  Q    And is that Christmastime?

25  A    Yes.

DIRECT EXAMINATION - CC XXXXXX

Page 467

1  Q    Who are the presents from that you are holding?

2  A    It's from Daniel.

3  Q    And do you know where this photo was taken?

4  A    Perhaps it was the second -- the second home.

5  Q    So you mentioned the first and second home of Hope

6  Transition Center.  How many homes did you live at?

7  A    Three.

8  Q    I am going to ask you to take a look at Government

9  Exhibit 271, please.  Do you recognize that?

10  A    Yes.

11  Q    And is that one of the homes of Hope Transition Center?

12  A    The first house.

13  Q    And Government Exhibit 272, please.  Do you recognize

14  that one?

15  A    Yes.

16  Q    Which location is that?

17  A    The second home.

18  Q    And Government Exhibit 139, please.  What about that

19  one?

20  A    The third house.

21  Q    And have you described that house as being near Sansam

22  Kosal?

23  A    Yes.

24  Q    Is that spelled S-A-N-S-A-M, K-O-S-A-L?

25  A    Yes.

Page 468

1    Q    You said you lived at all three of these locations?

2    A    Yes.

3    Q    And were you living at the third location when Daniel

4    Johnson was arrested?

5    A    Yes.

6    Q    What kinds of things did you do when you were living at

7    Hope Transition Center?

8    A    At that time, after the problem occurred?

9    Q    No, let's go back to when you first moved there.  So

10   before the problem occurred, what kinds of things did you do

11   every day?

12   A    I don't remember.

13   Q    Did you go to school, for example?

14   A    Yes.

15   Q    Did you do chores around the house?

16   A    Yes.

17   Q    What kinds of things did you do for fun with the other

18   boys?

19   A    Playing, run around, and we would climb up a tree to

20   pick mangoes and eat.

21   Q    Did people from the United States ever visit Hope

22   Transition Center?

23   A    Yes.

24   Q    And was that a fun time?

25   A    Fun.

DIRECT EXAMINATION - CC XXXXXX

Page 469

1   Q    Now, CC X, I want to ask you about the time period

2   between August 2012 and December 2013.  Were you living at

3   Hope Transition Center during that time?

4   A    Yes.

5   Q    And was that at the third location?

6   A    Yes.

7   Q    Now, I would like to ask you about some things that

8   happened there that you told the FBI about, okay?

9   A    Yes.

10  Q    Did you ever spend time in Daniel Johnson's bedroom when

11  you were at that third location?

12  A    Yes.

13  Q    What kinds of things did you do in his bedroom?

14  A    Perhaps, I forgot.

15  Q    Well, you don't have to tell me everything you did in

16  his bedroom.  Can you give me an example?  Did you ever watch

17  TV in his bedroom?

18  A    Have.

19  Q    Did you ever hang out with other boys in his bedroom?

20  A    Yes.

21  Q    And who are some of those other boys?

22  A    I don't remember.

23  Q    Did you ever give Daniel Johnson a massage in his

24  bedroom?

25  A    Yes.

Page 470

1   Q    And where would Daniel be when you gave him that

2   massage?

3   A    In the bedroom.

4   Q    And where in the bedroom would he be?  Would he be

5   standing up or sitting down somewhere?

6   A    Sleeping.

7   Q    Would he be on a bed?

8   A    Yes.

9   Q    And what would Daniel wear when you gave him a massage?

10  A    He's wearing underwear or boxer or brief.

11  Q    Was he wearing anything else?

12  A    No.

13  Q    And what part of Daniel's body did you massage?

14  A    The whole entire body, all of it.

15  Q    Did you ever touch Daniel Johnson's penis?

16  A    Have.

17  Q    Can you tell me about that?

18  A    At that time he asked me for a massage.

19  Q    Did he ask you to touch his penis?

20  A    Yes.

21         MR. WEINERMAN:  Judge, I am sorry to interrupt, but

22  can we ask the witness to speak into the microphone again?

23         THE COURT:  Yes.

24         MR. WEINERMAN:  Thank you.

25  Q    BY MS. BRITSCH:  Thank you, CC X.  So you said that

DIRECT EXAMINATION - CC XXXXXX

Page 471

1   Daniel asked you to touch his penis; is that correct?

2   A   Yes.

3   Q   What part of your body did he ask you to touch his penis

4   with?

5   A   Hand.

6   Q   And was the skin of your hand on the skin of his penis?

7          MR. WEINERMAN:  Objection; leading.

8          THE COURT:  Overruled.

9          THE WITNESS:  Yes.

10  Q   BY MS. BRITSCH:  Did Daniel Johnson ever ejaculate when

11  you did that?

12  A   Came.

13  Q   So Daniel Johnson came?

14  A   Yes.

15  Q   Did you ever touch Daniel Johnson's penis with another

16  part of your body?

17  A   Repeat, please.

18  Q   Did you ever touch Daniel Johnson's penis with another

19  part of your body?

20  A   Not yet.

21  Q   Did that happen later, though?

22  A   Yes.

23  Q   Is that still at the third location?

24  A   Yes.

25  Q   Can you tell us about that?

Page 472

1   A    Yes.

2   Q    How did that happen?

3   A    At that time he asked me to go to the room.

4   Q    And then what happened?

5   A    And he asked for a massage.

6   Q    What happened next?

7   A    Afterward he asked -- I don't -- I don't remember.

8   Q    So after he asked you to give him a massage, can you

9   remember what happened next?

10  A    I don't remember; however, I already told you once

11  already.

12  Q    You did, and I am sorry.  I know this is hard to talk

13  about it.  But we need you to explain it one last time here

14  in this courtroom.  Can you do that for us?

15  A    Sometime I forgot.  Can you just read the words, what I

16  said already?  You know, my transcript.

17  Q    We can't, CC X.  We need you to tell us here now.

18          THE COURT:  Counsel, I don't mean to intervene, but

19  if you ask a more direct question like, Did you have oral sex

20  with Mr. Johnson, we might get an answer.

21          THE WITNESS:  Uh-huh.  Uh-huh.

22          MS. BRITSCH:  Thank you, Your Honor.

23  Q    BY MS. BRITSCH:  Did Daniel Johnson ever put his penis

24  in your mouth?

25  A    Did.

Page 473

1   Q    And did you ever put your penis in Daniel Johnson's
2   mouth?
3   A    No.
4   Q    When he put his penis in your mouth, did he ejaculate?
5   A    Came.
6   Q    Did Daniel Johnson ever put his penis into your butt?
7   A    Did.
8   Q    How did that feel when he did that?
9   A    Pain.
10  Q    Did Daniel Johnson put anything on his penis before he
11  put his penis into your butt?
12  A    Put.
13  Q    And what did he put on his penis?
14  A    It's like Allay.
15  Q    Is that a brand of lotion?
16  A    Yes.
17  Q    And did his penis penetrate your anus?
18  A    Penetrated.
19  Q    And about how many times did this happen?
20  A    Many.
21  Q    And how many times did Daniel Johnson put his penis in
22  your mouth?
23  A    Many times.
24  Q    Did all of this happen in Daniel Johnson's bedroom at
25  the third location?

Page 474

1  A    Yes.

2  Q    Did Daniel ever give you money after he did these things

3  to you?

4  A    Did.

5  Q    And did he ever give you gifts after he did these things

6  to you?

7  A    Did.

8  Q    What kinds of gifts did he give you?

9  A    Like iPad, iPort.

10 Q    And do you mean iPod?

11 A    Yes, iPod.

12 Q    So Daniel Johnson gave you an iPod?

13 A    Yes.

14 Q    Was anyone else around when Daniel Johnson did these

15 things to you?

16 A    No.

17 Q    How did you feel when these things happened to you?

18 A    Sometimes very difficult.

19 Q    So you felt difficult?

20 A    Difficult.

21 Q    Before Daniel was arrested, did you ever tell anyone

22 what Daniel was doing to you?

23 A    No.

24 Q    Why not?

25 A    Ashamed.

Page 475

1   Q    Any other reasons?

2   A    Nothing except for shame.

3   Q    Did Daniel Johnson ever apologize when he did these

4   things to you?

5   A    Did.

6   Q    What did he say to you?

7   A    He apologized.

8   Q    Do you remember the words he used?

9   A    Yes.

10  Q    What were those words?

11  A    "I am sorry."

12  Q    Now, CC X, I know you have talked to a lot of people

13  since Daniel's arrest.  And you didn't always tell them

14  everything you told us today?

15  A    Yes.

16  Q    When you were first asked about sexual abuse by Daniel

17  Johnson, did you tell the Cambodian National Police

18  everything that he did to you?

19  A    No.  However, yes, but I did tell them that he touched

20  my sex organ.

21  Q    And why didn't you tell them about the other things he

22  had done to you?

23  A    Because I am embarrassed.

24  Q    I am going to ask you to take a look at some more

25  photos, if that's okay.

Page 476

1    A    Yes.

2         MS. BRITSCH:  And, Your Honor, these are photos from

3    the day of the arrest.  They are not any of the photos that

4    the defense has lodged an objection to, so I believe they can

5    be published.

6         MR. WEINERMAN:  I don't think we have one, but I am

7    not sure which photos we're going to see.  So if I have one,

8    I will let you know.

9         MS. BRITSCH:  Government Exhibit 88, please.

10   Q    BY MS. BRITSCH:  Do you recognize this photo, CC X?

11   A    Yes.

12   Q    And do you see yourself in that photo?

13   A    Yes.

14   Q    Can you put a mark on the screen where you are sitting,

15   please?

16        A JUROR:  Are we supposed to see this?

17        THE COURT:  Not quite yet.

18        MR. WEINERMAN:  No objections.

19        THE COURT:  It will be published.

20              **(EXHIBIT 88 RECEIVED.)**

21   Q    BY MS. BRITSCH:  Do you remember when this photo was

22   taken, CC X?

23   A    When the problem happened.

24   Q    And when you say the problem, are you referring to

25   Daniel Johnson's arrest?

Page 477

1    A    Yes.

2    Q    And where was this photo taken?

3    A    On top of the house, at the house.

4    Q    And do you remember if this photo was taken before or

5    after you talked to the Cambodian National Police?

6    A    Before.

7            MS. BRITSCH:  Government Exhibit 106, please.

8            MR. WEINERMAN:  No objection.

9            THE COURT:  Received.

10                   (EXHIBIT 106 RECEIVED.)

11   Q    BY MS. BRITSCH:  Do you recognize this photo?

12   A    Yes.

13   Q    And who is that?

14   A    Me.

15   Q    Is that the same day of the arrest?

16   A    Yes.

17   Q    And do you remember what is going on in this photo?

18   A    This is a time when they asked us questions.

19           MS. BRITSCH:  Government Exhibit 103, please.

20   Q    BY MS. BRITSCH:  Do you recognize this photo, CC X?

21   A    Yes.

22   Q    And who is this in photo?

23   A    There's police and I.

24   Q    Is that you with the your head in your hand?

25           MS. BRITSCH:  Your Honor, I haven't heard an

Page 478

1    objection from defense.  May I publish these?

2              MR. WEINERMAN:  I am sorry.  No objection.

3              THE COURT:  It will be published.

4                      (EXHIBIT 103 RECEIVED.)

5    Q    BY MS. BRITSCH:  Sorry, CC X.  Is that you with your

6    head in your hand?

7    A    Yes.

8    Q    And who are the people around you?

9    A    There are police.

10   Q    And that's the day of the arrest?

11   A    Yes.

12             MS. BRITSCH:  Government Exhibit 112, please.

13             MR. WEINERMAN:  No objection.

14             THE COURT:  It will be received.

15                      (EXHIBIT 112 RECEIVED.)

16   Q    BY MS. BRITSCH:  Is that you in this photo?

17   A    Yes.

18   Q    Are you the taller one?

19   A    Yes.

20   Q    And who is that with you?

21   A    Luka.

22   Q    Do you remember when this photo was taken?

23   A    Don't remember.  However, perhaps it's around the time

24   of the problem.

25   Q    Do you know where the photo was taken?

Page 479

1   A    At the third house.

2         MS. BRITSCH:  And Government Exhibit 113, please.  I

3   don't hear an objection from the defense.  May we publish?

4         MR. WEINERMAN:  I have no objection.

5         THE COURT:  It will be received.

6                    (**EXHIBIT 113 RECEIVED**.)

7   Q    BY MS. BRITSCH:  Is this photo taken in the same place

8   as the previous photo, CC X?

9   A    Yes.

10  Q    And do you know when this photo was taken?

11  A    When there was the incident.

12  Q    And is the incident the arrest of Daniel Johnson?

13  A    Yes.

14  Q    Do you remember what time of day it was when this photo

15  was taken?

16  A    Night.

17  Q    And who are the three people in that photo?

18  A    It's I, LS X and Nick.

19  Q    And is the person towards the front of the photo, do you

20  know who that is?

21  A    It is the woman police.

22  Q    And do you remember what was happening when this photo

23  was taken?

24  A    I don't know.

25  Q    Now, you said that you told the Cambodian National

Page 480

1    Police that Daniel Johnson touched your sex organ; is that

2    correct?

3    A    Yes.

4    Q    And was that the day of the arrest that you told them

5    that?

6    A    Yes.  However, in the morning.

7    Q    Did you later say that Daniel Johnson had never touched

8    you?

9    A    Yes.

10   Q    Was that the truth or a lie?

11   A    A lie.

12   Q    And why did you tell that lie at that time?

13   A    Because I don't want them to ask me too many questions.

14   Q    Was there any other reason you said Daniel didn't touch

15   you at that time?

16   A    Because if I say that, they are going to ask me the same

17   thing over and over and over again.

18   Q    And did you tell that lie after you visited Daniel

19   Johnson in jail?

20        MR. WEINERMAN:  Objection; assumes facts not in

21   evidence, whether he visited him in the first place.

22        THE COURT:  Overruled.  We can establish that with a

23   follow-up question.

24        THE WITNESS:  True.

25   Q    BY MS. BRITSCH:  So you visited Daniel Johnson in jail

Page 481

1  in Cambodia; is that correct?

2  A    Yes.

3  Q    And how did he look in jail?

4  A    When he was in jail?

5  Q    Yes.

6  A    Skinny.

7  Q    And how did he act when you visited him?

8  A    Gentle.

9  Q    Did he apologize to you?

10 A    Asked.

11 Q    I am sorry, I don't understand your answer.  Did he

12 apologize to you, when you saw him in jail?

13 A    Can you please repeat it?

14 Q    When you visited Daniel Johnson in jail, did he ever

15 tell you, I am sorry?

16 A    Yes.  Did.

17 Q    And around this time, were you communicating with Daniel

18 Johnson on Facebook?

19 A    No, but I did spoke with him on the telephone.

20 Q    Did you ever talk to Daniel Johnson on Facebook?

21 A    I don't know.

22 Q    If I showed you some Facebook messages with Daniel

23 Johnson, would that help your memory as to whether you

24 communicated with him on Facebook yes?

25 A    Yes.

Page 482

1      MS. BRITSCH:  Your Honor, may I show the witness

2  what's been marked for identification as Government's

3  Exhibit 274?

4      THE COURT:  Yes.

5  Q   BY MS. BRITSCH:  Can you see that on your screen, CC X?

6  CC X, if you will read it silently to yourself, and then let

7  me know if that refreshes your memory as to ever speaking on

8  Facebook with Daniel Johnson?

9      THE WITNESS:  Can you read it?

10 Q   BY MS. BRITSCH:  I can't read it to you now, CC X.

11     MS. BRITSCH:  But may the interpreter interpret it

12 for him?

13     THE COURT:  Yes, please.  Translate the English,

14 please.

15     (Interpreter Translating Facebook posts.)

16     THE WITNESS:  Are you talking about Facebook then?

17 Q   BY MS. BRITSCH:  I am sorry.  I may have confused you by

18 using the words "spoke on Facebook".

19 A   I did not create this Facebook, because I was young.

20 Perhaps Daniel created it for me.

21 Q   So did Daniel Johnson create you a Facebook account?

22 A   Yes.

23 Q   And was that in the name CC XXXXXXXXX?

24 A   Yes.

25 Q   And was that when you were living at Hope Transition

DIRECT EXAMINATION - CC XXXXXX

Page 483

1   Center?

2   A    Yes.

3   Q    And do you recognize the Facebook in front of you as the

4   account, CC XXXXXXXXX?

5   A    Yes.

6   Q    And do you recognize the messages between CC XXXXXXXXX

7   and Daniel Johnson in that exhibit?

8   A    Yes.

9          MS. BRITSCH:  Your Honor, at this time I would move

10  to admit Government Exhibit 274.

11                  (**EXHIBIT 274 OFFERED**.)

12          THE COURT:  Any objection?  It will be received.

13          MR. WEINERMAN:  No, Judge, other than that, no.

14                  (**EXHIBIT 274 RECEIVED**.)

15  Q    BY MS. BRITSCH:  Can we please turn to page 2 of that

16  exhibit.

17          MS. BRITSCH:  And, Your Honor, I am not sure if this

18  has been published, but if not, may we publish it, please?

19          THE COURT:  It will be published.  And I'm sorry,

20  for the court reporter if it was over objection, it will be

21  received.

22          COURT REPORTER:  Thank you, Judge.

23  Q    BY MS. BRITSCH:  On page 2 of this exhibit, CC X, do you

24  see the message that says, Author, Daniel Johnson, Miss you

25  my son.  Hope you are doing okay.

DIRECT EXAMINATION - CC XXXXXX

Page 484

1   A    Yes.

2   Q    And is that message dated December 18, 2013?

3   A    Yes.

4   Q    And above that message, do you see where there's a photo

5   of a moto?

6   A    Yes.

7   Q    Do you see the message that is authored by Daniel

8   Johnson that says, You want moto like this, question mark?

9   A    Yes.

10  Q    Is that message dated December 3rd, 2013?

11  A    I see.

12  Q    Can we please turn to the next page of this exhibit?  Do

13  you see the message at the top that is authored by Daniel

14  Johnson that says, Hope to see you soon.  If I don't have

15  problem here next week, I will go to USA and hope 4 or

16  5 months can come back.  Pray for that.

17  A    Yes.

18  Q    Is that dated January 6, 2014?

19  A    Yes.

20  Q    Do you see the next message authored by Daniel Johnson?

21       MR. WEINERMAN:  Could I ask a quick question in aid

22  of objection?

23       THE COURT:  Yes.

24       MR. WEINERMAN:  Mr. CC X, do you recall receiving

25  any of the these messages?

DIRECT EXAMINATION - CC XXXXXX

Page 485

1           THE WITNESS:  Remember.

2           MR. WEINERMAN:  You remember receiving those

3    messages?

4           THE WITNESS:  Yes.  But I don't know on what day.

5           MR. WEINERMAN:  Thank you.

6    Q   BY MS. BRITSCH:  But do you see the date there,

7    January 6, 2014?

8           THE COURT:  The exhibit is in evidence.  The date is

9    there.  It speaks for itself.  I don't need him to confirm

10   every --

11          MS. BRITSCH:  Certainly, Your Honor.

12   Q   BY MS. BRITSCH:  That's okay, CC X.  I will move on.

13          Do you see the next message from Daniel Johnson that

14   says, I know they lie to you, I am sorry they do that to you.

15   Hope to see you soon.  Love you and miss you.

16   A   I see.

17   Q   And I am going to direct your attention to the bottom,

18   the second-to-last message.  It's authored by Daniel Johnson

19   and says, Miss you very much.  Your mom says she wants you to

20   go back to the court with a different lawyer and answer

21   again.  After you go back, you should be free.  Then send me

22   your number, okay.  Love you son.

23   A   I see.

24   Q   And then if we can turn to the next page, please.

25          MR. WEINERMAN:  Can I ask another question in aid of

Page 486

1    objection?

2          THE COURT:  You may.

3          MR. WEINERMAN:  This last message that was just read

4    to you by the interpreter, do you remember receiving it on

5    January 19, 2014?

6          THE WITNESS:  Did.

7          MR. WEINERMAN:  Thank you.

8          THE WITNESS:  But --

9          THE COURT:  We have not -- I am sorry, go ahead.

10          THE WITNESS:  But I didn't play.

11          MR. WEINERMAN:  Say that again.  I didn't hear the

12    interpreter.

13          THE WITNESS:  I did not play.  I mean, I did not

14    respond back.

15          MR. WEINERMAN:  You received it, but you didn't

16    reply?

17          THE WITNESS:  Yes.

18          MR. WEINERMAN:  Thank you.

19          THE COURT:  It's 11:00.  I think the court reporter

20    and the translator would like a break.  So folks, take a

21    brief morning break for 10 or 15 minutes.

22                          (JURY OUT.)

23                          (Brief recess taken from 10:52 a.m.

24                           to 11:12 a.m.)

25                          (JURY IN.)

1       THE COURT:  Please be seated.  Counsel, if you will

2   continue.

3       MS. BRITSCH:  Thank you, Your Honor.

4   Q   BY MS. BRITSCH:  Just a few more questions from me,

5   CC X.

6   A   Yes.

7   Q   Can you please take a look at page 8 of Government's

8   Exhibit 274, please.

9   A   The pages are not marked here.

10  Q   I apologize.  It's the page that looks like this, CC X

11  (indicating).

12      MS. BRITSCH:  Has it been published, Your Honor?

13      THE COURT:  Over objection, I am receiving it.

14  Q   BY MS. BRITSCH:  Do you see that photo, CC X?

15  A   See.

16  Q   If you please turn to page 12, and it will show up on

17  that screen for you to the left.  And page 13, please, and

18  page 14, please.

19      Do you see the message below the photo on page 14

20  that says, Miss you son so much.  I love you.

21  A   See.

22  Q   Now, CC X, after Daniel Johnson was arrested, did you

23  ever talk to Calvey and Lindsay Alderson about what he had

24  done to you?

25  A   Yes.

Page 488

1   Q    What did you tell them Daniel Johnson had done to you?

2   A    Perhaps, I forgot.

3   Q    You forgot what you told them?

4   A    Yes.  Because it's been a long time.

5   Q    I understand.  Did they take a video of what you told

6   them?

7   A    Perhaps.

8   Q    And are Calvey and Lindsay Alderson Americans who had

9   visited the orphanage?

10  A    Yes, they are the ones who support me.

11  Q    They are your sponsors?

12  A    Yes.

13  Q    Did you later talk to a woman from the FBI that was

14  named Martha?

15  A    Talking to in Prey Veng or here?

16  Q    In Prey Veng?

17  A    Yes.

18  Q    Do you remember that interview?

19  A    Yes.

20  Q    And do you remember telling Martha that Daniel had

21  touched your penis?

22  A    Yes.

23  Q    Did you tell Martha about the other things Daniel had

24  done to you?

25  A    No.

Page 489

1   Q    Why not?

2   A    Because shame.

3   Q    And did you later speak to a woman from the FBI who is

4   named Janetta, Janetta in Phnom Penh?

5   A    I remember.

6   Q    Did you tell Janetta about the things Daniel Johnson had

7   done to you?

8   A    Did.

9   Q    And did you tell her about all of the things he did to

10  you, the things you told us today?

11  A    Did.

12  Q    And was that last year, in March 2017?

13  A    Yes.

14       MS. BRITSCH:  Thank you, CC X.  No further

15  questions, Your Honor.

16       THE COURT:  I am going to have Mr. Johnson's

17  attorneys ask you some questions, now.

18

19                    CROSS EXAMINATION

20  BY MR. WEINERMAN:

21  Q    Is it all right if I call you CC X?

22  A    Yes.

23  Q    So CC X, you were with Mr. Johnson for approximately

24  four years before he was arrested?

25  A    Yes.

Page 490

1  Q    And he did much to help you during that time?

2  A    Yes.

3  Q    He sent you to school?

4  A    Yes.

5  Q    And in Cambodia school is not free, correct?

6  A    Free.

7  Q    So you don't have to pay teachers to attend school in

8  Cambodia?

9  A    Yes.  Because it's an organization, they don't take

10 money.

11 Q    So you don't have to pay the teachers?

12 A    Yes.

13 Q    But Daniel made sure you went to school?

14 A    Yes.

15 Q    And did Daniel help you learn English?

16 A    Yes, I did went to school, also, at the big school

17 learning English.

18 Q    And did Daniel help your family with problems, did he?

19 A    He did.

20 Q    Your mother had a medical problem?

21 A    Yes.

22 Q    When she was pregnant?

23 A    Yes.

24 Q    Daniel took her to the hospital?

25 A    Yes.

CROSS EXAMINATION - CC XXXXXX

Page 491

1   Q    And did Daniel help your mother start a farm?

2   A    I don't know.

3   Q    A farm on her property in Prey Veng?

4   A    Don't know.

5   Q    Did Daniel's ministry help build a well on your mother's

6   property?

7   A    Yes.

8   Q    You have seen the well?

9   A    Where?  What well?  Where at?

10  Q    The well on your mother's property?

11  A    Oh, yes.  Yes.

12  Q    Did you help build that?

13  A    I don't know.

14  Q    You don't remember one way or the other whether you

15  helped build the well?

16  A    Maybe not.

17  Q    Did Daniel encourage you to go to the university, to

18  study long enough so you could be admitted to a university in

19  Cambodia?

20  A    Yes.

21  Q    I would like to show you Defendant's Exhibit 602.

22       MR. WEINERMAN:  This has already been admitted so it

23  can be published.

24       THE COURT:  It can be published, yes.

25  Q    BY MR. WEINERMAN:  Do you recognize that as the first

CROSS EXAMINATION - CC XXXXXX

Page 492

1   place you lived?

2   A    Yes.

3   Q    That was -- was there a man living there for

4   approximately three years named Pilot?

5   A    No, not three years.

6   Q    Was there a man named Pilot living there part of the

7   time you lived there?

8   A    Yes.

9   Q    And he lived there with his wife?

10  A    Yes.

11  Q    And Pilot and his wife took care of the kids who lived

12  there?

13  A    Yes.

14  Q    And Daniel Johnson lived there as well, during that

15  time?

16  A    Yes.

17  Q    And then one day Pilot and his wife left?

18  A    Yes.

19  Q    And they were no longer taking care of the kids?

20  A    Yes.

21  Q    And is that when Daniel Johnson started taking care of

22  the kids?

23  A    Yes.

24  Q    And this location is also where the Coffee House

25  Ministry took place?

CROSS EXAMINATION - CC XXXXXX

Page 493

1   A    Yes.

2   Q    And did you participate in the Coffee House Ministry?

3   A    Yes, participated.

4   Q    And in things like -- I am sorry.  I am sorry.

5   A    It was a very good thing, they are helping kids, you

6   know, kids that has no food.

7   Q    So kids from the city, Phnom Penh?

8   A    Yes.

9   Q    They had no food, and they would -- and they would come

10  to the Coffee House Ministry to be fed?

11  A    Yes.

12  Q    I want to show you a few more pictures, Exhibit 602,

13  page 5.  Does that look like the inside of the building of

14  the first house?

15  A    Yes.

16  Q    And would you -- you are not in this photograph,

17  correct?

18  A    Yes.

19  Q    But you participated in activities like studying and

20  Bible study where you would sit around the table and talk?

21  A    Not on that table.  Most of the time it's on the floor.

22  Q    But what would they do on the table?

23  A    I think it's for regular education, and drawing and

24  things like that.

25  Q    Did you ever do that?

CROSS EXAMINATION - CC XXXXXX

Page 494

1    A    No, because I was young.

2    Q    So how about Exhibit 602, page 4, is that one of the

3    classrooms at the Coffee House Ministry?

4    A    At that time, but I have not been there yet.

5    Q    Have you ever been in this room before?

6    A    No.

7    Q    Next, would be 602, page 16.  Is this the courtyard of

8    the Coffee House Ministry building?

9    A    Yes.

10   Q    And this is a typical event that Daniel's ministry would

11   run at the Coffee House Ministry?

12   A    Yes.

13   Q    People are singing?

14   A    Yes.

15   Q    And there's some -- the upper part of the photograph,

16   there's some musicians, at least one musician, playing the

17   guitar?

18   A    Yes, I see.

19   Q    And you have attended events like this?

20   A    Yes, I have.

21   Q    Exhibit 602, page 14, is this one of the programs where

22   they fed kids from the city?

23   A    Yes.

24   Q    And you have attended events like that?

25   A    Yes.

CROSS EXAMINATION - CC XXXXXX

Page 495

1  Q   Exhibit 602, page 13, these are people cooking food for
2  the kids?
3  A   Yes.
4  Q   Did you get to eat the food, as well?
5  A   I did.
6  Q   Was the food good?
7  A   Yes.
8  Q   Did you ever cook?
9  A   No.
10 Q   All right.  Not much different than America, I guess.
11 A   Yes.
12 Q   Exhibit 116, page 84 --
13          COURT REPORTER:  I'm sorry, give me that number
14 again.
15 Q   BY MR. WEINERMAN:  I'm sorry, I messed up that number.
16 I'm sorry.  It's Exhibit 611, page 84, do you recognize this
17 as a well that Daniel helped build somewhere in Cambodia?
18 A   Correct, but I was not there at that time.
19 Q   You were there for some of the wells, but not all of the
20 wells?
21 A   Yes.
22 Q   Exhibit 616, page 52, do you recognize this church --
23 it's not up yet, sorry.  So while we're putting that up, you
24 come from Prey Veng, correct?
25 A   Yes.

Page 496

1   Q    And that's in the countryside?

2   A    Yes.

3   Q    About two to three hours away from Phnom Penh?

4   A    If you are driving, it's two hours, or an hour and a

5   half.

6   Q    So is it true that Daniel's ministry built a number of

7   things in Prey Veng?

8   A    Yes.

9   Q    They built a church?

10  A    Yes.

11  Q    Did you help with any of the work?

12  A    Helped.

13  Q    Did you help with any of the chores in building the

14  church?

15  A    Yes.

16  Q    Showing you the exhibit, does that look like the church?

17  A    This is the church, but the other side, no.

18  Q    I am sorry.  The last part?

19  A    The other side, no.

20  Q    What do you mean by the other side?

21  A    I try and say there's -- this side is one side, and

22  there's another side to the right side of it.

23  Q    That's not in the photograph, the one in the right side?

24  A    Yes.

25  Q    This is the church in Prey Veng that you helped build?

CROSS EXAMINATION - CC XXXXXX

Page 497

1   A    Yes.

2   Q    Exhibit 616, page 56, do you recognize this as the

3   church and the church grounds?

4   A    Yes.

5   Q    And finally, Exhibit 615, page 48.  And is that another

6   view of the church?

7   A    Yes.

8   Q    And did you go to services at the church?

9   A    I did.

10  Q    With other kids from Hope Transition Center?

11  A    Yes.

12  Q    Were -- we're getting back to when you were living at

13  Hope Transition Center, at all three locations --

14  A    Yes.

15  Q    -- and there were rules?

16  A    Yes.

17  Q    And if kids broke the rules, they would be punished?

18  A    Yes.

19  Q    And Daniel was strict?

20  A    Yes.

21  Q    And he sometimes would hit kids who broke the rules?

22  A    When the kid does wrong, usually he slapped them in the

23  face, but the big ones only.

24  Q    Did that ever happen to you?

25  A    I have stand and watched the wall.

Page 498

1    Q    I am sorry.  Would the interpreter repeat the answer?

2           THE INTERPRETER:  "I have stand and watched the

3    wall."

4    Q    BY MR. WEINERMAN:  So you had to stand in the corner for

5    a few minutes if you broke the rules?

6    A    Half an hour, or 20 minutes.

7    Q    And you had to stand still?

8    A    Yes.

9    Q    Did Daniel ever do anything more than make you stand in

10   the corner?

11   A    No.  No, because I was young.

12   Q    When Daniel was arrested in 2013, you were 16 years old?

13   A    Around maybe around 15 or 16 years old.

14   Q    So I want to ask you some questions now about the day

15   Daniel was arrested.

16   A    Yes.

17   Q    And that's the same day you were interviewed by the

18   Cambodian police?

19   A    Yes.

20   Q    So the police came to Hope Transition Center in the

21   morning?

22   A    Yes.

23   Q    And they arrested Daniel and took him away?

24   A    Yes.

25   Q    And then if we could publish Government Exhibit 88, and

Page 499

1  this was you and other boys waiting to be questioned by the
2  police?
3  A    Yes.
4  Q    And there's a man standing in the back watching you and
5  the others?
6  A    Yes.
7  Q    And is that someone from the Cambodian police?
8  A    Perhaps.
9  Q    Well, he was someone from the authorities, correct?
10 A    Yes.
11 Q    He was telling you and the other boys who are sitting
12 that they had to wait?
13 A    Maybe.
14 Q    Did this man in the back tell you that you had to sit
15 there and wait?
16 A    Don't know.
17 Q    Were you free to get up and walk away, and go wherever
18 you wanted to?
19 A    No.
20 Q    You had to sit there and wait, correct?
21 A    Yes.
22 Q    Do you know why this man put so many of you in what
23 looks like a fairly small sitting area?
24 A    I don't know.
25 Q    You don't know, or you don't remember?

CROSS EXAMINATION - CC XXXXXX

Page 500

1   A   Don't remember.

2   Q   Are you scared of the Cambodian police?

3   A   Scared.

4   Q   They have a bad reputation, don't they?

5   A   Yeah.  They have bad attitude, in general.  No good.

6   Q   Aggressive?

7   A   Yes.

8   Q   Mean?

9   A   Yes.

10  Q   Dishonest?

11  A   Not honest.

12  Q   Not honest?

13  A   Yes.

14  Q   You can get in trouble if you don't do what they want

15  you to do, correct?

16  A   Correct.

17  Q   And you can get into trouble if you don't say what they

18  want you to say?

19  A   Yes.

20  Q   So on the day Daniel was arrested you made a statement

21  to the police?

22  A   Yes.

23  Q   And they asked you questions about Daniel?

24  A   Yes.

25  Q   And you were scared?

CROSS EXAMINATION - CC XXXXXX

Page 501

1   A    Yes.

2   Q    And you told them that Daniel touched you?

3   A    Yes.

4   Q    And you believed that is what they wanted you to say?

5   A    Yes.

6   Q    That --

7   A    But --

8   Q    But -- go ahead.

9   A    Yes.  I was scared so I said -- I told a lie, because I

10  don't want to have problems, you know, messy problems.

11  Q    So you also said later, when you were talking to the FBI

12  about a year later, that you were in a panic because of the

13  police being there?

14  A    Fear.

15          MR. WEINERMAN:  Could we publish Government

16  Exhibit 106, please.

17  Q    BY MR. WEINERMAN:  So this is a photograph of you being

18  questioned?

19  A    Yes.

20  Q    And all the other people who are questioning you are off

21  to the side, not in the photograph?

22  A    Yes.

23  Q    You look tired?

24  A    Yes.

25  Q    You looked uncomfortable there?

CROSS EXAMINATION - CC XXXXXX

Page 502

1   A    Yes.

2           MR. WEINERMAN:   Could we look at Government

3   Exhibit 103.

4   Q    BY MR. WEINERMAN:   That is another photograph of you

5   being questioned by the police?

6   A    Yes.

7   Q    Could you touch the screen where you are sitting?

8   A    (Complies.)

9   Q    So there were three people talking to you, or at least

10  listening to you?

11  A    Listening and asking, and ask again and again and again

12  and again, over and over again.

13  Q    Making you feel uncomfortable?

14  A    Yes.

15  Q    And afraid?

16  A    Yes.

17  Q    And the man who is actually sitting down, facing you, do

18  you know who that is?

19  A    Perhaps it's a police agent, but I don't know who he is.

20  Q    Was he asking you a lot of questions?

21  A    Many.

22  Q    Many?

23  A    But --

24  Q    But --

25  A    Yeah.   The words -- the questioning words is the same

1  words over and over and over and over again.

2  Q    So next I would like to ask you about a conversation

3  that you had with an investigator for Daniel Johnson.  Do you

4  remember talking to an investigator for Daniel Johnson in

5  Cambodia two different times?

6  A    Yes.

7  Q    So let me, before I get to the dates, you talked to the

8  Cambodian National Police on the day Daniel was arrested?

9  A    Yes.

10 Q    And then you talked to FBI Martha on November 9, 2014,

11 about what Daniel had done to you?

12 A    Yes.

13 Q    And you told her that Daniel Johnson touched you?

14 A    Yes.  Yes.

15 Q    And you gave FBI Martha that statement at the office of

16 the Cambodian National Police?

17 A    Yes.

18 Q    And there were some people there listening or watching

19 from the Cambodian National Police?

20 A    Yes, perhaps watching the video.

21 Q    And everything you said was being recorded on the video?

22 A    Yes.

23 Q    And you were concerned that if you told FBI Martha

24 different than what you told the Cambodian police, you could

25 get into trouble?

Page 504

1  A    Yes.

2  Q    And you could get into trouble with the Cambodian

3  police?

4  A    Yes.

5  Q    So now I want to talk about your meeting with the

6  investigator Martine?

7  A    Yes.

8  Q    And that was after you talked to the Cambodian National

9  Police, right?

10  A    Yes.

11  Q    And after you talked to FBI Martha at the Cambodian

12  National Police office in Phnom Penh?

13  A    Yes.

14  Q    And you talked to Martine around June of 2015, or

15  approximately six, seven months after you talked to FBI

16  Martha?

17  A    Please repeat.

18  Q    I was afraid you were going to ask that.  I will ask it

19  in smaller shots.

20        So you talked to Martine, around June 18, 2015,

21  correct?

22  A    Don't remember, but, yes, I did get to speak to --

23  Q    Let me ask you this way:  You talked to Martine about

24  six months after you talked to FBI Martha?

25  A    Yes.

CROSS EXAMINATION - CC XXXXXX

Page 505

1   Q   And you talked to him in your home town in Prey Veng?

2   A   Yes, at the province.

3   Q   And it was near the church?

4   A   Who?

5   Q   When you talked to Martine, did you talk to him in Prey

6   Veng near the church?

7   A   Who's Martine?

8   Q   Let me back up.  I will get to that.  Martine is the

9   person, the investigator, who represents Daniel Johnson.

10  A   Oh.

11  Q   Remember him?

12  A   Maybe I remember.

13          MR. WEINERMAN:  I can't hear, I am sorry.

14          THE INTERPRETER:  "Maybe I remember."

15  Q   BY MR. WEINERMAN:  He was tall?

16  A   Old.

17  Q   By your standards, probably, yes.

18  A   Yes.

19  Q   Skinny?

20  A   Yes.

21  Q   And your mother was close by when you talked to Martine?

22  A   No.  No.

23  Q   She wasn't in the vicinity?

24  A   No.

25  Q   But he told you that you didn't have to talk to him if

Page 506

1   you didn't want to?

2   A    Yes.

3   Q    And that you could leave at any time?

4   A    Yes.

5   Q    But you agreed to talk to him?

6   A    Yes.

7   Q    And was it a friendly atmosphere?

8   A    Yes.

9   Q    You weren't scared like you were when you talked to the

10  Cambodian police?

11  A    Yes.

12  Q    And he asked you about what happened when you talked to

13  the Cambodian police on the day Daniel was arrested?

14  A    Yes.

15  Q    And you told Martine that you felt pressured to talk to

16  the Cambodian police.

17  A    Yes.

18  Q    And you felt like you had no choice, you had to talk to

19  them?

20  A    Yes.  Yes.

21  Q    And you told Martine you didn't tell the truth?

22  A    Yes.

23  Q    And you just told them what you believed they wanted to

24  hear?

25  A    Yes.

CROSS EXAMINATION - CC XXXXXX

Page 507

1      THE WITNESS:  May I go to the bathroom, please?

2      THE COURT:  Yes.  I think we're right at noon, so we

3  will go ahead and break for the next hour and 15 minutes, and

4  we will resume at that time.  Thank you.

5      Folks, one more thing, I do want to make sure you

6  jurors do not look up any -- don't look up newspaper articles

7  locally.  There is an article I noticed in one of the media

8  publications and I want to make sure you are not looking at

9  that.  So do not read any local newspaper websites or local

10 papers.  Thank you.

11     (JURY OUT.)

12                 (Proceedings adjourned at

13                 11:59 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

DEBORAH COOK, OFFICIAL COURT REPORTER
deborah_cook@ord.uscourts.gov

Page 508

1    STATE OF OREGON   )

2                            )ss

3    COUNTY OF YAMHILL)

4

5              I, Deborah L. Cook, RPR, Certified Shorthand

6    Reporter in and for the State of Oregon, hereby certify that

7    at said time and place I reported in stenotype all testimony

8    adduced and other oral proceedings had in the foregoing

9    hearing; that thereafter my notes were transcribed by

10   computer-aided transcription by me personally; and that the

11   foregoing transcript contains a full, true and correct record

12   of such testimony adduced and other oral proceedings had, and

13   of the whole thereof.

14              Witness my hand and seal at Dundee, Oregon, this

15   4th day of May, 2018.

16

17   /s/ Deborah L. Cook

18   _____
     DEBORAH L. COOK, RPR
19   Certified Shorthand Reporter
     OREGON CSR #04-0389
20   CALIFORNIA CSR #12886
     WASHINGTON CSR #2992
21

22

23

24

25