Page 983

1          UNITED STATES DISTRICT COURT

2              DISTRICT OF OREGON

3     THE HON. MICHAEL J. McSHANE, JUDGE PRESIDING

4

5    UNITED STATES OF AMERICA,     )

6              Government,     )

7        vs.                    )  No. 6:14-cr-00482-MC-1

8    DANIEL STEPHEN JOHNSON,     )

9              Defendant.     )

10

11         REPORTER'S TRANSCRIPT OF PROCEEDINGS

12                  EUGENE, OREGON

13               Wednesday, May 9, 2018

14              Day 8, Afternoon Session

15            Volume 7P - PAGES 983 - 1025

16

17

18

19

20

21              DEBORAH COOK, RPR, CSR.
                OFFICIAL COURT REPORTER
22               405 East 8th Avenue
                     Suite 2130
23              Eugene, Oregon 97401
                   (541) 431-4162
24          Deborah_Cook@ord.uscourts.gov

25

1    APPEARANCES OF COUNSEL:

2    FOR THE GOVERNMENT:

3    Jeffrey S. Sweet
     United States Attorney's Office
4    405 E. Eighth Avenue, Suite 2400
     Eugene, OR 97401
5    541-465-6771
     Fax: 541-465-6917
6    Email: Jeff.sweet@usdoj.gov

7    Lauren E. Britsch
     U.S. Department of Justice
8    Criminal Division
     1400 New York Ave NW, 6th Floor
9    Washington, DC 20530
     202-514-2220
10   Fax: 202-514-1793
     Email: Lauren.britsch@usdoj.gov
11
     Ravi Sinha
12   United States Attorney's Office
     1000 SW Third Ave, Suite 600
13   Portland, OR 97204
     503-727-1014
14   Fax: 503-727-1117
     Email: Ravi.sinha@usdoj.gov
15
     FOR THE DEFENDANT:
16
     Craig E. Weinerman
17   Office of the Federal Public Defender
     859 Willamette Street, Suite 200
18   Eugene, OR 97401
     541-465-6937
19   Fax: 541-465-6975
     Email: Craig_weinerman@fd.org
20
     Lisa A. Maxfield
21   Pacific Northwest Law LLP
     1255 NW Ninth Avenue, No. 11
22   Portland, OR 97209
     (503) 222-2661
23   Fax: (503) 222-2864
     Email: Lamaxfield@pacificnwlaw.com
24
                      * * * * *
25

Page 985

1                        WITNESS INDEX

2                                              Page/Line

3              FOR THE GOVERNMENT
                  FORREST SCHOENING                986    11
4          CROSS EXAMINATION                       986    14
           BY MR. WEINERMAN:
5
                  RT XXXXXXXXX                      992     9
6          DIRECT EXAMINATION                       992    21
           BY MS. BRITSCH
7          CROSS EXAMINATION                       1005    20
           BY MS. MAXFIELD:
8          REDIRECT EXAMINATION                     1013    21
           BY MS. BRITSCH
9
                  KARLA COMSTOCK                    1018    14
10         DIRECT EXAMINATION                       1018    18
           BY MR. SWEET
11

12

13
                  EXHIBIT OFFERED INDEX
14
           EXHIBIT 152 OFFERED                      994    13
15         EXHIBIT POSTER BOARD OFFERED             998    11
           EXHIBIT 42 OFFERED                       1015    15
16
                  EXHIBIT RECEIVED INDEX
17         EXHIBIT 210 RECEIVED                     986    22
           EXHIBIT 152 RECEIVED                     994    16
18         EXHIBIT POSTER BOARD RECEIVED            998    15
           EXHIBIT 42 RECEIVED                      1015    19
19                                                 1015    22

20

21

22

23

24

25

DEBORAH COOK, OFFICIAL COURT REPORTER
deborah_cook@ord.uscourts.gov

Cross Examination - Forrest Schoening

Page 986

PROCEEDINGS

1
PROCEEDINGS

2
Wednesday, May 9, 2018, at 1:18 p.m.

3

4       THE COURT:  Get the government's witness back on the

5  stand, and let's get the jury.

6                     (JURY IN.)

7       THE COURT:  Thank you, folks.  We will jump right

8  into cross-examination.

9       Go ahead, Counsel.

10

11                 FORREST SCHOENING,

12  produced as a witness, having been previously duly sworn, was

13  examined and testified as follows:

14

15                 CROSS EXAMINATION

16  BY MR. WEINERMAN:

17  Q   So could we bring up Government's Exhibit 210, the

18  passport of Mr. Johnson.  And I think this has been admitted,

19  but I will defer to Ms. Pew on that.

20       COURT CLERK:  Yes.

21       THE COURT:  If it hasn't, I will admit it.

22            **(EXHIBIT 210 RECEIVED.)**

23  Q   BY MR. WEINERMAN:  Now, we have to figure out what page

24  it was.  It's the page that had, I believe -- let's try the

25  date it was signed, which was April 13, 2010.  I am sorry, I

1    don't remember the page number.  It's the page that has the

2    occupation of Mr. Johnson.

3            MR. WEINERMAN:  Sorry, Judge, we're having trouble

4    finding the exact page.

5            THE COURT:  That's okay.

6    Q    BY MR. WEINERMAN:  Page 10 of Exhibit 210, Agent

7    Schoening, I believe you testified that that is part of the

8    passport package that you have submitted as an exhibit, or

9    the government has submitted as an exhibit.

10           Do you remember testifying about that?

11   A    Yes, I do, sir.

12   Q    And there's a place on there for Daniel Johnson's

13   occupation.  And what did he put down as his occupation?

14   It's very faint writing, so you may have to get closer to

15   look.

16   A    Yes, sir.

17   Q    Can you tell us what it says for occupation?

18   A    Missionary, sir.

19   Q    And now if we could put up 157, Government's Exhibit --

20   I believe you are familiar with this document?

21   A    Yes, sir.  When I reviewed it it wasn't highlighted that

22   like that.

23   Q    Right.  So when you reviewed it -- so since you obtained

24   this document, somebody has put in some highlighting,

25   correct?

Cross Examination - Forrest Schoening

Page 988

1   A    Yes, sir.

2   Q    Which color is the added highlighting?

3   A    I believe it's the green, but when I reviewed it I

4   printed it off a black and white printer.  But I don't

5   remember the green being there.

6   Q    So the yellow was there, and the red was there?

7   A    I can't recall.

8   Q    That's okay.  So this appears to be a roster of some

9   sort about different children who were residing at Hope

10  Transition Center, probably as of sometime in 2012?

11  A    I would agree to that, sir.

12  Q    And there's different categories.  The English name --

13  let me go with the categories.  So we have categories for

14  English name, correct?

15  A    Yes.

16  Q    And then the Khmer name?

17  A    Yes, sir.

18  Q    And then the gender of each child?

19  A    Yes, sir.

20  Q    And their birth place?

21  A    Yes, sir.

22  Q    And their date of birth?

23  A    Yes.

24  Q    Their age?

25  A    Yes.

Cross Examination - Forrest Schoening

Page 989

1  Q    When they approximately arrived at Hope Transition
2  Center?
3  A    Yes, sir.
4  Q    And then status, they have different categories for
5  status?
6  A    Yes, sir.
7  Q    And then the grade, I believe that's probably school
8  grade?
9  A    That's what I presumed, as well, sir.
10 Q    And then there's the last category, sponsors?
11 A    Yes, sir.
12 Q    So based on your knowledge of the investigation, there
13 were individuals, mainly in the United States, who sponsored
14 some of the kids, correct?
15 A    Yes, sir.
16 Q    And they made monthly contributions.  Is that what these
17 dollar amounts reflect?
18 A    I don't know if they were monthly or one time.  But yes,
19 some of them were definitely on a regular basis.
20 Q    So sponsors, that would be names of different sponsors,
21 correct?
22 A    Yes, sir.
23 Q    And some of them sponsored more than one child?
24 A    Yes, sir.
25 Q    Can we go to the second page of the exhibit.  Same

Cross Examination - Forrest Schoening

Page 990

1  thing, just not all the nice colors as page one, correct?

2  A    Yes, sir.

3  Q    And this document was found on one of the digital

4  devices, but you don't recall which one?

5  A    Yes, it was found on one of the digital devices, and no,

6  I don't recall which one.

7  Q    The last category of questions I want to ask you a

8  little bit about is this Performance Improvement Plan?

9  A    Yes.

10 Q    And I am not asking to embarrass you in any way, just

11 want to clarify some things.

12 A    Yes, sir.

13 Q    So the notice of Performance Improvement Plan was

14 submitted to you, I assume, by a supervisor?

15 A    Yes, sir.

16 Q    And it says, alleges, whatever language you want to use,

17 that between certain dates, your supervisors found your

18 performance at an unacceptable level, one of which applied to

19 the Daniel Johnson case; is that accurate?

20 A    Yes, sir.

21 Q    So I am only going to talk about that one.

22 A    Okay.

23 Q    So the criticism was in terms of the organizing,

24 planning, and coordinating; in other words, they felt your

25 performance was deficient in that particular area?

Cross Examination - Forrest Schoening

Page 991

1   A    Yes.

2   Q    And I think you indicated you fought that and disagreed

3   with it?

4   A    I disagreed with it, sir.  It turns out since it was not

5   considered a disciplinary action, I didn't really have any

6   recourse to fight it.

7   Q    So there was no administrative recourse; you couldn't

8   object?

9   A    Only insofar as I could talk to my boss about it, my

10  supervisor, and then the assistant special agent in charge,

11  and I went clear up to the special agent in charge.

12  Q    So you disagreed with the critique and they didn't

13  change their opinion about your performance; is that true?

14  A    Correct, sir.

15  Q    And they came up with a Performance Improvement Plan?

16  A    Yes, they did.

17  Q    And you agreed to it?

18  A    Yes.

19  Q    And that plan was implemented?

20  A    Yes, it was.

21  Q    In your opinion, did it improve your performance?

22  A    It improved the aspects that they were looking for me to

23  improve, yes, sir.

24       MR. WEINERMAN:  I have no further questions.

25       THE COURT:  Any redirect?

Page 992

```
1          MR. SWEET:  Nothing, sir.
2          THE COURT:  Agent, you are free to go.
3          MS. BRITSCH:  Your Honor, the government calls RT XX
4   XXXXXX.
5          THE COURT:  Mr. RT XX, if you would like to step up
6   to the witness stand, and if you would remain standing for
7   just a moment.  Ms. Pew is going to have you sworn in.
8
9                      RT XXXXXXXXX,
10  produced as a witness, having been first duly sworn, was
11  examined and testified as follows:
12
13          (NOTE:  Unless otherwise indicated, all answers
14  represented by "A" and "THE WITNESS" will be answers given by
15  the witness through the interpreter after translation.)
16          THE WITNESS:  I do.
17          COURT CLERK:  Please be seated.  State your name for
18  the record, spelling your first and last.
19          THE WITNESS:  My name is RT XXXXXXXXX, X-X-X-X-X-X,
20  RT XX, X-X-X-X-X.
21                      DIRECT EXAMINATION
22      BY MS. BRITSCH:
23  Q    May I call you RT XX today?
24  A    Yes.
25  Q    And RT XX, can you tell us where you are from, please?
```

Direct Examination - RT XXXXXXXXX

Page 993

1   A    I am from Cambodia.

2   Q    And were you born in the province area of Cambodia?

3   A    Yes.

4   Q    And which province is that?

5   A    Kratie.

6   Q    Is that spelled K-R-A-T-I-E?

7   A    Yes.

8   Q    Is that where you were born?

9   A    Yes.

10  Q    And have you ever been outside of Cambodia before you

11  traveled for trial?

12  A    No.

13  Q    Do you have brothers and sisters, RT XX?

14  A    I do.

15  Q    How many?

16  A    Five.

17  Q    And is one of those an older brother?

18  A    Yes.

19  Q    And what is your older brother's name?

20  A    LT XXXXXXX.

21  Q    And do you go to school in Cambodia?

22  A    Yes.

23  Q    What grade are you in?

24  A    11th.

25  Q    What do you study in school?

Direct Examination - RT XXXXXXXXX

Page 994

1 A   General and Khmer -- I mean, general education and

2 Khmer.

3 Q   How old are you, RT XX?

4 A   18.

5 Q   What is your birth date?

6 A   XXXXXXX, 2000.

7 Q   I am going to ask you to take a look at Government

8 Exhibit 152.  It will be on the screen to your left.  Just

9 give us one second, RT XX.  RT XX, is that your passport?

10 A   Yes.

11        MS. BRITSCH:  Your Honor, I move to admit Government

12 Exhibit 152, please.

13                    (**EXHIBIT 152 OFFERED**.)

14        MS. MAXFIELD:  No objection.

15        THE COURT:  It will be received.

16                    (**EXHIBIT 152 RECEIVED**.)

17 Q   BY MS. BRITSCH:  Do you see your birth date on that

18 exhibit?

19 A   Yes.

20        MS. BRITSCH:  And, Your Honor, now that it's

21 admitted, may it be published to the jury?

22        THE COURT:  Yes.

23 Q   BY MS. BRITSCH:  Does that show your birthday as

24 XXXXXXX, 2000?

25 A   Yes.

1  Q    RT XX, do you know a man named Daniel Johnson?

2  A    I do.

3  Q    And when did you first meet Mr. Daniel Johnson?

4  A    You mean the date?

5  Q    If you can't remember the date, about how old were you

6  when you met Mr. Daniel Johnson?

7  A    When -- probably when I was around eight or nine years

8  old.

9  Q    And did you meet Mr. Daniel Johnson through a man named

10  Pastor Sinai?

11  A    Yes.

12  Q    And at some point did you begin living at an

13  organization with Mr. Daniel Johnson?

14  A    Yes.

15  Q    And what was that organization called?

16  A    Hope Transition Center.

17  Q    And why did you move to Hope Transition Center?

18  A    Because of our poor living conditions.

19  Q    And had your father just passed away?

20  A    Yes.

21  Q    Did your older brother, LT XXXXXXX, move to Hope

22  Transition Center with you?

23  A    Yes.

24  Q    And about how old was he when you moved?

25  A    11, 12.

Page 996

1   Q    RT XX, I am going to ask you to look at a poster with a

2   couple of photos on it; is that okay?

3   A    Yes.

4   Q    Now, RT XX, do you recognize the photo under Location 1

5   of this poster?

6   A    I do.

7   Q    And what is that a photo of?

8   A    It is the first house that I -- a picture of the first

9   house that I lived.

10  Q    Is that where you lived with Mr. Daniel Johnson?

11  A    Yes.

12  Q    And what about the photo under Location 2?

13  A    That is the second house that we moved to.

14  Q    And did you live there with Mr. Daniel Johnson?

15  A    Yes.

16  Q    And what about the photo under Location 3?

17  A    That is the third house, from the second house.

18  Q    And is that where Mr. Daniel Johnson was arrested?

19  A    Yes.

20  Q    And were you living there at that time?

21  A    Yes.

22  Q    Now, RT XX, there are diagrams next to each photo; is

23  that correct?

24  A    Yes.

25  Q    I am going to ask you to take a look at those diagrams,

Direct Examination - RT XXXXXXXX

Page 997

1    if that's okay.

2          MS. BRITSCH:  Your Honor, the diagrams are small.

3    May the witness approach the poster?

4          THE COURT:  He can move to get closer.  That's fine.

5    Q   BY MS. BRITSCH:  RT XX, do you recognize the diagram

6    that is for the first location?

7    A   I do.

8    Q   And on that diagram, do you know where Mr. Daniel

9    Johnson's bedroom was?

10   A   Right here.

11         MS. BRITSCH:  Your Honor, may I make a mark where

12   the witness pointed?

13         THE COURT:  Yes.

14   Q   BY MS. BRITSCH:  RT XX, did I put a mark where you

15   identified Daniel Johnson's bedroom?

16   A   Yes.

17   Q   And now I understand for the second diagram, that

18   diagram is a bit confusing; is that correct?

19   A   Yes.

20   Q   Do you know where Daniel Johnson's bedroom is on that

21   second diagram?

22   A   If I look at the program, I can't tell.  But in the

23   picture, I know that his room was here (indicating).

24   Q   That's all right.  Do you recognize the diagram for the

25   third location?

Direct Examination - RT XXXXXXXXX

Page 998

1  A    I do.

2  Q    And can you point to where Mr. Daniel Johnson's bedroom

3  was at that location, please?

4  A    This one (indicating).

5  Q    And RT XX, did I put a mark where you identified Daniel

6  Johnson's bedroom?

7  A    Correct.

8  Q    Thank you, RT XX.

9         MS. BRITSCH:  Your Honor, at this time we move that

10  this poster be published to the jury.

11                   (**EXHIBIT POSTER BOARD OFFERED**.)

12         THE COURT:  Any objection?

13         MS. MAXFIELD:  No objection.

14         THE COURT:  It will be published.  Thank you.

15                   (**EXHIBIT POSTER BOARD RECEIVED**.)

16  Q    BY MS. BRITSCH:  And RT XX, I just have one more

17  question about this poster.  You said you didn't recognize

18  where Mr. Daniel Johnson's bedroom was on the diagram for the

19  second location?

20  A    According to the diagram, I don't understand it.  But

21  with the picture, I can.

22  Q    Now, I am going to point where you pointed on the

23  picture, and can you tell me if I am correct where Mr. Daniel

24  Johnson's bedroom is, please?  Did you say that Mr. Daniel

25  Johnson's bedroom was here?

Direct Examination - RT XXXXXXXX

Page 999

1  A    Yes.

2  Q    Thank you.  So RT XX, am I correct that you lived at all

3  three of these locations?

4  A    Yes.

5  Q    And did your brother, LT XXXXXXX, live there with you,

6  as well?

7  A    Yes.

8  Q    Were there several boys that lived at Mr. Daniel

9  Johnson's center?

10        THE INTERPRETER:  I am going to repeat the question.

11        THE WITNESS:  Yes.

12  Q    BY MS. BRITSCH:  And when you were living there, did you

13  find that Daniel Johnson gave different or better presents to

14  some boys, rather than others?

15  A    Yes.

16  Q    And who were the boys that you observed receiving better

17  or different gifts from Mr. Daniel Johnson?

18  A    Like SO XXX and others.

19  Q    Do you remember any of the other names?

20  A    Maybe not.

21  Q    That's okay.  So just SO XXX that you can remember now?

22  A    Yes.

23  Q    Did any of the boys ever sleep in Daniel Johnson's

24  bedroom?

25  A    Yes, and the person who lived with Daniel was Brother

Page 1000

1   SO XXX.

2   Q    And do you know if BT XX ever slept in Daniel Johnson's

3   bedroom?

4   A    For Brother BT XX, he used to previously.

5   Q    And was that at the first house?

6   A    Yes.

7   Q    RT XX, how was your relationship with Mr. Daniel

8   Johnson?

9   A    It was fine, regular, like two acquaintances.

10  Q    Did there ever come a time at the third house where

11  there was a problem between you and Mr. Daniel Johnson?

12  A    Yes.

13  Q    Can you tell me about that, please?

14  A    One day I went into his room, and he tried to use his

15  hand to grab my penis.

16  Q    And when he did that, did he try to go under your shorts

17  or on top of your shorts?

18  A    He tried to stick it in.

19  Q    And what did you do when Daniel Johnson tried to stick

20  his hand in your shorts?

21  A    I was trying to take his hand out.

22  Q    And how did you try to take his hand out?  Did you push

23  it away or touch his hand?

24  A    I pulled his hand out.

25  Q    And when you did that, how did Mr. Daniel Johnson react?

Page 1001

1   A    He behaved like he didn't like it.

2   Q    Did he say anything to you?

3   A    No.

4   Q    Did you say anything to him?

5   A    No.

6   Q    And about how old were you when this happened?

7   A    Not sure, but I think I was about 12, 13 years old.

8   Q    And you said this happened when you were in Mr. Daniel

9   Johnson's bedroom; is that correct?

10  A    Yes.

11  Q    What were you and Mr. Daniel Johnson doing at the time

12  he tried to touch your penis?

13  A    At that time, I was on the bed.

14  Q    Were you watching TV or playing games, or doing anything

15  like that?

16  A    I was watching TV.

17  Q    And when Daniel Johnson tried to touch your penis, how

18  did that make you feel?

19  A    I didn't like it.

20  Q    Were you angry?

21  A    A little bit.

22  Q    RT XX, did you talk to the Cambodia police or to people

23  from APLE when Daniel Johnson was arrested?

24  A    Yes.

25  Q    And at that time, why didn't you tell them that Daniel

1  Johnson had tried to touch your penis?

2  A    Well, because he did good thing to me, I had gratitude

3  to him, and also I didn't like the police.

4  Q    When you say you had gratitude towards him, was that for

5  the food and school and shelter you received at Hope

6  Transition Center?

7  A    Yes.

8  Q    And you also said you didn't like the police that were

9  talking to you at that time?

10  A    Correct.

11  Q    Were you afraid of them at all?

12  A    Some.

13  Q    And then when you first spoke to the FBI, why didn't you

14  tell them then that Daniel Johnson had touched your penis?

15  A    I was still think that -- well, I still thought that he

16  did a good thing for me.

17  Q    So you were still grateful for everything at Hope

18  Transition Center?

19  A    Yes.

20  Q    RT XX, after Mr. Johnson was arrested, did you visit him

21  in jail?

22  A    Yes.

23  Q    Did you also talk to him on Facebook?

24  A    Yes.

25  Q    Did you ever talk to him on the phone?

Page 1003

1  A    Yes.

2  Q    When you visited Mr. Johnson in jail, do you remember

3  him saying anything to you?

4  A    I don't remember.  When we met, we were just asking how

5  each of us were doing.

6  Q    After Mr. Johnson was arrested, did his brother, Gary

7  Johnson, send money to your brother, LT XXXXXXX?

8  A    Yes.

9  Q    And did you use some of that money for your school?

10  A    Yes.

11  Q    Did you also sometimes go to Western Union to pick up

12  that money?

13  A    Yes.  I went with my brother.

14  Q    And sometimes when you did go to Western Union, did you

15  use your brother, LT XXXXXXX's, ID to get the money?

16  A    Yes.

17  Q    And did you also talk to Gary Johnson, Daniel Johnson's

18  brother, on Facebook?

19  A    Yes.

20  Q    Was that after Mr. Daniel Johnson was arrested?

21  A    Yes.

22  Q    And RT XX, you mentioned in addition to visiting him in

23  jail and talking to him on the phone, you spoke to

24  Mr. Johnson himself on Facebook, correct?

25  A    Yes.

Page 1004

1  Q    I am going to show you just two exhibits of Facebook

2  messages.  If you could look at your screen on the left.  The

3  first is Government Exhibit 306, please.  If we could zoom in

4  on the top three sections, please.

5         And do you recognize the account, Daniel Johnson, on

6  this exhibit?

7  A    Yes.

8  Q    And the other user name is RT XXXX X-X, space, X-X-X-X?

9  A    Yes.

10 Q    Is that a name you used on Facebook at one point?

11 A    Yes.

12        MS. BRITSCH:  Your Honor, at this time I would move

13 for Government 306 to be admitted and published to the jury.

14        MS. MAXFIELD:  It's already admitted, Your Honor.

15        THE COURT:  It's received, and it will be published.

16 BY MS. BRITSCH:  RT XX, I am going to read two lines from

17 here, and if you could tell me if I am correct.

18        On May 21st, 2014, author Daniel Johnson, I will get

19 you iPod 6 when I am back.  But maybe three to four months.

20 But I not live in Phnom Penh.  Do you see that message,

21 RT XX?

22 A    Yes.

23 Q    And if we could please look at Government's Exhibit 285.

24 RT XX, did Daniel Johnson sometimes call you RT XX as a

25 nickname?

1  A    Yes.

2  Q    And do you see in this message that's what he's calling

3  you?

4  A    Yes.

5       MS. BRITSCH:  Your Honor, at this time I would move

6  to admit Government's Exhibit 285.

7       THE COURT:  I believe that it's in, and it can be

8  published.

9       MS. BRITSCH:  Can I ask that it be published?

10 Q    BY MS. BRITSCH:  Do you see the message on May 26, 2014,

11 author Daniel Johnson?

12 A    Yes.

13 Q    RT XX, please, when you hear someone speaking negative

14 and not speaking love from their heart, tell them they should

15 not be like that.  Jesus not want that, okay?

16 A    Yes.

17      MS. BRITSCH:  Nothing further, Your Honor.

18      THE COURT:  Any cross?

19      MS. MAXFIELD:  Yes, Your Honor.

20

21                    CROSS EXAMINATION

22      BY MS. MAXFIELD:

23 Q    Good afternoon, RT XX.  I am Lisa Maxfield, and I am one

24 of Daniel Johnson's lawyers.  I have a few questions for you.

25           You testified on direct that you used your brother's

Page 1006

1   Facebook account to exchange messages with Gary Johnson; is

2   that right?

3   A    Yes.

4   Q    And it's true when you were exchanging messages with

5   Gary Johnson, you were pretending that you were your brother?

6   A    Correct.  But in there, I was not the only one -- I mean

7   I did not do all of the chatting.  I was just chat -- to chat

8   just to ask him how he was doing.

9   Q    But when you did chat, you pretended to be someone you

10  were not; is that true?

11  A    Yes.

12  Q    And Gary Johnson was a sponsor for your brother?

13  A    Yes.

14  Q    And he had been a sponsor for your brother a long time

15  before Daniel Johnson was arrested; is that true?

16  A    No, I think that is incorrect.  He just sponsored after

17  D was in jail.

18  Q    Who would know the answer to that question better, you

19  or your brother?

20  A    I think it's me.

21  Q    You know better than your brother?

22  A    No, it's not that I know better.  When he was supported

23  or received a donation, he told me.  So I know just as much

24  as him.

25  Q    Now, you testified that Gary Johnson would send money to

Cross Examination - RT XXXXXXXXX

Page 1007

1   Western Union for your brother, and that you would go collect

2   that money; is that right?

3   A    Yes.  I went with my older brother.

4   Q    You didn't go with your brother, whose identification

5   you were using?

6            THE INTERPRETER:  Counsel, the interpreter did not

7   understand your question.

8            MS. MAXFIELD:  Let's ask a better question.  My bad.

9   Q    BY MS. MAXFIELD:  When you went to get the money, were

10  you with your brother, LT XXXXXXX?

11  A    Yes.

12  Q    And the money was intended for LT XXXXXXX?

13  A    Yes.

14  Q    But you told the prosecutor that you used your brother's

15  ID; is that right?

16  A    Yes, when I went to collect the money, I had to use his

17  ID before I could take out the money.

18  Q    Even though your brother was there?

19  A    Correct, because my brother couldn't collect the money.

20  He had to fill out the paper and sign it and everything, but

21  I had to go and collect it.

22  Q    You had to pretend that you were your brother and use

23  your brother's ID so that he could collect the money?

24  A    Oh, my brother went with me, and he signed the paper.

25  If he did not sign, I would not be able to collect the money.

1    Q    Well, we can leave this for a minute.  But I am confused

2    as to why you needed to use your brother's ID so that your

3    brother could collect the money?

4    A    Please ask the question again.  I am -- it's not clear.

5    Q    That's all right.  Let's move on.

6         You were interviewed by the Cambodian police just a

7    day or so after Mr. Johnson's arrest; is that right?

8    A    Yes.

9    Q    You were interviewed at the SPECA shelter?

10   A    Yes.

11   Q    And that was before you had any opportunity to talk to

12   Mr. Johnson in jail; is that right?

13   A    Can you repeat that, please?  Can you repeat the

14   question, please?

15   Q    You were interviewed by the Cambodian police on

16   December 11th of 2013, and the interview occurred before you

17   visited Mr. Johnson in jail?

18   A    Yes.

19   Q    And the Cambodian police asked you whether you had ever

20   been touched improperly at Hope Transition Center?

21   A    At that time, I answered no.

22   Q    You told them that you had been asked to massage him for

23   three to five minutes, but he did not touch your penis; is

24   that correct?

25   A    Can you repeat the question, please?

Page 1009

1   Q    Sure.  You told the Cambodian police that Daniel Johnson

2   asked you -- asked you to massage him for three to five

3   minutes, but he did not touch your penis?

4   A    Yes, correct.  At that time that's what I said.

5   Q    You were interviewed the next time, I think, in March of

6   2017 by the FBI.  Do you remember that interview?

7   A    I don't remember.

8   Q    Do you remember being interviewed by an FBI agent named

9   Janetta Michaels?

10  A    There was so many interviewers that I don't remember.

11  Q    Do you recall being in an interview that was video

12  recorded?

13  A    Yes.

14  Q    Every question and every answer was tape recorded or

15  video recorded?

16  A    Yes.

17  Q    And you were told at the beginning of the interview that

18  one of the rules of the interview, an important rule, was

19  that you only tell things that are true?

20  A    Yes.

21  Q    So you knew it was important to be truthful in that

22  interview?

23  A    Yes.

24  Q    And the FBI agent asked you what you told the Cambodian

25  police; isn't that true?

1   A    Yes.

2   Q    And you told the FBI, quote, I told the truth regarding

3   Daniel's good and bad behavior toward kids.  And when asked

4   what the not good or bad things were that you shared with the

5   Cambodian police, you said, quote, The bad things are not

6   many because when someone made a mistake, he would talk to

7   them at a quiet place, two or three people if there was an

8   interpreter, too.  So that they would know what to do.  I

9   don't know anymore than that.  For me, that's exactly what he

10  did to me.

11       That was the bad thing that you shared with the

12  Cambodian police; is that true?

13  A    Yes.

14  Q    You told the agent that you were telling her everything

15  you knew.  Quote, I speak the truth.  I also don't like to

16  lie.

17  A    Yes.

18  Q    And when she asked you, were you ever asked to sleep in

19  Daniel's room like any other kids, your response was, never?

20  A    Yes.

21  Q    You talked to her also about your treatment by the

22  Cambodian police; isn't that true?

23  A    Can you ask --

24       THE INTERPRETER:  Counsel, the interpreter cannot

25  translate the word "treat".  Can you switch the word?

Page 1011

1          MS. MAXFIELD:  Let's try a new question.

2          THE INTERPRETER:  Thank you.

3    Q    BY MS. MAXFIELD:  Do you remember the agent asking you,

4    did anyone ever ask you to say something that was not true?

5    A    I still don't understand your question.

6    Q    The FBI agent asked you, did anyone ever ask you to say

7    something that was not true?

8    A    No.

9    Q    Do you recall telling the agent, When he had the

10   problem, the police came down to interview each of us.  There

11   were a few police officers who were not convinced in what I

12   was saying.  They tried to give me the answers they wanted to

13   hear.

14         Do you recall saying that to the agent?

15   A    I remember.

16   Q    And the agent asked you, What did they want to hear?

17   And your answer was, I think what they want to hear from us

18   is something bad, or allegation.

19   A    Yes.

20   Q    And you told her that the police officer had done things

21   that they should not have done, correct?

22   A    Again, can you repeat that?

23   Q    Sure.  You told her that a few police officers had done

24   things that they should not have done?

25   A    Yes.

Cross Examination - RT XXXXXXXXX

Page 1012

1   Q    You told her that the Cambodian police yelled and did
2   not accept your answers, correct?
3   A    I don't remember.
4   Q    A few months later, you went to meet with a different
5   FBI agent, a male?  Do you remember that meeting?
6   A    I don't remember.
7   Q    Several of the people in this case have been asked to
8   meet with the FBI to get passports.  Do you remember that?
9   A    If you tell me the location, I might remember.
10  Q    Brooklyn Pizza?
11  A    Yes.
12  Q    So you went to a pizza parlor with some other folks in
13  this case who were getting passports; is that right?
14  A    No, it was not to go to get the passport, but to learn
15  how to apply for a passport.
16  Q    Had one of your friends invited you to that meeting?
17  A    Friend?
18  Q    Who invited you to the meeting?
19  A    The FBI agent.
20  Q    And the FBI wanted you to get a passport even though you
21  said that Mr. Johnson had done nothing wrong; is that right?
22  A    I am all confused.
23  Q    I understand.  Your last meeting with the FBI was in
24  January of this year, correct?
25  A    Yes.

Page 1013

1    Q    And it was then that you told this story of Mr. Johnson

2    trying to touch your penis, but not succeeding?

3    A    Yes.

4    Q    And at the end of that interview, the FBI asked you if

5    you had any questions for the FBI?

6    A    Yes.

7    Q    And you asked the FBI agent, you said, I have a question

8    related to scholarship.  You said that you wanted to talk to

9    the FBI about a scholarship to study in the United States of

10   America.

11   A    Yes.

12   Q    Shortly after that, did you change the introduction to

13   RT XX on your Facebook page?

14   A    Yes.

15   Q    And you noted for those who followed you that your

16   prayer now is to study abroad at Yale University; is that

17   right?

18   A    It was just one of my dreams to reach.

19         MS. MAXFIELD:  I have no further questions.  Thanks.

20         THE COURT:  Any redirect?

21         MS. BRITSCH:  Yes, Your Honor.

22                    REDIRECT EXAMINATION

23   BY MS. BRITSCH:

24   Q    Just a couple of questions, RT XX.  Defense counsel

25   asked you about how you told the FBI you had never slept in

Page 1014

1    Daniel Johnson's bedroom.

2    A    Yes.

3    Q    When Daniel Johnson tried to touch your penis, were you

4    sleeping in his bedroom or just watching TV in there?

5    A    I was on the bed, and I was watching TV.

6    Q    But you didn't sleep in there, correct?

7    A    I was just sitting on there.

8    Q    And was that at the third location of Hope Transition

9    Center?

10   A    Yes.

11   Q    Did Mr. Daniel Johnson ever try to touch you at the

12   first location?

13   A    No.

14   Q    Did he ever touch you at the second location?

15   A    No.

16   Q    Did Mr. Daniel Johnson try to engage in any other type

17   of sex with you?

18        THE INTERPRETER:  The interpreter just got stuck.

19   Q    BY MS. BRITSCH:  Did he ever try to engage in oral sex

20   with you?  Did he ever try to put his mouth on your penis?

21   A    No.

22   Q    Did he ever ask you to put your mouth on his penis?

23   A    No.

24   Q    Did he ever ask you to touch his penis?

25   A    No.

Redirect Examination - RT XXXXXXXX

Page 1015

1    Q    So you have told us about just one incident where he

2    tried to touch your penis; is that correct?

3    A    Yes.

4    Q    And is what you have told us about that the truth?

5    A    Yes.

6    Q    And RT XX, I am just going to ask you to look at three

7    more pictures, real quick.  Government Exhibit 42, please.

8    Is that you?

9    A    Yes.

10   Q    Was that taken while you were living at Hope Transition

11   Center?

12   A    Yes.

13         MS. BRITSCH:  Your Honor, move to admit this exhibit

14   and publish it to the jury, please.

15                    (**EXHIBIT 42 OFFERED**.)

16         MS. MAXFIELD:  No objection.

17         THE COURT:  42 will be received and published.  Can

18   you clarify which house he was living at?

19                    (**EXHIBIT 42 RECEIVED**.)

20   Q    BY MS. BRITSCH:  RT XX, do you know which location you

21   were living at when this photo was taken?

22   A    The first house.

23   Q    Government's Exhibit 43, please.  Is that you?

24   A    Yes.

25   Q    And do you know which location that was taken at?

Redirect Examination - RT XXXXXXXX

Page 1016

1   A    House No. 1.

2   Q    And do you know about how old you are in this photo?

3   A    9 or 10.  Not -- I am not sure.

4   Q    Was that soon after you moved to Hope Transition Center?

5   A    Maybe so.

6   Q    And Government Exhibit 44, please.  Do you know where

7   this photo was taken?

8   A    At the second house.

9   Q    Is that at Hope Transition Center?

10  A    Yes.

11  Q    Is that you?

12  A    Yes.

13           MS. BRITSCH:  No further questions, Your Honor.

14           THE COURT:  RT XX, thank you very much.  You are

15  free to go.  You are still under subpoena, so it's possible

16  you could be called back, but that's unlikely.

17           All right.  Our next witness.

18           MR. SWEET:  Thank you.  The government calls Karla

19  Comstock.

20           The witness stepped into another room for just a

21  second.

22           THE COURT:  Folks, let's talk about Federal Court.

23  A lot of times jurors ask what else do you do, because you

24  really only get to see this one little spot of what we do.

25           Most of my work is in the civil area, as opposed to

Page 1017

1   the criminal.  It's very different than State Court where

2   often -- I was a judge in Portland for many years.  And a

3   State Court judge, 80 percent of the work is criminal cases.

4   Here, 80 percent of my work is civil cases.

5           We deal primarily with cases that deal with the

6   Constitution, anything that is being asked to declare as

7   un-Constitutional behavior.  We deal with Federal Acts, the

8   Endangered Species Act, Americans with Disabilities Act, Fair

9   Debt Collection Practice Act.

10          We deal with certain acts that are created by

11  Congress.  So we deal a lot with discrimination cases.  We do

12  a lot with cases involving government action, like arrests or

13  searches, when people are suing, saying he was arrested

14  illegally, or searched illegally, or the arrest was overly

15  excessive in the type of force that was used.

16          We deal a lot with employment cases where people

17  have lost their jobs, and they were alleging they were let go

18  for discriminatory reasons, or they were working in a hostile

19  working environment.

20          And then we deal with cases where people are suing

21  each other and they live in different states.  So if the

22  controversy, the amount they are suing for is over $75,000,

23  and you are suing someone in another state you can come to

24  Federal Court.

25          So if you are suing the hospital here, Peace Health,

Page 1018

1  because it's a Vancouver corporation, the case can be moved

2  to Federal Court.  But if you are in Portland and suing

3  Portland Adventist, it would have to go to State Court

4  because everybody belongs in the same state.  So sometimes it

5  doesn't make a lot of sense.

6          So that's generally the kind of work we do.  Again,

7  we do much less criminal work.  Most of the criminal work has

8  to do with large amounts of drugs coming across state

9  borders, gun cases, those kinds of things.  Bank robberies,

10  because the banks are Federally insured.

11          And with that, we have another witness.

12  Ms. Comstock, you are still under oath so you can simply have

13  a seat.

14                    KARLA COMSTOCK,

15  produced as a witness, having been previously duly sworn, was

16  examined and testified as follows:

17

18                  DIRECT EXAMINATION

19      BY MR. SWEET:

20  Q    Good afternoon, Ms. Comstock.

21  A    Good afternoon.

22  Q    I have a few questions for you.  Ms. Comstock, are you

23  friends with BT XXXXXXX?

24  A    Yes.

25  Q    Did you become friends with him in Cambodia?

Direct Examination - Karla Comstock

1  A    Yes, I did.

2  Q    And once he came to the United States, did your

3  friendship continue?

4  A    Yes, it did.

5  Q    I would like to show you Exhibit 68, so I can remind

6  everybody who BT XXXXXXX is.  It that BT XX?

7         MR. SWEET:  And I'd ask that it be published.

8         THE COURT:  Yes.

9  Q    BY MR. SWEET:  Do you see a picture?

10 A    Not yet.  Yes.  That's BT XX.

11 Q    And did you see BT XX when you visited with him when he

12 was in Oregon?

13 A    Yes.

14 Q    I am not asking for a date, but do you recall when

15 Mr. Johnson was arrested in Cambodia?

16 A    Yes, I do.

17 Q    And shortly before that incident, were you visiting with

18 BT XXXXXXX?

19 A    Yes, he was down visiting.

20 Q    And was that -- were you with him and someone else at

21 that other person's house?

22 A    Yes, I was.

23 Q    And while you were there, did you all talk about Daniel

24 Johnson?

25 A    Yes, his -- yes, we did.

Page 1020

1   Q    And again, this was before Mr. Johnson's arrest?

2   A    Correct.

3   Q    As you talked about Mr. Johnson, what was BT XXXXXXX's

4   mood?

5   A    He suddenly broke down and started crying, and said he

6   was really scared of Daniel.

7   Q    Had you seen BT XX cry much before?

8   A    Only one other time.

9          MR. SWEET:  I have nothing further.

10         THE COURT:  Any cross?

11         MS. MAXFIELD:  Nothing.

12         THE COURT:  Ms. Comstock, thank you very much.  You

13  are free to go.

14         Next witness.

15         MR. SWEET:  The government has no further witnesses.

16         THE COURT:  So folks, what we're going to do for the

17  afternoon is to break.  There are obviously a lot of exhibits

18  that I am going to continue to go through with the attorneys

19  to clarify what are in evidence, and which aren't.  So we

20  will be working a little bit this afternoon.

21         Part of the way I have scheduled this case was

22  because both sides needed to know when to start calling their

23  witnesses, and it's sometimes unclear how long we're going to

24  go.

25         The defense case is not going to start until Monday.

Page 1021

1   So and I am a little unclear on -- I don't know if you are

2   not ready to answer this question, but do we know how many

3   days, in general, the defense case might last?

4           MR. WEINERMAN:  Not sure, yet, Judge.

5           THE COURT:  We will have more of a sense of that

6   shortly.  But we're going to, at this stage, break until

7   Monday morning at 9:00.  So that's a little bit longer than I

8   had initially thought, and maybe I would have rethought it in

9   retrospect but we do need to have witnesses have some

10  certainty as to when they need to fly in and get to Eugene.

11          So we're going to start Monday at 9:00, and again,

12  please do not talk about the case with others, or look up any

13  information.  And certainly if anything comes up in terms of

14  any emergencies, please call Ms. Pew right away.

15          With that, thank you.  You are on vacation for the

16  rest of the week.  See you on Monday.

17          (JURY OUT.)

18          THE COURT:  Please be seated.  So I assume the

19  parties spoke with Ms. Pew to make sure that we determine

20  which exhibits are in, and which aren't so that we can have

21  the government formally rest on Monday morning, don't you

22  think?  If there's any dispute over exhibits, I am around so

23  I am not going anywhere.  Is there anything else we need to

24  discuss?

25          MR. SINHA:  Your Honor, I am not sure where we are

Page 1022

1    in terms of the government submitting the unanimity

2    instruction for the Court's review.  And I think we were also

3    going to try to submit a joint limiting instruction with

4    regards to facts regarding the Cambodian case.

5         So I know we have submitted the latter, and I don't

6    believe we have talked to Mr. Johnson's attorneys, but we

7    will figure it out and submit those to the Court.

8         THE COURT:  Once I get those, I can get you a draft

9    of what we're giving.  There are a couple things I have

10   changed in the uniform instructions, nothing dramatic.

11   There's some that you requested that don't seem particularly

12   applicable, so I have pulled those out.  But we can talk

13   about whether I am missing something in terms of whether they

14   are necessary.

15        I did want to check on scheduling next week.

16   There's one thing that I can't move.  It's not until the

17   17th, on Thursday.  I need to be at the University to give a

18   presentation at 4:30.  So my guess is I would have to leave

19   here around by 4:00, if not a little bit earlier.  Other than

20   that, I don't think --

21        COURT CLERK:  We have a 1:00 on the 15th, Judge.

22        THE COURT:  1:00 on the 15th?  Which case is that?

23        COURT CLERK:  Roderick Wilson, it's a change of

24   plea.

25        THE COURT:  Any chance we can do it tomorrow or

Page 1023

1    Friday?

2           COURT CLERK:  I will see.

3           THE COURT:  If there's a transport issue, I don't

4    want to get in their way.

5           COURT CLERK:  I don't see a custody flag, but --

6    yeah.

7           THE COURT:  Anything else we need to discuss?

8           MR. WEINERMAN:  Judge, we have a couple of other

9    instructions I would like to submit to the Court.  When would

10   the Court like those?

11          THE COURT:  Depends on how long -- if your case is

12   one day, I would like them Friday.  If the case is going to

13   last a couple of days, we can wait until Monday.

14          MR. WEINERMAN:  We have some scheduling problems,

15   which I am going to see if we can rectify them and get people

16   here earlier than -- if necessary, earlier so we have some

17   continuity.  So for now, I will give the instructions to you

18   tomorrow.  There's only two.

19          THE COURT:  I will go over those and whatever the

20   government has.  I mean, I am happy to meet this week -- we

21   can meet on Friday if you want to go over instructions.  I

22   don't think there's really a lot of remarkable issues to

23   discuss on instructions.

24          I know the defense has asked for element

25   instructions, and I think I have already ruled on with regard

Page 1024

1  to the separate counts.  But if we need to, either side can

2  request some time on Friday where we can meet and talk about

3  instructions.

4         MR. WEINERMAN:  We're available, Judge.

5         THE COURT:  All right.  Then I hope all of you get a

6  little bit of a break.  Once again, I want to tell both sides

7  that I am impressed with the preparation and amount of work

8  you are putting into the case, and I know the jury

9  appreciates it as well.  So we will see everyone on Monday,

10  if not sooner.

11              (Proceedings concluded at 2:36 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 1025

1    STATE OF OREGON  )

2                     )ss

3    COUNTY OF YAMHILL)

4

5            I, Deborah L. Cook, RPR, Certified Shorthand

6    Reporter in and for the State of Oregon, hereby certify that

7    at said time and place I reported in stenotype all testimony

8    adduced and other oral proceedings had in the foregoing

9    hearing; that thereafter my notes were transcribed by

10   computer-aided transcription by me personally; and that the

11   foregoing transcript contains a full, true and correct record

12   of such testimony adduced and other oral proceedings had, and

13   of the whole thereof.

14           Witness my hand and seal at Dundee, Oregon, this

15   9th day of May, 2018.

16

17   /s/ Deborah L. Cook, RPR, CSR

18   _____
     DEBORAH L. COOK, RPR
19   Certified Shorthand Reporter
     OREGON CSR #04-0389
20   CALIFORNIA CSR #12886
     WASHINGTON CSR #2992
21

22

23

24

25