Page 1140

1          UNITED STATES DISTRICT COURT

2              DISTRICT OF OREGON

3     THE HON. MICHAEL J. McSHANE, JUDGE PRESIDING

4

5  UNITED STATES OF AMERICA,    )

6              Government,      )

7        vs.                    )  No. 6:14-cr-00482-MC-1

8  DANIEL STEPHEN JOHNSON,      )

9              Defendant.       )

10

11         REPORTER'S TRANSCRIPT OF PROCEEDINGS

12                 EUGENE, OREGON

13             Tuesday, May 15, 2018

14           Day 10, Morning and Afternoon

15           Volume 9 - PAGES 1140 - 1308

16

17

18

19

20

21             DEBORAH COOK, RPR, CSR
               OFFICIAL COURT REPORTER
22             405 East 8th Avenue
                  Suite 2130
23             Eugene, Oregon 97401
                 (541) 431-4162
24           Deborah_Cook@ord.uscourts.gov

25

Page 1141

1    APPEARANCES OF COUNSEL:

2    FOR THE GOVERNMENT:

3    Jeffrey S. Sweet
     United States Attorney's Office
4    405 E. Eighth Avenue, Suite 2400
     Eugene, OR 97401
5    541-465-6771
     Fax: 541-465-6917
6    Email: Jeff.sweet@usdoj.gov

7    Lauren E. Britsch
     U.S. Department of Justice
8    Criminal Division
     1400 New York Ave NW, 6th Floor
9    Washington, DC 20530
     202-514-2220
10   Fax: 202-514-1793
     Email: Lauren.britsch@usdoj.gov

11
     Ravi Sinha
12   United States Attorney's Office
     1000 SW Third Ave, Suite 600
13   Portland, OR 97204
     503-727-1014
14   Fax: 503-727-1117
     Email: Ravi.sinha@usdoj.gov

15
     FOR THE DEFENDANT:

16
     Craig E. Weinerman
17   Office of the Federal Public Defender
     859 Willamette Street, Suite 200
18   Eugene, OR 97401
     541-465-6937
19   Fax: 541-465-6975
     Email: Craig_weinerman@fd.org

20
     Lisa A. Maxfield
21   Pacific Northwest Law LLP
     1255 NW Ninth Avenue, No. 11
22   Portland, OR 97209
     (503) 222-2661
23   Fax: (503) 222-2864
     Email: Lamaxfield@pacificnwlaw.com

24
                        * * * * *

25

```
 1                         WITNESS INDEX

 2                                          Page/Line

 3        FOR THE DEFENSE:

 4            TRUDY JACOBSEN, PhD           1152    1
          DIRECT EXAMINATION               1152    10
 5        BY MR. WEINERMAN

 6


 7


 8        Defense Rests                    1178    16
          JURY INSTRUCTIONS                1185    18
 9        GOVERNMENT'S CLOSING ARGUMENT    1209    9
          DEFENSE CLOSING ARGUMENT         1239    19
10        REBUTTAL CLOSING ARGUMENT        1285    16

11
                      EXHIBIT OFFERED INDEX
12

13
                      EXHIBIT RECEIVED INDEX
14        EXHIBIT 277 RECEIVED             1182    3

15

16

17

18

19

20

21

22

23

24

25
```

Page 1143

PROCEEDINGS

Tuesday, May 15, 2018, at 9:14 a.m.

1

2

3

4         THE COURT:  Ready for the jury?

5         MR. WEINERMAN:  Judge, there's one thing to bring up

6    and that would be the jury instruction on page 27, which is

7    the elements of counts 1-6, and I think we worked it out.

8         THE COURT:  Go ahead.  I am sorry.

9         MR. WEINERMAN:  The column on nickname, we're asking

10   that that be removed.  I think the government is willing to

11   do that, and I've agreed just to put those names under name.

12   As the Court knows, the indictment does not name -- put the

13   real names of any of the alleged victims.  They identify them

14   by number.

15        So of course, we have no objection to their real

16   name being disclosed to the jury.  But since there's really

17   not been any evidence of nicknames, we feel there shouldn't

18   be a nickname column, but the name in the current nickname

19   column be put in the name column so there's no confusion.

20        THE COURT:  So more -- that's called an Anglicized

21   version of their names instead of their actual native name.

22        MR. WEINERMAN:  For example, for BT XXXXXXXX it

23   would just say under that, BT XX or BT XXXXXXX.  So ES XXXXX

24   XXX it would shift from the nickname column, ES XXX or

25   "ES XXX," because I think along the way witnesses have

DEBORAH COOK, OFFICIAL COURT REPORTER
deborah_cook@ord.uscourts.gov

Page 1144

1    referred to the alleged victims by the nickname, but not as a

2    nickname, necessarily.  And just the whole term "nickname"

3    has not come up, to my knowledge, during the trial.

4              THE COURT:  It's come up a number of times.  What is

5    the government's thought?

6              MR. SINHA:  Your Honor, my understanding of

7    Mr. Weinerman's proposal is basically to strike the word

8    "nickname" from the instruction and combine those two

9    columns, and we're fine with that.  We're just trying to make

10   sure the jury knows who each count is referring to.

11             THE COURT:  I don't think it's necessary.  We can --

12   I know the witnesses have actually used the word "nickname"

13   in describing their own various names.  I don't know how that

14   actually translates, but the fact is, every alleged victim in

15   the case is operating under at least two names, at various

16   times.

17             I think we have generally known them by their

18   shortened easier names, which are either nicknames or some of

19   them are Anglicized names, so -- I think we have both names

20   available to the jury so they can clarify.  Some may be

21   taking notes under the name they spelled out to the jury as

22   their formal names.  Others may have taken notes using the

23   more general nickname, for want of a better word.  I don't

24   know how else to call it.

25             MR. WEINERMAN:  Judge, the last thing I will say

Page 1145

1    about this is I realize the Court is not sending the

2    indictment back to the jury.  The indictment does not refer

3    to the term "nickname".  The indictment has the name by

4    number of each victim.  So again, I am not asking the Court

5    to send the indictment back, because that doesn't help the

6    jury very much because it just has numbers, rather than

7    names.

8           But it just seems to me that additional information

9    that is not in the indictment, we should keep to a minimum

10   because the Grand Jury has returned an indictment, not based

11   on these names, but on numbers.

12          So it just seems to me we should limit the amount of

13   extraneous information.  Nickname is not a concept that has

14   been put into the indictment.  So I -- again, I don't oppose

15   the jury knowing which number refers to which alleged victim,

16   but I think we should be careful about labeling these names

17   as nicknames when that's not in the indictment.

18          As the Court knows, the government can allege in the

19   indictment aka's.  We know why they didn't do it in this

20   case, we understand that.  But we think the whole concept of

21   nickname since it's not in the indictment should not be sent

22   back to the jury in this instruction.

23          THE COURT:  Okay.  Well, I want both names on the

24   this chart to go to the jury so there's no confusion, because

25   multiple names have been used.  We can strike "nickname" and

1  put "also known as".  I don't know if that is helping you

2  anymore than nickname.

3         MR. WEINERMAN:  No, I don't think we should do that.

4  But again, the substance, the names that may have been

5  referred to, we have no objection to that.  I really -- I can

6  boil the argument down, and ask that the word "nickname" be

7  stricken from this instruction.

8         THE COURT:  And keep both columns.

9         MR. WEINERMAN:  Sure, we can keep both columns.  I

10 don't mind that.

11        THE COURT:  We will strike nickname.  I think it's

12 clear that there are two names for each minor victim.  I

13 assume you will clarify that a little bit in your closing

14 arguments.

15        MR. SINHA:  We will.  And as I told Mr. Weinerman,

16 we have slides that say "nickname" so he's agreed we don't

17 have to change them.

18        We have one other thing we would like to raise with

19 the Court.  But the first one is with regards to the

20 alternate jurors.  I don't know what the Court's plan is in

21 terms of dismissing the alternate jurors.  We would ask the

22 Court to consider perhaps keeping them under -- I don't know

23 if it's sequestration, or the Court's instruction so we can

24 use them in case we lose somebody during deliberations.

25        THE COURT:  We will keep them through closing

Page 1147

1   argument, and I instruct them not to deliberate with their

2   fellow jurors but to say their goodbyes and then also not to

3   discuss the case with anybody in the event that we have --

4   something remarkable were to happen, we would have to call

5   one of them in to begin deliberations all over.  And then we

6   will call them as soon as a verdict comes in to let them

7   know.

8           MR. SINHA:  Thank you, Your Honor.

9           MS. BRITSCH:  Sorry.  Two more brief issues.  First,

10  for the record, we would like to note the two interpreters

11  used for the government, Pauline Laurent and Rithy Lim are

12  both certified by the State of California as Court certified

13  interpreters in Khmer, and they were used for witnesses that

14  primarily speak Khmer, rather than English.  So we wanted to

15  note that for the record.

16          And secondly, I believe there may be one area of

17  dispute with respect to the defense's expert witness who is

18  about to testify.  Mr. Weinerman has indicated he may still

19  seek to have her testify about police tactics regarding

20  interviewing children.  We still maintain an objection to

21  that.  That's outside of her area of expertise.

22          So I just wanted to note that for the Court in case

23  the Court would like to address that before she gets on the

24  stand.

25          MR. WEINERMAN:  And, Judge, and I am going to try to

1   lay a foundation.  I will just tell the Court I learned this

2   morning that she did some work for the UN in Cambodia.  I am

3   trying to read my writing -- UN Transitional Authority in

4   which she was involved with studying the interviewing

5   techniques of witnesses and child witnesses so she is

6   familiar.  And I think she can testify about the lack of

7   training in that area, that they are not trained in the

8   techniques and the concepts of interviewing child witnesses.

9        So I think she does qualify in that very limited

10  area.  It's not going to be a major part of our presentation,

11  but I think it is relevant and she should be allowed to

12  testify about it.

13       THE COURT:  I think you need a child forensics

14  psychologist who specializes in this area; otherwise, you can

15  call anybody who can Google the issue on the Internet and say

16  what they found out.  That's not her expertise.  There really

17  hasn't been evidence in this case presented by the defense

18  that the interviews themselves in this case were defective.

19       Certainly you can put on a forensic child

20  psychologist and say, I reviewed the interviews and they were

21  inappropriate.  They led the witness, they suggested answers,

22  they forced the witness to answer when the witness didn't

23  want to.  Some of the general things we often hear in these

24  kinds of cases.  They were interviewed around too many

25  people.

Page 1149

1        The list goes on for the kinds of issues that a

2   forensic psychologist would raise in really any sex abuse

3   interview.  But putting a history professor on to talk about

4   it seems to go too far, so I would sustain the objection.

5        MS. BRITSCH:  Thank you, Your Honor.  I don't think

6   we have anything else before the jury comes in.

7        MR. WEINERMAN:  One minute, Judge.

8        THE COURT:  Yes.

9        MR. WEINERMAN:  Judge, I am informed we have an

10  unresolved objection to Exhibit 277 which is in front of me.

11  So there are three areas.  The first one -- and just for

12  context, this is a chat between BT XXXXXXX and Knot Mariah.

13  I am not going to try to pronounce the last name.  Who, at

14  one time, was in a relationship with Daniel Johnson, for some

15  context.

16       And this takes place on the day Mr. Johnson was

17  arrested, December 9, 2013.  So unlike other texts that the

18  Court has permitted with BT XXXXXXX complaining about things

19  before Mr. Johnson was arrested, this text occurred after he

20  was arrested.  So the first one we're objecting to is

21  Mr. BT X saying, "I will tell you because you are my dear

22  sis," and then a minute later texting, "he committed sexual."

23       We're also objecting to two lines down.  "I don't

24  know for sure, but I just know he had sex with one of the boy

25  in the center."  And we feel that that is not relevant, or

Page 1150

1  the Court should exercise its discretion under 403 in that

2  he's not identifying a particular person, unlike some of the

3  other instances where he does.  And then finally, he also

4  texts to Knot Mariah that "When I talked with him about this

5  he cried a lot, and he wanted to commit suicide."  And we

6  think the part about committing suicide should go out under

7  relevancy on 403 grounds.

8       THE COURT:  How many pages is the exhibit, because I

9  am only seeing one page?

10       MR. WEINERMAN:  The actual exhibit looks like it's

11  five pages.

12       THE COURT:  I am going to need a copy, because I am

13  not able to scroll on the screen.  I am only seeing one page.

14       MR. SWEET:  I can give the Court a copy of 277,

15  which I just marked on and highlighted.  And I have a

16  slightly longer version of the chat, which has some of the

17  parts that we removed and I can provide both of those to the

18  Court.

19       And I will say this, Your Honor, the conversation

20  appears to potentially split between a discussion that

21  Mr. BT X had regarding a boy who may have disclosed during

22  the arrest, and then also discussions prior to the arrest,

23  because it indicates that he confronted Mr. Johnson.  So I

24  think there's a little bit of a split with pre-arrest and

25  post-arrest conduct.

1      MR. WEINERMAN:  And, Judge, to add to the context,

2  Mr. BT X is in the United States when this conversation, this

3  chat is being held, and Knot Mariah, we believe Knot Mariah

4  was in Korea at the time.  So neither of them are in

5  Cambodia.  Doesn't mean they can't have information about

6  what is going on there, but it seems to me that it's somewhat

7  speculative.  Two people in two different countries talking

8  about something that occurred in Cambodia, and it just

9  doesn't seem that it should go to the jury.  It's confusing,

10  and it's irrelevant.

11      THE COURT:  All right.  How about I take a look at

12  it while our first witness this morning is testifying, and

13  then we can break and I will rule a little bit more.  Let's

14  bring in the jury.

15                    (JURY IN.)

16      THE COURT:  Please be seated.  Welcome back.  Thank

17  you.  We're now going to hear from the final witness for the

18  defense.

19      Mr. Weinerman, your next witness.

20      MR. WEINERMAN:  Yes, Judge.  The defense would call

21  Dr. Trudy Jacobsen.

22      THE COURT:  Go ahead and step up to the witness

23  stand, and remain standing and you will be sworn in.

24  //

25  //

Page 1152

TRUDY JACOBSEN, PhD,

1

2  produced as a witness, having been first duly sworn, was

3  examined and testified as follows:

4          THE WITNESS:  I do.

5          COURT CLERK:  Please be seated.  State your name for

6  the record, spelling your first and last.

7          THE WITNESS:  Trudy Anne Jacobsen, T-R-U-D-Y,

8  A-N-N-E, J-A-C-O-B-S-E-N.

9

10                    DIRECT EXAMINATION

11     BY MR. WEINERMAN:

12  Q   Can I call you Dr. Jacobsen?

13  A   Yes.

14  Q   Because you have a PhD?

15  A   Correct.

16  Q   Can you please tell the ladies and gentlemen of the jury

17  how you are employed.

18  A   I am tenured at the rank of full professor at Northern

19  Illinois University in DeKalb, Illinois.

20  Q   Can you tell us the areas of the subjects, the topics

21  that you teach and you write about at that university, and

22  other areas?

23  A   I teach at the undergraduate and graduate level, courses

24  in anthropology, political culture, ethnography, gender and

25  sexuality studies, and history, specifically in Southeast

Page 1153

1   Asia.  And my country of research, primarily, is Cambodia.

2   Q    And you mentioned Cambodian culture?

3   A    Yes.

4   Q    And could you give us a general idea of some of the

5   classes you teach in these subjects?

6   A    Certainly.  Gender and sexuality in Southeast Asia,

7   Buddhist Southeast Asia, history of genocide, history of

8   Cambodia, ethnographic methods, doing research in developing

9   countries.

10  Q    Could you give us a brief background on your educational

11  background?

12  A    Certainly, I hold undergraduate degrees in history and

13  anthropology, double major.  First class honors from the

14  Columbia University of Queensland in Brisbane, Australia, and

15  a PhD in history.

16  Q    From what university?

17  A    From the university of Queensland.

18  Q    And just give us a little background about where you

19  grew up?

20  A    Certainly.

21  Q    Where you lived up until now?

22  A    Both of my parents worked in development.  My father was

23  a soil scientist, my mother is an epidemiologist.  I grew up

24  in Algeria, Indonesia, and Cambodia.  And my mother first

25  went to Cambodia when I was 13 years old.  She was one of the

Page 1154

1  first 50 nonSoviet technical experts allowed into Cambodia to

2  assist with the reconstruction of the country after the Khmer

3  register in 1988.

4  Q    And I judge from your accent you were born in --

5  A    I am Australian.

6  Q    And you lived the first how many years of your life

7  there?

8  A    Four and a half, Algeria for three, Indonesia for five

9  and a half, Cambodia since I was 13.

10 Q    Tell us about living in Cambodia from the age of 13 on?

11 A    The country was still very much under the control of the

12 Vietnamese, who assisted with the liberation of Cambodia from

13 the Khmer Rouge in 1979.  They had a shadow presence as a

14 government for ten years until 1989.

15            Foreigners were not permitted to live in houses.  We

16 were expected to live in three different hotels.  The United

17 Nations and other aid agencies had to run their offices out

18 of one particular hotel.  Western technical experts and

19 program officers were not allowed to interact with the Soviet

20 technical experts.

21            There was a nightly curfew of 8:00 p.m.  Schools

22 were few and far between.  I, myself, carried out

23 correspondence studies until my senior year of high school in

24 1991 when I returned to Australia to take my baccalaureate

25 there.

DIRECT EXAMINATION - TRUDY JACOBSEN, PhD

Page 1155

1   Q    Did you attend school when you were a teenager in

2   Cambodia?

3   A    I was carrying out correspondence classes.  I also had

4   Saturday jobs typing reports for many of the nongovernmental

5   organizations, since I was foreign.

6        I learned Khmer when I was living in Cambodia with

7   my mother.  But I was unable to read or write it until I

8   started doing my PhD thesis on Cambodia in the year 2000.

9   Q    Let's talk about your language proficiency in Khmer.

10  Would you tell us about that, please?

11  A    I did not have formal classes.  I learned Khmer from

12  interacting with friends and people in Cambodia.  Therefore,

13  I was in an unusual position in 1992 when the United Nations

14  transitional authority in Cambodia came in to begin to

15  prepare for the elections in Cambodia in 1993, in that I

16  spoke a more accurate version of Khmer from the 1980s and

17  1990s than many experts that had learned Khmer in the 1960s.

18        THE COURT:  You are going to have to slow down a

19  little bit.  We have a court reporter who has to take

20  everything down.

21        THE WITNESS:  I am sorry, ma'am.

22  Q    BY MR. WEINERMAN:  What is your reading and writing

23  proficiency?

24  A    When I began taking my PhD, I carried out formal

25  instruction in Cambodia in reading and writing, so I am able

DIRECT EXAMINATION - TRUDY JACOBSEN, PhD

Page 1156

1    to read and write proficiently.

2    Q    Do you have experience observing Cambodian culture?

3    A    I do, both formally and informally.  My mother

4    established the cold chain in Cambodia, which is the system

5    for keeping vaccines safe as they are carried to rural places

6    in order to carry out mass vaccinations.  So I was,

7    therefore, able to see a great deal of Cambodia in the late

8    1980s and early 1990s.  I also maintained a residence in

9    Cambodia from 1999 until after my son was born in the year

10   2010.

11   Q    Tell us about, I think you mentioned work with the

12   United Nations.  Tell us about your work with that, and what

13   you did?

14   A    When I finished secondary school I returned to Cambodia.

15   I believe I took what was one of the earliest gap years.  It

16   was the late -- no, early 1990s, and I wanted to work in

17   Cambodia before I went to university to take a degree.  And

18   it so happened that the Paris Peace Accord had been signed in

19   1989.

20   Q    We ought to back up.  And one or two sentences on what

21   that was?

22   A    The UN came in to educate people on how to have an

23   election and how to vote.  I was in the fortunate position of

24   speaking English, French, and Khmer.  I was hired by the

25   human rights component, particularly the investigation and

Page 1157

1  monitoring team.  Our responsibility was to carry out

2  investigations into politically motivated intimidation,

3  harassment, assault and death.  And also to train local law

4  enforcement agents on how to carry out similar

5  investigations.

6  Q    So how long did that go on, your work with the UN?

7  A    I worked for the UN from March of 1992 until September

8  of 1993.

9  Q    And have you published numerous articles and

10 peer-reviewed monographs on aspects of Cambodian society,

11 religion, and politics?

12 A    Yes.  I have two single monographs specifically on

13 Cambodia, published in 2008 and 2017, and I believe 40 peer

14 reviewed book chapters or general articles.

15        MR. WEINERMAN:  We would ask the Court to allow her

16 to testify as an expert on Cambodian history and culture.

17        MS. BRITSCH:  No objection, Your Honor.

18        THE COURT:  I will.  Thank you.

19 Q    BY MR. WEINERMAN:  Dr. Jacobsen, let me start with a

20 real basic question.  Is Cambodia a poor country?

21 A    It is among the poorest in Southeast Asia.

22 Q    And could you explain why it is one of the poorest

23 countries in Southeast Asia?

24 A    Certainly.  From the 1960s on, Cambodia began

25 experiencing a civil insurgency, which affected the ability

Page 1158

1   of rural communities to produce regular crops of rice.  The

2   Vietnam conflict, which was happening at the same time, drove

3   many people from farming into the cities seeking refuge.

4           Infrastructure, which was never particularly good in

5   Cambodia since the French colonial period, began to falter.

6   Unemployment rose, even though young people had been promised

7   that education would lead to good government jobs, they did

8   not eventuate.  Many people were disillusioned and went to

9   join the socialists, who they believed would provide them

10  with a more equitable future in Cambodia as opposed to the

11  capitalism and corruption they saw from the existing regime.

12          In 1970 the leader of the government, Sihanouk,

13  S-I-H-A-N-O-U-K, was deposed in a coup.  He sought exile in

14  China, and soon joined the Khmer Rouge who promised to

15  reinstate him if --

16  Q    Tell us briefly who the Khmer Rouge was?

17  A    The Khmer Rouge -- there were two groups of the Khmer

18  Rouge.  One is lasting from the 1930s with Ho Chi Min

19  IndoChinese Communist Party.  Cambodians who were

20  disillusioned with the idea of colonialism and capitalism

21  joined in a vision of social utopia in mainland Southeast

22  Asia.

23          Another group, people who were educated in France

24  during the colonial period, and they came into contact with

25  French communists and socialists in the 1940s and '50s began

DIRECT EXAMINATION - TRUDY JACOBSEN, PhD

Page 1159

1   to spread ideas of a socialist government.  During the 1950s

2   and '60s, when political parties were allowed to form, these

3   people tried to participate in usual political activities and

4   were repressed by the Sihanouk's government.  They went and

5   joined the former communists --

6   Q    Let's move a little more into more modern times, and

7   again, the context of the question is why is Cambodia a poor

8   country, whether we get into employment, lack of education,

9   things like that.  So we can -- so we have information about

10  the current situation in Cambodia in terms of poverty.

11  A    Definitely.  In 1979 when the Khmer Rouge were deposed,

12  a quarter of the population had either died of malnutrition,

13  torture, purges by the Khmer Rouge, or had fled the country

14  to neighboring Thailand and Vietnam.

15  Q    So you are saying it lost a quarter of its population

16  either to immigration or death?

17  A    Fleeing rather than immigration.  And even before the

18  Khmer Rouge took power, the educated elite had managed to get

19  out of the country fleeing to France or the United States,

20  where they remained during the Khmer Rouge period.

21         In 1979 the Vietnamese assisted the remaining

22  Cambodians, many of whom did not have the necessary skills to

23  rehabilitate their own country in beginning to get the

24  country back together.  This was hampered by the fact the

25  Khmer Rouge continued a civil war against the Cambodians

DIRECT EXAMINATION - TRUDY JACOBSEN, PHD

Page 1160

1  until 1997.  Apart from a brief period during the UN, when

2  they agreed to participate in the elections and then reneged.

3        With all of the civil war, it was very difficult for

4  Cambodia to continue to grow their own food, to reconstruct

5  what little infrastructure had been in place previously, and

6  the government was dealing with a civil insurgency as opposed

7  to trying to rehabilitate the country.

8        There was very little investment in education, very

9  little investment in social programs that we would expect in

10  a country of Cambodia's size.

11  Q   So fast forward to more recent times, like today, if you

12  know, what the average per capita gross income is, of the

13  average Cambodian --

14  A   GDP is $3,700 on paper, but this is skewed because there

15  are a group of very, very rich Cambodians, and there are a

16  large number of Cambodians who are extremely poor, so the

17  average is misleading.

18        The majority of Cambodians living in a rural

19  situation would be largely subsistence farmers, small

20  livestock holders, and existing on remittances from family

21  members working in the cities, and whatever cottage

22  industries they are able to produce.

23  Q   So let's talk about what is going on right now.  Tell us

24  about the urban population, the capital is Phnom Penh,

25  correct?

DIRECT EXAMINATION - TRUDY JACOBSEN, PhD

Page 1161

1   A    Correct.

2   Q    What percentage of Cambodians live in the urban area of

3   Phnom Pehn?

4   A    The official statistics state that 90 percent of

5   Cambodians are rural dwellers.  This is also misleading

6   because when people are not required to perform agricultural

7   tasks, so for example, when you are not planting rice or

8   harvesting rice, it has been traditional for people to go to

9   the cities to seek other forms of temporary labor.

10          It's very common for men, particularly, to come to

11  the cities to provide public transport on their motorbikes or

12  tuk tuk, et cetera.  And then once they are needed back in

13  the countryside, they will return then.  So the population is

14  fluctuating.

15  Q    So let's talk about, if this is the right term, the

16  migration of people, particularly young people, from the

17  rural areas, agricultural areas, into the cities.

18  A    Sociologists and demographers have noted that

19  particularly in the last ten years, with foreign investment

20  increasing in Cambodia, in the form of establishing many

21  factories, such as the Gap factory, Banana Republic, who have

22  factories in the north of Phnom Penh, increasingly South

23  Korea and Chinese businesses are choosing to manufacture in

24  Cambodia as well, because labor is cheaper than in their own

25  countries, a large number of young people, particularly,

Page 1162

1    don't want to stay and grow rice.  They want to come to the

2    cities and take what they perceive as more lucrative jobs in

3    these factories, believing that they will then be able to

4    enjoy consumer goods such as cell phones, TVs, and remit

5    money back to their families living in the rural countryside.

6    Q    So there's a shift in population from the rural areas to

7    the urban areas, but we don't know in terms of numbers?

8    A    No.  I mean there are some studies, but they are on one

9    province at a time, so we don't have a good idea.

10   Q    Do they have a census in Cambodia?

11   A    They do.  I believe the next one is due to be carried

12   out in 2019.

13   Q    So tell us about the educational opportunities in the

14   rural areas versus the urban areas.  And again, what parents

15   of young kids in the rural areas do in terms of educating

16   their kids.

17   A    At the village level, which may be ten houses with rice

18   paddies in common that they farm, children will often walk an

19   hour to the nearest school, as a matter of course.  If

20   children want to go to the high school -- there's only a

21   primary school and high school.  There's no middle school in

22   Cambodia -- they will often have to use some other form of

23   transport to get to a high school in a larger town.  Or,

24   which is more common, they will have to go live with a

25   relative in that larger town.

Page 1163

1           If people wish to go to university or vocational

2     training, they have to go and live in the capital city of

3     Phnom Penh.  It is not a common cultural practice for people

4     to go and live alone in Cambodia, rent an apartment.  There's

5     no dormitory attached to the university.  Therefore, the

6     expectation is you will go and live with family.

7     Q    So what about elementary school?  Kids who are

8     elementary school, middle school age who live in the rural

9     areas, agricultural areas?  Has there been a shift of

10    population of those kids leaving their parents, if they

11    exist, and leaving the agricultural areas and moving to

12    cities, like Phnom Penh, for education?

13    A    Since the UN election, parents have realized

14    increasingly that for their families to get ahead, English

15    language is important.  There is no English language

16    instruction in the elementary school system in Cambodia.  So

17    most parents will send their children to the local school,

18    and then send them to an international school where they will

19    learn English or Chinese or Korean, is becoming increasingly

20    common.  But those private schools for language instruction

21    don't exist in the countryside.  They exist in the larger

22    cities.  Battambang, B-A-T-T-A-M-B-A-N-G, and the capital,

23    Phnom Penh.

24    Q    So if -- the kids who wind up in Phnom Penh for

25    educational purposes, what has your observation been as far

Page 1164

1  as their parental situation, whether they have parents to

2  send them, whether they are orphans, explain that to us.

3  A    There is no data listing the numbers of children who

4  have been sent from the countryside.  It is, however, an

5  extremely common practice.  Almost -- I would imagine, most

6  children who are in Phnom Penh attending an international

7  school are not originally from the city center itself.

8  Q    In Cambodia does the state provide educational services,

9  or are there other organizations that fill that void?

10  A    The state provides schools, and a teacher in the school.

11  The teacher is usually poorly paid in comparison to what we

12  would see in the United States, and often has a second job

13  tutoring or teaching in a private school.

14        Parents are expected to provide school uniforms, buy

15  text books, and exercise books, pencils, et cetera.  Into the

16  void for language instruction have stepped a number of

17  organizations.  For example, the Australian Center for

18  English has a variety of scholarships funded by private

19  donors for Cambodians who wish to learn English to attend.

20  And there are similar schools that have private donor schemes

21  to provide instruction for students.

22  Q    Are there private organizations, of NGOs, religious

23  organizations, that provide services, education, shelter,

24  food for young people who live in the city Phnom Penh?

25  A    Certainly.  In fact, in the absence of government

DIRECT EXAMINATION - TRUDY JACOBSEN, PhD

Page 1165

1  services, particularly -- and this is my area -- people who

2  are survivors of trafficking or domestic violence, rape,

3  there are no government services for them.  Therefore, the

4  only recourse people in this situation have is to go to

5  either nonprofit organizations funded by foreign governments,

6  or faith-based organizations, not necessarily Christian.

7  There is an organization called CAMAN, which is funded,

8  C-A-M-A-N -- which is funded from Malaysia, and donations

9  from the Middle East, for example.

10          There are organizations that have been set up to

11 provide a place for children to live while they attend high

12 school and university that is privately funded from Belgium.

13 And Somaly Mam Foundation for victims of trafficking and

14 child sex abuse, et cetera, which is probably one of the more

15 famous ones.

16 Q    Some of the organizations that provide these services

17 are faith based?

18 A    Yes.

19 Q    And different religious denominations?

20 A    Absolutely.

21 Q    Including Christian organizations --

22 A    Including different denominations of Christian --

23 there's a Morman one, Presbyterian one.  There's a Scottish

24 Methodist one.  I believe every denomination would be

25 represented if we did a survey.

DIRECT EXAMINATION - TRUDY JACOBSEN, PhD

Page 1166

1    Q    So would it be fair to say that if someone wants to be

2    upwardly mobile, if a parent wants their child to be upwardly

3    mobile, their best bet is to get out of the rural areas to

4    get into the urban areas for education support?

5    A    Absolutely.  There are very few resources available for

6    rural parents who wish their children to get what would be

7    considered a comprehensive education and be able to enter

8    into a job in a lucrative sector, such as tourism, where

9    either English, Korean, or Chinese is necessary.

10   Q    During this trial we have heard the term "orphanage."

11   We have heard the term "center."  Could you tell us your

12   observations about orphanages in terms of the parents, are

13   there parents, are the parents alive, are the parents

14   deceased?  What are the criteria?

15        Let me ask it this way:  What is the criteria and

16   the ability to verify the criteria for a child, let's say

17   from a rural area being able to live in an orphanage or

18   center in Cambodia, in Phnom Penh, in order to access the

19   services that are available there?

20   A    Being an orphan in Cambodia is simply somebody who

21   either does not know where their parents are, or has not seen

22   them for an extended period of time, or is not living with

23   them.  And there is a cultural tradition in Cambodia of

24   parents sending their children to live with more affluent

25   relatives in order to access educational services or to pay a

DIRECT EXAMINATION - TRUDY JACOBSEN, PhD

Page 1167

1  debt.  And the child would receive education in return for

2  doing chores around the house.

3       Living apart from your parents in Cambodia was never

4  something that was odd or uncommon.  The existence of

5  orphanages really began in Cambodia after the Khmer Rouge

6  period when so many children had lost parents, and they did

7  not know where they were.

8  Q    In the West, our conception of orphanages is your

9  parents are deceased.  Is that the same thing in Cambodia?

10 A    It is not.

11 Q    So I want to ask you a few questions about the system of

12 documenting births in Cambodia.  Do they have a similar

13 system like we have here in the West?

14 A    Well, no.  To begin with, most births would be carried

15 out in the home.  Nobody comes by with paperwork when a baby

16 is born.  The onus is on the parents to go and register a

17 birth.

18       But this might not take place until there is some

19 need for the child's existence to be documented, so for

20 example, to go to a school.  Most children don't get issued a

21 birth certificate.  A parent will go to the village chief and

22 state this child has been born on this date, this is their

23 name, and the village chief should keep a record in the

24 village.  Many do not.

25       In some villages the system is you go to the nearest

Page 1168

1    district capital and register there.  This, again, might be a

2    long way away, and somebody may not have a reason to go to

3    the district capital for months or years.  And, therefore,

4    also the ability of a central authority in Phnom Penh, for

5    example, to issue a driver's license or a passport might not

6    have any way of getting to the person responsible for record

7    keeping at the district level.

8    Q    Is registration contemporaneous with the birth, or not

9    necessarily?

10   A    Not necessarily.

11   Q    We talked a little bit about the civil servant system in

12   Cambodia.  Government jobs, village jobs, how are they paid?

13   A    The government does have a budget for civil servants,

14   and included in that categorization are teachers, police

15   officer, magistrates, village chiefs, et cetera.  They are

16   very poorly paid.  For example, a mid-level police officer in

17   Phnom Penh makes $240 a month, which is not enough, even in a

18   country like Cambodia that is less expensive in terms of

19   paying rent and food, it is not enough to support a family.

20   Therefore, almost everybody there has another job and a

21   family business, probably.

22   Q    Are there other ways to supplement one's income, other

23   than a second job?

24   A    Certainly.  There's a concept in Cambodia called Ahasai.

25   Q    You have to spell that one.

DIRECT EXAMINATION - TRUDY JACOBSEN, PHD

Page 1169

1   A    I am about to.  A-H-A-S-A-I.  It literally means cords,

2   and it's a system wherein everybody is in some form of

3   reciprocal relationship.  So if your uncle lives in the

4   district capital, you are a farmer, you will make sure you

5   send mangoes to that uncle, so if it happens that you get

6   into some legal trouble, he will be able to pull strings for

7   you so that nothing too bad happens to you.  If you are a

8   student, you should bring a present of some kind to your

9   teacher.  And the teacher then will emit goodwill towards

10  you.

11          This sometimes can be corrupted.  There have been

12  some very famous cases of teachers at the law school not

13  allowing students to sit for the law exam, because they

14  hadn't received a nice enough present.  But everyone is in

15  some kind of obligation to each other.

16  Q    So this is part of the culture?

17  A    Yes, it's not perceived as corruption.

18  Q    So I have some questions about some of the cultural

19  practices in Cambodia that may be different than ours.  First

20  of all, could you talk a bit about -- not immigration

21  policies of the United States -- but the movement of

22  population out of Cambodia due to poverty and other reasons?

23  A    Certainly.  I mainly work with women who are trying to

24  obtain a marriage partner in the West, particularly, but

25  increasingly in China, South Korea, as these places become

Page 1170

1   more affluent.

2          And the reason for this is the majority of people

3   who had some form of dual citizenship, whether the United

4   States or France, before the Khmer Rouge were able to escape

5   and be safe, and then be able to return to Cambodia.  During

6   the Khmer Rouge period, obviously people are aware of the

7   genocide, the suffering, family members dying, horrible

8   malnutrition, tortures and death, and for this reason people

9   in Cambodia never feel quite secure about not being able to

10  get out of the country.

11         And increasingly, anyone with any financial assets

12  don't want to keep them in Cambodia.  They want to keep them

13  in another country where they know what happened under the

14  Khmer Rouge was the obliteration of money, bank accounts,

15  deeds of property were completely obliterated never to be

16  recovered.  So it's seen as insurance, having a passport to

17  another country.

18  Q   And in general, how do people go about leaving Cambodia

19  if they can, and where do they want to go?

20  A   Those with enough money are able to send their

21  university age children to other countries to go to school.

22  So New Zealand, Australia, the United States, France, Western

23  countries, and Japan to some extent.

24         Once people have a visa to study in a country, it's

25  relatively easy to convert it to permanent residency and then

DIRECT EXAMINATION - TRUDY JACOBSEN, PHD

Page 1171

1  citizenship.  That's one avenue, but that's only available to

2  very wealthy people.

3         Women often try to form relationships leading to

4  marriage with men who do visit Cambodia quite often.  And

5  often older men come to Cambodia looking for a younger woman

6  who might like to come back and live with them in their home

7  country.  This is another avenue.  It's becoming more and

8  more difficult, however, for these visas to be issued by a

9  country such as United Kingdom and Germany have been cracking

10 down on this for some time.  This did not begin in Cambodia,

11 but in other countries there has been -- there are often

12 visas --

13        MS. BRITSCH:  Objection, Your Honor.  I am going to

14 object to the relevance of immigration visas in other

15 countries.

16        THE COURT:  Sustained.

17 Q   BY MR. WEINERMAN:  So how -- you talked about what

18 wealthy people try to do to leave Cambodia.  What about poor

19 people?  What are the options available to them if they want

20 to leave the poverty of Cambodia, to leave and go to a

21 Western country?

22 A   Sometimes they will sign on to work units, for example,

23 working in construction in Vietnam or Thailand.  And once

24 there, try and remain in those countries, and from there

25 springboard to others in the West.  Some people use work

DIRECT EXAMINATION - TRUDY JACOBSEN, PHD

Page 1172

1   visas to come to a country, such as the United States, on a

2   six-month work visa, and then stay.  Others use other means,

3   such as special visa categories, where they can go to, for

4   example, give -- to go to a wedding, and then they will stay

5   and overstay their visa, and not have a legal reason to be in

6   that country anymore.

7           There are other options however, people can

8   convert --

9           THE COURT:  You need to slow way, way down, or we're

10  not going to get all of this on the record.

11  Q   BY MR. WEINERMAN:  Again, getting back to a poorer

12  person, is there an option available to at least try to come

13  to a Western country to study?

14  A   Yes.

15  Q   And how would someone who is poor, who doesn't have the

16  financial means, how would they go about doing that?

17  A   Usually they would have to come to the attention of a

18  private donor or organization that would fund such an

19  activity for someone.  Particularly in the Cham community in

20  Cambodia who are Muslims, wealthy Malaysians are funding Cham

21  Muslim kids to come study in Malaysia, for example.

22  Q   So you would need a benefactor?

23  A   You would.  You would not be able to do it yourself.

24  Q   You may have touched upon this, but in general, do

25  people in Cambodia, are they still concerned about their

Page 1173

1   safety in remaining in Cambodia?

2   A    Yes.  Even though things have been very calm, as the

3   civil war has been ended now for some time, over 20 years,

4   there is still a fear in Cambodia that these things could

5   happen again, the genocide could happen again.  There is also

6   a fear from current -- the current government, which has

7   recently taken a turn towards being very oppressive with the

8   elimination of all other political parties recently, the

9   closing of newspapers that are anti-government in their

10  rhetoric.

11          But also people are sort of victims of the state as

12  the state sells off land, and they evict people without

13  providing an alternative accommodation.  And when people

14  protest, even peacefully, the government responds very

15  violently.  So state agents are not seen in Cambodia as

16  people to trust.  They are seen as people of whom you should

17  be scared.

18  Q    What is the Prime Minister's name?

19  A    Hun Sen, H-U-N, S-E-N.

20  Q    And how long has he been the Prime Minister?

21  A    He has held high government office since 1984.  He was

22  elected Prime Minister in 1993 in the UN election, and has

23  remained there.

24  Q    In your opinion, are there free and fair elections in

25  Cambodia?

Page 1174

1   A    I believe the 1993 election was free and fair.  The

2   others, which have occurred every five years, have become

3   increasingly beset with electoral irregularities.

4   Q    The second-to-last area, talk about some of the domestic

5   culture.  First, sleeping arrangements in a family.  Could

6   you touch upon that a little bit?  What might be a little

7   different than what we're accustomed to in the West?

8   A    First of all, the concept of family, it's not a nuclear

9   family.  Many extended family members will live together in

10  one household, especially in rural areas.  A household might

11  be one room.  It's simply one room.  Everybody sleeps in the

12  same room under different mosquito nets.

13            But people share sleeping mats.  People share beds.

14  I have seen as many as six children in a double bed together.

15  This is a normal practice.  There's only one bed.  If it's

16  very hot, people might sleep under the house, as well as in

17  it.  But everyone is sleeping together.  The concept of

18  privacy is not really that common.

19  Q    How about adults sharing the same bed with children?

20  A    Yes, that's very common.  There is usually only one bed

21  elevated off the floor.

22  Q    Might there be other reasons for adults and children to

23  share beds, other than the lack of space?

24  A    Well, malaria and dengue fever are very serious problems

25  in Cambodia, and the acquisition of a Deet net are very

Page 1175

1   effective against eliminating those diseases, might mean only

2   one exists per family, so everybody will get underneath it.

3   Q    When you are talking about adults sleeping in the same

4   bed with children, are they part of the nuclear family, or

5   are there other adults who could be in that arrangement?

6   A    Other adults, depending on the particular family

7   dynamic.  It's not considered to be a sexual thing.

8   Q    Let's talk a little bit, we have heard a lot of

9   testimony in this case about massage, massaging.  Could you

10  tell us about the custom of massaging in Cambodia?

11  A    Again, it's not considered to be a prelude to sexual

12  behavior, as I believe it is in the West.  It's considered to

13  be medicinal.  And there are other -- apart from massage,

14  there's things such as cupping or coining, which is when you

15  take a coin and run it down various parts of the body,

16  depending on what is afflicting you at the particular time.

17          And it's common for household members to perform

18  these tasks, and others that, I guess, we would consider

19  grooming, such as searching the hair for lice, to be a

20  function of existing in the same household.

21  Q    And the attire that is worn, there's been some testimony

22  about people getting massages without a shirt on.  Is that

23  common, or is the custom that the person receiving the

24  massage is fully clothed?

25  A    I have never seen anyone in Cambodia getting a massage

Page 1176

1   being fully clothed.

2   Q    Partially clothed?

3   A    It is -- if someone is going to a doctor or a

4   practitioner of massage or coining in order to receive

5   treatment for some ailment, you are not wearing your clothes.

6   You will be asked to remove them to receive this treatment.

7   If it is being carried out in the household, people wouldn't

8   be fully clothed anyway, because most people have only one

9   set of good clothes that they wear to work or university or

10  to school.  So as soon as you come home, Cambodia is very hot

11  and your clothes soil easily.  So people will remove them and

12  put on something comfortable.

13          For women, it might be loose pajamas.  For men, it

14  might be baggy pajama pants, or a sarong, or something like

15  that until everyone has a shower before they leave the house

16  again, putting their good clothes on again.

17  Q    So using -- not wearing good clothes inside the house?

18  A    Right.

19  Q    You mentioned wearing a sarong, a short --

20  A    Like a length of cotton cloth that you just tie around

21  your waist.  Women would tie it around up here (indicating),

22  or wearing sort of pajama shorts or shorts.  Something like

23  that, just something loose and comfortable.

24  Q    What about men wearing a very short attire around their

25  waste covering their private parts, not having a shirt on,

DIRECT EXAMINATION - TRUDY JACOBSEN, PHD

Page 1177

1  have you observed that in Cambodia?

2  A    As long as your genitals are covered, and breasts for

3  women, you are not considered to be risque or obscene.  It

4  would be normal.

5  Q    Is there any cultural connotation to someone,

6  particularly a male, just wearing a short covering over the

7  lower part of their body?

8  A    No.

9  Q    Perhaps what I was getting at, and I hope I can spell

10 this right, the concept of O-M-N-A-I-C-H, "Omnaich," tell us

11 about that.

12 A    Omnaich, so in Cambodia there are different forms of

13 power you can have in society.  One of them is sel, which is

14 a kind of Buddhist, you are a good Buddhist.  You perform

15 good work.  Omnaich is political power, so you have the

16 ability to make other people do what you want to be done,

17 like charisma, I think we would call it in the West.

18        Omnaich, you have Omnaich if you are the quietest

19 one at a business meeting.  Everybody else is talking and

20 arguing.  The person who has Omnaich at the table is the

21 person who doesn't say a word, they don't need to.  But when

22 they do speak, everyone else is quiet.

23 Q    Who normally occupies those types of positions?

24 A    In society, it's people who have the ability to make

25 your life miserable.  So people like the police, for example,

DIRECT EXAMINATION - TRUDY JACOBSEN, PHD

Page 1178

1  the tax collectors.  In relation to students, teachers have

2  more Omnaich than the students do.  In the household, it's

3  the head of the household, which may not necessarily be the

4  father, sometimes it's the mother, or sometimes it's an uncle

5  whose house it is, but he's allowing his relatives to live

6  there.  It depends on the circumstances.

7          MR. WEINERMAN:  Let me just check my notes.  I have

8  no further questions.

9          THE COURT:  Cross-examination.

10          MS. BRITSCH:  Thank you.  We have no questions, Your

11  Honor.

12          THE COURT:  Thank you, Dr. Jacobsen.  You are free

13  to go.

14          Any further witnesses from the defense?

15          MR. WEINERMAN:  No, Your Honor.

16                     (Defense Rests.)

17          THE COURT:  Any rebuttal?

18          MR. SINHA:  No, Your Honor.

19          THE COURT:  Reserving issues around exhibits, both

20  sides have closed their cases, folks.  We're going to take a

21  morning break.  When you come out, we'll read the legal

22  instructions that apply to the case, and then we will begin

23  our closing arguments.

24                     (Jury Out.)

25          THE COURT:  With regard to Government Exhibit 277, I

1   have read the proposed exhibit.  A lot of it is not relevant.

2   There's a lot of talk of God, repentance, sin, morality.  I

3   think the relevant statements, if they are to be considered,

4   consistent -- prior consistent statements of the witness are

5   that he committed sexual, but then BT XXXXXXXXXX says, "I

6   don't know the story for sure, but I know he had sex with the

7   boy in the center.  When I talked with him about this, he

8   cried a lot, and he wanted to commit suicide."

9           I guess my issue with that is within the context of

10  the statement he says, I don't know for sure.  I just know

11  but it doesn't tell you the context, really, of his

12  testimony, which was that he had -- at least one boy had come

13  forward to him to talk about it.

14          So at this point it seems mostly irrelevant,

15  somewhat confusing with the hearsay nature of the actual

16  statement.  And also I would think somewhat cumulative at

17  this point, so I will sustain the objection to 277.

18          MR. SWEET:  Your Honor, just to clarify, if I may, I

19  believe the defense was objecting to just three parts of 277,

20  three small subsections of it.  That may change after what

21  the Court just said --

22          MR. WEINERMAN:  It just changed.

23          THE COURT:  I mean, they are objecting to the

24  salient part, which is the actual statements, which I think I

25  have addressed.  The rest of it, in my mind, seems

Page 1180

1  irrelevant.

2       MR. WEINERMAN:  Judge, if this jury reads every page

3  of every exhibit, we will be here until next May, so it's

4  cumulative.

5       MR. SWEET:  To clarify, Your Honor, did the Court

6  mention a part of 277 that the Court was not troubled by?

7  And I would say when Mr. BT X is talking about, "I want to

8  see him repent for his sins and then he can go to haven," is

9  what he wrote.  The government did discuss that with BT XXX

10  XXXX, and some of his other things that he wrote.

11       And the relevance is that Mr. BT X has been accused

12  of doing this to come get a visa, and here he is expressing

13  his love, his concern, his concern for Mr. Johnson's

14  salvation.  He expressed a concern for his soul on the stand.

15  And he talks about having confronted Mr. Johnson before.

16       He talks about I did -- on the very first page, "I

17  did go talk with him" -- well, six lines down, "I have been

18  praying for him for six year and I did go talk with him, but

19  he's still the same.  I knew one day this going to happen for

20  him and I did tell him."

21       So that's going to a prior discussion with -- with

22  Daniel.  And it's clear that it's regarding sex, because he

23  discusses -- it's about immoral, God is punishing him.  I

24  understand what the Court is saying regarding the uncertainty

25  about the sex with the boy, the suicide, but all this talk

Page 1181

1    about, "He told me he wants to change but he can't."  "Did

2    you have sex with him?"  "He try to, but I didn't allow,"

3    that's clearly, the last part about having sex with him, is

4    consistent.  That's the top of page 3.

5         And perhaps counsel and I could take one more crack

6    at this, and come down to a stripped-down version that we

7    could try and see if we can reach.

8         THE COURT:  No, I think that's helpful, Mr. Sweet.

9    I was looking at this just in the context of prior consistent

10   statements, and not -- I didn't have a complete understanding

11   of the context of relevancy that you have just laid out.

12        So that does make sense to me that the statements

13   that talk about why, his concern for Mr. Johnson, as opposed

14   to his desire to come to the United States would come in.

15        I still share a concern, and I think these really

16   were the concerns that the defense had about the somewhat

17   vague nature of his knowledge in what other boys may have

18   said.

19        MR. SWEET:  The government is happy to strike that,

20   Your Honor, and I believe that would be December 9, 2013 at

21   12:07.  There are three sections for that.

22        THE COURT:  If you strike those, I will allow 277.

23        Sorry, Mr. Weinerman, I didn't understand the

24   relevance of the document until Mr. Sweet put it into some

25   context for me.

Page 1182

1          COURT CLERK:  That will be admitted as redacted?

2          THE COURT:  Yes.

3                    (**EXHIBIT 277 RECEIVED**.)

4          THE COURT:  So in terms of how we want to proceed,

5     it's 10:19, and 10:30 when we bring the jury back out.  We

6     can go forward this morning, probably about 15 minutes of

7     instructions.  I think the government said they were about

8     45 minutes.

9          I guess the question is, do we want to break for an

10    early lunch and do closings completely, following an early

11    lunch, or do we want to get some of it in this morning?

12         MR. SINHA:  The government may be closer to an hour

13    once we put it together.

14         THE COURT:  Still shorter than I thought you would

15    be.

16         MR. SINHA:  Our preference would be to break for

17    lunch, because we're going to try to move the television over

18    so our PowerPoint can be viewed by the jury.  So that would

19    be our preference, to do an early lunch.

20         MR. WEINERMAN:  I'm not giving the closing,

21    Ms. Maxfield is, but it seems it's fairer for there not to be

22    a break.  We should go all the way through, whether we do it

23    all in the morning or all in the afternoon.  That would be

24    our preference.

25         THE COURT:  So we will instruct them this morning,

Page 1183

1  and then we will break for an early lunch, and what if we

2  start back up at 12:30?

3          MR. WEINERMAN:  You are just going to instruct.

4          THE COURT:  We're going to instruct.  But let's take

5  a short break, and then I will hopefully give the

6  instructions in a clear voice, and we will break when that is

7  done until 12:30.

8                    (Brief recess taken from 10:20 a.m.

9                     to 10:42 a.m.)

10         MR. WEINERMAN:  First thing, I would like to renew

11 the Rule 29 motion, which we have to do after we rest our

12 case.

13         THE COURT:  All right.  Consistent with my earlier

14 ruling, I will deny the motion.

15         MR. WEINERMAN:  And then I would like to read into

16 the record -- the government has no objections to any of

17 them, but to make sure they get to the jury.  Exhibit 600,

18 Exhibit 602 through 618, so all of those numbers, rather than

19 read each one individually.  Exhibits 624, 625, 700, 701-A,

20 701-B, 709, 710, 711, 713, 716, 717, 720 through 723, and 726

21 through 729.

22         THE COURT:  All right.  Thank you.

23         MR. WEINERMAN:  And the last matter, Judge, I was

24 looking at Federal Rules of Criminal Procedure 30(d), which

25 deals with objections to instructions and having to do it out

Page 1184

1  of the presence of the jury, and out of the jury's hearing.

2  And requiring us to make specific objections, and the grounds

3  before the jury retires to deliberate.

4      If it's acceptable to the Court, I would like the

5  record to reflect that the Court has considered our

6  objections previously made, including the ones in the

7  pretrial conference, and that we satisfied the requirement of

8  Rule 30.  I have seen some judges, before the jury -- after

9  they are instructed and they hear argument, and before they

10 retire, call us up and ask if there's any exceptions other

11 than previously made.  So I want to make sure we had complied

12 with the rule, and are not stuck with plain, narrow review if

13 there's an appeal in the case.

14     THE COURT:  Yes, you complied with the rule, and I

15 think I will tell the jury not to begin deliberations until

16 they are instructed by Ms. Pew to do so, because you are

17 going to have to -- the alternate jurors are going to have to

18 gather up their things and leave while that is happening.

19     We can put on the record whether there's any

20 additional exceptions, and then Ms. Pew can instruct them to

21 begin their deliberations.

22     Mr. Sweet.

23     MR. SWEET:  The government's exhibits -- and the

24 government has no objection to the exhibits that the defense

25 read.  We went over these last night.  I don't recall each

Page 1185

1  and every number, but we went over them together so we're

2  fine with that.  And likewise, the government has filed a

3  third exhibit list which ends with 312, so rather than read

4  those into the record, the government would move to admit --

5  and I believe there may be a few that Ms. Pew notes that

6  weren't actually admitted, 1 through 312, except the ones

7  that are noted as withdrawn.

8          We did go over these with the defense yesterday

9  afternoon.  We made a few redactions and withdrawals since

10  then, which are reflected in this list.  And 312 is the board

11  in the back, which we're going to ask that that go to the

12  jury, as well.  So there -- I believe there are no objections

13  to 1 through 312, except the ones that were withdrawn.

14          THE COURT:  We will bring the jury in for

15  instructions.

16                  (JURY IN.)

17

18                  JURY INSTRUCTIONS

19          THE COURT:  All right.  You have heard all the

20  evidence in the case.  Thank you, again, on behalf of all the

21  parties, and myself and my staff for all the work you've put

22  into this case.  My plan is to give you the instructions this

23  morning.  It's going to take some setting up for closing

24  argument, so we're going to break early for lunch and have

25  you back here at 12:30, in which case we will start our

Page 1186

1    closing arguments.  When those are complete, we will then

2    begin the deliberations.

3           You will have a copy of these instructions with you

4    in the jury room.  We will make one for each of you, so do

5    not feel like you have to write down everything I am saying.

6           It is your duty to weigh and evaluate the evidence

7    received in the case, and in that process, decide the facts.

8    It is also your duty to apply the law as I give it to you, to

9    the facts as you find them, whether or not you agree with the

10   law or not.  You must decide the case solely on the evidence

11   and the law.  Do not allow personal likes or dislikes,

12   sympathy, prejudice, fear, or public opinion to influence

13   you.  You should also not be influenced by any person's race,

14   color, religion, national ancestry or gender, sexual

15   orientation, profession, occupation, celebrity, economic

16   circumstances, or position in life or in the community.  You

17   will recall that you took an oath promising to do so at the

18   beginning of the case.

19          You must follow all of these instructions and not

20   single out some and ignore others.  They are all important.

21   Please do not read into these instructions, or into anything

22   I may have said or done, any suggestion as to what verdict

23   you should return -- the matter is entirely up to you.

24          Because you must base your verdict only on the

25   evidence received in the case and on these instructions, I

Page 1187

1    remind you that you must not be exposed to any other

2    information about the case or to the issue it involves,

3    except for discussing the case with your fellow jurors during

4    deliberations.

5         I have given you throughout the trial and in the

6    beginning of the trial, several warnings about not listening

7    to the media, not discussing the matter outside of court,

8    being in a position where you are not overhearing others talk

9    about the case.  So I am not going to read to you those

10   instructions again.  But I will read -- some of these are

11   repetitious from earlier, but I think they are worth

12   repeating.

13        The first is, what is evidence?  The evidence you

14   are to consider in this case in deciding the facts consists

15   of the sworn testimony of any witness, and exhibits that are

16   received into evidence, any facts to which the parties have

17   agreed, called stipulations, and any facts that the Court has

18   instructed you to accept as true.

19        So what is not evidence?  Reaching your verdict you

20   may consider only those things that are previously listed.

21   The following things are not evidence, and you may not

22   consider them in deciding what the facts are.  One,

23   questions, statements, objections and arguments by the

24   lawyers are not evidence.  The lawyers are not witnesses.

25   Although you must consider a lawyer's question to understand

JURY INSTRUCTIONS

Page 1188

1   the answer of a witness, the lawyer's questions are not

2   evidence.

3           Similarly, what the lawyers have said or will say in

4   their opening statements -- or said in their opening

5   statements and will say in their closing arguments, and at

6   other times is intended to help you interpret the evidence,

7   but it is not evidence.  If the facts, as you remember them,

8   differ from the way the lawyers state them in their

9   arguments, your memory of them controls.

10          Two, any testimony that I have excluded, stricken or

11  instructed you to disregard is not evidence.  Three, anything

12  that you may have seen or heard when court was not in session

13  is not evidence.  You are to decide this case solely on the

14  evidence received at the trial.

15          Direct and circumstantial evidence, there are two

16  types of evidence, direct and circumstantial.  Evidence may

17  be direct or circumstantial.  Direct evidence is direct proof

18  of a fact, such as the testimony of an eyewitness about what

19  that witness personally saw or heard or did.  Circumstantial

20  evidence is indirect evidence, that is it's a proof of one or

21  more facts from which you can find another fact.  The proof,

22  sometimes, we would describe it as proof of a chain of facts

23  pointing to the existence or nonexistence of another fact.

24          You are to consider both direct and circumstantial

25  evidence.  Either can be used to prove any fact.  The law

JURY INSTRUCTIONS

Page 1189

1  makes no distinction between the weight to be given to either

2  direct or circumstantial evidence.  It is for you to decide

3  how much weight to give the evidence.

4          You have watched transcripts and recording -- you

5  have watched recordings that have been received into

6  evidence.  Each of you was given a transcript of the

7  recording to help you identify speakers and help you listen

8  to the recording.  However, bear in mind that the recording

9  is the evidence, not the transcript.  If you heard something

10 different from what appeared in the transcript, what you

11 heard is controlling.

12         For recordings that involve the translation of a

13 foreign language, such as Khmer, you must accept the English

14 translation as evidence.

15         Foreign language testimony.  You have heard

16 testimony of a witness who testified in the Khmer language.

17 Witnesses who do not speak English, or are more proficient in

18 another language testify through an official interpreter.  It

19 says here, although some of you may know the Khmer

20 language -- I don't think we've asked you this.  Do any -- is

21 there anybody who actually knows some Khmer language, that

22 you understand some words?

23              (No Response.)

24         THE COURT:  Well, if you did, it is important that

25 jurors consider the same evidence; therefore, you must accept

1    the interpreter's translation of the witness' testimony.  You

2    must disregard any different meaning.

3           You must not make assumptions about a witness or a

4    party based solely on the fact that an interpreter was used.

5           Credibility of witnesses, in deciding this case you

6    may have to decide which testimony to believe and which

7    testimony not to believe.  You may believe everything a

8    witness says, part of it, or none of it.

9           In considering the testimony of any witness, you may

10   take into account, one, the witness' opportunity and ability

11   to see or hear or know the things testified to; two, the

12   witness' memory; three, the witness's manner while

13   testifying; four, the witness's interest in the outcome of

14   the case, if any; five, the witness' bias or prejudice, if

15   any; six, whether other evidence contradicted the witness'

16   testimony; seven, the reasonableness of the witness'

17   testimony in light of all the evidence; eight, the prior

18   statements of the witness; and nine, any other factors that

19   bear on believability.

20          Sometimes a witness may say something that is not

21   consistent with something else he or she said.  Sometimes

22   different witnesses will give different versions of what

23   happened.  People often forget things or make mistakes in

24   what they remember.  Also, two people may see the same event,

25   but remember it differently.  You may consider these

Page 1191

1  differences, but do not decide the testimony is untrue just

2  because it differs from other testimony.

3          However, if you decide that a witness has

4  deliberately testified untruthfully about something

5  important, you may choose not to believe everything that

6  witness testified.  However, on the other hand, if you think

7  the witness testified untruthfully about some things, but

8  told the truth about others, you may accept the part you

9  think is true, and ignore the rest.

10          The weight of the evidence as to a fact does not

11  necessarily depend on the number of witnesses who testify.

12  What is important is how believable the witnesses are, and

13  how much weight you think their testimony deserves.

14          Prior statements of a witness, some witnesses who

15  testified in Court also made statements to others in the

16  past.  You may consider the consistency or the

17  inconsistencies of these statements in deciding whether or

18  not to believe a witness, and how much weight to give to the

19  testimony of a witness.

20          Testimony of witnesses, compensation and benefits.

21  You have heard testimony from some witnesses who received

22  benefits or compensation from the government in connection

23  with this case.  For this reason, in evaluating the testimony

24  of these witnesses, you should consider the extent to which

25  or whether their testimony may have been influenced by the

Page 1192

1    compensation or benefits.  You should examine the testimony

2    of these witnesses with greater caution than that of other

3    witnesses.  It is for you to determine the weight to give

4    such evidence.

5         Opinion evidence, expert witness, you have heard

6    testimony from certain witnesses who testified to opinions

7    and reasons for their opinions.  The opinion testimony is

8    allowed because of their education or experience of this

9    witness.  Such opinion testimony should be judged like any

10   other testimony.  You may accept it or reject it, and give it

11   as much weight as you think it deserves, considering the

12   witness' education and experience, the reasons given for the

13   opinion, and all the other evidence in the case.

14        Statements made by a defendant, you have heard

15   testimony that Mr. Johnson made certain statements to others.

16   It is for you to decide, one, whether Mr. Johnson made the

17   statement, and two, if so, how much weight to give to it.  In

18   making those decisions you should consider all of the

19   evidence about the statement, including the circumstances

20   under which Mr. Johnson may have made it.

21        Prior proceedings.  You have heard testimony that

22   Mr. Johnson was arrested in Cambodia and spent time in jail

23   in Cambodia.  You have also heard testimony about a court

24   proceeding in Cambodia.  You should not speculate as to the

25   nature or outcome of the proceeding in Cambodia.  What a

Page 1193

1   Cambodian Court did or did not do is not relevant to your

2   deliberations.  You should base your verdict only on the

3   evidence you heard in this case.

4           Charts and summaries and transcripts not admitted

5   into evidence, during the trial certain charts and summaries

6   and transcripts were shown to you in order to help explain

7   the evidence in the case.  Some of these charts and summaries

8   and transcripts were not admitted into evidence, and will not

9   go into the jury room with you.  They are not themselves

10  evidence or proof of any facts.

11          If they do not correctly reflect the facts or

12  figures shown by the evidence in the case, you should

13  disregard these charts and summaries and determine the facts

14  from the underlying evidence.

15          Use of notes, some of you have taken notes during

16  the trial.  Whether or not you took notes, you should rely on

17  your own memory of what was said.  Notes are only to assist

18  your memory.  You should not be overly influenced by your

19  notes, or by the notes of your fellow jurors.

20          Consideration of punishment, the punishment provided

21  by law for this crime is for the Court to decide.  You may

22  not consider punishment in deciding whether the government

23  has proved its case against Mr. Johnson beyond a reasonable

24  doubt.

25          Stipulations of fact, the parties have agreed to

JURY INSTRUCTIONS

Page 1194

1    certain facts that have been stated to you.  Those facts are

2    now conclusively established.  The Court is instructing you

3    that the following facts are true, and you will have these

4    with you as part of the instructions.

5            Stipulation No. 1, on January 10, 2014, an APLE,

6    A-P-L-E social worker and an APLE lawyer met with ES XXXXXXXX

7    and SO XXXXXXX at a shelter in Cambodia.  The boys said that

8    Sambo Heng, former staff member from Hope Transition Cambodia

9    met them at their high school a week ago.  Sambo said that he

10   visited Daniel Johnson, who was in custody in Cambodia.

11   Sambo said that Daniel was very thin and having a very

12   difficult time, and Sambo felt pity for him.

13           Both ES XXXX and SO XXX said to the APLE

14   members that their statements about the abuse, by Daniel

15   Johnson, were not true.  They did not want to lie to

16   everybody and they did not want someone to be prosecuted

17   because of a lie, and that they would change their

18   statements.

19           APLE wrote a report regarding their statements on

20   January 11, 2014, and provided the FBI with the report.

21           On January 6, 20 -- excuse me, on January 6, 2013,

22   FBI Special Agent Jeff Yesensky spoke with the APLE employees

23   regarding Daniel Johnson.  The APLE employee did not have

24   copies of the Cambodian National Police interview reports

25   with LS XXXXX, VS XXXXXXXXXXXXX, CC XXXXXX, SO XXXXXXX and

JURY INSTRUCTIONS

Page 1195

1   ES XXXXXXXX, but had been briefed on the case.  To the APLE

2   employee's knowledge, none of the victims had disclosed that

3   Daniel Johnson had taken explicit images of them.

4           MR. WEINERMAN:  Judge, I think there's an error.  I

5   think both parties agree.  The date should read on January 6,

6   2014 when the --

7           THE COURT:  All right.  We will fix that.

8           MR. WEINERMAN:  Same date.  January 6, 2014, not

9   2013.

10          MR. SWEET:  That's correct, Your Honor.

11          THE COURT:  We will make that correction.

12          Stipulation two, at all relevant times, including

13  between November 1st, 2005, and December 9, 2013, Daniel

14  Johnson's last known domestic residence was in the District

15  of Oregon.

16          Stipulation No. 3.  1, Mr. Johnson's TECS records,

17  airline records, passport, and US and Cambodian immigration

18  records, including records regarding immigration status,

19  travel, and entry and exit data, and the information

20  contained in those records are true and accurate.

21          2, Mr. Johnson became a United States citizen at

22  birth, and he has remained a United States citizen,

23  continuously and without interruption from the time of his

24  birth to present.

25          3, Mr. Johnson traveled in interstate and foreign

Page 1196

1    commerce between the United States and Cambodia, between, on,

2    or about the following dates:  November 28, 2005, departing

3    the US, to December 6, 2005, arriving in Cambodia;

4    January 11, 2007, departing the US, January 12th, 2007

5    arriving in Cambodia; October 10, 2008, departing the US,

6    October 11, 2008, arriving in Cambodia; October 22nd, 2009,

7    departing the US, October 23rd, 2009, arriving in Cambodia;

8    June 8, 2010, departing US, June 10, 2010, arriving in

9    Cambodia; January 18, 2011, departing the US, January 19,

10   2011, arriving in Cambodia.

11         4, Mr. Johnson was present within the District of

12   Oregon and then traveled in interstate and foreign commerce

13   between the United States and Cambodia on or about the

14   following dates:  June 21st, 2011, in Oregon, July 5, 2011,

15   departed the US, July 7, 2011, arrived in Cambodia;

16   December 1st, 2011, in Oregon, December 20th, 2011 departed

17   the US, December 22nd, 2011, arrived in Cambodia; July 24,

18   2012, in Oregon, August 24, 2012, departed the US, August 27,

19   2012, arrived in Cambodia; November 19, 2012, in Oregon,

20   December 5, 2012, departed the US, December 7, 2012, arrived

21   in Cambodia; May 28, 2013, in Oregon, May 29, 2013, departed

22   the US, May 30, 2013, arrived in Cambodia.

23         Stipulation No. 4, in accordance with Title 28,

24   Section 1821 of the United States Code, any fact witnesses

25   for either party must be paid a $40 witness fee for each day

Page 1197

1  they attend the trial, and for each day necessarily occupied

2  in going to and returning from the place of attendance.  That

3  same Federal law requires that, in addition to travel-related

4  expenses, fact witnesses must be paid a subsistence

5  allowance.  The subsistence allowance paid to any fact

6  witness in the case will be the current Federal per diem rate

7  for Eugene, Oregon of $59 per day.

8          Defendant's decision not to testify, a defendant in

9  a criminal case has a Constitutional right not to testify.

10  In arriving at your verdict, the law prohibits you from

11  considering in any manner that Mr. Johnson did not testify.

12          Presumption of innocence, burden of proof.  The

13  indictment is not evidence.  Mr. Johnson has pleaded not

14  guilty to the charges.  He's presumed to be innocent unless

15  and until the government proves his guilt beyond a reasonable

16  doubt.  Mr. Johnson does not have to testify or present any

17  evidence.  He does not have to prove innocence.  The

18  government has the burden of proving every element of the

19  charge beyond a reasonable doubt.

20          Beyond a reasonable doubt, proof beyond a reasonable

21  doubt is proof that leaves you firmly convinced that

22  Mr. Johnson is guilty.  It is not required that the

23  government prove guilt beyond all possible doubt.

24          A reasonable doubt is based on reason and

25  commonsense, and is not based purely on speculation.  It may

Page 1198

1  arise from a careful and impartial consideration of all the

2  evidence, or from a lack of evidence.

3         If, after careful and impartial consideration of all

4  the evidence, you are not convinced beyond a reasonable doubt

5  that Mr. Johnson is guilty, it is your duty to find him not

6  guilty.

7         On the other hand, if, after careful and impartial

8  consideration of all the evidence in the case, you are

9  convinced beyond a reasonable doubt that Mr. Johnson is

10 guilty, it is your duty to find him guilty.

11        Activities not charged, you are here only to

12 determine whether Mr. Johnson is guilty or not guilty of the

13 charges in the indictment.  He is not on trial for conduct or

14 offenses not charged in the indictment.

15        Separate consideration of multiple counts, single

16 defendant.  A separate crime is charged against Mr. Johnson

17 in each count.  You must decide each count separately.  Your

18 verdict on one count should not control your verdict on any

19 other count.

20        I am now going to go through the different counts of

21 the indictment, and the elements that are required legally to

22 be proven by the government beyond a reasonable doubt.

23        First, Counts 1 through 6.  Mr. Johnson is charged

24 in Counts 1 through 6 of the indictment with traveling in

25 foreign commerce and engaging in illicit sexual conduct in a

JURY INSTRUCTIONS

Page 1199

1   foreign place in violation of Section 2423(c) of Title 18 of

2   the United States Code.  In order for him to be found guilty

3   of these charges the government must prove each of the

4   following elements beyond a reasonable doubt.

5           One, that Mr. Johnson is a United States citizen;

6   two, that Mr. Johnson traveled in foreign commerce from the

7   United States to Cambodia; and three, Mr. Johnson engaged in

8   illicit sexual conduct with the victims referenced in that

9   count of the indictment, and it will say, "please see the

10  chart below."

11          And to clarify, Mr. Johnson engaged in illicit

12  sexual conduct with the victim referenced in that count in

13  the indictment, in Cambodia.

14          Now, in the instructions you will see Count 1

15  through 6, the same criminal charge, but it involves six

16  different minor alleged victims.  So this chart puts the

17  names and the dates for each of the counts of the indictment.

18          So you will see Count 1 says Minor Victim No. 1,

19  name BT XXXXXXXXX.  Next you will see BT XXXXXXX, so that you

20  know specifically which of the alleged victims we're talking

21  about.

22          A person born in the United States is a United

23  States citizen at birth.  A United States passport issued by

24  the Secretary of State to a citizen of the United States is

25  proof of United States citizenship for the period during

Page 1200

1  which the passport is valid.

2         Lack of consent is not an element of the offense.

3  The government does not have to prove that the victim did not

4  consent to the illicit sexual conduct, nor is the government

5  required to show that the victim resisted.

6         The government does not have to prove that the

7  illicit sexual conduct violated the laws of the foreign

8  country where it occurred.

9         For this offense, the government does not have to

10 prove that Mr. Johnson intended to engage in illicit sexual

11 conduct at the time he departed the United States.

12        Count 7 of the indictment, Mr. Johnson is charged in

13 Count 7 of the indictment with traveling in foreign commerce

14 for the purpose of engaging in any illicit sexual conduct

15 with a person under 18 years of age in violation of Section

16 2423(b) of Title 18 of the United States Code.  In order for

17 Mr. Johnson to be found guilty of this charge the government

18 most prove each of the following elements beyond a reasonable

19 doubt.

20        One, that Mr. Johnson is a United States citizen;

21 two, that Mr. Johnson traveled in foreign commerce from the

22 United States on or about June 23rd, 2011, and May 29th,

23 2013; three, Mr. Johnson traveled for the purpose of engaging

24 in illicit sexual conduct.

25        Again, a person born in the United States is a

Page 1201

1    United States citizen at birth.  A United States passport

2    issued by the Secretary of State to a citizen of the United

3    States is proof of a United States citizenship for the period

4    during which the passport is valid.

5            For this offense, the government does not have to

6    prove that Mr. Johnson actually engaged in illicit sexual

7    conduct, but must prove that he travelled for the purpose of

8    engaging in such conduct.  In doing so, the government need

9    not prove that Mr. Johnson traveled in foreign commerce for

10   the sole and exclusive purpose of engaging in illicit sexual

11   conduct.  A person may have different purposes or motives for

12   travel, and each may prompt in varying degrees the act of

13   making the journey.

14           For this count, the government must prove beyond a

15   reasonable doubt that a dominant, significant, or motivating

16   purpose of Mr. Johnson's travel in foreign commerce was to

17   engage in illicit sexual conduct.  In other words, the

18   government must prove the sexual act was not merely

19   incidental to travel.  The government does not have to prove

20   the illicit sexual conduct is illegal in the country to which

21   Mr. Johnson traveled.

22           Count 8 of the indictment.  Mr. Johnson is charged

23   in Count 8 of traveling across a state line with the intent

24   to engage in a sexual act with a person who was less than

25   12 years old.

Page 1202

1          In order for you to find him guilty of this charge

2     the government must prove each of the following elements

3     beyond a reasonable doubt:  One, Mr. Johnson traveled across

4     a state line between on or about June 23rd, 2011, and May 29,

5     2013; and two, Mr. Johnson traveled with the intent to engage

6     in a sexual act with a person who is less than 12 years old.

7          Again, the government does not have to prove that

8     Mr. Johnson actually engaged in a sexual act with a person

9     under 12, but must prove that he traveled with the intent to

10    engage in such conduct.

11         In doing so, the government need not prove that

12    Mr. Johnson traveled across a state line for the sole and

13    exclusive purpose of engaging in a sexual act with a person

14    under 12.  A person may have different purposes or motives

15    for travel, and each may prompt in varying degrees the act of

16    making the journey.

17         For this Count, the government must prove beyond a

18    reasonable doubt that a dominant, significant, or motivating

19    purpose of Mr. Johnson's travel across a state line was to

20    engage in a sexual act with a person under 12.  In other

21    words, the government must prove the sexual act was not

22    merely incidental to the travel.

23         Some definitions.  The term "illicit sexual conduct"

24    means knowingly engaging in a commercial sex act with a

25    person, the victim, who is under 18 years of age; the

Page 1203

1  government does not have to prove the defendant knew the

2  victim was under the age of 18.

3            Or illicit sexual conduct means knowingly causing a

4  person who is under 18 years of age to engage in a sexual

5  act, one, by using force against that person, or two, by

6  threatening or placing that person in fear.

7            Or the term illicit sexual conduct means knowingly

8  engaging in a sexual act with a person, the victim, who has

9  attained the age of 12 years, but has not attained the age of

10  16 years, and is at least four years younger than the

11  defendant; the government does not have to prove that the

12  defendant knew the age of the victim, nor does it have to

13  prove the defendant knew the requisite age difference

14  existed.

15            Illicit sexual conduct also means knowingly engaging

16  in a sexual act with a person, the victim, who is under

17  12 years of age; the government does not have to prove the

18  defendant knew the victim was under the age of 12.

19            The term "sexual act" means contact between the

20  penis and the anus, involving penetration, however slight, or

21  contact between the mouth and the penis, or the mouth and the

22  anus, or penetration, however slight, of the anal opening by

23  a hand, finger, or any object, with the attempt to abuse,

24  humiliate, harass, or degrade the person, or to arouse or

25  gratify the sexual desire of the defendant or any other

Page 1204

1  person.

2          Or an intentional touching, not through the

3  clothing, of the genitalia of the person younger than

4  16 years old, with the intent to abuse, humiliate, harass, or

5  degrade the person, or to arouse or gratify the sexual desire

6  of the defendant, or any other person.

7          The term "commercial sex act" means any sex act, on

8  account of which anything of value is given or received by

9  any person.

10          The term "travel in foreign commerce" means travel

11  between any part of the United States and a foreign country.

12          On or about, the indictment charges the offenses

13  alleged occurred on or about a certain date.  Although it is

14  necessary for the government to prove beyond a reasonable

15  doubt that the offense was committed on a date reasonably

16  near the date alleged in the indictment, it is not necessary

17  for the government to prove that the offense was committed

18  precisely on the date charged.

19          Venue, Counts 1 through 6, for the offenses charged

20  in Counts 1 through 6, the government must prove it is more

21  likely true than not that Mr. Johnson was first brought to or

22  arrested in the District of Oregon, or that his last known

23  residence was in the District of Oregon.  You decide these

24  facts by considering all the evidence and deciding what

25  evidence is more believable.  This is a lower standard of

Page 1205

1  proof than beyond a reasonable doubt.  The requirement of

2  proof beyond a reasonable doubt applies to all other issues

3  in this case.

4       Counts 7 and 8, for the offenses charged in Counts 7

5  and 8, the government must prove it is more likely true than

6  not true that the offense was begun, continued, or completed

7  in the District of Oregon.  You decide these facts by

8  considering all the evidence and deciding what evidence is

9  more believable.  This is a lower standard of proof than

10 proof beyond a reasonable doubt.  The requirement of proof

11 beyond a reasonable doubt applies to all other issues in this

12 case.

13      The word "knowingly," an act is done knowingly if

14 the defendant is aware of the act and does not act through

15 ignorance, mistake, or accident.  The government is not

16 required to prove the defendant knew that his acts or

17 omissions were unlawful.  You may consider evidence of the

18 defendant's words, acts, or omissions, along with all other

19 evidence, in deciding whether the defendant acted knowingly.

20      Unanimous agreement, with regard to Count 7 the

21 parties have stipulated that during the time frame set forth

22 in Count 7, Mr. Johnson took five trips from the United

23 States to Cambodia.  While you may consider all of these

24 trips in your deliberations, you may only find Mr. Johnson

25 guilty of Count 7 if you all unanimously agree beyond a

JURY INSTRUCTIONS

Page 1206

1   reasonable doubt, one, that Mr. Johnson possessed the

2   requisite intent for a specified United States to Cambodia

3   trip, and two, that Mr. Johnson was a US citizen at the time

4   of the trip.  You must unanimously agree on at least one

5   trip.

6            In other words, six of you can't agree that

7   something occurred during trip two, and 6 of you say, no, but

8   we think it occurred during trip three.  12 of you have to

9   agree on a single trip.

10           Count 8, the parties have stipulated that during the

11  time frame set forth in Count 8, Mr. Johnson took five trips

12  from the United States, to Cambodia.  While you may consider

13  all of these trips in your deliberations, you may only find

14  Mr. Johnson guilty of Count 8 if you all unanimously agree

15  beyond a reasonable doubt as to a specific trip in which he

16  crossed a state line with the requisite intent.  You must

17  unanimously agree on at least one trip.

18           You have a verdict form that has been prepared for

19  you.  After you reach a unanimous agreement on a verdict,

20  your presiding juror, foreperson, should complete the form

21  according to deliberations and sign it and date it, and

22  advise the clerk that you are ready to return to the

23  courtroom.

24           I will give you further instructions about

25  deliberations, brief instructions, after the closing

Page 1207

1    statements.  Because the attorneys will likely reference the

2    verdict form, I think what we will do is give you a copy of

3    the verdict form to have with you to reference during the

4    closing statements, so that the attorneys can express to you

5    their arguments about how you should go about filling out the

6    verdict form.  So you will have a copy during closing

7    statements, and then of course you will take a copy back with

8    you.

9            So our plan now is to break for lunch until 12:30.

10   At 12:30 the government will begin their closing statement.

11   Remember, the government has the complete burden of proof

12   here.  So they will go first, followed by the defense, and

13   because the government has the burden of proof, they will

14   have an opportunity to provide rebuttal argument.

15           We will then say goodbye to our alternate jurors,

16   and the 12 jurors will be able to begin their deliberations.

17   So with that, we will break for lunch and see you back here

18   at 12:30.

19                     (JURY OUT.)

20           THE COURT:  Please be seated.  Mr. Weinerman, since

21   I just gave the instructions and we don't have the jury

22   deliberating until later this afternoon, now is as good a

23   time as any to make any exceptions to the record.

24           MR. WEINERMAN:  Yes, Judge, and I am going to

25   mention a few.  That doesn't mean we don't continue our

Page 1208

1   exception to the remainder.

2          We still believe the Court should identify an

3   alleged victim in Count 7 and 8.  The Court has done so in

4   Counts 1 through 6, but not 7 and 8.  And here I know the

5   Court has redenied that, but we wanted to renew that request.

6          And we previously submitted our instruction on

7   Counts 1 through 6, the elements of the offense.  I think we

8   did at the pretrial conference.  I don't have the document in

9   front of me, and the Court denied.  But we're renewing that

10  request to renew the instruction on Counts 1 through 6.

11         THE COURT:  Thank you.

12         For the record, any exceptions from the government?

13         MR. SWEET:  No exceptions.  Just one error that I

14  believe we made on page 27.  There's, for Count 1 there's an

15  extra zero in November 12, 2008.  It's 20,008 right now.

16  That's the only thing.  Thank you.

17         THE COURT:  We will fix that.  There are a couple of

18  other minor typos that we will go through.

19         See everybody back at 12:30, and if you need to stay

20  and set up for your closing statements, please do so.

21                    (Lunch recess taken from 11:25 a.m.

22                     to 12:39 p.m.)

23         THE COURT:  All right.  Ready to go?  Bring the jury

24  in.  This would be a good time to remind people to turn their

25  phones down or off.  I am usually the worst when it comes to

Page 1209

1    that.

2                          (JURY IN.)

3            THE COURT:  Please be seated.  Mr. Allnatt is

4    handing out a copy of the verdict form so you have some sense

5    of the questions you are going to be asked to answer.  With

6    that, we will hear closing summation from the government.

7            Mr. Sinha.

8

9                    GOVERNMENT'S CLOSING ARGUMENT

10           MR. SINHA:  Control and abuse.  At the beginning of

11   this trial, the United States, Ms. Britsch, stood up here and

12   told you that this is a case about control and abuse.  And

13   over the last two-and-a-half weeks of testimony, what seemed

14   like a lifetime, you have heard testimony from 13 Cambodian

15   witnesses and 10 Americans.  And together, they have painted

16   a portrait of control and abuse.

17           They have painted a harrowing and horrifying

18   portrait of what life was like for the boys who lived at the

19   Hope Transition Center under the control of Daniel Johnson.

20   That portrait has included being in fear, being threatened,

21   being hit.  That portrait has included being systematically

22   and repeatedly sexually abused by Daniel Johnson whenever he

23   wanted.

24           Now, you have heard extensive testimony from boy

25   after boy after boy after boy after boy about the things that

DEBORAH COOK, OFFICIAL COURT REPORTER
deborah_cook@ord.uscourts.gov

GOVERNMENT'S CLOSING ARGUMENT

Page 1210

1    Daniel Johnson did to them, and the things that Daniel

2    Johnson attempted to do to them.  But I want to focus your

3    attention on six of them today.  These are the six children

4    whose abuse underlies Count 1 through 6 of the indictment.

5    These are the six children who are going to ask you to

6    consider the evidence about their abuse.

7            The first, underlying Count 1 is BT XX.  Two, Count

8    2 is ES XXX, or sometimes called "ES XXX."  3, Count 3 is

9    LS XXXXX.  4, Count 4 is SO XXX.  5, Count 5 is VS XXXX, or

10   VS XXXX.  And 6, Count 6 is CC X, or CC XXXXXX.

11           Now, ladies and gentlemen, you sat through this

12   trial and you have watched these kids testify.  And though

13   they spoke through interpreters, you don't have to speak a

14   foreign language to understand what they were telling you.

15   You don't have to speak Khmer to hear the pain in their

16   voice, to see the shame on their faces, to see the scars that

17   they still bear from the things that Daniel Johnson did to

18   them.

19           Ladies and gentlemen, you don't have to speak Khmer

20   to see the tears that some of them had.  And when you saw

21   that, you can make a determination that when they told you

22   about the ways in which Daniel Johnson repeatedly and

23   systematically sexually abused them, they were speaking from

24   the heart.

25           Now, you also heard from several other boys who

Page 1211

1   lived at Hope Transition Center, boys who Daniel Johnson also

2   controlled, and either attempted or succeeded in sexually

3   abusing.  Now, those are boys who told you about their

4   experiences themselves, but they also told you what they saw.

5   And they provided you with important context and

6   corroboration of the things that Mr. Johnson did to those six

7   victims.

8           Some of the details that those boys told you are

9   difficult to forget.  You may recall SESX talking to you

10  about how Mr. Johnson attempted to touch his genitals

11  whenever he gave him a massage.  And SESX expressed his love

12  for Mr. Johnson, saying if he keeps continuing to do that to

13  me, I am going to stop giving him a massage.

14          You heard RT XX talk about Mr. Johnson trying to

15  grab his penis, and from LT XXXXXXX who actually left the

16  orphanage and had to leave his little brother behind, because

17  Mr. Johnson repeatedly grabbed his penis.

18          You may also remember LT XXXXXXX telling you what

19  LS X told him about Mr. Johnson.  In strikingly similar

20  language to what LS X told you from the stand, LS X told

21  LT XXXXXXX quote, "He sucked my dick."

22          You heard from SS XX, and at first how SS XX -- how

23  Mr. Johnson tried to grab SS XX's genitals, and second, how

24  SO XXX disclosed the abuse that Mr. Johnson had put upon him,

25  and the sexual abuse that Mr. Johnson had committed against

Page 1212

1  SO XXX, disclosed it to SS XX.  But perhaps most strikingly

2  from SS XX, you heard his testimony that was corroborated by

3  SESX.

4          That at night Mr. Johnson would come into the room

5  where the boys were sleeping with a flashlight, and he would

6  walk around and choose which of the boys he was going to pick

7  up and carry into his bedroom, and that he often chose

8  SO XXX, LT XXXXXXX, and ES XXX.  As SS XX put it, at times

9  they were asleep and he came and just took them.

10         In addition to the boys at Hope Transition Center,

11  you also heard from a number of volunteers.  First, you heard

12  from Celena Ocen who told a story of volunteering and being

13  there on the morning of Mr. Johnson's arrest.

14         She told you that she went to worship services at

15  5:00 a.m., and after she got done and took a shower, she was

16  outside Mr. Johnson's bedroom for about four hours.  No one

17  came in, and no one went out.  And in spite of her repeated

18  knocking at the door, Mr. Johnson didn't answer.

19         Celena then told you she saw a boy emerge from that

20  room looking disheveled, I believe she said looking

21  intoxicated.  And that Mr. Johnson came out later tucking in

22  his shirt.

23         You also heard from Kelby and Lindsay Alderson.

24  Kelby and Lindsay told you about the times that SO XXX and

25  CC X had told them about Mr. Johnson's sexual abuse of them.

Page 1213

1   But Lindsay sat up here, and with tears welling in her eyes,

2   recounted to you how SO XXX told her that one time he

3   pretended to be asleep while another boy was being abused so

4   that Mr. Johnson wouldn't abuse him.

5            Ladies and gentlemen, this is a difficult case to

6   serve on.  I have little doubt that you have heard things you

7   never wanted to hear, and we have asked you to consider in

8   depth things that I suspect you never want to think about.

9   And frankly, I have no illusion about the cost of your

10  service on this jury to you.  The sleepless nights it may

11  have caused, the sleepless nights it may cause you.

12           But the United States can't apologize for the

13  evidence you have heard.  The United States didn't create

14  this evidence.  Mr. Johnson created the evidence you heard,

15  and it's evidence of his control and abuse of these children.

16           So let's talk about that evidence, and let's talk

17  about how it fits into the charges against Mr. Johnson.

18  While I talk I want to remind you of three things:  First and

19  foremost, what I tell you, what Ms. Maxfield tells you, or

20  what Mr. Sweet tells you is not evidence.

21           The evidence is the testimony you heard, what you

22  saw with your eyes, the exhibits that have been admitted, and

23  the agreed-upon facts.  I also want to tell you that while

24  we're going to talk about the law, and I am going to try to

25  give you an insight into how the government views the case,

Page 1214

1   what I tell you is not the law.  If there's any conflict,

2   refer to the jury instructions.

3          And finally, I want to remind you that at all points

4   the United States bears the burden of proving each element of

5   these crimes.  With those three things in mind, let's talk

6   about the evidence.  The evidence has shown that Mr. Johnson

7   repeatedly and systematically sexually abused multiple boys

8   under the age of 16, and in one case, under the age of 12,

9   who lived at Hope Transition Center.  These boys, who were as

10  young as seven years old when Mr. Johnson started molesting

11  them, have told you of the fear they lived in.

12         Not only has VS XXXX said, the fear that he would

13  continue to violate them, but also the fear that the

14  orphanage would close if they said anything, that they

15  wouldn't be able to seek their education, that their source

16  of food and shelter would go away, that Mr. Johnson would hit

17  them.

18         And they told you, as ES XXX said, that it really

19  made little difference if they tried to resist, he would do

20  it anyway.  They also told you about the commercial nature of

21  Mr. Johnson's sexual abuse.  They told you that after the

22  abuse, in many instances, Mr. Johnson gave them money, or

23  gave them cookies.  They knew that they were living in the

24  orphanage and receiving the food and shelter and schooling

25  that they were receiving was a condition upon them not

Page 1215

1   speaking out to the police.  They told you how reliant they

2   were on Mr. Johnson.  And how sometimes they would get gifts

3   if they submitted to the abuse.

4          Now, for all of this, Daniel Johnson stands accused

5   of eight Federal crimes.  So let's talk about them in order.

6   The first six crimes are all charged under the same statute,

7   so they all have the same elements.  So I am going to talk

8   about them together, and then we will break them up.

9          Counts 1 through 6 of the indictment charge

10  Mr. Johnson with traveling in foreign commerce and engaging

11  in illicit sexual conduct.  So the first things to consider

12  in Counts 1 through 6 is whether there is venue for these

13  charges, and I think this is an easy question for you.  There

14  are two situations in which each of those counts can be

15  venued in the District of Oregon.

16         One is that Mr. Johnson was first brought or

17  arrested into the District of Oregon, and two, is that his

18  last known residence was in the District of Oregon.  So in

19  terms of him first being brought, you have Exhibit 221 and

20  you have testimony from Special Agent Forrest Schoening who

21  told you that Mr. Johnson was first brought and touched down

22  in America in Portland, Oregon.

23         That's borne out by 221, which shows his itinerary

24  going from Phnom Penh to Seoul, Seoul to Vancouver, Canada,

25  and then into Portland.  So that aspect of the venue would be

GOVERNMENT'S CLOSING ARGUMENT

Page 1216

1   sufficient.

2          But even if you didn't find that aspect of venue,

3   you have the second option, which is that Mr. Johnson's last

4   known residence was in the district of Oregon.  The

5   stipulation states that at all relevant times, Mr. Johnson's

6   last known residence was in the District of Oregon.

7          So let's go to the next element.  Once you have

8   established venue, you have to find three elements in order

9   to find Mr. Johnson guilty of any of these charges.  First

10  element is that Mr. Johnson was a United States citizen.

11  This also is an easy lift.  Mr. Johnson and the United States

12  have agreed that Mr. Johnson has, his entire life,

13  continuously been a United States citizen.  Those are

14  stipulated facts.

15         You could also, if you wanted to, rely on

16  Mr. Johnson's passports, which are admitted into evidence,

17  Mr. Johnson's passport application and other evidence.  But

18  you don't need to.

19         The second element is that Mr. Johnson traveled in

20  foreign commerce from the United States to Cambodia.  Now you

21  have an instruction on what that means, but this also is a

22  pretty easy lift for you, because the parties have stipulated

23  that Mr. Johnson traveled in interstate and foreign commerce

24  between the United States and Cambodia, and then it gives you

25  the dates on which he traveled.  This is in part three, and I

Page 1217

1    believe there's a second part, as well.

2            But in total, you are going to be looking at ten

3    trips in which the parties have agreed that Mr. Johnson

4    traveled between the United States and Cambodia.

5            Turning to the third element, the third element is

6    that Mr. Johnson engaged in illicit sexual conduct with the

7    victim referenced in the count of the indictment.  And like I

8    say, we will go through each of these counts individually.

9    So what does illicit sexual conduct mean?  Well, it's got a

10   few definitions.  You could find any of these in finding that

11   there's illicit sexual conduct.

12           So the first one is that Mr. Johnson knowingly

13   engaged in a commercial sex act with someone under the age of

14   18 years.  So I will note for you that a commercial sex act

15   means any act on account of which anything of value is given,

16   or received by the person.  So that doesn't mean that is

17   confined to instances in which Mr. Johnson gave someone

18   money.  It could be he gave them, for instance, food or gifts

19   or he provided something to them, such as shelter or housing

20   or schooling.

21           Alternatively, you could find that Mr. Johnson

22   engaged in illicit sexual conduct by finding he knowingly

23   caused a person who is under the age of 18 to engage in a sex

24   act by either using force against that person, or by

25   threatening or placing that person in fear.  Here again,

GOVERNMENT'S CLOSING ARGUMENT

Page 1218

1   either one works, and there's been testimony, I believe, with

2   regards to both.

3           There are two other ways to find illicit sexual

4   conduct.  One is when there is a gap in age between the

5   person who is perpetrating the crime and the victim.

6   Actually, that one involves a victim who is under the age of

7   16 years old, but is over the age of 12, where the

8   defendant -- excuse me, where the perpetrator is over four

9   years older.  So here, you have victims who are under the age

10  of 16, but over the age of 12, and as has been testified to,

11  Mr. Johnson is, as we sit here, 40 years old.

12          So you can look at the dates on which the kids were

13  born, and look at the dates in the indictment, and you can

14  determine that Mr. Johnson was never within four years of

15  these kids.

16          Finally, for victims who were under 12 years old,

17  you can simply find, regardless of what the gap in age

18  between the victim and the perpetrator is, that the victim

19  was under 12 years old, and that Mr. Johnson knowingly

20  engaged in a sex act with this person.

21          So let's talk about what constitutes a sex act.

22  There are several things that constitute a sex act.  First,

23  contact between the penis and anus, involving penetration,

24  however slight.  You have heard testimony about anal

25  penetration by Mr. Johnson of his victims.  And several of

Page 1219

1  them talked to you about how it was painful.  A couple of

2  them talked about how he used lubricant.

3          Contact between the mouth and the penis, or the

4  mouth and the anus.  Here again, you have heard testimony

5  over and over and over again about Mr. Johnson either

6  performing oral sex on these children, making the children

7  perform oral sex on him, attempting to make them perform oral

8  sex on him, or some variation of those three things.

9          Next, penetration, however slight, of another

10  person's anal opening by hand, finger, or any object with an

11  intent to abuse, humiliate, harass, degrade the person.  Or

12  an intent -- and this is the one that seems applicable here,

13  to arouse or gratify the sexual desire of the defendant, or

14  of any person.  So if you find there is penetration, however

15  slight, of the anus, and you find that Mr. Johnson was doing

16  so to fulfill his own sexual desire or to gratify or arouse

17  his own sexual desire, that's illicit sexual conduct.

18          Finally, the intentional touching, not through the

19  clothing, of the genitalia of a person younger than 16 years

20  old.  Again, with the same intent.  And the one I want to

21  draw your attention to is at the end, with the intent to

22  arouse or gratify the sexual desire of the defendant, or any

23  other person.

24          Now, here in this case you have heard testimony over

25  and over and over again about Mr. Johnson touching these

Page 1220

1    boys' penises, and about Mr. Johnson making them touch his

2    penis.  And what you have heard asked almost always after

3    that testimony was, was that skin on skin contact.  Was that

4    over your clothes or under the clothes?  And the boys in the

5    charged counts have testified to you that that was skin on

6    skin contact.  That was not through the clothing.  So finding

7    that, you can find illicit sexual conduct, sexual contact,

8    and you can find a sex act.

9          So let's break up the counts and talk about them

10   individually.  Count 1 involves BT XXXXXXXX, who you have

11   heard referred to throughout sometimes as BT XX.  BT XX was

12   born in 1991.  As he testified, Mr. Johnson began abusing him

13   when BT XX was 14 or 15 years old.  And that abuse continued

14   at Hope Transition Center at three different locations until

15   BT XX was almost 18 years old.

16         BT XX told you that Mr. Johnson sexually abused him

17   in a variety of ways 19 to 22 times.  He told you that Daniel

18   Johnson provided him with money for BT XX's sick dad, and for

19   BT XX's schooling.  BT XX told you that he was afraid during

20   the abuse, and that Daniel Johnson would later apologize to

21   him, cite scripture seeking forgiveness, and said he was

22   abusing BT XX because he had been abused.  Daniel Johnson

23   reminded BT XX that Daniel Johnson knew people in high

24   places.

25         Now, the illicit sexual conduct that Daniel Johnson

GOVERNMENT'S CLOSING ARGUMENT

Page 1221

1    engaged in with BT XX included skin on skin contact, between

2    Mr. Johnson and BT XX's penises.  Oral sex, BT XX told you

3    that Daniel Johnson performed oral sex on him many times,

4    attempted to make BT XX perform oral sex on Mr. Johnson, and

5    attempted anal sex where Daniel Johnson put lubricant on

6    BT XX's anus and attempted to have anal sex with him.  He

7    eventually gave up, and as BT XX told you, he then tried to

8    put his penis in BT XX's mouth.

9         BT XX told you in describing this event, "So he

10   sucked me in that house, and then after he tried to -- and

11   then after that, he tried to put his penis in my butt.  But I

12   tried to avoid.  I tried to stop him from doing that.  Then

13   after that, he also tried to put it in my mouth again."

14        Count 2, Count 2 involves ES XXXXXXXX, who you have

15   heard referred to as both ES XXX and "ES XXX."  ES XXX was

16   born in 1997, and he was 13 years old when he moved to Hope

17   Transition Center.  He lived there from 2009 until the date

18   of Daniel's arrest on May 9, 2013.

19        Though ES XXX told you that he was abused less than

20   three times per week during this period, he told you that the

21   abuse happened pretty much the entire time he lived there.

22   It started almost immediately after he got there, and it only

23   ended a couple of weeks before Daniel was arrested after he

24   told Pastor Sopheak.  ES XXX talked to you about how he tried

25   to resist and how he couldn't try to resist more.

GOVERNMENT'S CLOSING ARGUMENT

Page 1222

1        And he told you a couple things.  He said, "I mean,
2   we had done this since we were young, so even when you
3   refused it didn't do you any good.  Why continue to refuse?"
4   And then the question was asked, "What happened when you
5   refused?"  And ES XXX's answer was, "He continued to do it.
6   Like yanking on your arms or shoulders."

7        Now, ES XXX talked to you about a variety of abuse.
8   He talked to you about Daniel Johnson touching his penis,
9   skin on skin.  He talked to you about Daniel Johnson making
10  him touch Daniel Johnson's penis.  He talked to you about
11  Daniel Johnson performing oral sex on him, and he talked to
12  you about Daniel Johnson touching his penis to ES XXX's
13  mouth.

14       ES XXX also talked to you about Daniel Johnson's
15  attempted anal sex with him.  And he said, as others said,
16  that it was, quote, painful.  And in explaining why it wasn't
17  possible for Daniel Johnson to have anal sex with him, he
18  said it was impossible because he was an adult and I was a
19  child.

20       Count 3, Count 3 involves LS XXXXX.  He's largely
21  been referred to as LS X, but occasionally LS X.  LS X lived
22  at Hope Transition Center from 2009 until the date of
23  Daniel's arrest in 2013.  LS X told you he was born in 2002.
24  So he was seven years old when he moved to Hope Transition
25  Center.  And he lived there from the time he was seven until

Page 1223

1  11, when Daniel was arrested.

2          LS X told you that Daniel abused him three or four

3  times a week, the entire time he was at Hope Transition

4  Center, with the exception of about two weeks from his

5  arrival date, and two to three weeks before Daniel's arrest

6  on December 9th.

7          So the entire time that LS X was there, Daniel

8  Johnson was sexually abusing him.  And LS X's age during that

9  time was age 7 to 11 years old.  LS X told you that among the

10 things that Daniel Johnson did to him was Daniel touched and

11 masturbated LS X's penis.  Daniel made LS X touch and

12 masturbate Daniel's penis.  Daniel performed oral sex on

13 LS X, and tried to make LS X perform oral sex on him.

14         LS X told you about the, quote, countless times that

15 Daniel's penis came in contact with LS X's buttocks.  And he

16 told you about one instance in which Daniel Johnson tried to

17 anally penetrate him, but ultimately gave up.  LS X told you

18 about that time, and he told you how painful it was for him.

19         LS X also told you that during this period, Daniel

20 Johnson, while touching him, would also touch himself.  And

21 LS X gave you a series of details that someone that age

22 usually wouldn't give about Daniel Johnson ejaculating on

23 him, ejaculating on a mattress, ejaculating on Daniel

24 Johnson's own stomach while these things were happening.

25         Count 4, Count 4 involves SO XXXXXXX.  You have

Page 1224

1   heard him referred to as SO XXX.  SO XXX was between the ages

2   of 12 and 16 years old during the time he lived at Hope

3   Transition Center and was being abused by Daniel Johnson.  He

4   told you that Daniel Johnson sexually abused him two to three

5   times per month.  That the abuse lasted for a span of two to

6   three years, and that he was abused by Daniel Johnson at all

7   three Hope Transition Center locations.  SO XXX told you that

8   right after the abuse, Daniel gave SO XXX money.  He gave him

9   ice cream, gave him candy, he gave him cookies while SO XXX

10  was still in Daniel's bedroom.

11        SO XXX told you that Daniel Johnson slapped him and

12  hit him with a belt, and that Daniel Johnson threatened to

13  call the police on him.  Daniel Johnson abused SO XXX in a

14  variety of ways similar to the other boys.

15        Daniel Johnson touched SO XXX's penis.  SO XXX told

16  you he ejaculated.  Daniel Johnson performed oral sex on

17  SO XXX, and he attempted, like others, to have anal sex with

18  SO XXX.  SO XXX told you that he avoided it, that he tried to

19  avoid it by twisting his body away from Daniel, but that it

20  was ultimately painful.

21        SO XXX also told you why he didn't come forward with

22  the disclosure of the abuse.  He said of Daniel Johnson, "I

23  also feel sorry for him and I wanted him to come out and I

24  wanted him -- and he wanted to.  Well, he helped a lot of

25  other children, and I want him to continue to help children.

GOVERNMENT'S CLOSING ARGUMENT

Page 1225

1  And that's why I couldn't tell the truth."

2          SO XXX and others talked about the very mixed

3  feelings they had about Daniel.  On the one hand, he provided

4  them with their sole source of food and shelter and

5  schooling.  And on the other hand, as they told you, time and

6  time again, he used that power to control them and sexually

7  abuse them.

8          That was equally true for VS XXXX, who underlies

9  Count 5.  VS XXXX lived at Hope Transition Center for two

10  years before Daniel was arrested.  During that period VS XXXX

11  was ages 11 to 13 years old.  VS XXXX told you for that whole

12  period, so from before he was 12, Daniel Johnson was, in

13  VS XXXX's words, violating him at Hope Transition Center.  He

14  was sexually abusing him.

15          And as VS XXXX told you very much like LS X told

16  you, Daniel Johnson would give him money or cookies after the

17  abuse, and VS XXXX and LS X understood it to be payment for

18  the abuse.  They understood it to be as a result of the

19  abuse.  When asked whether VS XXXX was scared of Daniel,

20  VS XXXX told you, I was afraid he would continue to violate

21  me.

22          Now, VS XXXX detailed the abuse that he endured.  He

23  told you about the first time that Daniel Johnson abused him.

24  He and LS X were in Daniel Johnson's bedroom watching TV.

25  LS X fell asleep, and afterwards, Daniel Johnson made VS XXXX

GOVERNMENT'S CLOSING ARGUMENT

Page 1226

1  perform oral sex on him.  He did that many, many times.
2  VS XXXX told you how Daniel Johnson pushed his head down when
3  making him perform oral sex, and told you how Daniel Johnson
4  came.

5       VS XXXX also told you about the two or three times
6  that Daniel Johnson anally penetrated him.  He told you that
7  it was painful.  He told you that Daniel Johnson used
8  lubricant, and he told you that he couldn't stop Daniel
9  Johnson because Daniel Johnson was much bigger than VS XXXX.

10      Count 6, Count 6 involves CC XXXXXX, who is often
11 referred to as CC X.  CC X was between the ages of 12 and
12 15 years old while he lived at Hope Transition Center.  He
13 was 15 when Daniel was arrested.  As CC X told you, Daniel
14 Johnson sexually abused CC X in very familiar ways.  And
15 afterwards he gave CC X money and gifts right after it
16 happened.

17      CC X told you that he was ashamed.  In fact, when
18 asked, "Before Daniel Johnson was arrested, did you ever tell
19 anyone what Daniel was doing to you?"  And CC X said, "No."
20 When asked, "Why not?"  He said a single word:  "Ashamed."

21      Daniel Johnson's sexual abuse of CC X included skin
22 on skin touching where Daniel Johnson made CC X touch Daniel
23 Johnson's penis.  It included oral sex where Daniel Johnson
24 put his penis in CC X's mouth, and when Daniel Johnson
25 ejaculated.  And it included anal sex where, as CC X told

Page 1227

1  you, Daniel Johnson put lotion on his penis first, and then

2  painfully penetrated CC X.

3         Count 7 and 8 have different charges.  They involve

4  traveling, either across a country line or across a state

5  line with an intent.  So let's talk about them each in order.

6         With Counts 7 and 8 you have a different venue

7  requirement, so let's talk about that first.  For Counts 7

8  and 8 the government has to prove that it is more likely than

9  not that the offense was begun, continued, or completed in

10 the District of Oregon.  There's a couple of things you can

11 look for in finding this venue requirement is satisfied.

12        First, you can look to the parties' stipulation, and

13 the stipulated fact that everyone has agreed on.  These facts

14 show you the date on which Daniel Johnson was in Oregon, then

15 departed the United States and traveled to Cambodia.

16        And if you look at these dates and overlay them with

17 the dates of the abuse, you will see that during this period

18 Mr. Johnson was doing exactly what it seems like he was

19 doing.  He was abusing these kids in Cambodia, systematically

20 and repeatedly, several children.  He was coming back to the

21 United States, and as Lindsay Alderson told you, raising

22 money to fund the orphanage and then he was turning around

23 and going back to Cambodia.

24        And on each of those trips to the United States

25 Mr. Johnson hit destinations all around the country, but each

GOVERNMENT'S CLOSING ARGUMENT

Page 1228

1  one he came to Oregon.  So the venue statute requires that

2  the offense was begun, completed, or continued in or through

3  Oregon.  And that's the basis for you finding venue.

4         In addition to the travel stipulation, you also have

5  in Exhibits 307 through 311, Mr. Johnson's IP and message

6  records from his Facebook.  So you can go through these

7  carefully if you would like.  What they will show is

8  Mr. Johnson did exactly what I just described to you.  He was

9  in Cambodia abusing these kids.  He came back to the United

10 States to raise money.  He hit a bunch of churches around the

11 country, one of the places he stopped was in Oregon, and then

12 he turned around and went back to Cambodia.  He always

13 intended to go back, and he always did factually go back to

14 Cambodia.

15        Once you find venue, that it was more likely than

16 not that there was venue, you can turn to Count 7 and we can

17 look at the elements of that charge.  Count 7 charges

18 Mr. Johnson with traveling in foreign commerce with the

19 intent to engage in illicit sexual conduct.

20        So there's three elements here, and we will talk

21 about each in turn.  First is that Mr. Johnson is an American

22 citizen.  So we have talked about this.  You have a passport

23 and a stipulation that says he has always been an American

24 citizen.  Second, is that Mr. Johnson traveled in foreign

25 commerce from the United States to Cambodia.

GOVERNMENT'S CLOSING ARGUMENT

Page 1229

1          Now, there's ample evidence of the time that
2    Mr. Johnson was in Cambodia, but we also have a stipulation.
3    And the stipulation tells you that on these dates, dates
4    within the period indicted in Count 7, Mr. Johnson traveled
5    from the United States to Cambodia, back and forth, back and
6    forth, raising money here, and sexually abusing kids there.

7          Finally, the third element requires for you to find
8    that Mr. Johnson traveled to Cambodia for the purpose of
9    engaging in illicit sexual conduct.  So let's talk about
10   that.  As the Court instructed you, there's law on how you
11   figure out whether there was a purpose for which Mr. Johnson
12   was traveling.  So let's talk about what that law is.

13         In order to find that Mr. Johnson is guilty of Count
14   7, you have to find that a dominant, significant, or
15   motivating purpose of his travel back to the orphanage in
16   Cambodia to run it and to sexually abuse these children was
17   to engage in illicit sexual conduct.  You have to find, in
18   other words, that his travel from the United States was
19   not -- excuse me, that his intent or desire to sexually abuse
20   these kids was not just incidental to his travel.

21         Now, in finding that it's a dominant, significant,
22   or motivating purpose, you don't have to find that it was the
23   only purpose.  A person can have a variety of purposes while
24   they are traveling.  It just has to have been a significant
25   one.

Page 1230

1      So you have to think about the evidence and use your

2  commonsense and ask yourself, how big of a role do you think

3  it played for Mr. Johnson, that waiting for him in Cambodia

4  he had a stable of children who he could sexually abuse

5  whenever he wanted, however he wanted, for as long as he

6  wanted?  How big of a role do you think it played for

7  Mr. Johnson when he was deciding whether to stay in America

8  or go back to that orphanage in Cambodia, do you think it

9  played that those kids were scared of him, and they were

10  scared of losing their home, and they were scared of

11  resisting him.  And they were scared of getting in trouble,

12  so he could do whatever he wanted with them.

13      Do you think that that was incidental to

14  Mr. Johnson's travel to go back to Cambodia and run an

15  orphanage that was predominantly boys, and included several

16  boys who he was sexually abusing on a regular basis?

17      Count 8, Count 8 is in many ways very similar to

18  Count 7.  There's a couple of differences.  Count 8 has two

19  elements.  The first of which is that Mr. Johnson traveled

20  across a state line -- didn't travel internationally, just

21  traveled across a state line, between the dates in the

22  indictment.

23      Here again, this is pretty easy, because you have

24  to -- the parties have agreed that Mr. Johnson was in Oregon

25  on these days, which are included in the indicted period, and

Page 1231

1   that he left, not only Oregon, he left the United States and

2   traveled to Cambodia.  So in order to leave the United States

3   you have to cross the Oregon state line.  You don't have to

4   spend a ton of time on that one.

5           The second element is similar to what we just talked

6   about.  You need to look at what Mr. Johnson's intent was

7   when he crossed that state line.  And again, you need to find

8   that it was a dominant, significant, or motivating purpose;

9   that it wasn't merely incidental that he engaged in a sex act

10  with a child under the age of 12.

11          Now, you can match up the dates, but I will tell you

12  what two children you should focus on.  LS XXXXX was abused

13  during the entire period that he was at Hope Transition

14  Center up to Mr. Johnson's arrest.  And at no point during

15  that period was he ever over the age of 12.  You have heard

16  testimony and you have seen evidence, including LS X's

17  passport, that tells you that on the day of Mr. Johnson's

18  arrest, he was 11 years old.

19          The other kid you can look at in considering this

20  charge -- well, you can just look at LS X.  That's all for

21  now.

22          Now, you have heard a lot of testimony from these

23  boys, and you have heard a lot of testimony from other boys

24  who were abused, or who Mr. Johnson intended to abuse.  And

25  it seems that over the course of this trial you have heard

GOVERNMENT'S CLOSING ARGUMENT

Page 1232

1    day after day after day after day of people corroborating the
2    boys' testimony, of the boys corroborating one another's
3    testimony, of evidence that corroborates the boys' testimony.

4         So while I will not go over all of the pieces of
5    corroboration that you have heard, I will remind you of 30 of
6    them, so let's go through those.  For Count 1 involving BT XX
7    XXXX, you heard testimony that right after the arrest BT XXX
8    XXXX told a woman, Knot, that Daniel had abused him, and he
9    tried to have sex with him.  You also heard in early 2014
10   BT XX confided in Kelby Alderson, telling Kelby that it was
11   true Daniel had sexually abused him.

12        You also heard testimony from Lindsay Alderson,
13   telling you that in early 2014 BT XX told her that the
14   accusations of sexual molestation against Daniel were true.
15   And finally, you heard about the 2014 child forensic
16   interview conducted by Martha Finnegan, who is a forensic
17   interviewer for the FBI, in which BT XX talked to her about
18   the abuse.

19        For Count 2, ES XXX, you heard testimony from Tola
20   telling you that he saw ES XXX sleeping in Daniel Johnson's
21   room at the third house in Hope Transition Center.  You heard
22   testimony from Pastor Sopheak saying approximately two or
23   three weeks, ES XXX and LS X came to him and told him that
24   Daniel was sexually abusing them.

25        You heard testimony from SESX, who told you that at

Page 1233

1   the first or second house for Hope Transition Center, ES XXX

2   had told him that Daniel had played with his penis and sucked

3   his penis.  You heard testimony from BT XX who told you that

4   before he moved to the United States, he had spoken to ES XXX

5   and ES XXX had told him what Daniel had did to him, quote,

6   just like husband and wife.  And finally, you heard part of

7   ES XXX's forensic interview with the FBI from 2017.

8          Count 3, LS X, for LS X, you also heard testimony

9   from Tola who told you that at the third house he overheard

10  LS X tell his friends that Daniel had touched his penis.  You

11  heard from Pastor Sopheak who, like ES XXX, told you about

12  two to three weeks before Daniel's arrest LS X and ES XXX had

13  told him that Daniel was abusing them.

14         You heard testimony from ES XXX who told you that

15  his younger brother had told him that Daniel was abusing him.

16  You heard testimony from LT XXXXXXX, who told you that LS X

17  had told him that Daniel had touched his penis, and also had

18  told him that Daniel had sucked his penis.

19         You heard testimony regarding LS X's disclosure on

20  the date of arrest by the Cambodian National Police, and what

21  he told them.  And that he told you that he had, quote,

22  sparingly told them, end quote, what Daniel had been doing,

23  he told you that he had disclosed the abuse that was taking

24  place.

25         LS X also told you that when it came time for

GOVERNMENT'S CLOSING ARGUMENT

Page 1234

1   Daniel's trial in Cambodia, he stood up and he told them
2   about Daniel abusing him.  Finally, you heard part of LS X's
3   forensic interview with FBI forensic interviewer Martha
4   Finnegan that took place in 2014.

5           For SO XXX you heard BT XX testify that SO XXX had
6   told him that Daniel was abusing him before BT XX moved to
7   the United States.  You heard Pastor Sopheak tell you that
8   SO XXX had told him that Daniel was sexually abusing him, and
9   told him that Daniel had played with his penis and that
10  Daniel had had sex with SO XXX, but that Daniel pulled his
11  penis out of SO XXX's anus because it was hurting SO XXX.

12          You heard from SESX who told you that at the second
13  or third house, SO XXX told him that Daniel had been with him
14  in a sexual way.  You heard from SS XX who told you that
15  the -- who told you that before the arrest, LS X had told him
16  that he and Daniel had slept together and done sexual things.

17          You heard from Lindsay Alderson who told you about
18  SO XXX telling her that the sexual allegations against Daniel
19  were true, and that Daniel had done those things to SO XXX.
20  You heard from Kelby Alderson who told you basically the same
21  thing.  And you heard about the 2016 forensics interview in
22  which SO XXX disclosed abuse to the FBI.

23          For VS XXXX, you heard that VS XXXX testified and
24  talked about the abuse at the Cambodian trial.  And you heard
25  that VS XXXX had talked to FBI interviewer Martha and told

Page 1235

1    her about the uncomfortable things that Daniel had done to

2    him.

3            Finally for Count 6, you heard from Lindsay Alderson

4    that CC X, who is the subject of Count 6, told her that

5    Daniel would call him into his room, touch him in an area,

6    and at that point he pointed to his genitals.  You heard from

7    Kelby Alderson who told him the same thing.

8            You heard that CC X told the Cambodian National

9    Police that Daniel had touched his sex organ, and you heard

10   about CC X's interviews in 2014 and 2017 with the FBI

11   forensic interviewers in which he told them that Daniel had

12   touched his penis, and told the second one about all the

13   things that Daniel had done to him.

14           Now, ladies and gentlemen, in addition to all of

15   this corroboration, I want to highlight two more things.

16   First, you heard testimony from three witnesses, Pastor

17   Sopheak, ES XXX and LS X about ES XXX and LS X telling Pastor

18   Sopheak, before Daniel's arrest, before the involvement of

19   any law enforcement, before any interviews, telling Pastor

20   Sopheak that Daniel was abusing them.

21           And you heard testimony from ES XXX and Pastor

22   Sopheak about Pastor Sopheak confronting Daniel about two or

23   three weeks before Daniel's arrest.  You also heard testimony

24   from ES XXX and LS X that after Pastor Sopheak confronted

25   him, the abuse stopped up until the time of Daniel's arrest.

GOVERNMENT'S CLOSING ARGUMENT

Page 1236

1        And you have heard testimony regarding Facebook

2   messages that Pastor Sopheak sent and received prior to the

3   confrontation with Daniel, and after that confrontation.

4        You have also heard testimony and seen evidence of

5   another confrontation in which BT XX spoke to Daniel, and

6   Daniel explained that "I have done nothing in the United

7   States and I have done nothing in Vietnam."  But notably

8   absent from Daniel Johnson's denials to BT XX was "I have

9   done nothing in Cambodia."

10       In addition to the evidence of Daniel Johnson's

11  repeated abuse of all these boys, you have also learned of

12  the years that Daniel Johnson spent frightening,

13  intimidating, and most of all controlling them.  You have

14  heard about his efforts to control them before he was

15  arrested, but you have also heard about how those efforts

16  continued after the arrest.

17       And they give you some insight into why the boys

18  haven't always disclosed abuse to everyone they spoke to.

19  You heard testimony from SO XXX and ES XXX regarding their

20  recantation, and from ES XXX about Daniel telling him to tell

21  his younger brother LS X to lie.

22       You heard testimony from LT XXXXXXX about him

23  visiting Daniel in jail.  Daniel apologizing to him, and

24  telling him, Don't say anything to the FBI.  You have seen

25  Facebook messages between Daniel's brother Gary and Pastor

DEBORAH COOK, OFFICIAL COURT REPORTER
deborah_cook@ord.uscourts.gov

Page 1237

1   Sinai talking about perhaps giving 10K to BT XX to change his

2   story.

3        And you have also seen Facebook messages between

4   Daniel's brother, Gary, and SO XXX talking to SO XXX about

5   talking BT XX into recanting, and how if they do that,

6   Daniel's lawsuit against the FBI will be successful, and they

7   can share in the profits.

8        Ladies and gentlemen, at the end of the day, this is

9   not a difficult case to understand.  You have heard boy after

10  boy after boy after boy after boy after boy after

11  boy disclose Daniel Johnson's sexual abuse of them, or his

12  attempts to sexually abuse them.  One by one they got on the

13  stand and testified to you about Daniel Johnson grabbing

14  their penises, making them grab his penis, performing oral

15  sex on them, making them perform oral sex on him.  And Daniel

16  Johnson's sometimes successful, sometimes unsuccessful,

17  efforts to anally penetrate them.

18       Now, you saw and you listened to these witnesses.

19  Does it sound like they were making it up for a witness fee?

20  Did it look like they were fabricating their stories to get

21  immigration benefits?  Do you think that 11-year-old LS XX

22  XXX, raised in the rural provinces of Cambodia, coming to

23  Phnom Penh just for the opportunity to go to school and

24  living in this orphanage, do you think that LS XXXXX was

25  coming up with a way in which to make up allegations so he

Page 1238

1  could game the American immigration system and eventually get

2  a T visa at 11 years old?  Does that make sense to anyone?

3          Taken together, these boys have painted a stark and

4  horrifying picture of their lives at Hope Transition Center,

5  where they were subjected to repeated sexual abuse by Daniel

6  Johnson, where they were afraid of him, where he gave them

7  money and food and gifts and provided shelter and schooling

8  to them, and where what he got out of it was control and

9  sexual abuse of them.

10         They told you that they knew they couldn't have

11 resisted, that it wouldn't have made any difference.  And

12 that disclosing the abuse to anyone might have caused the

13 orphanage to shut down, and for them to lose the food,

14 shelter, and schooling they depended on.

15         The evidence has shown you that during the period

16 where Daniel Johnson was abusing all of these kids, he

17 traveled back and forth between the United States and to

18 Cambodia.  And each time he did so, he came and went from

19 Oregon.  As we told you, a person can have multiple purposes

20 when they travel and you have to ask yourself whether a

21 significant purpose of Daniel Johnson's travel was his

22 ability to go back to Cambodia and abuse BT XX, ES XXX, LS X,

23 SO XXX, VS XXXX, and CC X.

24         We believe that when you consider the evidence, the

25 testimony, and the exhibits, the stipulated facts, and you

DEFENSE CLOSING ARGUMENT

Page 1239

1    follow the Court's instructions and use your commonsense, you

2    will find that Daniel Johnson molested every one of these

3    boys, and that he traveled across state lines and to Cambodia

4    to continue doing so.

5         And given that recognition and the other evidence

6    before you, we believe that you will return a verdict of

7    guilty on all counts.  Thank you.

8         THE COURT:  Let's take a brief break while the

9    defendant sets up to give its closing argument.  We will be

10   in recess for five minutes.

11                   (JURY OUT.)

12                   (Brief recess taken from 1:33 p.m.

13                    to 1:44 p.m.)

14        THE COURT:  All right.  Bring the jury in.

15                   (JURY IN.)

16        THE COURT:  Please be seated, everybody.  We will

17   now hear from Ms. Maxfield for the defense.

18

19                   DEFENSE CLOSING ARGUMENT

20        MS. MAXFIELD:  Good afternoon, may it please the

21   Court, Counsel, Mr. Johnson, ladies and gentlemen of the

22   jury, I want to begin by thanking each of you.  I know that

23   these long trials, especially taking two weeks out of a

24   spring period, can be burdensome and can be disruptive, both

25   professionally and personally.  And I want to thank you for

DEFENSE CLOSING ARGUMENT

Page 1240

1   taking the time to do this.

2          Each of us has noticed how attentive all of you have

3   been from the beginning to the end, and I want to thank you

4   for that, too.  I want to thank you, especially on behalf of

5   my client, who appreciates the fact that as his fate is in

6   your hands, you have taken the time to really pay attention

7   to the evidence.

8          The American system of justice is unlike any other

9   system of justice, we don't try the accused based on

10  suspicion.  We do not convict him based on conjecture, and in

11  this case we certainly don't convict a person based on

12  unreliable proof.  In the American Court system a prosecution

13  must prove a man's guilty beyond all reasonable doubt with

14  descent, reliable, believable evidence.

15         Proof beyond a reasonable doubt.  It doesn't mean

16  that maybe he's guilty.  It doesn't mean that probably he's

17  guilty.  It certainly doesn't mean that it's highly likely

18  that he's guilty.  To convict in American Court, you have to

19  be sure, based on the evidence that you have actually heard

20  in the case.

21         Maybe the best way to understand proved beyond a

22  reasonable doubt is to look at the various levels of proof

23  that we use in American Courts.

24         I see how you're doing that.  She's way ahead of me.

25         Probable cause.  What does probable cause mean?  It

Page 1241

1  means that there's a quantum of evidence that would actually

2  let you search a car, a person's car.  It means there's

3  probably something going on there.

4         Preponderance of the evidence.  That means we get to

5  a 51 percent chance, it's more likely that this occurred than

6  that it didn't occur.

7         The next area is clear and convincing.  Clear and

8  convincing is a very, very high level of proof.  The Supreme

9  Court has said that it's one of those that leaves you without

10  any significant doubt, but it's the level of proof that we

11  actually are willing to take a person's child away.

12         In other words, you could lose your children if they

13  can prove by clear and convincing evidence that you have done

14  something that is harmful to them, or they are not safe with

15  you.  It's a very high burden of proof.

16         But higher than that still is proof beyond a

17  reasonable doubt.  And that means as you sort through the

18  evidence, if there's any remaining reasonable doubt you have

19  an obligation to acquit.

20         The Court is going to tell you that a reasonable

21  doubt isn't one based on something that is imaginary or

22  something that you have made up.  A reasonable doubt is based

23  on a lack of evidence, or something that is missing in the

24  case, or something that gnaws you about what you heard.

25         What is an imaginary doubt?  I don't know how many

DEFENSE CLOSING ARGUMENT

Page 1242

1   of you scuba dive.  I used to, and then ended up in the

2   chambers and stopped that.  But one of the things you do

3   before you go down in the water is you want to check your

4   regulator to make sure it's clear.  And you might have

5   checked your regulator before you got on the boat, you might

6   have checked the regulator when you left the house.  You

7   might have checked your regulator five times in the car, but

8   just before you step off the boat, you check your regulator

9   again to make sure that it's clear.

10          Is that an unreasonable doubt?  No.  That regulator

11   could have been clear 99 times out of 100, but it's not an

12   unreasonable doubt to check the regulator before you jump.

13   Same thing with a parachute.  Nothing crazy about checking

14   the chute to make sure it's folded exactly as it should be

15   before you jump out of the plane.

16          Even though everything would suggest that everything

17   is probably fine, there's nothing unreasonable about looking

18   again to make sure that you are safe.

19          An imaginary doubt would be something crazy.  I had

20   a trial a little while ago, and the prosecutor had talked to

21   the jury about circumstantial evidence.  And she tells a

22   story that prosecutors often do about the mom who bakes

23   cookies and tells the boy, don't eat the cookies.  And the

24   mom leaves, and the little boy eats all the cookies.  And the

25   mom comes home, and she sees crumbs all over the cookies

DEFENSE CLOSING ARGUMENT

Page 1243

1   (sic), she says, I think you ate the cookies.  And the boy

2   says, no.

3        And then the prosecutor says that's proof beyond a

4   reasonable doubt.  You can see it from circumstantial

5   evidence.  So my client was so upset about this that he came

6   up to me afterwards and he said, well, that's not at all --

7   like what could have happened is like a guy could have been

8   walking down the street.  He could have walked in the house.

9   He could have found those cookies, he could have eaten all

10  but one.  He could have forced the little boy to eat a

11  cookie, and then he would have crumbs on him.

12       So that would be an imaginary doubt.  That would be

13  cobbling a bunch of crazy things together to call into

14  question the level of proof.  But in this case, a reasonable

15  doubt just requires you to sift through the evidence

16  carefully.

17       Where to begin in this case, because I think it's

18  where the government has really failed to prove a material

19  element, and it's an important material element.  And that's

20  in Counts 7 and 8.  7 and 8, each of these charges are

21  different than Counts 1 through 6.  Counts 1 through 6

22  actually talk about engaging in a sex act.  That's kind of

23  the core of the offense, to engage in a sex act.

24       But Counts 7 and 8 are thought crimes.  It has to do

25  with what is in the defendant's head.  This defendant's head

DEFENSE CLOSING ARGUMENT

Page 1244

1    at the time that he travels.

2             You were there, and then you weren't.

3             And the question really for all you is, why did

4    Daniel Johnson get on a plane and fly to Cambodia?  That's

5    the question you have to answer, and you have to look at the

6    evidence to see whether the government has proven that the

7    reason he got on an airplane and flew to Cambodia is to have

8    sex with kids.

9             7 and 8 both turn on his purpose and intent, and the

10   Court has instructed you that the purpose and intent has to

11   do with the dominant, significant, or motivating purpose.  In

12   Count 7, is the dominant, significant, or motivating purpose

13   to engage -- to travel in foreign commerce to engage in

14   illicit sexual conduct.  And Count 8, the government has to

15   prove the same thing, a dominant, significant, or motivating

16   purpose of Mr. Johnson to travel across the state line to

17   engage in sex with someone under the age of 12.

18            So the key question and the key period is, what is

19   in his head when he gets on the plane.  And the way we

20   examine that is to look at the phrases, dominant,

21   significant, and motivating purpose.

22            Dominant, an ordinary definition, is commanding or

23   controlling or prevailing over all others.  Significant,

24   important, great, especially in leading to a particular

25   result.  Motivating, the reason one has for acting in a

DEFENSE CLOSING ARGUMENT

Page 1245

1    particular way.  And then contrary to that is incidental,

2    accompanying, but not a major part of something.

3            So what was Daniel Johnson's purpose in traveling?

4    I think if you actually look at the evidence, that the

5    evidence would point you to a single purpose for travel.  The

6    best way to understand why Daniel Johnson traveled, is to

7    think about what he was focused on, and what he was doing in

8    Cambodia, and why he would have left the country at the time.

9            Pretty soon you are going to see a slide that says

10   reasonable doubt.  Mr. Johnson traveled to fund and

11   facilitate the Hope Ministries, good works in Cambodia.  Look

12   at the evidence and ask yourself, what did the evidence show

13   that Mr. Johnson was doing during the relevant period in

14   these counts.  During the time he had been in Cambodia -- I

15   think Karla Comstock begins in 2011, 2012 is when she comes

16   to visit.  And that gives a good sense of what he's up to.

17           Pastor Sopheak is also there during that period of

18   time.  And what Pastor Sopheak says is that during this

19   period of time that he had met Daniel Johnson, and then he

20   met a fellow by the name of Pastor Pilot are doing just

21   ordinary good works in Cambodia.

22           And Daniel Johnson has managed to find a bunch of

23   computers, and he set up this Coffee House where people can

24   come and take Bible classes, learn English and work on a

25   computer.  At this time he has no intention or desire to run

Page 1246

1   any kind of Cambodian orphanage.

2          But Pastor Pilot at one point moves in, and Pastor

3   Pilot brings with him several children.  One day, and Pastor

4   Sopheak talked to you about this, Pastor Sopheak is out in

5   Prey Veng and he's looking for some land or property for them

6   to build a Prey Veng compound on.

7          And while he's away, out of nowhere, Pastor Pilot

8   and his wife leave, they leave the premises, and they leave

9   the children behind.  So at this point, things kind of shift,

10  but not too much.  Karla Comstock tells you by the time she

11  gets there and she's meeting the children, that she has a

12  sense that Daniel Johnson really -- that's not where his

13  focus is.

14         You may recall she testified that she's going to go

15  talk to him about the fact that he's being short or abrupt

16  with the children, and she says, Before I began to even

17  explain what I was upset with, he jumped into it just saying,

18  I never knew I was going to be a single man working in this

19  country with all these kids.  It's really hard.  She says he

20  buried his head and threw his notebook down, and she doesn't

21  remember if he started to cry or if he sobbed, but she does

22  remember that he was very very upset.

23         She also remembers his energy in that time period,

24  what he was focused on just personally.  She said it was

25  amazingly chaotic.  Daniel Johnson was very busy, hectic,

Page 1247

1    kind of coming and going a lot.  He just seemed overwhelmed,

2    always giving people instructions for people to come and go

3    and do this and do that.  And making arrangements for the

4    church teams to come to the center, to go out and do the good

5    works.  It was the good works.  It was the good works that

6    had Mr. Johnson's heart, and it was the good works that held

7    his time, and it was the good works that held his attention.

8          The very, very best evidence, and frankly, the only

9    evidence that you have about why Daniel Johnson traveled back

10   to Cambodia is to look at the evidence about why he left

11   Cambodia in the first place.  And he left Cambodia to find a

12   way to fund the good works projects that they were doing at

13   Hope Transition.  He would go to the United States, because

14   it was the only way to fund the projects that they had going.

15         He would come to the United States and spend

16   anywhere between five and eight weeks, and he would go around

17   to these various churches, and he would have these fund

18   raising events.  And he would raise enough money over the

19   period of time to fund the things that he was thinking about,

20   or were in the planning stages back in Cambodia.

21         One of the very best pieces that gives you a clue

22   about what Mr. Johnson was thinking while he was in the

23   United States is to look at Government's Exhibit 311.  In

24   Government's Exhibit 311 -- and that's really tiny.  What you

25   see is they have pulled out of a Facebook page Mr. Johnson's

DEFENSE CLOSING ARGUMENT

Page 1248

1  itinerary.  This is what I am going to do while I'm in the

2  United States.

3          And if you look at that itinerary, it's just chock

4  full of fund raising, and visiting the various churches, to

5  get the money together, and to get the support and try to

6  find church teams that will come back to Cambodia to assist

7  in the projects that they were doing.

8          So for example, in this one from April 26 to May

9  31st, from a solid month he's moving from church to church to

10 church to church to raise money, to do fund raisers, and talk

11 about the good works that they are doing, and try to keep the

12 energy behind the forces of good works that Hope is engaged

13 in in Cambodia.  And then finally on May 31st he flies back

14 to Cambodia.

15         Having spent four to eight weeks in the United

16 States in Christian churches, raising money, why did he

17 decide to go back to Cambodia?  He decided to go back to

18 Cambodia to spend the money.  That's why he's going back to

19 Cambodia.  He's going back to Cambodia with the money that

20 he's made, with the time investment, the teams that are now

21 going to come, and he's going to engage in the good works

22 that have been planned.  That's his goal.  That is his

23 dominant purpose, that is his purpose and intent.

24         Anything else is peripheral.  He has more wells he

25 wants to dig.  He has more eyeglass clinics that he wants to

DEFENSE CLOSING ARGUMENT

Page 1249

1    put on.  He wants to go back and fix the church in Kampot.

2    He had money to do that.

3            In fact, in 2013, just as everything has exploded in

4    his last trip to the United States, what's he focused on?

5    He's focused on the medical clinic in the Prey Veng compound,

6    the medical clinic that is partially finished.  He's gone to

7    raise money in the United States to finish that clinic.  He's

8    gone to get the medical supplies to actually supply that

9    clinic, and that's the next phase of what he's going to do.

10   Everything, everything, all of his focus, 100 percent of his

11   focus when he leaves Cambodia and comes back from Cambodia is

12   to make these projects work.  And there's no other evidence

13   in the record.  That's the only evidence in the record.

14           The government's suggestion that there's some

15   peripheral purpose in him leaving the United States and then

16   coming back really doesn't make any sense if you think about

17   what he's doing, where his focus is on.  If the government is

18   correct and his sole focus is on molesting children, or even

19   primary focus is on molesting children, why leave Cambodia in

20   the first place?

21           He leaves Cambodia to fund the projects and in these

22   two elements, 7 and 8, the government has failed to prove

23   this -- these two charges beyond a reasonable doubt, because

24   they have failed to establish he has an ulterior purpose, his

25   motivating purpose, his significant purpose in traveling.

DEFENSE CLOSING ARGUMENT

Page 1250

1          You are going to have in the jury room exhibits --I

2     have shown you a few, but you are going to have a gazillion.

3     You have seen us go through this, because we wanted to give

4     you a sense of what our client was doing in this country.

5     But you are going have a gazillion photographs, itineraries,

6     you are going to have conversations all focused on what

7     Mr. Johnson was focused on, and that's the good works in

8     Cambodia.

9          Now I want to talk about the other charges more

10    generally.  A different measure.  We're dealing with a

11    different culture.  We're dealing with people who come from a

12    very different place, who have very, very different lives

13    than any of us.

14         In trying to measure the motives of people and

15    trying to measure whether something is a benefit, trying to

16    measure whether someone would make an accusation or not make

17    an accusation, it would be a terrible mistake to use an

18    American ruler.  Because the government stressed, and we all

19    stressed in this case that the Cambodian witnesses are very,

20    very poor.  They are very deprived.  They are looking for

21    ways to survive.

22         And it's all very true.  That's exactly who these

23    people are.  That's exactly where they have come from.  The

24    Cambodian witnesses have lived in a very poor, undeveloped

25    country.  And they testified their parents have died, or

DEFENSE CLOSING ARGUMENT

Page 1251

1   abandoned them, or simply were unable to provide them with

2   even the basics of food and shelter.  That's who these

3   witnesses are.

4          Karla Comstock describes the country as being --

5   she's overwhelmed by how extremely impoverished it is, how

6   it's run down, and the people need so much.  They don't have

7   a foot to stand on.  She talks about the fact that there

8   aren't very many educated people in the country to build it

9   back up, and people are needy, hungry, wonderful people to

10  work with.  But it's that level of need and deprivation you

11  need to keep in mind as you measure motive.

12         SO XXX describes why he lives with his uncle.  As

13  you recall, his parents disowned him, and abandoned him, and

14  just kind of given up on him.  And he talks about going to

15  live with his uncle, and he says that he's up very, very

16  early in the morning and constantly working until midnight.

17  And that's what is expected of him.  That's how his day goes.

18         Again, we're talking about people with a level of

19  deprivation and desperation that is probably unlike the

20  people that any of us know in this country.

21         As a result of that, you have witnesses who have

22  been conditioned to focus first on what it's going to take to

23  survive.  Survival is and always will be the bottom line.  It

24  just will be.  As you recall, there was some testimony about

25  it's a common problem in Hope Transition with the folks that

DEFENSE CLOSING ARGUMENT

Page 1252

1  lived there with stealing and lying, and just had these kids

2  coming in.  BT XXXXXXX, I think, he was questioned about the

3  little boy who kept stealing, and a description of what to

4  do -- check his pack, send an older boy to school with him,

5  do all of these things because this was part of how the kid

6  interacted, trying to take what he needed.

7        If you recall LS X's final punishment that he and I

8  talked about on cross-examination, perhaps the most serious

9  punishment he had was for stealing some money.  Even ES XXX

10  talks about this.  There's a story he tells about getting in

11  trouble for the new shirt, the new shirt that he brings back,

12  claiming that a neighbor has just given him the new shirt.

13  He ended up getting punished on that occasion, presumably

14  because Mr. Johnson believed it wasn't a gift, and in fact,

15  it was a shirt that had been stolen.

16        I only tell you these stories, because it gives you

17  a sense of what these kids are up against, and what it is

18  that motivates them, and how it is that they get through

19  life.  And it's important to keep in mind as you sit through

20  the evidence in this case.  From birth these are young men

21  who have learned they won't survive, let alone succeed,

22  unless they are willing to scrape, and sometimes steal,

23  manipulate, and yes, in this case, sometimes lie.  They have

24  been conditioned to keep a sharp eye out for the next

25  opportunity.

DEFENSE CLOSING ARGUMENT

Page 1253

1          Reasonable doubt.  Hopes and promises.  The young

2    Cambodian witnesses are deprived, but they are not

3    unmotivated.  These are not just -- they haven't given up.

4    These are kids that are as induced by a prayer and induced by

5    a hope as they are by a promise.  They know any opportunity

6    shouldn't be squandered, that you need to grasp the next

7    opportunity because it might be your last one.  They have an

8    eye out for it, and they will invest energy in obtaining it.

9          The government made the witnesses a few really

10   significant promises in this case in exchange for

11   cooperation.  Motivators by themselves, but they also left a

12   huge amount of room with these witnesses for hopes and

13   prayers.  Things that you might get, things that you probably

14   could get.  And it's kind of in this area of hopes, prayers,

15   and promises that we find the chief motivators in this case.

16         Judge McShane has instructed you, it's in the

17   instruction on testimony of witnesses, compensation and

18   benefits.  That you should examine the testimony of these

19   witnesses who receive benefits from the government with

20   greater caution than with other witnesses.

21         This is -- I mean, this isn't minor.  It's something

22   you should consider seriously as you sift through the

23   evidence and think about why people said the things they

24   said, and why people did the things they did.

25         Now, all of the government witnesses are going to

DEFENSE CLOSING ARGUMENT

Page 1254

1    make about $2,800 just in witness fees.  A lot of that, I

2    hope, will go home with them, although LS X says he ate all

3    of his.  Maybe he discovered room service or something else

4    about our country.  But hopefully, some of this goes home,

5    because one of the things you learned from the expert witness

6    today is that a police officer in Cambodia makes $240 a

7    month.

8            So $2800 gives you, what, about 10 months, 11 months

9    of salary.  That's -- that is -- that's a motivating amount

10   of money in the place where these folks live.

11           But I submit to you that really that's not all

12   that's in play here.  There are other potential benefits,

13   other potential parting gifts that are much, much more

14   significant than the cash that might go home.  And I want to

15   look at what has happened to BT XXXXXXX, to discuss that.

16           BT XXXXXXX agreed to cooperate, and as a result, he

17   was promised, first of all, an extended visa that allows him

18   to stay for a period of time.  But with that comes much, much

19   more.  What is the value -- think about the value you put on

20   the path to US citizenship.  We know many, many people who

21   would give an arm and leg for such a path to US citizenship.

22   It can't be ignored as a powerful, powerful motivator.

23           The government is going to say it was just BT XXX

24   XXXX.  None of the other people got that.  And I want to look

25   again at BT XXXXXXX's cross examination, and talk to you

DEFENSE CLOSING ARGUMENT

Page 1255

1    about how all of that played out.  And then we're going to

2    come back and ask whether that claim really makes any sense

3    at all.

4            Mr. Weinerman talked to Mr. BT X and he asked, "At

5    some point you decided that you wanted to stay here, right?"

6    Remember, this was at a time when Mr. BT X's -- he has this

7    one-year visa, and it's about to expire and now he's deciding

8    whether he's going to go talk with the FBI.

9            So Mr. Weinerman says, "You wanted to stay here,

10   right?

11           "Mr. BT X, Yes.

12           "And at some point you decided to talk to the FBI,

13   right?

14           "Yes.

15           "And that was in February of 2014?

16           "Yes.

17           "And that's the first time you told them or anyone

18   in the United States about alleged sexual abuse by Daniel

19   Johnson?

20           "Yes.

21           "And you discovered at some point in 2014 before

22   your visa expired that if you cooperated in the investigation

23   of Daniel Johnson that you could be eligible to get a visa

24   that would allow you to stay in the United States?

25           "Yes.

DEFENSE CLOSING ARGUMENT

Page 1256

1          "And you have been here since August of 2013, right?

2          "Yes.

3          "And you have not been back to Cambodia in four and

4   a half years, almost five?

5          "Correct.

6          "And the FBI helped you get that extension of your

7   Visa; is that correct?

8          "Yes.

9          "And the FBI helped you find an attorney to do that

10  correct?

11         "Yes.

12         "And your visa was extended before it expired?

13         "Yes.

14         "And it allows you to work?

15         "Yes.

16         "And you have been working here since you got this

17  new visa?

18         "Yes, I have been working at a grocery store in

19  Beaverton.

20         "And does this visa also allow you to go to school?

21         "Yes.

22         "And to get financial aid?

23         "Yes.

24         "And you have been able to do both, go to school and

25  get financial aid, correct?

DEFENSE CLOSING ARGUMENT

Page 1257

1          "Yes.

2          "And so you obtained another visa in 2016 which

3   allows you to stay here until 2020, and you are allowed to

4   apply for a green card within three years, correct?

5          "Yes.

6          "And it also allows you, within five years after

7   obtaining the green card, to become a United States citizen?

8          "Yes.

9          "And it's your understanding, Mr. BT X, that to

10  obtain this visa and to be able to remain in the United

11  States, that you have to cooperate with the FBI in the

12  investigation and prosecution of Daniel Johnson?

13         "Yes."

14         Now, that's the trade that was made.  What did we

15  learn from the testimony of BT XXXXXXX?  I want to look at

16  these component parts.  First of all, BT XXXXXXX is in the

17  United States, which creates the availability of this visa.

18  So we learn that a person who is a victim of crimes like

19  those charged in this case are eligible for an extended --

20  Mr. BT X called it a T visa if they cooperate with the FBI.

21         The FBI can and will help a cooperating witness to

22  get an extended T visa, or if he or she keeps cooperating,

23  the FBI will even pay for the help of an immigration lawyer.

24  The FBI -- if the FBI asks the Department of Human Services

25  to grant an extended visa, it's very likely to be granted.

DEFENSE CLOSING ARGUMENT

Page 1258

1          That extended visa will allow someone to work in the

2    United States.  It will allow someone to go to school and get

3    financial aid.  Three years after that visa is extended you

4    are eligible for a green card, and five years after that

5    green card you are eligible for US citizenship.

6          Now, Mr. BT X's clock ran out, and he was in an

7    unusual position.  His clock ran out, he was literally in the

8    country.  And so the FBI had to provide this assistance maybe

9    a little sooner than it wanted to provide.  You listened to

10   some of these kids talk about when they made the inquiry,

11   kind of this, We will talk about that when the case is over.

12         But in any event, I think it's very, very likely

13   that the other witnesses in this case would ask for the same

14   sort of benefit, or the same sort of treatment that BT XXX

15   XXXX has been given.  In fact, they have said as much when

16   they testified in this case.

17         SO XXX said -- we asked, "Did you talk to an

18   attorney about how you could stay here after you are done in

19   Court?"  And he said, "I was just asking about going to

20   school here, and they said that we could talk.  We could talk

21   after this, or later."

22         So in other words, this is a benefit we can talk

23   about once this trial is done.  But to suggest that it's not

24   a benefit that is in the wings, I think really is

25   disingenuous.

DEFENSE CLOSING ARGUMENT

Page 1259

1           LS XXXXX says the same thing.  I said, "When you
2    talked to FBI Martha, do you remember telling her that you
3    wanted to come to the United States to go to school, and to
4    be a doctor?"  And he said, "Yes, I did tell her that."
5           "Is that still your hope?
6           "Yes.
7           "And when you talked to that lawyer, did you talk to
8    him about maybe moving to the United States?
9           "Yes, I did.
10          "And have you talked with that lawyer since you have
11   been here, or another lawyer since have you been here, in the
12   United States about staying here?
13          "I did.
14          "Do you think there's some chance that you will be
15   able to stay?
16          "I hope.
17          CC XXXXXX, also one of the kids who met with the
18   lawyer, says the same thing.  Mr. Weinerman asked, "In the
19   beginning of the interview with the FBI on March 21st, 2017,
20   about ten minutes into that interview did you ask the FBI
21   when you will be going to the United States?
22          "Yes.
23          "And after you told the FBI on March 21st that
24   Daniel had sexually abused him, did you ask them whether you
25   can go to the United States?

DEFENSE CLOSING ARGUMENT

Page 1260

1          "Yes.

2          "Lindsay Alderson encouraged you to change your

3    story again, and tell the FBI that Daniel had sexually abused

4    you.

5          "Yes, she encouraged me to tell the truth.

6          "And you want to live with her in the United States;

7    is that correct?

8          "Yes.

9          "And after that you told the FBI on March 21st that

10   Daniel hat sexually touched you, and you asked them if you

11   could go to the United States?

12         "Yes.

13         "Did you talk to the attorney about trying to stay

14   here after testifying in this case?

15         "I asked.  I only asked.

16         "You asked if you could?

17         "Yes.

18         VS XXXXXXXXXXXXX also testified that he was someone

19   with a lawyer.  And kind of as an aside here, VS XXXX also

20   had some pretty significant benefits that go a little bit

21   above and beyond witness fees.  He tells you that after he

22   finally gets through and back home with his parents, the

23   authorities bring him a new bike.  He doesn't know who the

24   authorities are, but those same authorities apparently paid

25   for some repairs on his parents' home.  And then it's

DEFENSE CLOSING ARGUMENT

Page 1261

1    clarified later that actually, they gave him a new house and

2    put a new roof on it.  So VS XXXX's benefits were

3    significant.  In these kids' minds though, it's all just

4    coming from the authorities.

5           ES XXXXXXX, what does he get?  I would imagine

6    ES XXX gets whatever his brother LS X gets.  That seems fair.

7    Almost certainly he would also talk to the FBI about filing

8    some kind of lawsuit.  But ES XXX Soy gets LS X back.  ES XXX

9    XXX doesn't tell the FBI that he's been abused until there's

10   this period where all of a sudden there's a chance for him

11   and LS X to be reunited.  And another thing that ES XXXXXXX

12   gets is the promise that the questioning, all the authority's

13   questioning will finally, finally come to an end.

14          You recall on cross-examination that we talked to

15   him about how often he had been questioned.  "When you met

16   with the FBI the second time, you told them you were meeting

17   because you wanted it to finally be over?

18          "Yes.

19          "And you believed it wouldn't be finally over until

20   you told them that you had been sexually abused?

21          "Yes.

22          "And then you were asked to come to this country?

23          "Yes.

24          "And to talk about it yet once again.

25          "Yes.

DEFENSE CLOSING ARGUMENT

Page 1262

1          "And you came with the final hope that this would

2     finally be over.

3          "Yes.

4          "And you have said what you need to say for it to be

5     over?

6          "Yes."

7          ES XXX's motivation lies in having it be done, but

8     he's probably in the same position that his brother is in if

9     there's more to be hoped for.

10         Pastor Sopheak gets control of Prey Veng and Kampot.

11    Let me take you back --

12         THE COURT:  Excuse me.  It's the second time.

13         MS. MAXFIELD:  These kids have cooperated with the

14    FBI.  They testified they were sexually abused in Cambodia.

15    They come to this country and cooperated in every single way.

16    How are they materially different from BT XXXXXXX?  They are

17    not.  They are in exactly the same position that he is, and

18    their hopes that access to this country, just to even come

19    here to work here, to go to school here, and even to be a

20    citizen here, the road should be no different.  All that is

21    different, I would submit, is the timing of when that hope

22    becomes a reality.

23         A reasonable doubt.  Tell a lie once, and all your

24    truths become questionable.  Every one of these young

25    Cambodian witnesses believes that telling a pragmatic lie is

DEFENSE CLOSING ARGUMENT

Page 1263

1  okay.  And they make that very clear in their testimony to

2  you.  Instead of it being wrong, a pragmatic lie is viewed as

3  a necessary survival tool, and a tool to success.

4           For these kids truth has more to do with whatever I

5  am saying to you right now, and it has much to do with who is

6  asking the questions.  And you can tell that that is true by

7  what they say to you.  Every kid said, I lied, I lied.

8  SO XXXXXXX, now when -- "SO XXX, when you were first asked

9  about sexual abuse by Daniel Johnson you said -- did you tell

10 the truth?

11          "At first in Cambodia I didn't tell the truth.  The

12 first time with the FBI, I did not tell the truth.

13          "But you told APLE that Daniel didn't do anything to

14 you sexually?

15          "Yes, at that time I didn't tell the truth.

16          "And about nine months later the FBI came to

17 Cambodia, correct?

18          "The first FBI I did not tell the truth, either.

19          "So do you think it was wrong to lie about that?"

20          This is when he's talking about whether his parents

21 are dead, and that was kind of interesting.  He's telling the

22 story about how he's been abandoned, that he can choose to

23 stay with his uncle and live that life that has him up at

24 5:00 in the morning and working until midnight.

25          And what does he say?  "I feel it was severely wrong

DEFENSE CLOSING ARGUMENT

Page 1264

1  to do that, but my cousin said I had to do that.  And if I
2  didn't do that, I wouldn't be able to live there."  He was
3  willing to tell a lie to live in a better place.
4       The other kids also said that they had lied during
5  the investigation, and this is like a five-year
6  investigation, so these things go back and forth and
7  boomerang through.  LS XXXXX says that he lied, as well.
8  Talking about the interview with the FBI, "I told her, but I
9  just told her so many times because I lied to her.  There
10 were times that I told a lie, but there were times that I
11 told the truth."
12      ES XXXXXXX, he lied, as well.  "So when you spoke to
13 APLE and said that Daniel had not abused you, was that the
14 truth or a lie?
15      "It was a lie.
16      "And that same year, did you meet with a woman named
17 Martha from the FBI?
18      "Yes.
19      "Did you lie to her, also?
20      "Yes.  Everything I said was a lie.  It was a lie,
21 and it was not because I was scared and it was not because I
22 was nervous, or anything like that.
23      "So then pretty much everything you said to Martha
24 was untrue?
25      "Correct.  It was a lie."

DEFENSE CLOSING ARGUMENT

Page 1265

1           We're going to come back to this interview in a

2   minute, because it's a significant interview in this case.

3   But it's just a matter of fact, that was a lie.  CC XXXXXX

4   said he lied.  "Did you later say that Daniel Johnson had

5   never touched you?

6           "Yes.

7           "Was that the truth or a lie?

8           "A lie.

9           "And why did you tell that lie at the time?

10          "Because I don't want them to ask me too many

11  questions.

12          "Okay.  I understand that you are saying you lied to

13  Martine?

14          "Answer, Yes.

15          "And you thought it was to okay to lie to Martine?

16          "Yes.

17          "And you told them that Daniel Johnson touched you?

18          "Yes.

19          "And you believed that is what they wanted you to

20  say?

21          "Yes.  But --

22          "But, go ahead.

23          "Yes.  I was scared so I said I told a lie, because

24  I don't want to have problems, you know, messy problems."

25          These kids are making decisions on what to say in

Page 1266

1    any given circumstance based on what tomorrow is going to

2    look like, how messy their lives are going to be.

3              VS XXXXXXXXXXXX also lied.  This is a conversation

4    he and I had about when Martine goes to visit VS XXXX after

5    he's finally gone home.  He's been isolated from his parents

6    for a couple of years.  "So about two years after Daniel

7    Johnson was arrested, do you remember a man named Martine

8    coming to your home village?

9              "Yes.

10             "And did Martine ask your parents if he could talk

11   with you?

12             "Yes.

13             "And you and Martine went inside a church to talk?

14             "Yes.

15             "Was it a Christian church?

16             "Yes.

17             "And you didn't want to tell a lie inside the

18   church?

19             "Yes.

20             "And you told Martine that you had exaggerated and

21   told lies when you talked with the FBI?

22             "Yes."

23             Are you getting there?

24             Calling ten witness who have admitted to lying,

25   depending on who is asking the questions -- and again, that's

DEFENSE CLOSING ARGUMENT

Page 1267

1    how the government has couched it, and that's because now

2    we're in trial and now they are the dominant force asking the

3    questions.

4         Calling ten witnesses who have lied during a

5    five-year investigation, admitted that they have lied is an

6    evidentiary ploy to paper over the fact that the government

7    is relying on unreliable witnesses.  It's built its case on

8    unreliable witnesses.

9         Rather than meet its burden with reliable evidence

10   to prove beyond a reasonable doubt, the guilt of Daniel

11   Johnson, the government calls ten witnesses, each of whom

12   admitted to lying about the case, and then tells you, because

13   there are ten of them, if you add them all together, that's

14   proof beyond a reasonable doubt.

15        No.  No.  Together they add up to ten individuals

16   who have told serious untruths in the course of a five-year

17   investigation.  Ten admitted nontruth-tellers don't add up to

18   proof beyond a reasonable doubt, nor 20, nor would 50.

19        The fact that they have all come through this

20   gauntlet and told things that are untrue doesn't make the

21   whole more believable than the parts.

22        Reasonable doubt.  The contaminating influences and

23   coercive pressures in this case are mind blowing.  The

24   Cambodian police, or as I call them, the Canadian police

25   which makes them seem so much nicer on horses and funny

DEFENSE CLOSING ARGUMENT

Page 1268

1   hats -- but the Cambodian police are scary folks.  And they

2   aren't scary in the abstract.  Every Cambodian kid knows that

3   it's smart to be afraid of the Cambodian police.

4           The Cambodian police and the Cambodian authorities

5   are corrupt.  And they are corrupt on a scale that we can't

6   really imagine in this country, and every Cambodian kid has

7   adjusted life according to that truth.  Karla Comstock talks

8   about it, and Trudy Jacobsen talked about that earlier.  It's

9   a fact of life in Cambodia.  It's a system built on

10  corruption, and if you are a kid who wants to survive, if you

11  are a deprived kid who doesn't have a lot of tools to get

12  from point A to point B, appreciating the corruption of a

13  Cambodian police officer is a wise thing to do.

14          There are other influences in this case, and we have

15  got church members talking to these kids about what to tell

16  or not to tell.  When you combine God, and -- God and the

17  sponsorship, the money, not only is it God is telling you to

18  do this, but you might recall SO XXX who had denied, denied,

19  denied, is now being questioned by CC XXXXXX's sponsor,

20  Ms. Alderson.  And all of a sudden has his own account of

21  abuse.  And what follows that?  What follows that is a new

22  sponsor.  And maybe a new place to live.

23          So this potent combination of God and money is

24  something you have to think about as you sift through the

25  evidence.  And we all know basically about peer pressure, and

Page 1269

1  that peer pressure plays it own part in a case like this when

2  all these kids are talking.  But no influence, none at all

3  are as coercive and as corrosive as what the Cambodian

4  National Police brought to this table.

5          The Cambodian National Police believed in an

6  investigation by intimidation and isolation of these boys,

7  and it had an impact.  Every one of these kids talked to you

8  about the fact that they were afraid.  LS X says, "Many

9  people came and we were afraid.  It wasn't just a few."  CCXX

10  XXXX, he gives a pretty good description.  "Are you scared of

11  the Cambodian police?

12          "Scared.

13          "They have a bad reputation, don't they?

14          "Yeah, they have bad attitude in general.  No good.

15          "Aggressive?

16          "Yes.

17          "Mean?

18          "Yes.

19          "Dishonest?

20          "Not honest.  Not honest.  Yes.

21          "You can get in trouble if you don't do what they

22  want you to do, correct?

23          "Correct.

24          "And you can also get in trouble if you don't say

25  what they want you to say?

DEFENSE CLOSING ARGUMENT

Page 1270

1          "Yes.

2          "So you also said later that when you were talking

3     to the FBI about a year later, that you were in a panic

4     because of the police being there?

5          "Fear."

6          VS XXXX had the same sort of fear.  "Do you remember

7     how many police came?

8          "I don't remember.  There were many.

9          "There were many?

10          "Yes.

11          "Were the children at the center, the kids at the

12     center frightened when the police came?

13          "Yes.

14          "And you were frightened, too; is that right?

15          "Yes.

16          "The Cambodian police, they are scary.

17          "Yes.

18          Celena Ocen, the US missionary who had come, she

19     tells this interesting story.  She's there at the compound

20     and she's there at the Hope Transition Center on the day the

21     police swooped in.  And it's a very small part of her

22     testimony, but it gives you a picture for how frightening the

23     Cambodian police are.

24          She says at the very end, it's late at night, and

25     all of these kids have been questioned, and it's been a long

DEFENSE CLOSING ARGUMENT

Page 1271

1    day.  And the Cambodian Police are kind of swooping these

2    kids into vans.  And then there's a commotion, because the

3    people in the village come and try to grab the children away

4    from the Cambodian police.

5            She said, "I observed that the kids were being

6    escorted to the van.  And that there were other individuals

7    who were trying to take the kids.  And the people who might

8    have been resisting, they were the friends, relatives of the

9    kids, who maybe wanted them to prevent them from being taken

10   to another location.  They were just the Cambodian people."

11           So imagine this scene as the Cambodian police are

12   collecting these kids into the vans, and people in the

13   village -- or people in the village come to do what they can

14   to separate the children from the Cambodian police.  It tells

15   you a lot about the impact and the influence of the Cambodian

16   police, and the fears that the people in the community had

17   when they find themselves interacting with these folks.

18           The prosecution witnesses also described the

19   pressures that were put on them during this process.  You

20   have these police officers who are kind of watching -- first

21   of all, they take over the compound.  They are watching all

22   over these kids.  They take the kids and literally collect

23   them on benches, or in corners, and tell them they are not

24   allowed to move around, that they are basically prisoners.

25           So these kids sit there.  They are coerced into

1   silence, and then they are taken off to be questioned.  This

2   is CC XXXXXX, CC XXXXXX being questioned.  Look at what is

3   surrounding CC XXXXXX.  He's asked about this picture and who

4   are these people, perhaps, it's a police agent.

5           But in any event, what does he say?  They keep

6   questioning him, there were many.  The words, the question

7   words is the same words over and over and over and over

8   again.  That's what is happening to CC XXXXXX as those grown

9   men stand around him, asking him questions.  And apparently

10  we need to ask them over and over, because we don't get the

11  answer we want the first time the question is asked.

12          Same thing happened with CC XXXXXX.  "Was it a

13  friendly atmosphere?

14          "Yes.

15          "And you weren't scared" -- I know, when Martine

16  comes.  Martine comes, and he's going to talk to him about

17  what is going on.

18          "And was it a friendly atmosphere?

19          "Yes.

20          "And you weren't scared like you were when you

21  talked to the Cambodian police?

22          "Yes.

23          "And he asked you about what happened when you

24  talked to the Cambodian police on the day that Daniel was

25  arrested?

DEFENSE CLOSING ARGUMENT

Page 1273

1          "Yes.

2          "And you told Martine that you felt pressured to

3     talk to the Cambodian police?

4          "Yes.  And you felt like you had no choice, you had

5     to talk to them?

6          "Yes.

7          "And you told Martine that you didn't tell the

8     truth?

9          "Yes.

10          "And you just told them what you believed they

11     wanted to hear?

12          "Yes."

13          LS XXXXX was questioned, as you remember.  He talked

14     about four or five policemen.  Only one is asking questions,

15     but he talks about how they are kind of circling or swarming

16     around him as the one person is asking questions.  He's very,

17     very aware of multiple police presences as he's asking

18     questions.

19          But even more key to what is going on with LS X this

20     day is that he has been physically separated from his

21     brother, ES XXX, on purpose, I would submit, because it's a

22     two-year separation, as it turns out.  But ES XXX and LS X

23     are separated, and that's the environment, and that's the

24     context in which LS X is questioned.  And the questioning

25     didn't end until the police heard what they wanted to hear.

DEFENSE CLOSING ARGUMENT

Page 1274

1          "Let's talk about while you were still being

2     questioned by the police.  You said that they asked you

3     questions again and again and again.  Did that happen at the

4     Hope Transition Center?

5              "Yes.

6              "So they asked you, they would not stop questioning

7     you until you told them that you had been touched?

8              "Yes.

9              "That was the only way to make the questioning stop?

10             "Yes."

11             It's kind of interesting if we look at what happened

12    with ES XXX that day.  The Government Exhibit 105, there he

13    is on the day that the police arrive, and he's looking away.

14    And you recall him being asked by counsel about that look on

15    his face, and he just didn't want to say anything to them.

16    He's obviously not pleased to be in that environment.  He's

17    not pleased to be questioned.  It's written all over his

18    body, and it's written all over his face.

19             But the next exhibit is pretty interesting.  Look

20    how he's dressed.  The very next day, 12/9 he's looking way

21    and looking aside.  By 12/10 they are back again, and he's

22    dressed in exactly the same shirt.  And now he's being

23    questioned anew.  Apparently the things that were said on

24    12/9 weren't satisfactory to the police, so they show up

25    again on 12/10.

DEFENSE CLOSING ARGUMENT

1    VS XXXXXXXXXXXXX talks about how frightened he was

2    by the police, but the other thing that happens to him is he

3    is literally swept away in one of these vans that the people

4    in the community are trying to save him from.  And what

5    happens to him over the next two years is he's literally kept

6    away from his parents for two years.  He's held in one of

7    the -- these, I guess, orphanages, but with a connection

8    somehow, or at least of the choosing of the government.  He's

9    not allowed any contact with his parents.

10    His parents, his mom is actually petitioning the

11    Cambodian Courts to try to have her son back, so to have

12    access to her son and it doesn't happen.  It doesn't happen

13    for two years, over two years before he actually gets to go

14    home.  These are the pressures that these kids found

15    themselves in.

16    RT XX tells the story, although he tells it on

17    cross-examination because he told it earlier, when he was

18    first talking to FBI.  When he was first talking to the FBI

19    he said this:  "When we had the problem, the police came down

20    to interview each of us.  There were a few police officers

21    who were not convinced in what I was saying.  They tried to

22    give me the answers they wanted to hear."

23    And the FBI said, "What did they want to hear?"  And

24    RT XX said, "I think what they want to hear from us is

25    something bad or allegation."  And he describes the exact

DEFENSE CLOSING ARGUMENT

Page 1276

1  same situation that you are seeing in these photos, although

2  now he finds himself as a government witness.

3          The other key to all of this is that the authorities

4  are the authorities are the authorities are the authorities.

5  These kids find themselves, in the first instance,

6  intimidated and questioned by the Cambodian National Police,

7  but there is no daylight between the Cambodian National

8  Police and the FBI.

9          Now, we all know that our FBI are not the Cambodian

10 police.  But they are not viewed this way.  Each of these

11 kids knows when they go in for their FBI interview, which

12 takes place at the Cambodian National Police office, that in

13 the room next to them is a bunch of Cambodian National Police

14 officers who are watching what they say in these videotaped

15 interviews.

16         I am sure that there's a not-scary reason for why

17 that is occurring, but for these kids who are already

18 intimidated, now they go in to be interviewed by the FBI, the

19 people who had interviewed them at the center are now in the

20 room next-door, watching what they say on videotape.  And

21 these kids know it.

22         CC X:  "And there were some people there listening

23 or watching from the Cambodian National Police?

24         "Yes, perhaps watching the video.

25         "And you were concerned that if you told FBI Martha

DEFENSE CLOSING ARGUMENT

Page 1277

1   different than what you told the Cambodian police, that you

2   could get into trouble?

3           "Yes.

4           CC X, and there were people there listening or

5   watching from the Cambodian police -- I think it was VS XXXX

6   who also talked about it.

7           Anyway, there were several of these kids who knew

8   that while this is going on, they are being interviewed by

9   the FBI, supposedly a professional forensics interviewer, but

10  in the shadows, in the back room, are the people that had

11  intimidated them before.

12          Repeated interviews, repeated coaching.  You have

13  listened to a number of witnesses come into this courtroom

14  and tell a story, and it's been a story that has been put

15  together professionally.  It's been a story that has, as

16  counsel showed you, the corroborating witnesses, and all of

17  the connections.

18          But what has come before you five years after the

19  fact has layers and layers and layers of things that happened

20  before.  What you saw has been built over several years, and

21  it's been built as a result of repeated interviews.  And what

22  really is repeated coaching.

23          There are nearly 30 -- we're going to move down to

24  30 inconsistent statements.  There are nearly 30 prior

25  inconsistent statements that this case has been built on.

DEFENSE CLOSING ARGUMENT

Page 1278

1   These kids have been interviewed multiple times.  LS X was

2   four.  Somebody was up to five, seven, six.

3           And that doesn't include when the defense

4   investigator went to talk to a kid, or when someone less

5   formal, like a church person, talked to the kids.  These kids

6   have been interviewed and asked questions about the events

7   that you heard about for a long, long time.

8           Let's look at the inconsistent things, the things

9   different than what you heard in this courtroom.  ES XXX is

10  questioned first on the day that they come to the center.

11  And here he is, again, in Exhibit 105, when apparently that

12  was not a satisfactory interview, he's interviewed again the

13  very next day.

14          In January of 2014 you heard testimony that he and

15  SO XXX talked to the people at APLE and NGO, and told them

16  no, we were not sexually abused.  Then on November 14th --

17  and this was the long FBI interview that the government

18  didn't show you.  But ES XXX and I talked about it.  It's an

19  interview that lasted an hour -- he recalled somewhere an

20  hour and a half, but it really is an hour and 24 minutes.

21          And he was asked for an hour and 24 minutes again

22  and again and again whether anyone sexually abused him.  And

23  in the course of that interview, 20 denials.  That's what

24  this case is built on.  That's what ES XXX said to the FBI on

25  November 14th in 2014, when it was the answer that he thought

DEFENSE CLOSING ARGUMENT

Page 1279

1    was going to put him in the best place for tomorrow.

2            In June of 2015 he's questioned again by the defense

3    investigator and he adamantly denies to Martine that he was

4    sexually abused.  The defense investigator comes back a year

5    later.  He still adamantly denies that he had been sexually

6    abused.

7            Finally in March 2017 ES XXX tells the FBI what they

8    want to hear.  And he explains why he does that, that if he

9    kept telling it like he had been telling it, that this still

10   is not going to finish.  It's not going to be over.

11           LS XXXXX.  LS X's story isn't like a back and forth

12   and back and forth.  LS X's story is one that grows bigger

13   and bigger and bigger as a result of repeated interviews.  It

14   starts small with playing with my penis, I think is what

15   Pastor Sopheak said.

16           But he talks again about how the questioning doesn't

17   stop.  "So they asked you -- they would not stop questioning

18   you until you told them that you had been touched?

19           "Yes.

20           "And that was the only way to make the questioning

21   stop?

22           "Yes."

23           So with each story he adds more to the story and

24   more to the story, but like his brother, he's a young guy who

25   wants the questioning to end.  And he believed it never would

Page 1280

1  unless he provided the account that the authorities were

2  looking for, or maybe even insisting upon.

3      CC XXXXXX, again, is interviewed on December 9th.

4  Again, they come back to him like ES XXX on December 10th for

5  a follow-up interview.  In June of 2015 he's interviewed by

6  Martine, and we have already talked about this, but he tells

7  Martine that he was intimidated by the Cambodian National

8  Police, and that he simply told them what they wanted to hear

9  and that he had not been sexually abused, and he only said

10 that because that's what they were insisting upon.  In this

11 June 2016 when Martine comes back, he confirms that same

12 account.

13     VS XXXXXXXXXXXXX is a kid who goes back and forth

14 and back and forth, too.  He went -- but I think the two that

15 you should pay attention to, once he's finally allowed to go

16 home and be with his parents, he talks to his father.  And

17 his father asked him whether he's been sexually abused, and

18 he tells him that nothing had happened with Daniel Johnson,

19 and D had done nothing wrong.

20     And then he has this interview with Martine that

21 takes place in the church.  And I think that for VS XXXX an

22 interview that takes place in a church actually had some

23 meaning.  And he tells Martine that he had exaggerated and

24 told lies to the FBI when they had questioned him.

25     BT XXXXXXX, BT XXXXXXX started out telling people in

DEFENSE CLOSING ARGUMENT

Page 1281

1   the church that he hadn't been sexually abused.  And, in

2   fact, no one had been sexually abused, and that's basically

3   the account that he provides in the month of December.

4          So he began by denying any sexual abuse had

5   occurred, and then a few months before his visa had expired

6   he kind of changed course.  It was then that he was

7   interviewed by the FBI, maybe five, six more times, and with

8   each FBI interview his story also grew.  But the growth in

9   his story is a growth that matches the promise of a visa.

10          If you -- if what the government had presented were

11  a number of witnesses, and what you heard from these

12  witnesses is not, they talked about a visa, and maybe I can

13  get a visa.  If what you heard from that witness was, the

14  government gave me a million dollars to cooperate in this

15  investigation, that would cause you some pause.  And you

16  would have to think very, very seriously about what -- the

17  reliability of what you are hearing from the witness stand.

18          Well, what the government gave Mr. BT X is worth at

19  least a million dollars to many, many people.  You might

20  compare it to like these E-5 investment visas that people pay

21  a million dollars to get.  Wealthy Chinese people agree to

22  put a million dollars within the US economy to get access to

23  our country, and to our citizenship exactly like Mr. BT X

24  finds himself with today.

25          That's what it is worth to people to live in this

DEFENSE CLOSING ARGUMENT

Page 1282

1   country.  It's worth a lot.  And as you are measuring motives

2   and incentives you can't lose sight of the value.

3          Now, SO XXX had denied and denied and denied.  He

4   told APLE, along with ES XXX, that there had been no sexual

5   abuse.  And then in November, just like ES XXX, he sits in

6   for a two-hour interview.  Two hours with the FBI, and for

7   two hours denies again and again and again and again and

8   again that he had been sexually abused.  Then boom.  His best

9   friend, BT XXXXXXX, gets a visa.  And in 2016 SO XXX tells

10  the FBI for the very first time that he had been sexually

11  abused, too.

12         The evidence in this case leaves reasonable doubt

13  around every single corner.  In Count 7 and 8 the government

14  has completely failed to prove a material element of the

15  crime.  Mr. Johnson's intent and purpose for traveling to

16  Cambodia was to bring back the charitable donations to fund

17  the good works.

18         And all of the evidence, all of the documentary

19  evidence, the witness evidence, everything supports that that

20  is why he left Cambodia, and that's why he came back.

21         As to the other Counts 1 to 6, those allegations are

22  built upon witnesses who, first of all, told you about a

23  willingness to lie, depending on who is asking the questions.

24  It's built upon inducements and benefits that are more

25  valuable than almost any I've seen in any case.  And it's

DEFENSE CLOSING ARGUMENT

Page 1283

1  built upon inconsistencies that have papered over

2  governmental witness coaching, and the fact that these kids

3  really have been whipped back and forth.  It happened, it

4  didn't happen, it happened, it didn't happen, depending on

5  which authority is asking the question.

6          In the end there's nothing but reasonable doubt if

7  you think through the motives, and think through the history.

8  There's only one person in this case that is entitled to

9  reasonable doubt.  When we come into these cases we think

10 about all the witnesses, and what a struggle it is to get

11 them on the witness stand, and go through this, and have 12

12 grownups in a box and staring them down.

13         But the truth is in a criminal trial, there's only

14 one person entitled to the benefit of your reasonable doubt,

15 and that person is Daniel Johnson.  In the American Courts,

16 he's the only person who is entitled.  The Constitution gives

17 him and him alone the benefit of proof beyond a reasonable

18 doubt.

19         BT XX, ES XXX, CC X, VS XXXX, SO XXX, none of them

20 is entitled to proof beyond a reasonable doubt.  There's only

21 one person who is entitled to the benefit of those doubts,

22 and that's Daniel Johnson.

23         If the witnesses give radically inconsistent

24 accounts in this courtroom than they have given on other

25 days, it's Daniel Johnson who is entitled to your reasonable

DEFENSE CLOSING ARGUMENT

Page 1284

1    doubt.  If the rewards for cooperating are so valuable that

2    it causes pause and might tempt some people to lie, it's

3    Daniel Johnson who is entitled to the benefit of your

4    reasonable doubt.

5            Weaknesses in the case should never benefit the

6    government, ever.  This makes sense because there's only one

7    person whose fate is in the balance.  Every single witness

8    here will go home to a life when this case is over, no matter

9    the result.  It is Daniel Johnson who faces the loss of

10   liberty, and that's the reason our Constitution provides him

11   with the protective cloak that it does.

12           Pretty soon, very soon, Daniel Johnson's fate will

13   be yours and yours alone.  When this happens, the whole

14   dynamics in this courtroom is going to change.  You will

15   become the most powerful people in the courtroom.  You will

16   be certainly more powerful than me, more powerful than any of

17   these folks sitting at counsel table.  And in that jury room,

18   even more powerful than Judge McShane.

19           Because your job is different than our jobs.  Our

20   job is to do the law.  We are here to handle all of the legal

21   issues.  If I make a mistake on the law, if counsel makes a

22   mistake, or even if the judge makes a mistake on the law, the

23   Appellate Courts are there to fix our mistakes.

24           But you and only you are the finders of the facts.

25   That is your job, your job alone.  No lawyers and no Courts.

Page 1285

1    And sadly, your mistakes are yours alone.

2           I ask you to talk amongst yourselves as much as you

3    can to sift through the evidence as carefully as you can, to

4    think about the issues that have been raised and the concerns

5    about how this case came before you, and all that lies under,

6    historically, the testimony that you heard.  And for all of

7    those reasons, I will ask you to find my client not guilty.

8    Thank you.

9           THE COURT:  Thank you, Ms. Maxfield.

10          Do we need a break between rebuttal?

11          MR. SWEET:  I would refer to the jury, Your Honor.

12          THE COURT:  Do we need a short break?

13          A JUROR:  We're good.

14          THE COURT:  Mr. Sweet, go for it.  Thank you.

15

16                  REBUTTAL CLOSING ARGUMENT

17          MR. SWEET:  I think Ms. Maxfield saw a different

18   trial than what I saw.  I think she observed the witnesses in

19   a completely different light, and I think her recollection,

20   though, perhaps well-intended and sincere, is different in

21   many ways.  And I would like to talk about that.

22          Ms. Maxfield categorized the boys as conniving,

23   scheming, looking for an edge in any way.  But did you see

24   boys that were open and wounded and sincere?  Did you see

25   boys who talked to you, and explained the suffering that they

REBUTTAL CLOSING ARGUMENT

Page 1286

1    had been through?  Did you see the raw emotion in them?

2         And as far as a visa, they were open about that,

3    too.  I don't know.  I talked to somebody.  I don't remember

4    their name.  I thought about it.  Some said yes, some said

5    no.  Where is the conniving, scheming, manipulative boys that

6    she depicted?

7         And the other thing that Ms. Maxfield -- she ignored

8    huge parts of this case.  What happened to the disclosures

9    that the boys made prior to the arrest of Daniel Johnson?

10   Where did those go?  How much discussion did you hear about

11   those?  I didn't hear any.  How much discussion did you hear

12   about SO XXX going to Pastor Sopheak at the second house, and

13   talking about Daniel Johnson trying to put his penis in

14   SO XXX?  Where was that?

15        How about LS X and ES XXX going to Pastor Sopheak,

16   LS X crying, Pastor Sopheak talking to them?  Pastor Sopheak

17   sending a message about it to BT XXXXXXX.  This is before

18   Daniel Johnson's arrest.  Did Ms. Maxfield talk about that?

19        And BT XXXXXXX remembered getting that message that

20   discussed this.  And then Pastor Sopheak confronted Daniel

21   Johnson about it, and he messaged BT XXXXXXX about that, too.

22   Where was that?

23        And then BT XXXXXXX, BT XXXXXXX on December 8th in

24   America, he wrote, "Daniel tried to have sex with me but I

25   didn't let him."  So as of the day of Daniel Johnson's

REBUTTAL CLOSING ARGUMENT

Page 1287

1    arrest, BT XXXXXXX is already talking about attempted sexual

2    abuse, from BT XXXXXXX.

3           And counsel labeled all the boys liars.  Well, I

4    think I missed that, too.  Where did SESX, and SS XX and

5    LT XXXXXXX -- where did they lie?  Those are the ones who

6    came in March of 2017.  You may remember SESX.  SESX is the

7    one who said, "I will always love him forever," when talking

8    about Daniel Johnson.  He was one who it pained him to say

9    anything remotely negative about Daniel Johnson.  How is he

10   lying?  Because he disclosed that Daniel Johnson had tried to

11   touch his genitals on several occasions, and he also

12   disclosed that ES XXX and SO XXX had told him about abuse

13   prior to Mr. Johnson's arrest.  Where was that?

14          What about SS XX?  SS XX, who said that Daniel

15   Johnson tried to touch his buttocks.  He also said SO XXX

16   disclosed prior to arrest.  Where are the lies for that?  She

17   labeled everyone a liar, but they are not.

18          SESX, SS XX, LT XXXXXXX, BT XXXXXXX started early.

19   And LS X, LS X disclosed abuse from the beginning.  He

20   disclosed more, but he disclosed abuse from the beginning.

21   And this was painted as some professional, coached,

22   manipulated series of events.

23          Well, that's funny because a couple of boys recanted

24   right away.  You have got the stipulation about SO XXX and

25   ES XXX recanting to APLE.  So a couple of questions about

REBUTTAL CLOSING ARGUMENT

Page 1288

1  that.  What were they recanting?  They are recanting their

2  accusations.  They are recanting something.  And if the

3  Cambodian National Police and APLE are all so corrupt, why

4  are they reporting this recantation to the FBI?

5          This isn't some polished, professional, rehearsed

6  presentation.  Let's think about it.  When did the FBI first

7  contact SESX, SS XX, and LT XXXXXXX?  March 2018, less than

8  two months before trial.  If these boys were waiting to come

9  to the US for money, what were they going to do, wait until

10 late March of 2018?

11         No.  The FBI reached out to them.  The FBI reached

12 out to those boys, and they came here, and they spoke.  And

13 they gave really limited disclosures.  All of them were

14 attempted touching of either the genitals or the buttocks.

15 They didn't have the same level of abuse that you heard from

16 others.

17         But how can they all be called liars?  Just because

18 Ms. Maxfield, with all due respect, says something, it

19 doesn't make it true.  Just because I say something, it

20 doesn't make it true.  You all are the deciders of fact.  You

21 all listen and hear and judge the evidence that comes in from

22 the witness stand.

23         I think many things that Ms. Maxfield said, she

24 talked about her opinion:  I think or it's really very

25 likely.  Well, that's her opinion, and she's entitled to it,

REBUTTAL CLOSING ARGUMENT

Page 1289

1    but just because he says it 50 times doesn't make it true.

2          Evidence, opinion, and arguments.  So what basis

3    does she have for calling all these boys liars?  She just

4    gave a blanket label, and it's not true.  Like Hagar, she

5    talked about VS XXXX, VS XXXX getting a bike.  I believe

6    VS XXXX testified the bike came from Hagar, which was the

7    center that helped boys.

8          And here's the thing that we all have to remember.

9    These boys are dealing with a difficult, traumatic, emotional

10   circumstance.  If this were a polished presentation from the

11   beginning, if this were coached and orchestrated, do you

12   think it would have looked like this?  Do you think you would

13   have had recantations?  Do you think you would have had these

14   different stories?

15         No, it would have been put together from the start.

16   But it's not.  It's real.  It's these boys dealing and coping

17   with what happened to them.  Boys in difficult, difficult

18   circumstances.  And here's the other thing, behind all of

19   this --

20         Well, another thing I have to say that Ms. Maxfield

21   didn't talk about that we're going to talk about.  She didn't

22   discuss at all the prior statements of the boys before Daniel

23   Johnson's arrest.  The other thing she didn't talk about, she

24   didn't talk about BT XXXXXXX's chats with Daniel Johnson.

25   Where Daniel Johnson said, "I am not saying anyone is wrong."

REBUTTAL CLOSING ARGUMENT

Page 1290

1   That's after being accused already of -- "I knew long time

2   already that you had sexual abuse to the kids."  "I am not

3   saying anyone is wrong, really."

4          Is that how people respond to that?  We're going to

5   talk about that.  But that was something that you haven't

6   heard of.

7          I need to discuss Daniel Johnson for a minute,

8   because Daniel Johnson was the puppet master in this case.

9   He manipulated the boys, he controlled the boys, and there's

10  a message that we haven't discussed yet.  I believe it's

11  Exhibit 170, if that's the one I just handed over.  And I

12  want to talk to you about it for a minute.

13         So this is a message that helps to explain the

14  influence that is put on these boys, not by the Cambodian

15  National Police, not by the FBI, but by Daniel Stephen

16  Johnson.  So I am going to walk you through this.  It's from

17  the Gary Donna Johnson account, which the FBI discussed with

18  you was used by Daniel Johnson's brother.

19         And in there it talks about, "I went to jail and I

20  may need him to come to the US to testify."  So I think you

21  will be able to see that this was passed on by someone else

22  and written by Daniel Johnson.  So you are going to recognize

23  a lot of the names in here.

24         Let's start the second line at the top.  So first

25  line starts about talking about Daniel, but then it moves

REBUTTAL CLOSING ARGUMENT

Page 1291

1   into -- it talks about Gary talking about Daniel, and then it

2   goes into what I am going to call the marching orders that

3   are being issued.  "LS X still needs to be removed from

4   Hagar."  We all know who LS X is, and we all know he was

5   staying at Hagar.  "His family needs to talk to him.  APLE

6   and Hagar are trying to get him to USA for trail."

7          And this is full of misspellings but try.  It talks

8   about blank documents.  But how about this:  "Get him out no

9   matter what it takes."  Get LS X away from Hagar.  Get him

10  away from a neutral party.  Get him back under Mr. Johnson's

11  control.

12         And then we go to VS XXXX, and you heard about

13  VS XXXX talking to Martine, the defense investigator.

14  VS XXXX in Prey Veng keeps changing his story.  Why would

15  that concern Mr. Johnson, if he's changing his story?  He

16  told Mr. Martine something negative.  Negative in

17  Mr. Johnson's world means implicating him.

18         "I think he is still afraid of police.  His parents

19  need to talk to him.  They think he is speaking positive but

20  he is not."

21         So we have talked about LS X, charged victim,

22  VS XXXX, charged victim.  ES XXX, LS X's older brother, was

23  interviewed.  During the interview with Martine, he got up

24  and walked out.  Why?  Because he was pro Daniel Johnson?  Is

25  that why he got up and walked out from meeting with their

REBUTTAL CLOSING ARGUMENT

Page 1292

1   investigator?

2          "ES XXX, please encourage him and let him know I

3   need him, and may need him to come to the US and to testify.

4   He needs to be strong about the police scaring him in a

5   closed room, and trying to get him to lie."

6          This one is Tola, you will see it's Tola.  Asked by

7   David Roth if Daniel did it, and Tola said, he did.  "Tola

8   needs to clarify this."  Which way do you think Tola needs to

9   clarify this?  What does Mr. Johnson want him to do?  He

10  wants him to recant that.  Tola was saying that based on

11  what, and then he gives an explanation.  That's what APLE and

12  the Cambodian police were telling him and that's firsthand

13  knowledge.

14         Sorry, speaking too fast.

15         David Roth, FBI, Tola misconstrued.

16         Let's go on to somebody you are going to recognize.

17  "RT XX needs to tell the investigator when he is asked that

18  APLE and police forced his fingerprint, but the document was

19  fortunately not negative."  So truth has nothing to do with

20  anything.  Mr. Johnson just issues his marching orders as to

21  what he needs these boys to say for his benefit, because he's

22  trying to control everything.

23         When we talk about BT XX, BT XX says he has a plan

24  to stay in the USA.  Let's go on to CC X.  It's about three

25  lines below -- about five lines below Tola.  Far right.

Page 1293

1   "CC X needs to speak strongly that he was told he had to

2   continue following the police with a lie, or he would go to

3   jail.  APLE would help his family."  Now CC X is another

4   charge victim.  Let's go to another charge victim.

5         "SO XXX said I gave him money after I went to jail.

6   He needs to clarify."  A lot of boys need to do a lot of

7   clarifying in Mr. Johnson's world.  "He needs to clarify that

8   the money came from Bill and Lonna to help him with school,

9   not from me."

10        I am going to skip down.  "Warn all of them to be

11  careful with Peter and Kelby and Lindsay" -- probably Kelby

12  and Lindsay Alderson, we heard testimony -- "BT XX," probably

13  BT XXXXXXX, "Chuck and Janice."  More people -- "Phillip and

14  Sue."  And you wonder why some of the boys struggle in

15  getting a consistent story.  Because Daniel Johnson is behind

16  the scenes being the puppet master.

17        So now I have to tell you, when you look at this

18  case from the beginning, this is not about digging wells,

19  this is not about building churches, and feeding the hungry.

20  Those are all good things, and I hope that some part of

21  Mr. Johnson found that to be valuable.

22        But this case is about his systemic and repeated

23  sexual abuse of these boys, boy after boy, time after time,

24  year after year.  That's what this case is about.

25  Mr. Johnson, I don't think this was just a small purpose for

REBUTTAL CLOSING ARGUMENT

Page 1294

1   him.  I think he was consumed with sexual abuse.  He ran Hope

2   Transition Center as his practical personal sexual

3   playground.

4           And that's what he did to these boys there.  He

5   would go in at night, and choose which boy he wanted.  And

6   yes, did they need funds to keep it running?  Sure he did.

7   He would go back to America and get funds.  Did he do some

8   good things with those funds?  Yes, he did, and that's a good

9   thing.  We're not saying every waking moment of Mr. Johnson's

10  life was filled by nothing but abuse.

11          I am sure if he saw one of his children fall and

12  scrape their knee he would pick them up, dust them off, and

13  put a bandage on.  But then he was abusing too many of them

14  at night in his room.

15          And this case is not about money, or about visas.

16  Do you really think -- again, the defense is viewing these

17  boys through a scheming, grasping, they are from a poor

18  country, therefore, they are all just coming to say anything

19  for money.

20          Do you think they got on a plane and flew over here

21  and sat in the same room with the man who molested them, and

22  took the stand and disclosed the most personal, graphic

23  details they will hopefully ever have to say in their entire

24  life?  Do you think they did that for a per diem?  You all

25  presumably get a juror fee.  I hope you get money for gas,

REBUTTAL CLOSING ARGUMENT

Page 1295

1    and a per diem for your hotel.

2          Do you feel compromised or bought?  Is it worth more

3    to them than it is to you?  Sure.  But is that why they are

4    here?  You heard them say, We didn't even know how much we

5    were getting.  Do you think when the Cambodian police came to

6    Hope Transition Center on December 9, 2013, do you think

7    those boys knew, well, Daniel Johnson's sexual abuse of me

8    can be prosecuted in the United States of America?

9          How many of you, how many people do you think know

10   that this crime, a crime committed in Cambodia, can be

11   prosecuted here?  How many teenagers do you think know that?

12   How many 11-year-olds know that?  And how many 11-year-olds

13   in Cambodia at an orphanage know that?

14         They came here.  They weren't bought.  They are not

15   here for a visa.  There's no orchestrated scheming plan.  You

16   have all those boys saying -- and you have BT XXXXXXX saying,

17   halfway across the world at the same time.

18         Exhibit 277, please.  This is going to take a second

19   because I didn't tell them this one was coming.

20         This is BT XXXXXXX and Knot.  Second page, please

21   very bottom, Knot, December 9th.  "Did you have sex with

22   him?"  "No."  It's on the next page.  "He tried to but I

23   didn't allow."  Let's go back to the very first page, please.

24   BT XXXXXXX, December 8th, "I know Daniel is a good man but

25   he's kind of demon spirit stay inside him.  I have been

REBUTTAL CLOSING ARGUMENT

Page 1296

1   praying for him for six years and I did go talk with him, but

2   he's still the same."

3          How is this a last-minute fabrication?  That's

4   December 8th of 2013, and he's talking about -- he's talking

5   about not just what Daniel Johnson tried to do to him, but

6   what he's been thinking about this whole time.  And this

7   isn't to the FBI.  This is to Daniel Johnson's girlfriend

8   that he's having the conversation with.

9          See, I talked to you about SESX.  SESX who said, "I

10  will always love him forever."  And SO XXX said something

11  like, "I loved him like my father."  BT XXXXXXX, he was

12  worried about Mr. Johnson going to heaven, and he was

13  concerned about his soul.

14         Are these young men with an axe to grind?  Are these

15  young men here who are vindictive, or they are trying to get

16  something?  It's not because of any benefit that they are

17  here.  It is in spite of Daniel Stephen Johnson's efforts to

18  keep them from being here.  It is in spite of the shame and

19  the embarrassment.  It is in spite of his efforts to silence

20  them that they are here.

21         They endured.  They sacrificed to be at that

22  orphanage.  There was a price to be paid for being at that

23  orphanage, and that price for too many was sexual abuse.  Why

24  did they pay that price?  BT XXXXXXX told you.  "Daniel gave

25  money for my sick dad, and money for university."  And BT XX

REBUTTAL CLOSING ARGUMENT

Page 1297

1  was going to be the first person to graduate university.

2          And LS X, what did LS X say when the police first

3  came?  This was LS X talking on the stand.  When the police

4  came he said, "I was afraid that we were not going to have a

5  place to stay and we couldn't go to school anymore."

6          They are not going to jeopardize their situation.

7  They are an impoverished country in a vulnerable situation.

8  Mr. Johnson is the food on the table, the roof over their

9  head, and the money for the school.  And they are going to

10 make something up and throw it all away for an uncertain

11 future?  For why?  They cared about him.

12         Again, they are here in spite of Daniel Johnson's

13 efforts to silence them.  What did he say?  He wrote to Becka

14 Norris, "Silence is golden."  He wrote to Lindsay Alderson,

15 "Silence is all that we can do now."  To BT XXXXXXX, "Peace

16 upon you and your tongue and wisdom in your thoughts, words,

17 actions.  Healing does not begin until we stop picking at the

18 scab."

19         In other words, stop talking BT XX.  Stop talking.

20 "Healing doesn't begin until we stop picking at the scab,

21 peace on your tongue."  He's trying to get them to be quiet.

22         And I have to talk about Pastor Sopheak for a minute

23 more.  You see, I talked about these boys enduring the abuse,

24 and endure they did, but there was a limit.  Because SO XXX

25 went to Pastor Sopheak, and Pastor Sopheak can tell you what

Page 1298

1  house it was, second house, what room it was.  What that

2  meeting followed.  It followed a sermon about sin.

3          And SO XXX came and talked to him, and told Pastor

4  Sopheak about what he did.  And Pastor Sopheak didn't do

5  anything with that information.  And that's to his regret,

6  because Pastor Sopheak -- you may recall he had kind of a

7  nervous laugh.  He smiled at times when it didn't make sense

8  to smile, but then at the end I asked him, "Do you regret not

9  telling anyone about SO XXX?"  And he said, essentially,

10  "It's really hard for me to think about that.  I don't feel

11  good inside.  It's a burden that I carry, and I want to take

12  a burden and release it.  I feel like it's something I have

13  to carry with me all the time and I want to be free."

14          Do you remember Pastor Sopheak on that stand?  Do

15  you remember him, how upset he was?  Well, the good thing

16  that came of that, is it stiffened his spine, because the

17  next time those boys came to him he did something about it.

18          Because LS X and ES XXX, they came to Pastor

19  Sopheak.  Now we're at the third house.  And it was kind of

20  a -- I think it started with ES XXX, and ES XXX went and

21  spoke to Pastor Sopheak.  And LS X was there, and LS X was

22  just crying.  And Pastor Sopheak, he sent a message to BT XXX

23  XXXX about this, and he gave you the date of the message,

24  November 24th, 2014.  And then he went and confronted Daniel

25  Johnson.

REBUTTAL CLOSING ARGUMENT

Page 1299

1       And Daniel Johnson said something like, "Well, they

2   wanted something from me, and I didn't give it to them and

3   they made this up."  And remember ES XXX telling this from

4   the other end, and he could hear the raised voices from in

5   there.  And then Pastor Sopheak sent another message

6   afterwards to -- sent another message to BT XXXXXXX.  BT XXX

7   XXXX remembered that, too.

8       And so you now have SO XXX disclosing beforehand.

9   You have LS X and ES XXX disclosing beforehand.  You have

10  someone else who didn't endure in silence, and that's LT XXX

11  XXXX.  He just got up and left.  He got up and left.  I think

12  it was three times that he said Daniel Johnson tried to touch

13  his penis.  He left, and he left his little brother there.

14  He walked away from the orphanage, and you have heard about

15  the hardship these boys suffer.

16      I think somewhere in one of the defense exhibits is

17  a summary of LT XXXXXXX and his life, and what he came from.

18  And what he would be going back to.  I don't think everything

19  on that summary is correct, because I think -- but it

20  describes what they were risking and losing by walking away.

21      And then we talked about BT XXXXXXX, December 8th.

22  And I am going to talk about BT XXXXXXX, and I am not going

23  to keep you much longer.  But BT XXXXXXX, he confronted

24  Daniel Johnson.  And this is Exhibit 163.  And if you want to

25  see anything that is full of information about this case,

REBUTTAL CLOSING ARGUMENT

Page 1300

1  it's Exhibit 163.

2          And on page 2414 BT XX says, as clearly as you could

3  say, "I knew long time already that you had sexual abuse to

4  kids but I didn't want to defile you."  He goes on.  Daniel

5  Johnson in responding, he doesn't deny it.  He doesn't admit

6  it.  The conversation continues.  Later BT XX says, "Then you

7  did appropriate to LS X and ES XXX."  And again you are not

8  going to see denials when you go through, but what you will

9  see is sort of a back and forth.  And finally BT XX, BT XX

10  writes, "What did I do wrong?  Just say the truth about what

11  I had seen and experience with you in Cambodia."

12          Page 2421, and what is the response from

13  Mr. Johnson?  "I am not saying anyone is wrong.  I am just

14  saying that might be the wrong spirit in a situation based on

15  scripture.  I tell you I did nothing in the USA."  And then,

16  "I assure you there is nothing in Vietnam."  But what about

17  Cambodia?  What about Cambodia?  And it goes on.

18          And BT XX says later, "I really don't want to say

19  anything" -- anything negative -- "but when people ask me

20  what is the truth I can't lie."  And Mr. Johnson gives some

21  helpful answers for BT XX, "Brother, sometimes saying I am

22  sorry, I don't want to talk about it or I don't want to speak

23  anything negative or I don't know for sure.  Right now the

24  best thing you can do is pray, or I would like to think not."

25          We would all like to think not.  But that's not the

REBUTTAL CLOSING ARGUMENT

Page 1301

1  case.  Mr. Johnson didn't say, BT XX, you are lying.  BT XX,

2  this isn't true.  BT XX, I didn't do anything.  He didn't

3  even ask who, who did I supposedly molest.  That's not asked

4  in here.  He does say, "Peace upon you and your tongue."  He

5  does say, "Stand with me and stand close."

6        You see, at the end of the day, these boys, what

7  they needed was they needed love from a parent.  They needed

8  that affection, and what Mr. Johnson wanted was sex.  He took

9  the love and the need and the affection in these boys, and

10  twisted it into his personal sexual gratification.

11        SESX, SESX described Daniel Johnson coming in with a

12  flashlight at night and taking a boy, his brother, SS XX.  He

13  described seeing Mr. Johnson come in and carry boys out of

14  the rooms.  We all know who his favorites are, you heard

15  them.  They are the boys who spent all the time in his room.

16  A lot of those boys, the same ones who were abused.

17        See this case is not about wearing a towel that is

18  too short.  It's not about sending really weird romantic text

19  messages or texts to the boys.  It's not about getting a lot

20  of massages.  It's not even about having boys in your room.

21  It's what he did to those boys' bodies once they were in his

22  room.  That's what this case is about.

23        Daniel Johnson needed to silence the boys, and you

24  heard why.  He violated their trust.  He violated their

25  bodies.  And he violated the law.  And you should find him

FURTHER JURY INSTRUCTION

Page 1302

1   guilty of each and every crime that he committed.  I thank

2   you for your attention.

3          THE COURT:  Folks, I have a short instruction to

4   give you.  I will come down here, because we have a screen.

5          When you begin your deliberations, select one member

6   of the jury to act as the presiding juror or foreperson who

7   will preside over your deliberations and speak for you in

8   Court.

9          The presiding juror doesn't have any greater voting

10  weight than any other juror, but is to be the spokesperson

11  for the jury.  You will then discuss the case with your

12  fellow jurors to reach agreement, if you can do so.  Your

13  verdict, whether guilty or not guilty, must be unanimous.  As

14  well as with the individual questions you are being asked to

15  answer, those must be unanimous.

16         Each of you must decide this case for yourself, but

17  you should do so only after you have considered all of the

18  evidence, discussed it fully with the other jurors, and

19  listened to the views of your fellow jurors.

20         Do not be afraid to change your opinion if the

21  discussion persuades you that you should, but do not come to

22  a decision simply because other jurors think it is right.

23         It is important that you attempt to reach a

24  unanimous verdict but, of course, only if each of you can do

25  so after having made your own conscientious decision.  Do not

FURTHER JURY INSTRUCTION

Page 1303

1   change an honest belief about the weight and effect of the

2   evidence simply to reach a verdict.

3        Perform these duties fairly and impartially.  Do not

4   allow personal likes or dislikes, sympathy, prejudice, fear

5   or public opinion to influence you.  You should also not be

6   influenced by any person's race, color, religion, national

7   ancestry, gender, sexual orientation, profession, occupation,

8   celebrity, economic circumstances, or position in life or in

9   the community.

10        It is your duty as jurors to consult with each other

11   and deliberate with one another with a view towards reaching

12   an agreement if you can do so.  During your deliberations,

13   you should not hesitate to reexamine your own views and

14   change your opinion if you are persuaded that it is wrong.

15        If it does become necessary to communicate during

16   deliberations with me, you may send a note through Ms. Pew,

17   signed by one or more of you.  No member of the jury should

18   ever attempt to communicate with me except by signed writing,

19   and I will respond to the jury concerning the case only in

20   writing or here in open court.  If you send out a question I

21   will consult with the lawyers before answering it, which may

22   take some time.  You may continue your deliberations while

23   you wait for an answer to any question.

24        Remember that you are not to tell anybody, including

25   me and Ms. Pew, how the jury stands, numerically or

FURTHER JURY INSTRUCTION

Page 1304

1  otherwise, on any question submitted to you, including the

2  question of the guilt of Mr. Johnson, until after you have

3  reached a unanimous verdict or have been discharged.

4       You have seen the verdict form.  The parties have

5  gone over it with you.  When you have answered all of the

6  questions on the verdict form, the presiding juror will sign

7  the form, date it, and then notify the bailiff and we will

8  reassemble to take your verdict.

9       It's up to you to decide what you want your schedule

10 to look like.  We want you to have as much time as you need.

11 You are certainly welcome to go later today, if you wish.  At

12 some point, Ms. Pew might ask you, because we need to make

13 sure some of the staff is still here to let people in and out

14 of the building, if we need to.  And then you can certainly

15 set a time if you wish to return tomorrow.

16      So that is completely up to you how you want to

17 schedule your time.  There are two of you that are alternate

18 jurors, and I know this doesn't -- seems unfair, I know.

19      So we have Mr. Watt and Nicki Taylor, so you are our

20 two alternates.  And you, at this time, are excused.  You can

21 go back and gather your things.

22      Couple of things, No. 1, I know it seems unfair that

23 you want to say something to these 12, but it's these 12 who

24 deliberate.  You don't get to deliberate with them.  Here's

25 the other thing.  We have to have 12 at the end of the case.

Page 1305

1    If an emergency occurs we have to call one of you back.  So

2    as a result, I am going to still admonish you don't look up

3    information about the case.  Don't talk to anybody about the

4    case until we inform you that this jury has reached a verdict

5    or it's been discharged.

6           It has happened before where somebody, one juror

7    during deliberations gets so sick that we have to call back

8    one of the alternates and ask you all to begin your

9    deliberations all over again.  That's why we hold you here

10   until the very end to hear all of these instructions.

11          So this is how we do reach a resolution to conflict

12   in our community.  You know, it's not judges who make these

13   decisions.  It's not angry moms.  It's not soldiers or

14   religious leaders.  We bring in people from the community.

15   12 of you have stepped up and taken that vow to be jurors,

16   and resolve this for us.

17          And I want to thank all of you for the time you put

18   into this case.  I will now have you return to the jury room.

19   The verdicts will -- excuse me, the instructions will be

20   brought back for you to have.  I think each of you will have

21   a copy, as well as all of the exhibits that have been

22   received into evidence for you to look at.

23          You can begin your deliberations immediately

24   following picking your presiding juror.  But with that, I

25   would like to thank all of you.

Page 1306

1          We can stay standing for my oath to the bailiff.

2          THE COURT:  Do you solemnly swear to keep this jury

3    together in some private and convenient place; that you will

4    not permit any person to speak or communicate with them, nor

5    do so yourself, unless by order of the Court; or to ask them

6    whether they have agreed upon a verdict; that you will return

7    them into court when they have agreed, or ordered by the

8    Court?

9          COURT CLERK:  I will.

10          THE COURT:  Ms. Pew will have you back to the jury

11    room.  Thank you very much.

12                    (Jury Out.)

13          THE COURT:  People can be seated.  I assume Ms. Pew

14    knows how to get ahold of everybody, but make sure she has

15    your cell phone and e-mails.  Around 4:30 I will have her

16    check with the jury and see if they are going to go past

17    5:00, if we need to let our security folks know if that's the

18    case, or whether they are going to break at a particular

19    time.  So she will get ahold of you if there's any questions

20    or anything else occurs.

21          Anything else we need to discuss?

22          MR. SWEET:  Nothing from the government, Your Honor.

23          MR. WEINERMAN:  Nothing from the defense.

24          THE COURT:  All right.  Again, I have already told

25    you this, but both sides did an incredibly professional job,

Page 1307

1    and both sides, obviously, put an incredible amount of work

2    into this case.  And it clearly showed by the preparation and

3    professionalism of the attorneys.  I really appreciate it.

4          We will hear from people soon.

5                  (Proceedings concluded at 3:27 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 1308

1    STATE OF OREGON  )

2                    )ss

3    COUNTY OF YAMHILL)

4

5            I, Deborah L. Cook, RPR, Certified Shorthand

6    Reporter in and for the State of Oregon, hereby certify that

7    at said time and place I reported in stenotype all testimony

8    adduced and other oral proceedings had in the foregoing

9    hearing; that thereafter my notes were transcribed by

10   computer-aided transcription by me personally; and that the

11   foregoing transcript contains a full, true and correct record

12   of such testimony adduced and other oral proceedings had, and

13   of the whole thereof.

14           Witness my hand and seal at Dundee, Oregon, this

15   1st day of June, 2018.

16

17   /s/ Deborah L. Cook, RPR, CSR

18   _____
     DEBORAH L. COOK, RPR
19   Certified Shorthand Reporter
     OREGON CSR #04-0389
20   CALIFORNIA CSR #12886
     WASHINGTON CSR #2992
21

22

23

24

25